Rachel Bien (SBN 315886)
OLIVIER & SCHREIBER LLP
595 E. Colorado Blvd., Suite 418
Pasadena, CA 91101
Tel: (213) 325-3430
Email: rachel@os-legal.com

Sally J. Abrahamson (admitted *pro hac vice*)
WERMAN SALAS P.C.
335 18th Place NE
Washington, D.C. 20002
Tel: (202) 830-2016
Email: sabrahamson@flsalaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BO AVERY, PHOEBE RODGERS, KRISTY CAMILLERI AND JILL UNVERFERTH, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>TEKSYSTEMS, INC.,<br><br>            Defendant. | Case No. 3:22-cv-02733-JSC<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: December 21, 2023<br>Time: 10:00 a.m.<br>Ctrm.: 8 – 19th Floor<br><br>Judge: Hon. Jacqueline Scott Corley |

1

## **Table of Contents**

2   NOTICE OF MOTION AND MOTION ................................................................. 1

3   STATEMENT OF THE ISSUES ......................................................................... 1

4   MEMORADUM OF POINTS AND AUTHORITIES ............................................... 2

5   INTRODUCTION ............................................................................................... 2

6   STATEMENT OF COMMON FACTS .................................................................. 3

7         I.      TEK Is a Recruitment Firm .................................................................. 3

8
        II.     Recruiters Work in an Entry-Level Position ........................................ 4
9
        III.    Recruiters' Common Primary Job Duty Is Producing IT Job Candidates to
10              Account Managers. ............................................................................. 5

11        IV.    TEK Subjects All Recruiters to the Same Production Quotas. ............... 12

12
        V.      TEK's Connected Data Shows Plaintiffs Overwhelmingly Spent Their Time
13              Contacting Candidates. ....................................................................... 14

14        VI.    TEK Provides Uniform Training to Recruiters ....................................... 15

15        VII.   Recruiters are Closely Supervised ....................................................... 17

16        VIII.  TEK Does Not Pay Overtime and Missed Meal and Rest Break Premiums to
17              Recruiters. .......................................................................................... 19

18   PROPOSED CLASS DEFINITION ................................................................... 20

19   LEGAL ANALYSIS .......................................................................................... 21

20        I.      Plaintiffs Meet All of the Rule 23(a) Requirements. ............................. 21

21              A.      Plaintiffs Easily Meet the Numerosity Requirement. ............... 22

22              B.      There Are Questions and Facts Common to the Class. ............... 22

23                      1.      The Applicability of the Administrative Exemption Raises
24                              Common Questions of Fact and Law ............................... 24

25                              a.      Whether Recruiter Duties Are Generally Related to
26                                      "Management Policies or General Business Operations" Is
                                        Subject to Common Proof ...................................... 25

27

28

b.    Whether Recruiters Routinely Exercise "Discretion and Independent Judgment" on Matters of Significance is Subject to Common Proof.................................. 27

c.    Whether Recruiters Perform Work Under Only General Supervision Is Subject to Common Proof......................... 29

2.    Plaintiffs' Claims Raise Common Questions. .............................. 31

C.    Plaintiffs' Claims Are Typical of the Class's Claims.............................. 31

D.    Plaintiffs Will Adequately Protect the Class. ........................................... 32

II.    Plaintiffs Meet All of the Rule 23(b) Requirements ...................................... 33

A.    Common Questions Regarding Recruiters' Exempt Status Predominate Over Any Individualized Issues................................................................. 33

B.    Common Questions of Law and Fact Predominate Over Plaintiffs' Meal and Rest Break Claims............................................................................. 34

C.    Common Questions of Law and Fact Predominate Over Plaintiffs' Final Pay Penalties. ....................................................................................... 36

D.    Defendant's Anticipated Arguments Do Not Defeat Predominance ........ 36

E.    A Class Resolution is Superior. ................................................................ 38

F.    The Court Should Appoint Plaintiffs' Lawyers as Class Counsel............ 40

CONCLUSION........................................................................................................ 40

1

## Table of Authorities

2

**Cases**                                                                                                          **Page(s)**

3

*Abdullah v. U.S. Sec. Assocs., Inc.*,
4
    731 F.3d 952 (9th Cir. 2013) ............................................................................. 33, 35

*Alba v. Papa John's USA, Inc.*,
5
    No. 05 Civ. 7487, 2007 WL 953849 (C.D. Cal. Feb. 7, 2007).......................... 23, 29

6
*Amchem Prods., Inc. v. Windsor*,
7
    512 U.S. 591 (1997) ............................................................................................ 39

8
*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
    568 U.S. 455 (2013) ............................................................................................ 33
9

*Bothell v. Phase Metrics, Inc.*,
10
    299 F.3d 1120 (9th Cir. 2002) ............................................................................. 26

11
*Boyd v. Bank of Am. Corp.*,
    300 F.R.D. 431 (C.D. Cal. 2014)........................................................... 23, 24, 35, 36
12

13
*Brinker Rest. Corp. v. Sup. Ct.*,
    53 Cal.4th 1004 (2012) .............................................................................. 35, 36, 38

14
*Campbell v. PricewaterhouseCoopers, LLP*,
    253 F.R.D. 586 (E.D. Cal. 2008)................................................................... 23, 30
15

16
*Chun-Hoon v. McKee Foods Corp.*,
    No. 05 Civ. 620, 2006 WL 3093764 (N.D. Cal. Oct. 31, 2006)........................... 22

17
*Dalton v. Lee Pub., Inc.*,
    270 F.R.D. 555 (S.D. Cal. 2010) ......................................................................... 31
18

19
*Damassia v. Duane Reade, Inc.*,
    250 F.R.D. 152 (S.D.N.Y. 2008) ......................................................................... 23

20
*DeLodder v. Aerotek, Inc.*,
21
    471 F. App'x 804 (9th Cir. 2012) .................................................................. 36, 37

22
*DeLodder v. Aerotek, Inc.*,
    No. 08 Civ. 06044, 2010 WL 11506881 (C.D. Cal. Aug. 16, 2010)................... 36, 37
23

24
*DeLuca v. Farmers Ins. Exchange*,
    No. 17 Civ. 00034, 2018 WL 1981393 (N.D. Cal. Feb. 27, 2018) ........... 23, 35, 39, 40

25
*DiMercurio v. Equilon Enter. LLC*,
    No. 19 Civ. 04029, 2021 WL 3885973 (N.D. Cal. Aug. 30, 2021) (Corley, J.) .......... 22, 32, 39
26

27
*Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*,
    No. 13 Civ. 0646 (C.D. Cal. July 30, 2014) 2014 WL 10988092 ............................ 34

28

*Eicher v. Adv. Bus. Integrators, Inc.*,
    151 Cal.App.4th 1363 (2007) ............................................................. 26

*Federico v. Overland Contracting, Inc.*,
    No. 12 Civ. 2588, 2013 WL 5516187 (N.D. Cal. Oct. 4, 2013)............... 30

*Fogh v. Los Angeles Film Sch.*,
    No. B230920, 2012 WL 6604709 (Cal. Ct. App. Dec. 18, 2012) ............ 31

*Gregory v. Albertson's, Inc.*,
    128 Cal. Rptr. 2d 389 (Cal. Ct. App. 2002)....................................... 36

*Greko v. Diesel U.S.A., Inc.*,
    277 F.R.D. 419 (N.D. Cal. 2011) ...................................................... 23

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..................................................... *passim*

*Harris v. Superior Ct.*,
    144 Cal. Rptr. 3d 289 (Ct. App. 2012) ............................................. 25

*Harris v. Superior Ct.*,
    53 Cal. 4th 170 (2011) ............................................................. 25, 37

*Humes v. First Student, Inc.*,
    758 F. App'x 593 (9th Cir. 2019)..................................................... 31

*James v. Uber Techs. Inc.*,
    338 F.R.D. 123, 129 (N.D. Cal. 2021) .............................................. 21

*Krzesniak v. Cendant Corp.*,
    No. 05 Civ. 05156, 2007 WL 1795703 (N.D. Cal. June 20, 2007)..................... 23, 24

*Leyva v. Medline Indus., Inc.*,
    716 F.3d 510 (9th Cir. 2013) .......................................................... 38

*Martin v. Cooper Elec. Supply Co.*,
    940 F.2d 896, 903 (3d Cir. 1991) .................................................... 26

*McKeen-Chaplin v. Provident Sav. Bank, FSB*,
    862 F.3d 847 (9th Cir. 2017) .......................................................... 25

*Metrow v. Liberty Mut. Managed Care LLC*,
    No. 16 Civ. 1133, 2017 WL 4786093 (C.D. Cal. May 1, 2017) ............... *passim*

*Nelson v. Avon Prods., Inc.*,
    No. 13 Civ. 02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015) ........... *passim*

*Norris-Wilson v. Delta-T Grp., Inc.*,
    270 F.R.D. 596 (S.D. Cal. 2010) ...................................................... 32

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651, 663 (9th Cir. 2022) ......................................................................... 21

*Pole v. Estenson Logistics, LLC*,
    2016 WL 4238635 (C.D. Cal. Aug. 10, 2016) ........................................................ 27

*Ramirez v. Yosemite Water Co., Inc.*,
    20 Cal. 4th 785, 794 (1999) .................................................................................... 23

*Rieve v. Coventry Health Care, Inc.*,
    870 F. Supp. 2d 856 (C.D. Cal. 2012) ..................................................................... 25

*Robert Hendricks v. Total Quality Logs., LLC*,
    No. 10 Civ. 0649, 2023 WL 6217073 (S.D. Ohio Sept. 25, 2023) .................... 23, 38

*Romero v. Producers Dairy Foods, Inc.*,
    235 F.R.D. 474 (E.D. Cal. Apr. 19, 2006) .............................................................. 23

*Roseman v. Bloomberg L.P.*,
    No. 14 Civ. 2657, 2017 WL 4217150 (S.D.N.Y. Sept. 21, 2017) ....................... 23, 34

*Sav-On Drug Stores v. Sup. Ct.*,
    34 Cal.4th 319 (2004) .............................................................................................. 39

*Shady Grove Orthopedic Assocs., P.A. Allstate Ins. Co.*,
    559 U.S. 393, 408 (2010) ......................................................................................... 21

*Smith v. Cardinal Logs. Mgmt. Corp.*,
    No. 07 Civ. 2104, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ....................... 23, 31

*Su v. F.W. Webb Co.*,
    No. 20 Civ. 11450, 2023 WL 4043771 (D. Mass. June 16, 2023) ........................... 38

*Tierno v. Rite Aid Corp.*,
    No. 05 Civ. 02520, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) ............. 23, 30, 34, 39

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................................. 33

*Valenzuela v. Best-Line Shades, Inc.*,
    No. 19 Civ. 07293, 2021 WL 3514101 (N.D. Cal. Aug. 10, 2021) (Corley, J.) ........... 22, 36, 39

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150, 1154 (9th Cir. 2016) ....................................................................... 38

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................. 22

*Walsh v. Unitil Serv. Corp.*,
    64 F.4th 1, 6 (1st Cir. 2023) .................................................................................... 26

*In re Wells Fargo Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009) ................................................................ 33

*Wixon v. Wyndham Resort Dev. Corp.*,
  No. 07 Civ. 02361, 2009 WL 3353445 (N.D. Cal. Oct. 19, 2009) ............................ 31

*Yokoyama v. Midland Nat. Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) ................................................................ 38

**Statutes**

Cal. Lab. Code § 203 ........................................................................ 36

Cal Lab. Code § 226.7(c) ..................................................................... 35

Cal. Lab. Code § 512 ........................................................................ 35

Cal. Lab. Code § 515 ........................................................................ 24

**Rules**

Fed. R. Civ. P. 23 ....................................................................... *passim*

**Regulations**

29 C.F.R. § 541.205 (2000) ............................................................. 25, 26, 28

29 C.F.R. § 541.207 ......................................................................... 28

Cal. Code Regs. tit. 8, § 11040 ..................................................... 24, 28, 35

**Other Authorities**

7A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure, § 1768 (3d ed.
  1986) ........................................................................................ 32

## Notice of Motion and Motion

**TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 21, 2023 at 10:00 a.m. or soon thereafter as the counsel may be heard, before the Honorable Jacqueline Scott Corley in Courtroom 8—19th Floor of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Bo Avery, Phoebe Rodgers, Kristy Camilleri, and Jill Unverferth (collectively, "Plaintiffs") will and hereby do move the Court for an order to certify their claims under Federal Rule of Civil Procedure 23, and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel.

Plaintiffs move this Court for an order certifying the following class and sub-classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

Class:

All current and former Recruiters employed by Defendant in California from January 28, 2018 to the final date of judgment.

Final Pay Subclass:

All Class Members who worked for Defendant as Recruiters on or after January 28, 2019 and who are no longer employed by Defendant and have not been employed by Defendant for more than 72 hours.

Plaintiffs seek to have certified for resolution on behalf of the class and subclass each of the following claims pled in their First Amended Class Action Complaint, ECF No. 1-2: Claim One for unpaid overtime; Claim Two for failure to timely pay wages upon termination; Claim Four for meal break violations; Claim Five for rest break violations; and Claim Six for unlawful, unfair, and/or deceptive business practices.

## STATEMENT OF THE ISSUES

Whether the Court should grant certification of the proposed class and subclass, and authorize Plaintiffs and Class Counsel to represent the class and subclass, because the class and subclass satisfy the requirements of Federal Rules of Civil Procedure 23(a) and (b).

1

2

## MEMORADUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs are entry-level Recruiters for Defendant TEKsystems, Inc. ("TEK" or "Defendant"), which is a professional staffing company focused on the information technology ("IT") field. Recruiters search and match candidates for open positions with TEK's clients. The job involves long hours and mundane tasks; Recruiters consistently work overtime, during which they review resumes, scroll through LinkedIn profiles, call candidates, and complete candidate intakes. TEK classifies all Recruiters as exempt from California's overtime laws, thereby pocketing funds it should pay as wages and enriching itself at Recruiters' expense. Plaintiffs bring this case to recover overtime wages TEK withheld from them, as well as other damages stemming from TEK's classification policy. To ensure other Recruiters may recover the same, Plaintiffs are moving to certify a class of similarly situated individuals under Federal Rule of Civil Procedure 23 ("Rule 23").

The Court should certify the class because it is tailor-made for Rule 23's requirements. To start, the class is too numerous for practicable joinder of all its members. The class also satisfies Rule 23's commonality and predominance requirements. The heart of this case is Plaintiffs' claim that TEK misclassifies Recruiters. The Court may resolve that claim in one stroke, on a class-wide basis, given the similarities among class members. The class members are virtually identical to each other in all respects relevant to this lawsuit; TEK trains, supervises, and evaluates Recruiters in a uniform manner, and all Recruiters share the same job duties.

Plaintiffs' claims are typical of the class. Typicality is easily satisfied where named plaintiffs and absent class members all suffered the same types of injuries stemming from a defendant's common practice. Plaintiffs and their attorneys will adequately represent the class. Plaintiffs have the same goals as the class, and extensive discovery has uncovered no conflicts of interest between Plaintiffs and class members. Further, Plaintiffs have retained counsel that has extensive experience in wage and hour class action litigation.

Finally, the class action device is the superior method for resolving this lawsuit.

1  Collective litigation will allow class members to pursue their claims without fear of retaliation

2  from their employer. And it will reduce unnecessary court costs and promote efficiency; rather

3  than litigating the propriety of TEK's classification policy for Recruiters across hundreds of

4  individual suits, the parties may resolve that issue in a single case.

5  **STATEMENT OF COMMON FACTS**

6  **I.    TEK Is a Recruitment Firm.**

7  TEK describes itself as a "leading information technology ('IT') staffing company."[1]

8  TEK's principal business purpose is to recruit IT workers and place them at companies as either

9  direct employees of the companies or as temporary workers through TEK.[2] TEK has two client

10  bases – customers, "companies that [TEK is] working with to help them build staffing" and

11  "consultants that [TEK] work[s] with."[3] TEK competes with other recruiting firms to place

12  candidates.[4] It represents that it has an "exhaustive search, training, and matching process" and

13  that the process was "developed and fine-tuned over 20-plus years in the market."[5]

14

15  [1]    Ex. 20 (*TEKsystems, Inc. v. Andiamo Consulting, LLC* ("*Andiamo*") Complaint) at ¶ 2;
16  Ex. 21 (*Andiamo* Preliminary Injunction) at 1; Ex. 24 (Career Opportunities & Expectations) at
    TEK-Recruiter_Lit-00386846.

17  [2]    Ex. 20 (*Andiamo* Compl.) at ¶ 2; Ex. 6 (TEK Senior Vice President of Talent Delivery
    Haycock Tr. ("Haycock Tr.")) 60:2-6; Ex. 3 (Rule 30(b)(6) Deposition DiBenedetto Tr.
18  ("DiBenedetto Tr.")) 134:5-13; Ex. 23 (*Andiamo* Rule 30(b)(6) Dep. Tr. of Alexander Pulido
    ("*Andiamo* Rule 30(b)(6) Tr.")) 24:14-25:5, 153:13-23; Ex. 25 (Q2 Talent Delivery Call) TEK-
19  Recruiter_Lit-00391866 at 3.

20  [3]    Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) 23:22-24:3; Ex. 11 (Unverferth Tr.) 67:24-68:2.
    [4]    Ex. 3  (DiBenedetto Tr.) 96:2-6 (testifying that part of the customer service goal with
21  potential job candidates is to get them to utilize TEK over its competitors); Ex. 4 (Rule 30(b)(6)
    Deposition Doyle Tr. ("Doyle Tr.")) 199:18-200:2; Ex. 5 (Doyle Sealed Tr. Portion) 237:20-
22  238:9 (Of the candidates TEK submits, only 31.8% were actually hired); Ex. 6 (Haycock Tr.)
    44:22-45:4 ("There's always a war for talent."); 48:1-7 ("[T]here are many, many many
23  competitors out there"); 48:10-49:12; Ex. 7 (Avery Tr.) 148:24-149:5; Ex. 13 (Brissey Decl.) ¶¶
    17, 38; Ex. 14 (Cunningham Decl.) ¶¶ 17, 38; Ex. 15 (DeCair Decl.) ¶¶ 16, 38; Ex. 16 (Doerner
24  Decl.) ¶¶ 16, 37; Ex. 17 (Larsen Decl.) ¶¶ 16, 37; Ex. 18 (Tillson Decl.) ¶¶ 16, 37; Ex. 19 (Topp
    Decl.) ¶¶ 17, 38; Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) 181:12-17; Ex. 26 (Haycock Email October
25  26, 2020) at TEK-Recruiter_Lit-00386105 ("We will need a two way system to create
    accountability for AMs and Recruiters to ensure good culture and reduce 'finger pointing' when
26  *we get beat on a requirement*.") (emphasis added).
    [5]    Ex. 20 (*Andiamo* Compl.) at ¶ 22.
27

28

1    TEK has five divisions: Applications, Communications, Dynamic Workplace Services,

2    and Infrastructure Optimization, as well as TEK Global Services.[6] All the divisions train, utilize,

3    and evaluate Recruiters in the same manner.[7]

## II.    Recruiters Work in an Entry-Level Position.

5    Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team.[8]

6    TEK employs people in 46 different recruiting job titles in California.[9] These job titles include

7    the senior and supervisory level recruiting positions described *infra* Statement of Common Facts

8    ("SOF") § VII.[10] With the exception of Recruiter Trainees, all of TEK's recruiting job titles are

9    classified as exempt.[11] Plaintiffs' proposed class only includes one of the 46 recruiting job titles:

10    "Recruiter."

11    Recruiters are entry-level employees.[12] TEK hires individuals early in their career and

12    TEK has an average annual attrition rate of approximately 38% to 47% of Recruiters.[13] The

---

[6]    Ex. 6 (Haycock Tr.) 73:19-75:6; Ex. 27 (Executive Dashboard) at TEK-Recruiter_Lit-00161733.

[7]    Ex. 3 (DiBenedetto Tr.) 46:6-21; Ex. 4 (Doyle Tr.) 58:22-59:3, 160:3-8, 163:4-164:16, 279:8-22, Ex. 6 (Haycock Tr.) 67:22-68:16, 129:17-131:13; 144:8-149:20, 157:19-21.

[8]    Ex. 6 (Haycock Tr.) 21:13-22:16, 103:6-104:1; Ex. 28 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 5.

[9]    Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.

[10]    *Id.* No. 2.

[11]    *Id.* No. 4.

[12]    Ex. 6 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; Ex. 9 (Rodgers Tr.) 12:25-14:2; Ex. 10 (Suliman Tr.) 29:23-30:21; Ex. 13 (Brissey Decl.) ¶ 3; Ex. 14 (Cunningham Decl.) ¶ 3; Ex. 15 (DeCair Decl.) ¶ 3; Ex. 16 (Doerner Decl.) ¶ 3; Ex. 17 (Larsen Decl.) ¶ 3; Ex. 18 (Tillson Decl.) ¶ 3; Ex. 19 (Topp Decl.) ¶ 3; Ex. 29 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At and entry level role, there are certain competencies that are more likely correlated to performance than others."); Ex. 28 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 2 ("Recruiting is also treated like an entry-level role."); Ex. 30 (Tabor July 31, 2018 Email) at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 (474 of Recruiters are new graduates, 75 had six months to one year of experience, and 110 of Recruiters had 1-2 years of experience. Therefore, approximately 74% of the 892 Recruiters have less than two years of experience).

[13]    Ex. 4 (Doyle Tr.) 266:23-268:10; Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 31 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738.

---

1  average tenure for Recruiters at TEK in California is only a little over one year.[14] TEK intends

2  for Recruiters to be promoted to its Account Manager or Recruiter Lead positions.[15] TEK does

3  not require Recruiters to have any previous IT knowledge or experience.[16]

4  **III.   Recruiters' Common Primary Job Duty Is Producing IT Job Candidates to Account
        Managers.**

5

6          TEK's witnesses, corporate officers, and documents concede that Recruiters work in a

7  producing role.[17] Recruiters' primary job duty is to screen and match IT job candidates for open

8  ─────────────────
[14]       Ex. 12 (Major Dec.) ¶ 30.
9  [15]       Ex. 8 (Camilleri Tr.) 98:1-99:2; Ex. 24 (Career Opportunities & Expectations) at TEK-
   Recruiter_Lit-00386849 ("TEKsystems promotes from within. More than 90 percent of current
10  leaders began their careers as recruiters."); Ex. 32 (Ligouri Dec. 6, 2018 Email) at TEK-
   Recruiter_Lit-00045215 ("We offer . . a promote from within growth model"); Ex. 33 (Mason
11  Oct. 24, 2019 Email) TEK-Avery-00492061; Ex. 34 (Sales Trainee Program) at TEK-
   Recruiter_Lit-00527262 (Discussing promotions from Recruiter to Account Manager).
12  [16]       Ex. 3 (DiBenedetto Tr.) 121:1-7; Ex. 4 (Doyle Tr.) 79:16-20, 208:23-210:17; Ex. 6
   (Haycock Tr.) 121:12-17; Ex. 7 (Avery Tr.) 145:16-146:5; Ex. 9 (Rodgers Tr.) 82:3-9; Ex. 11
13  (Unverferth Tr.) 69:21-70:5, 136:2-6; Ex. 13 (Brissey Decl.) ¶ 4; Ex. 14 (Cunningham Decl.) ¶ 4;
   Ex. 15 (DeCair Decl.) ¶ 4; Ex. 16 (Doerner Decl.) ¶ 4; Ex. 17 (Larsen Decl.) ¶ 4; Ex. 18 (Tillson
14  Decl.) ¶ 4; Ex. 19 (Topp Decl.) ¶ 4; Ex. 69 (Job Description) at TEK-Recruiter_Lit-00588313
   (not requiring IT knowledge).
15  [17]       Ex. 3 (DiBenedetto Tr.) 158:4-12; Ex. 4 (Doyle Tr.) 65:24-66:5 128:16-18, 213:4-7; Ex.
   6 (Haycock Tr.) 60:7-12; 68:1-16 ("Anyone that is in a role that is a salesperson account
16  manager or recruiter, we consider those as producing roles. Meaning that they are producing for
   the company. Our products and services are associated with putting people to work, and those
17  producers are – it's just a generic term that's used to say you're either a salesperson or a
   recruiter. . . . Again, as I've stated before, they are a recruiter that is producing. Meaning that
18  they are a – they're a recruiter that produces what recruiters produce . . . They find people for
   jobs."), 86:9-19 (SPP means "spread per producer" and refers to "recruiters"); Ex. 36 (Haycock
19  Ex. 15) TEK-Recruiter_Lit-00124518 (email attaching "*Producer* EOY Performance Reviews"
   and "*Producer* Performance Reviews 2021" for Recruiters) (emphasis added); Ex. 37 (Haycock
20  Dep. Ex. 5 (Project Lighthouse Communication Plan)) at TEK-Recruiter_Lit-00614413
   (referring to Recruiters as "production focused"); Ex. 38 (Alvather Email Oct. 2, 2019) at TEK-
21  Recruiter_Lit-00392555-56; Ex. 39 (Bhasin May 17, 2022 Email) at TEK-Recruiter_Lit-
   00125213; Ex. 40 (Fullerton July 10, 2020 Email) TEK-Recruiter_Lit-00194291 ("our producers
22  must document in a consistent, timely manner"); Ex. 27 (Executive Dashboard) TEK-
   Recruiter_Lit-00161739 ("SPP," which means spread per producer); Ex. 41 (Recruiter
23  Excellence: Scorecard FAQs) at TEK-Recruiter_Lit-00095089 ("we have *producers* who are
   under their PM line, yet they are maintaining 30 interactions; Meanwhile, many of our top
24  *producers* are not maintaining 30 interactions.") (emphasis added); Ex. 42 (Role Impact
   Summary: Producers (AM and Recruiters)) TEK-Recruiter_Lit-00004483; Ex. 43 (Performance
25

26

27

28

roles with TEK's clients and to submit candidates who match with the open roles to TEK's

Account Managers.[18]  Recruiters spend over 50% of their time reviewing potential candidates'

resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates.[19]

As the initial recruiting step, TEK's clients fill out a form that TEK's employees refer to

as "job requisitions," "job requirements," or "job reqs" ("job requisitions").[20] Job requisitions

outline TEK's clients' requirements for particular positions.[21] TEK's managers assign the job

---

Review Guide 2021) at TEK-Recruiter_Lit-00528423 (referring to Recruiters as "Producers");
Ex. 44 (Producer Documentation Guide) TEK-Recruiter_Lit-00125601; Ex. 45 (Producer
Performance KPI 8-4-2020) TEK-Recruiter_Lit-00281725 (Recruiter metric summaries are
referred to "Producer Performance KPI"); Ex. 46 (Annual Operating Plan) TEK-Recruiter_Lit-
00583663 at 3, 8 ("Producer Enablement Technology"); Ex. 41 (Recruiter Excellence) at TEK-
Recruiter_Lit-00095089 (referring to Recruiters as "producers"); Ex. 43 (Performance Guide)
TEK-Recruiter_Lit-00528423; Ex. 42 (Evolve) TEK-Recruiter_Lit-00004483.

[18]      Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) 165:15-24; Ex. 3 (DiBenedetto Tr.) 114:23-25 (Q:
"Who are recruiters trying to present candidates to? A: "Their account managers, specifically"),
162:18-163:7; Ex. 4 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 6 (Haycock Tr.)
21:13-22:16, 32:5-13, 59:2-11, 60:7-12; Ex. 7 (Avery Tr.) 87:12-88:23, 121:6-125:16; Ex. 8
(Camilleri Tr.) 43:8-15, 54:3-57:7, 104:4-8; Ex. 9 (Rodgers Tr.) 31:14-32:8; Ex. 11 (Unverferth
Tr.) 52:8-16; Ex. 13 (Brissey Decl.) ¶¶ 17, 37; Ex. 14 (Cunningham Decl.) ¶¶ 17, 37; Ex. 15
(DeCair Decl.) ¶¶ 16, 37; Ex. 16 (Doerner Decl.) ¶¶ 16, 36; Ex. 17 (Larsen Decl.) ¶¶ 17, 36; Ex.
18 (Tillson Decl.) ¶¶ 16, 36; Ex. 19 (Topp Decl.) ¶¶ 17, 37; Ex. 24 (Career Opportunities &
Expectations) TEK-Recruiter_Lit-00386846; Ex. 47 (Silicon Valley Welcome Packet) TEK-
Recruiter_Lit-00156629-30; Ex. 48 (LA Welcome Packet) TEK-Recruiter_Lit-00539864-65; Ex.
49 (Sacramento Welcome Packet) TEK-Recruiter_Lit-00107557-58; Ex. 50 (San Diego
Welcome Packet) TEK-Avery-00488750-51; Ex. 51 (TEK Acronyms) at TEK-Recruiter_Lit-
00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client.
*Screens* consultants . . . ."); Ex. 52 (Coaches Guide Recruiter 1 Participant Guide) at TEK-
Recruiter_Lit-00529902.

[19]      Ex. 4 (Doyle Tr.) 252:24-253:2; Ex. 6 (Haycock Tr.) 59:2-11; Ex. 8 (Camilleri Tr.)
55:11-20, 80:1-83:7; Ex. 9 (Rodgers Tr.) 46:10-13, 59:22-50:5, 128:13-129:6; Ex. 13 (Brissey
Decl.) ¶ 25; Ex. 14 (Cunningham Decl.) ¶ 25; Ex. 15 (DeCair Decl.) ¶ 24; Ex. 16 (Doerner Decl.)
¶ 24; Ex. 17 (Larsen Decl.) ¶ 24; Ex. 18 (Tillson Decl.) ¶ 24; Ex. 19 (Topp Decl.) ¶ 25; Ex. 53
(Recruiter Success Profile) TEK-Recruiter_Lit-00020276-89 ("high call volume environment");
*infra* SOF § V.

[20]      Ex. 6 (Haycock Tr.) 175:18-23; Ex. 3 (DiBenedetto Tr.) 91:9-22; Ex. 9 (Rodgers Tr.)
80:5-13; Ex. 54 (Requisition Form) TEK-Recruiter_Lit-00281942.

[21]      Ex. 3 (DiBenedetto Tr.) 154:11-155:17; Ex. 4 (Doyle Tr.) 58:5-25; Ex. 6 (Haycock Tr.)
59:2-6, 140:13-15; Ex. 8 (Camilleri Tr.) 55:21-56:5; Ex. 13 (Brissey Decl.) ¶ 15; Ex. 14
(Cunningham Decl.) ¶ 15; Ex. 15 (DeCair Decl.) ¶ 14; Ex. 16 (Doerner Decl.) ¶ 14; Ex. 17
(Larsen Decl.) ¶ 14; Ex. 18 (Tillson Decl.) ¶ 14; Ex. 19 (Topp Decl.) ¶ 15; Ex. 55 (SW Delivery
Road Map) TEK-Recruiter_Lit-00426820.

requisitions to Recruiters.[22]

Account Managers, and not Recruiters, are responsible for directly communicating with TEK's clients regarding their hiring needs.[23] If Recruiters have questions about the job requisition, they ask the Account Managers.[24] Account Managers provide information regarding the necessary qualifications, job details, and target pay for the position to Recruiters.[25]

Recruiters then search TEK's internal database and external sources, like LinkedIn, to match potential candidates with the clients' requirements.[26] Recruiters engage in the mundane

---

[22]    Ex. 3 (DiBenedetto Tr.) 122:10-13; Ex. 4 (Doyle Tr.) 94:21-96:15, 101:15-103:2, 123:25-124:8; Ex. 7 (Avery Tr.) 111:9-112:18; Ex. 8 (Camilleri Tr.) 51:6-20; Ex. 9 (Rodgers Tr.) 32:9-16, 39:24-40:2; Ex. 13 (Brissey Decl.) ¶ 14; Ex. 14 (Cunningham Decl.) ¶ 14; Ex. 15 (DeCair Decl.) ¶ 13; Ex. 16 (Doerner Decl.) ¶ 13; Ex. 17 (Larsen Decl.) ¶ 13; Ex. 18 (Tillson Decl.) ¶ 13; Ex. 19 (Topp Decl.) ¶ 14.

[23]    Ex. 3 (DiBenedetto Tr.) 115:9-14, 121:25-122:13; Ex. 4 (Doyle Tr.) 150:8-10, 178:14-15, 186:10-188:5. 189:11-25, 191:3-7, 191:22-192:4; Ex. 7 (Avery Tr.) 78:2-19, 121:6-122:14; Ex. 8 (Camilleri Tr.) 49:8-16, 51:5-20; Ex. 9 (Rodgers Tr.) 47:3-8, 48:1-24, 70:21-23, 72:1-73:7, 102:24-103:1; Ex. 11 (Unverferth Tr.) 148:13-21; Ex. 13 (Brissey Decl.) ¶ 31; Ex. 14 (Cunningham Decl.) ¶ 31; Ex. 15 (DeCair Decl.) ¶ 31; Ex. 16 (Doerner Decl.) ¶ 30; Ex. 17 (Larsen Decl.) ¶ 30; Ex. 18 (Tillson Decl.) ¶ 30; Ex. 19 (Topp Decl.) ¶ 31; Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) at 16:2-4; Ex. 56 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741 (Recruiters are evaluated if they "[o]btain missing information about the requirement from their Account Manager"), TEK-Recruiter_Lit-00152744 (Recruiters evaluated on the "ability to gather the appropriate client information from the Account Manager"); Ex. 57 (Delivery Qualification Form) at TEK-Recruiter_Lit-00413296 ("Recruiters "should come to the AM meeting PREPARED just like an AM would with their client."); Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and Account Managers communicating with TEK's customers.).

[24]    Ex. 3 (DiBenedetto Tr.) 110:22-112:4, 115:9-14, 123:2-14; Ex. 7 (Avery Tr.) 92:7-93:8; Ex. 8 (Camilleri Tr.) 56:7-57:7, 57:23-58:10; Ex. 9 (Rodgers Tr.) 92:3-93:25; Ex. 11 (Unverferth Tr.) 47:5-18, 58:18-59:9; Ex. 13 (Brissey Decl.) ¶ 16; Ex. 14 (Cunningham Decl.) ¶ 16; Ex. 15 (DeCair Decl.) ¶ 15; Ex. 16 (Doerner Decl.) ¶ 15; Ex. 17 (Larsen Decl.) ¶ 15; Ex. 18 (Tillson Decl.) ¶ 15; Ex. 19 (Topp Decl.) ¶ 16.

[25]    Ex. 7 (Avery Tr.) 92:11-21, 121:6-122:14; Ex. 8 (Camilleri Tr.) 49:8-16, 51:5-20; Ex. 9 (Rodgers Tr.) 95:6-10.

[26]    Ex. 3 (DiBenedetto Tr.) 92:6-93:25; Ex. 4 (Doyle Tr.) 143:17-144:22, 148:2-17, 151:9-152:18, 172:12-185:3; Ex. 6 (Haycock Tr.) 21:13-22:16, 32:5-13, 59:2-11, 60:7-12; Ex. 7 (Avery Tr.) 121:6-125:16; Ex. 8 (Camilleri Tr.) 53:4-55:20, 58:16-59:9, 80:3-19, 103:18-22, 104:4-8; Ex. 9 (Rodgers Tr.) 31:19-34:20, 38:18-39:6, 47:3-8, 79:2-24, 80:5-13, 95:11-14, 113:11-114:5; Ex. 11 (Unverferth Tr.) 52:8-16, 53:24-56:2; Ex. 13 (Brissey Decl.) ¶ 18; Ex. 14 (Cunningham Decl.) ¶ 18; Ex. 15 (DeCair Decl.) ¶ 17; Ex. 16 (Doerner Decl.) ¶ 17; Ex. 17 (Larsen Decl.) ¶ 17; Ex. 18 (Tillson Decl.) ¶ 17; Ex. 19 (Topp Decl.) ¶ 18.

tasks of reviewing resumes and LinkedIn profiles to make sure potential job candidates' experience and skills meet the minimum qualifications.[27] TEK provides Recruiters with "search and match" technology that helps automatize the screening process.[28]  TEK also provides Recruiters with step-by-step guidance on how to search and match candidates.[29] TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs."[30]

Once Recruiters have matched potential job candidates to the job requisition, Recruiters contact potential candidates through cold calls in the hope of reaching them to complete an initial intake.[31] TEK's own documents describe a primary duty for Recruiters as "[s]creen[ing]

---

[27]    *Supra* n.26; Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and Account Managers communicating with TEK's customers.).

[28]    Ex. 6 (Haycock Tr.) 39:17-40:24 ("Technology is getting better obviously every day to be able to do those matches by themselves"), 139:22-140:22; Ex. 13 (Brissey Decl.) ¶ 18-19; Ex. 14 (Cunningham Decl.) ¶¶ 18-19; Ex. 15 (DeCair Decl.) ¶¶ 17-18; Ex. 16 (Doerner Decl.) ¶¶ 17-18; Ex. 17 (Larsen Decl.) ¶¶ 17-18; Ex. 18 (Tillson Decl.) ¶¶ 17-18; Ex. 19 (Topp Decl.) ¶¶ 18-19.

[29]    Ex. 3 (DiBenedetto Tr.) 140:8-146:11; Ex. 4 (Doyle Tr.) 130:25-152:18; Ex. 6 (Haycock Tr.) 38:6-41:4; Ex. 7 (Avery Tr.) 121:6-122:23, 125:17-126:12; 142:3-144:17; Ex. 8 (Camilleri) 43:8-15, 54:3-57:7; Ex. 9 (Rodgers Tr.) 95:15-23; Ex. 11 (Unverferth Tr.) 49:14-22; Ex. 59 (Connected User Guide) TEK-Recruiter_Lit-00175558; Ex. 76 (Degreed Pathway) TEK-Recruiter_Lit-00078540.

[30]    Ex. 21 (*Andiamo* Preliminary Injunction) at 1; *see also* Ex. 22 (*Andiamo* Aff. Of Alexander Pulido) at ¶ 7 ("In support of its staffing and recruitment efforts, TEK uses a proprietary and confidential candidate database"); Ex. 7 (Avery Tr.) 126:2-12.

[31]    Ex. 9 (Rodgers Tr.) 95:15-23; Ex. 13 (Brissey Decl.) ¶ 19-21; Ex. 14 (Cunningham Decl.) ¶ 19-21; Ex. 15 (DeCair Decl.) ¶¶ 18-20; Ex. 16 (Doerner Decl.) ¶¶ 18-20; Ex. 17 (Larsen Decl.) ¶¶ 18-20; Ex. 18 (Tillson Decl.) ¶¶ 18-20; Ex. 19 (Topp Decl.) ¶¶ 19-21.

consultants."[32] The vast majority of Recruiters' outreach goes unanswered or is rebuffed.[33] TEK and Recruiters describe their job duties as a "grind."[34]

When Recruiters are able to connect with candidates, they do an intake, internally referred to as a "G2."[35] TEK's internal database prompts Recruiters to gather specific information from the potential candidates during the G2.[36] TEK provides Recruiters with detailed training and instructions about how to conduct a G2 with a candidate.[37]

If the potential candidate's experience and skills match TEK's client's requirements, the Recruiters forward their resume and information to the Account Managers.[38] The Account

---

[32]     Ex. 47 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156630 (emphasis added); Ex. 48 (LA Welcome Packet) TEK-Recruiter_Lit-00539868; Ex. 49 (Sacramento Welcome Packet) TEK-Recruiter_Lit-00107558; Ex. 50 (San Diego Welcome Packet) TEK-Avery-00488751; *see also* Ex. 56 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152743 (evaluated on "screen[ing]" candidates); Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK business cycle as including Recruiters "screening" candidates.); Ex. 7 (Avery Tr.) 87:12-88:23.

[33]     Ex. 3 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact); Ex. 7 (Avery Tr.) 137:19-24; Ex. 8 (Camilleri Tr.) 55:11-20; Ex. 9 (Rodgers Tr.) 55:1-3, 60:10-63:12, 66:6-14, 74:2-9, 83:3-5, 142:8-10; Ex. 13 (Brissey Decl.) ¶ 19, 22; Ex. 14 (Cunningham Decl.) ¶¶ 19, 22; Ex. 15 (DeCair Decl.) ¶¶ 18, 21; Ex. 16 (Doerner Decl.) ¶ 18, 21; Ex. 17 (Larsen Decl.) ¶¶ 18, 21; Ex. 18 (Tillson Decl.) ¶¶ 18, 21; Ex. 19 (Topp Decl.) ¶¶ 19, 22.

[34]     Ex. 7 (Avery Tr.) 197:17-198:9; Ex. 8 (Camilleri Tr.) 55:11-20; Ex. 9 (Rodgers Tr.) 55:1-3, 60:10-63:12, 66:6-14, 74:3-9, 83:3-5, 142:8-10; Ex. 61 (DiBenedetto Apr. 10, 2019 Email) TEK-Recruiter_Lit-00044799.

[35]     Ex. 3 (DiBenedetto Tr.) 84:11-85:13; Ex. 4 (Doyle Tr.) 144:25-145:10; Ex. 6 (Haycock Tr.) 60:19-21 ("A G2 is an information form that we use to be able to collect information about the candidate"); Ex. 8 (Camilleri Tr.) 43:20-44:1; Ex. 9 (Rodgers Tr.) 105:18-106:16; Ex. 11 (Unverferth Tr.) 57:1-59:9.

[36]     Ex. 3 (DiBenedetto Tr.) 87:12-88:5, 148:1-18; Ex. 4 (Doyle Tr.) 130:25-152:18; Ex. 6 (Haycock Tr.) 151:1-12; Ex. 7 (Avery Tr.) 125:20-126:12; Ex. 8 (Camilleri Tr.) 54:3-17; Ex. 11 (Unverferth Tr. 65:4-66:24).

[37]     Ex. 3 (DiBenedetto Tr.) 80:14-84:10, 90:13-91:8, 105:2-107:8, 148:1-18; Ex. 7 (Avery Tr.) 137:3-140:10; Ex. 8 (Camilleri Tr.) 43:20-44:1, 64:9-24, 94:6-12, 100:24-102:19; Ex. 9 (Rodgers Tr.) 54:17-55:3; Ex. 13 (Brissey Decl.) ¶ 21; Ex. 14 (Cunningham Decl.) ¶ 21; Ex. 15 (DeCair Decl.) ¶ 20; Ex. 16 (Doerner Decl.) ¶ 20; Ex. 17 (Larsen Decl.) ¶ 20; Ex. 18 (Tillson Decl.) ¶ 20; Ex. 19 (Topp Decl.) ¶ 21; Ex. 76 (Degreed Pathway) TEK-Recruiter_Lit-00078540; Ex. 62 (DiBenedetto Nov. 22, 2020 Email) TEK-Recruiter_Lit-00041158.

[38]     Ex. 3 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 127:4-25, 162:18-163:7; Ex. 6 (Haycock Tr.)

Managers then determine which candidates to forward on to TEK's client.[39] TEK's clients determine who they want to interview.[40] If a TEK's client is interested in interviewing the candidate, the client informs the Account Manager, who informs the Recruiter, and then the Recruiter contacts the candidate to coordinate the scheduling of the interview with the client.[41] Recruiters do not interview candidates.[42] The client, and not the Recruiters, decides which candidates it wants to hire.[43] If the client decides to make the candidate an offer, Recruiters relay the offer to the candidate.[44] Account Managers and TEK's clients determine the pay rate and

---

60:7-12; Ex. 8 (Camilleri Tr.) 86:8-88:20; Ex. 9 (Rodgers Tr.) 40:18-41:11, 47:3-8, 95:15-96:13; Ex. 11 (Unverferth Tr.) 64:20-65:17; Ex. 13 (Brissey Decl.) ¶ 28; Ex. 14 (Cunningham Decl.) ¶ 28; Ex. 15 (DeCair Decl.) ¶ 27; Ex. 16 (Doerner Decl.) ¶ 27; Ex. 17 (Larsen Decl.) ¶ 27; Ex. 18 (Tillson Decl.) ¶ 27; Ex. 19 (Topp Decl.) ¶ 28; Ex. 24 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.

[39]    Ex. 3 (DiBenedetto Tr.) 162:18-163:17; Ex. 4 (Doyle Tr.) 133:16-23, 137:10-139:14; Ex. 7 (Avery Tr.) 144:2-17; Ex. 8 (Camilleri Tr.) 87:22-88:12; Ex. 9 (Rodgers Tr.) 46:25-47:8; 72:14-74:19, 76:13-17, 95:24-96:4, 98:14-24, 144:5-145:1; Ex. 11 (Unverferth Tr.) 70:6-16; Ex. 13 (Brissey Decl.) ¶ 28-30; Ex. 14 (Cunningham Decl.) ¶¶ 28-30; Ex. 15 (DeCair Decl.) ¶¶ 27-29; Ex. 16 (Doerner Decl.) ¶¶ 27-29; Ex. 17 (Larsen Decl.) ¶¶ 27-29; Ex. 18 (Tillson Decl.) ¶¶ 27-29; Ex. 19 (Topp Decl.) ¶¶ 28-30; Ex. 63 (Operations Playbook) ("AMs must thoroughly screen or disqualify candidates.") TEK-Recruiter_Lit-00019675.

[40]    Ex. 3 (DiBenedetto Tr.) 154:2-7, 188:2-9; Ex. 4 (Doyle Tr.) 158:1-12; Ex. 7 (Avery Tr.) 150:9-151:6; Ex. 8 (Camilleri) 88:13-20; Ex. 9 (Rodgers Tr.) 96:5-13, 98:14-24; Ex. 11 (Unverferth Tr.) 66:1-68:19.

[41]    Ex. 7 (Avery Tr.) 88:24-89:23, 90:46-91:9; Ex. 8 (Camilleri Tr.) 88:13-24; Ex. 9 (Rodgers Tr.) 95:24-96:13; Ex. 11 (Unverferth Tr.) 68:3-19; Ex. 13 (Brissey Decl.) ¶ 32; Ex. 14 (Cunningham Decl.) ¶ 32; Ex. 15 (DeCair Decl.) ¶ 32; Ex. 16 (Doerner Decl.) ¶ 31; Ex. 17 (Larsen Decl.) ¶ 31; Ex. 18 (Tillson Decl.) ¶ 31; Ex. 19 (Topp Decl.) ¶ 32; Ex. 59 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 142 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview.").

[42]    Ex. 8 (Camilleri Tr.) 88:13-90:16; Ex. 13 (Brissey Decl.) ¶ 32; Ex. 14 (Cunningham Decl.) ¶ 32; Ex. 15 (DeCair Decl.) ¶ 32; Ex. 16 (Doerner Decl.) ¶ 31; Ex. 17 (Larsen Decl.) ¶ 31; Ex. 18 (Tillson Decl.) ¶ 31; Ex. 19 (Topp Decl.) ¶ 32.

[43]    Ex. 4 (Doyle Tr.) 192:13-193:8; Ex. 8 (Camilleri Tr.) 88:13-90:16; Ex. 11 (Unverferth Tr.) 75:3-76:16; Ex. 13 (Brissey Decl.) ¶ 33; Ex. 14 (Cunningham Decl.) ¶ 33; Ex. 15 (DeCair Decl.) ¶ 32; Ex. 16 (Doerner Decl.) ¶ 32; Ex. 17 (Larsen Decl.) ¶ 32; Ex. 18 (Tillson Decl.) ¶ 32; Ex. 19 (Topp Decl.) ¶ 33.

[44]    Ex. 7 (Avery Tr.) 89:15-90:9, 150:22-151:6; Ex. 8 (Camilleri Tr.) 91:3-10; Ex. 9 (Rodgers Tr.) 103:12-104:8; Ex. 11 (Unverferth Tr.) 75:3-76:16; Ex. 13 (Brissey Decl.) ¶ 33; Ex. 14 (Cunningham Decl.) ¶ 33; Ex. 15 (DeCair Decl.) ¶ 32; Ex. 16 (Doerner Decl.) ¶ 32; Ex. 17 (Larsen Decl.) ¶ 32; Ex. 18 (Tillson Decl.) ¶ 32; Ex. 19 (Topp Decl.) ¶ 33.

make the ultimate decisions about pay.[45] Recruiters do not negotiate terms of employment.[46]

TEK makes clear that it views the Recruiter position primarily as a production job, which it identifies as akin to a sales position and not a human resources position.[47] In fact, in its internal recruitment efforts to hire Recruiters, TEK states: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales."[48]

TEK also does not consider Recruiters to be "managers" – "they're not overseeing the actual work getting done."[49] Recruiters are not evaluating the substance of consultants' work.[50] Recruiters do not make termination decisions regarding consultants.[51] Recruiters are not involved

---

[45]    Ex. 4 (Doyle Tr.) 194:13-16; Ex. 7 (Avery Tr.) 102:25-103:7; Ex. 9 (Rodgers Tr.) 114:6-:117:19, 123:4-128:22; Ex. 11 (Unverferth Tr.) 76:23-81:6; Ex. 13 (Brissey Decl.) ¶ 33; Ex. 14 (Cunningham Decl.) ¶ 33; Ex. 15 (DeCair Decl.) ¶ 32; Ex. 16 (Doerner Decl.) ¶ 32; Ex. 17 (Larsen Decl.) ¶ 32; Ex. 18 (Tillson Decl.) ¶ 32; Ex. 19 (Topp Decl.) ¶ 33.

[46]    Ex. 4 (Doyle Tr.) 192:7-193:15; Ex. 7 (Avery Tr.) 185:24-187:24, 214:1-8; Ex. 8 (Camilleri Tr.) 96:9-12, 104:9-21; Ex. 9 (Rodgers Tr.) 114:6-13; Ex. 11 (Unverferth Tr.) 76:23-81:6, 87:7-10; Ex. 13 (Brissey Decl.) ¶ 33; Ex. 14 (Cunningham Decl.) ¶ 33; Ex. 15 (DeCair Decl.) ¶ 32; Ex. 16 (Doerner Decl.) ¶ 32; Ex. 17 (Larsen Decl.) ¶ 32; Ex. 18 (Tillson Decl.) ¶ 32; Ex. 19 (Topp Decl.) ¶ 33.

[47]    Ex. 3 (DiBenedetto Tr.) 90:13-91:8 (distinguishing Recruiters from human resources and noting Recruiters must have good sales skills); Ex. 6 (Haycock Tr.) 123:21-24, 136:13-23; Ex. 24 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386851 ("We work in a sales environment"); Ex. 32 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045214.

[48]    Ex. 32 (Ligouri Dec. 6, 2018 Email) TEK-Recruiter_Lit-00045214; *see also* Ex. 33 (Mason Oct. 24, 2019 Email) at TEK-Avery-00492061 ("we are looking for sales focused individuals"); Ex. 64 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sale"); Ex. 65 (Alvarado July 27, 2021 Email) TEK-Recruiter_Lit-00225566; Ex. 66 (DeGeus Sept. 1, 2022 Email) TEK-Recruiter_Lit-00178029; Ex. 67 (Stadler Dec. 20, 2018 Email) TEK-Avery-00433138; Ex. 68 (Murrell April 2, 2018 Email) TEK-Avery-00500049.

[49]    Ex. 6 (Haycock Tr.) 36:16-17; Ex. 13 (Brissey Decl.) ¶ 35; Ex. 14 (Cunningham Decl.) ¶ 35; Ex. 15 (DeCair Decl.) ¶ 34; Ex. 16 (Doerner Decl.) ¶ 34; Ex. 17 (Larsen Decl.) ¶ 34; Ex. 18 (Tillson Decl.) ¶ 34; Ex. 19 (Topp Decl.) ¶ 35.

[50]    Ex. 3 (DiBenedetto Tr.) 167:19-168:7; Ex. 6 (Haycock Tr.) 121:20-122:16, 144:18-145:12; Ex. 11 (Unverferth Tr.) 99:23-101:16; Ex. 13 (Brissey Decl.) ¶ 34; Ex. 14 (Cunningham Decl.) ¶ 34; Ex. 15 (DeCair Decl.) ¶ 33; Ex. 16 (Doerner Decl.) ¶ 33; Ex. 17 (Larsen Decl.) ¶ 33; Ex. 18 (Tillson Decl.) ¶ 33; Ex. 19 (Topp Decl.) ¶ 34.

[51]    Ex. 3 (DiBenedetto Tr.) 167:12-14 (Q: Do recruiters make the ultimate [termination]

---

in creating management policies and operational practices, or deciding whether to implement them.[52] Recruiters have no authority to: waive or deviate from TEK's policies and procedures in performing their work; formulate, interpret, or enforce management policies or operating procedures; or negotiate or enter into contracts on behalf of TEK.[53] Recruiters do not have the authority to negotiate or bind TEK or its clients with respect to significant matters.[54] They do not supervise anyone; represent TEK in formal grievance proceedings; advise TEK or its clients on how to more efficiently run its operations; or study or recommend changes to the operations or corporate structure of any business.[55] Nor do Recruiters provide human resource services, public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK.[56] Finally, TEK utilizes the same job description for all Recruiters.[57]

**IV.    TEK Subjects All Recruiters to the Same Production Quotas.**

TEK requires all Recruiters to meet the same quotas.[58] These quotas are determined at the corporate-level.[59] Currently, the quota for Recruiters is 25 points a week based on the following

---

decisions for the consultants? A: No."); Ex. 7 (Avery Tr.) 158:15-160:24; Ex. 13 (Brissey Decl.) ¶ 36; Ex. 14 (Cunningham Decl.) ¶ 36; Ex. 15 (DeCair Decl.) ¶ 35; Ex. 16 (Doerner Decl.) ¶ 35; Ex. 17 (Larsen Decl.) ¶ 35; Ex. 18 (Tillson Decl.) ¶ 35; Ex. 19 (Topp Decl.) ¶ 36.

[52]    Ex. 3 (DiBenedetto Tr.) 167:15-18; Ex. 6 (Haycock Tr.) 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives, and not recruiters, because the executives are "running [the] business."); 98:12-100:8 (Recruiters not part of the team "responsible for driving business"), 159:1-160:14; Ex. 11 (Unverferth Tr.) 99:23-101:1.

[53]    Ex. 2 (Def.'s Resp. to Pls. 2nd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters."); Ex. 3 (DiBenedetto Tr.) 167:15-18; Ex. 4 (Doyle Tr.) 30:11-23 (testifying that he negotiated contracts as an Account Manager and Director of Business Operations); Ex. 6 (Haycock Tr.) 159:1-162:5.

[54]    Ex. 2 (Def.'s Resp. to Pls. 2nd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters."); Ex. 3 (DiBenedetto Tr.) 109:23-110:3; *supra* n.53; Ex. 7 (Avery Tr.) 185:24-186:21; Ex. 8 (Camilleri Tr.) 104:9-16; Ex. 9 (Rodgers Tr.) 152:10-17.

[55]    *Supra*; Ex. 6 (Haycock Tr.) 34:3-6, 69:9-71:22, 122:17-123:25, 160:15-162:5.

[56]    Ex. 6 (Haycock Tr.) 123:21-24, 161:13-15.

[57]    Ex. 6 (Haycock Tr.) 116:20-118:3 (testifying "general job description" comes from corporate); Ex. 69 (Marland May 28, 2019 Email) TEK-Recruiter_Lit-00588314.

[58]    Ex. 4 (Doyle Tr.) 129:16-130:20; Ex. 6 (Haycock Tr.) 157:19-158:1; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069; Ex. 9 (Rodgers Tr.) 19-24, 159:1-24.

[59]    Ex. 6 (Haycock Tr.) 157:19-158:1; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069.

activity points: G2s (intakes); reference checks; submittals (which is when an Account Manager submits a candidate to a client that the Recruiter solicits); interviews (which is when TEK's clients interview the candidate); and starts (which is when a candidate ultimately starts a job with a TEK's client).[60] Prior to July 2022, TEK required Recruiters to maintain a weekly average of 30 "interactions" a week, such as reference checks, G2s, and meals with candidates.[61] TEK requires all Recruiters to meet the same spread levels, which align to their tenure at the company and is referred to as the "performance management line."[62] Spread is the difference between the amount a client pays TEK for placing the consultant and the costs to TEK to place them.[63]

TEK closely monitors Recruiters' compliance with the quotas and performance management line.[64] Every week, TEK generates a WIN Report to each Recruiter and their managers, which tracks how well Recruiters are meeting their quotas and spread compared to their peers.[65] Also on a weekly basis, TEK executives receive Executive Dashboards, which provide "a snapshot on the various operations of the business."[66] Included in the Executive

---

[60]     Ex. 4 (Doyle Tr.) 159:18-161:6; Ex. 6 (Haycock Tr.) 153:19-158:1; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069; Ex. 71 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512.

[61]     Ex. 4 (Doyle Tr.) 129:16-130:20, 153:5-19, 154:19-155:12; Ex. 6 (Haycock Tr.) 152:3-153:10; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069; Ex. 13 (Brissey Decl.) ¶ 23; Ex. 14 (Cunningham Decl.) ¶ 23; Ex. 15 (DeCair Decl.) ¶ 22; Ex. 16 (Doerner Decl.) ¶ 22; Ex. 17 (Larsen Decl.) ¶ 22; Ex. 18 (Tillson Decl.) ¶ 22; Ex. 19 (Topp Decl.) ¶ 23; Ex. 71 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512.

[62]     Ex. 4 (Doyle Tr.) 92:3-94:2, 299:8-21.

[63]     Ex. 6 (Haycock Tr.) 72:18-21; Ex. 9 (Rodgers Tr.) 120:11-17; Ex. 48 (LA Welcome Packet) TEK-Recruiter_Lit-00539869.

[64]     Ex. 4 (Doyle Tr.) 92:3-94:20, 112:6-113:21, 162:14-164:13, 255:3-256:8; Ex. 6 (Haycock Tr.) 147:5-11, 158:2-15; Ex. 11 (Unverferth Tr.) 105:9-108:109:12, 110:25-111:12; Ex. 13 (Brissey Decl.) ¶ 10; Ex. 14 (Cunningham Decl.) ¶ 10; Ex. 15 (DeCair Decl.) ¶ 9; Ex. 16 (Doerner Decl.) ¶ 9; Ex. 17 (Larsen Decl.) ¶ 9; Ex. 18 (Tillson Decl.) ¶ 9; Ex. 19 (Topp Decl.) ¶ 10; Ex. 72 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 27 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-65.

[65]     Ex. 4 (Doyle Tr.) 112:6-113:21; Ex. 6 (Haycock Tr.) 158:2-15; Ex. 11 (Unverferth Tr.) 107:14-108:9; Ex. 72 (WIN narratives) TEK-Recruiter_Lit-00392430.

[66]     Ex. 6 (Haycock Tr.) 69:13-71:19; Ex. 27 (Executive Dashboard) at TEK-Recruiter_Lit-00161739.

Dashboard are summaries about how well Recruiters are attaining their quotas.[67] TEK's offices have "spread boards" that publicize the amount of spread attained by each Recruiter from best to worst.[68] If Recruiters fail to hit the quotas and meet their spread requirements, TEK puts them on a performance improvement plan ("PIP").[69] TEK's human resources provides uniform PIP forms for Recruiters' managers to use.[70] Finally, TEK's annual reviews for all Recruiters are based on the same quotas and spread requirements, and follow the same process.[71]

## V.    TEK's Connected Data Shows Plaintiffs Overwhelmingly Spent Their Time Contacting Candidates.

TEK maintains an internal database that all of its Recruiters use.[72] It was formerly called RWS, but it is now called Connected.[73] Recruiters use Connected to search for potential candidates, to review information about candidates, and to record the work activities they perform.[74] TEK expects Recruiters to enter their activities into Connected in real time.[75] Defendant produced Connected data for the four Named Plaintiffs.[76] The Connected data identifies the work activities the Named Plaintiffs performed and the dates and times the

---

[67]     Ex. 6 (Haycock Tr.) 91:15-93:14; Ex. 27 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-65.

[68]     Ex. 7 (Avery Tr.) 172:22-173:11; Ex. 11 (Unverferth Tr.) 91:8-12, 119:21-24; Ex. 13 (Brissey Decl.) ¶ 24; Ex. 14 (Cunningham Decl.) ¶ 24; Ex. 15 (DeCair Decl.) ¶ 23; Ex. 16 (Doerner Decl.) ¶ 23; Ex. 17 (Larsen Decl.) ¶ 23; Ex. 18 (Tillson Decl.) ¶ 23; Ex. 19 (Topp Decl.) ¶ 24.

[69]     Ex. 4 (Doyle Tr.) 162:14-164:9.

[70]     Ex. 4 (Doyle Tr.) 162:14-164:9.

[71]     Ex. 4 (Doyle Tr.) 212:20-216:11; Ex. 36 (Yearly Performance Summary) TEK-Recruiter_Lit-00124520; Ex. 43 (Performance Review Guide 2021: For Leaders and Leads) TEK-Recruiter_Lit-00528422.

[72]     Ex. 6 (Haycock Tr.) 140:19-22; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 7.

[73]     Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 7.

[74]     Ex. 6 (Haycock Tr.) 140:19-22, 150:21-152:2; Ex. 7 (Avery Tr.) 80:21-81:20, 147:15-148:6; Ex. 8 (Camilleri Tr.) 53:22-54:1, 99:16-100:18; Ex. 9 (Rodgers Tr.) 105:20-106:3, 144:17-145:13; Ex. 11 (Unverferth Tr.) 63:8-18; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 7.

[75]     Ex. 3 (DiBenedetto Tr.) 180:13-181:10; Ex. 4 (Doyle Tr.) 124:25-126:20; Ex. 40 (Fullerton July 10, 2020 Email) TEK-Recruiter_Lit-00194291.

[76]     Ex. 12 (Major Decl.) ¶ 4.

1  activities were performed.[77] The data shows that 37.44% of Plaintiffs' activities recorded in

2  Connected were "Attempted Contact," followed by "G2" at 20.03%, and "Call" at 14.32%,

3  which altogether comprise approximately 71.79% of the total work activities.[78] The Connected

4  data further shows that the number of attempted contacts, G2 intake calls, and calls the Named

5  Plaintiffs made dwarfed the number of submittals and starts they had:[79]

|  | Attempts Contacts | G2s | Calls | Submitted | Starts |
|---|---|---|---|---|---|
| Bo Avery | 4,070 | 1,972 | 2,429 | 120 | 21 |
| Kristy Camilleri | 3,389 | 1,915 | 1,241 | 133 | 22 |
| Phoebe Rodgers | 5,682 | 2,338 | 1,603 | 142 | 6 |
| Jill Unverferth | 1,950 | 1,850 | 497 | 132 | 16 |

## VI.    TEK Provides Uniform Training to Recruiters.

TEK provides the same training to all its Recruiters.[80] The Recruiter Trainees undergo a

13-week training period designed by TEK's corporate training department.[81] During the 13-week

period, California Recruiters travel to Phoenix or Baltimore for a three-day classroom training.[82]

TEK's Professional Development department provides identical training materials to all

---

[77]     Ex. 3 (DiBenedetto Tr.) 180:13-181:10; Ex. 4 (Doyle Tr.) 124:25-126:20; Ex. 12 (Major Decl.) ¶ 5; Ex. 7 (Avery Tr.) 80:21-81:20; Ex. 8 (Camilleri Tr.) 53:22-54:17, 99:16-24; Ex. 9 (Rodgers Tr.) 105:18-106:3; Ex. 40 (Fullerton July 10, 2020 Email) TEK-Recruiter_Lit-00194291.

[78]     Ex. 12 (Major Decl.) ¶ 11.

[79]     Ex. 12 (Major Decl.) ¶¶ 20-23.

[80]     Ex. 3 (DiBenedetto Tr.) 44:10-46:21, 61:7-63:10, 68:13-69:10, 129:7-25; Ex. 73 (2022 Recruiter Training Plan) TEK-Recruiter_Lit-00228010-11; Ex. 74 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00391876 (uniform training and promotion process for Recruiters); Ex. 75 (Welcome to New Recruiter Training) TEK-Recruiter_Lit-00000942.

[81]     Ex. 3 (DiBenedetto Tr.) 39:18-43:7; Ex. 4 (Doyle Tr.) 204:1-11; Ex. 6 (Haycock Tr.) 127:5-132:12; Ex. 60 (Professional Development Org. Chart) TEK-Recruiter_Lit-00078541; Ex. 77 ("Recruiter Training Period FAQ") TEK-Recruiter_Lit-00252623; Ex. 24 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386848.

[82]     Ex. 3 (DiBenedetto Tr.) 44:10-46:21; Ex. 6 (Haycock Tr.) 127:5-132:12; Ex. 7 (Avery Tr.) 93:23-97:11; Ex. 8 (Camilleri Tr.) 22:11-18, 44:22-45:14; Ex. 11 (Unverferth Tr.) 41:16-42:25, 48:22-50:14; Ex. 13 (Brissey Decl.) ¶ 9; Ex. 14 (Cunningham Decl.) ¶ 9; Ex. 15 (DeCair Decl.) ¶ 8; Ex. 16 (Doerner Decl.) ¶ 8; Ex. 17 (Larsen Decl.) ¶ 8; Ex. 18 (Tillson Decl.) ¶ 8; Ex. 19 (Topp Decl.) ¶ 9; Ex. 73 (2022 Recruiter Training Plan) TEK-Recruiter_Lit-00228010-11; Ex. 74 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00391876.

1    Recruiters.[83] TEK's training includes how to: engage in conversations with potential job
2    candidates, complete an intake, present candidates to Account Managers, explain statistics
3    regarding the industry, match resumes with requisitions, and check references.[84] TEK provides
4    uniform guides to all its Recruiters including, but not limited to: Recruiter Onboarding Plan and
5    the Participant Guide, which contain sample scripts for conversations with candidates, Recruiter
6    Onboarding Plan, Reference Check Guidance, Red  Zone Script, Search Strings for LinkedIn
7    Recruiters, "Sourcing Strategy: Plan of Attack," "Consultant Conversation Guide," and
8    "Application Recruiting Smart Questions."[85]

9        TEK hires all new Recruiters as hourly, non-exempt Recruiter Trainees.[86]  After
10   Recruiter Trainees hit certain metrics, including earning a passing score on the Recruiter
11   Evaluation, they are converted into salaried, exempt Recruiters.[87] The same Recruiter Trainee
12   Evaluation is used company-wide for all Recruiters.[88] It evaluates the Recruiter Trainee on skills

---

[83]     Ex. 3 (DiBenedetto Tr.) 50:3-4.
[84]     Ex. 3 (DiBenedetto Tr.) 80:14-91:8, 114:7-25; Ex. 7 (Avery Tr.) 87:7-88:13, 95:16-97:8;
Ex. 8 (Camilleri Tr.) 43:8-15; Ex. 9 (Rodgers Tr.) 54:8-55:3; Ex. 58 (Recruiter Onboarding Plan)
at TEK-Recruiter_Lit-00097836-38 (listing training topics); Ex. 78 (Recruiter Onboarding
Participant Guide) TEK-Recruiter_Lit-00528540-528543.
[85]     Ex. 11 (Unverferth Tr.) 131:5-19; Ex. 79 (Consultant Conversation Guide) TEK-
Recruiter_Lit-00422805-09; Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-
00097862-63, TEK-Recruiter_Lit-00097895, TEK-Recruiter_Lit-00097914, TEK-Recruiter_Lit-
00097925, TEK-Recruiter_Lit-00097933, TEK-Recruiter_Lit-00097941; Ex. 80 (New Recruiter
Training) at TEK-Recruiter_Lit-00000697-99; Ex. 81 (Reference Check Guidance) TEK-
Thomas-00435337; Ex. 82 (Applications Recruiting Smart Questions) TEK-Thomas-00435342;
Ex. 83 (Sourcing Strategy: Plan of Attack) TEK-Recruiter_Lit-00001034; Ex. 84 (.Net Qual
Sheet) TEK-Thomas-00435339; Ex. 85 (Elevator Pitch TEK 2021) TEK-Recruiter_Lit-
00019819.
[86]     Ex. 6 (Haycock Tr.) 104:14-16; Ex. 7 (Avery Tr.) 53:4-57:25; Ex. 8 (Camilleri Tr.) 22:8-
23; Ex. 9 (Rodgers Tr.) 12:1-25; Ex. 11 (Unverferth Tr.) 33:22-34:25; Ex. 13 (Brissey Decl.) ¶ 7;
Ex. 14 (Cunningham Decl.) ¶ 7; Ex. 15 (DeCair Decl.) ¶ 6; Ex. 16 (Doerner Decl.) ¶ 6; Ex. 17
(Larsen Decl.) ¶ 6; Ex. 18 (Tillson Decl.) ¶ 6; Ex. 19 (Topp Decl.) ¶ 7.
[87]     Ex. 3 (DiBenedetto Tr.) 63:20-64:9; Ex. 6 (Haycock Tr.) 104:14-105:25, 137:20-144:6;
Ex. 7 (Avery Tr.) 53:16-57:15; Ex. 56 (Recruiter Trainee Evaluations) TEK-Recruiter_Lit-
00152740-00152744; Ex. 86 (13-week Recruiter Evaluation FAQ) TEK-Recruiter_Lit-
00530436.
[88]     Ex. 3 (DiBenedetto Tr.) 61:7-65:11, 168:18-173:1.

such as sourcing, but does not evaluate Recruiter Trainees on any management skills.[89] Recruiter

Trainees and Recruiters perform the same job duties.[90]

## VII.    Recruiters are Closely Supervised

TEK commonly employs multiple layers of supervisors – DBOs, DROs, Delivery

Managers, Recruiters Leads, and Account Leads – who supervise Recruiters on a constant and

daily basis.[91] Recruiters and their supervisors all attend daily Red Zone meetings where

Recruiters receive work assignments and report on the work activities they performed the prior

day.[92] Recruiters' managers receive weekly reports on how each Recruiter is performing with

respect to their quotas and performance metrics, and monitor the Recruiters' job performance.[93]

The offices are headed by a Director of Business Operations ("DBO"), whose job is to

"direct the operations of a local staffing office and a Delivery Manager, whose job is to be

responsible for managing one or more project/projects teams/programs at a time and provide

delivery assurance of application services to clients."[94] DBOs monitor Recruiters' metrics, run

daily morning Red Zone meetings, at which they assign work to Recruiters, manage Recruiters'

---

[89]    Ex. 6 (Haycock Tr.) 143:15-144:6; Ex. 56 (Recruiter Trainee Evaluations) TEK-Recruiter_Lit-00152740-00152744.

[90]    Ex. 4 (Doyle Tr.) 210:5-15; Ex. 7 (Avery Tr.) 85:21-86:15; Ex. 8 (Camilleri Tr.) 112:23-113:1; Ex. 11 (Unverferth Tr.) 45:15-23; Ex. 13 (Brissey Decl.) ¶ 8; Ex. 14 (Cunningham Decl.) ¶ 8; Ex. 15 (DeCair Decl.) ¶ 7; Ex. 16 (Doerner Decl.) ¶ 7; Ex. 17 (Larsen Decl.) ¶ 7; Ex. 18 (Tillson Decl.) ¶ 7; Ex. 19 (Topp Decl.) ¶ 8.

[91]    Ex. 13 (Brissey Decl.) ¶ 12; Ex. 14 (Cunningham Decl.) ¶ 12; Ex. 15 (DeCair Decl.) ¶ 11; Ex. 16 (Doerner Decl.) ¶ 11; Ex. 17 (Larsen Decl.) ¶ 11; Ex. 18 (Tillson Decl.) ¶ 11; Ex. 19 (Topp Decl.) ¶ 12; Ex. 24 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386849 (Identifying leaders above "Recruiter.")

[92]    Ex. 3 (DiBenedetto Tr.) 136:17-137:16; Ex. 4 (Doyle Tr.) 238:16-246:4, 255:3-256:8; Ex. 7 (Avery Tr.) 110:6-111:19, 115:6-117:16; Ex. 8 (Camilleri Tr.) 51:21-52:9, 81:2-82:20; Ex. 9 (Rodgers Tr.) 87:11-18; Ex. 11 (Unverferth Tr.) 90:8-93:9; Ex. 13 (Brissey Decl.) ¶ 14; Ex. 14 (Cunningham Decl.) ¶ 14; Ex. 15 (DeCair Decl.) ¶ 13; Ex. 16 (Doerner Decl.) ¶ 13; Ex. 17 (Larsen Decl.) ¶ 13; Ex. 18 (Tillson Decl.) ¶ 13; Ex. 19 (Topp Decl.) ¶ 14; Ex. 91 (Talent Delivery) TEK-Thomas-00000214.

[93]    *Supra* n.92.

[94]    Ex. 47 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156629; Ex. 48 (LA Welcome Packet) TEK-Recruiter_Lit-00539864; Ex. 49 (Sacramento Welcome Packet) TEK-Recruiter_Lit-00107557; Ex. 50 (San Diego Welcome Packet) TEK-Avery-00488750l; Ex. 9 (Rodgers Tr.) 20:5-21.

1   performance, and participate in the hiring and termination of Recruiters.[95] Smaller offices at

2   TEK are headed by Sales Managers, whose jobs are identical to DBOs except that they have to

3   engage in sales activities in addition to DBO duties.[96]

4          The California DBOs report to Northwest and Southwest Regional Vice Presidents

5   ("RVPs") who oversee all offices on the west coast. [97]  RVPs also monitor Recruiters' spread.[98]

6          California offices also have Delivery Managers, whose job is to focus on "delivery

7   strategy; specifically, how to effectively source and present candidates, as well as close business.

8   Delivery Managers work to improve performance with Recruiters and Account Managers."[99]

9   Delivery Managers report to the DBO and Director of Regional Operations.[100] Under Delivery

10  Managers are Recruiter Leads, who are also referred to as Specialization Leads.[101] Recruiter

11  Leads oversee Recruiters "with the priority being onboarding, development, management and

12  success of new recruiters in addition to their own individual performance goals."[102] Finally,

13  corporate officers also monitor the quota compliance and spread attainment of Recruiters.[103]

14         Recruiters are also aligned to at least one Account Manager, whose job is to "provide

15  solutions to [their] clients' business and technology needs and ensure [they] place quality

---

[95]    Ex. 3 (DiBenedetto Tr.) 136:11-137:16; Ex. 4 (Doyle Tr.) 44:2-18, 84:1-14, 91:21-92:2, 108:9-16, 247:12-248:10; Ex. 6 (Haycock Tr.) 131:9-132:3; Ex. 7 (Avery Tr.) 110:4-112:18; Ex. 8 (Camilleri Tr.) 80:20-82:1; Ex. 9 (Rodgers Tr.) 139:1-24.

[96]    Ex. 4 (Doyle Tr.) 45:23-47:1, 48:9, 64:5-65:4.

[97]    Ex. 4 (Doyle Tr.) 50:22-51:15; Ex. 6 (Haycock Tr.) 77:15-78:13, 81:7-8; Ex. 27 (Executive Summary) TEK-Recruiter_Lit-00161739-40.

[98]    Ex. 4 (Doyle Tr.) 104:3-11.

[99]    Ex. 47 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156629; Ex. 48 (LA Welcome Packet) TEK-Recruiter_Lit-00539865; Ex. 49 (Sacramento Welcome Packet) TEK-Recruiter_Lit-00107558; Ex. 50 (San Diego Welcome Packet) TEK-Avery-00488751.

[100]   Ex. 4 (Doyle Tr.) 255:3-256:8 (DROs monitor the Recruiters on a region-wide basis), 275:2-5; Ex. 91 (Talent Delivery) TEK-Thomas-00000214 at 2.

[101]   Ex. 4 (Doyle Tr.) 94:17-20.

[102]   Ex. 47 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156630; Ex. 48 (LA Welcome Packet) TEK-Recruiter_Lit-00539864.

[103]   Ex. 6 (Haycock Tr.) 70:13-71:22; Ex. 27 (Executive Dashboard) TEK-Recruiter_Lit-00161741-65; Ex. 87 (Haycock Jan. 25, 2018 Email) TEK-Recruiter_Lit-00253346.

1  (technical and cultural fit) consultants."[104] Recruiters work in close proximity to their Account

2  Managers, and the Account Managers also regularly monitor Recruiters' work activities.[105]

3      Each office is laid out similarly – Recruiters' desks are located in the "pit," an open

4  office set up with cubicles, with managers' offices surrounding them.[106]  This layout allows

5  managers to monitor Recruiters' phone calls and hours.[107]

6
7  **VIII.  TEK Does Not Pay Overtime and Missed Meal and Rest Break Premiums to Recruiters.**

8      TEK requires its Recruiters to regularly work over eight hours a day and over 40 hours a

9  week.[108] TEK's policies explain that Recruiters are expected to work "45-60 Hours Per Week.

10 The habits you develop early in your career play a pivotal role in determining success. Working

11 long days and weekends are often a necessary part of meeting business goals."[109]

12     TEK requires Recruiters to be in the office or, when remote, online prior to the morning

13 Red Zone meeting.[110] Generally, Recruiters start work before 8:00 a.m.[111] Recruiters generally

14
15
16 104    Ex. 47 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156629; Ex. 50 (San Diego Welcome Packet) TEK-Avery-00488750.

17 105    Ex. 7 (Avery Tr.) 84:12-85:13, 100:5-14; Ex. 9 (Rodgers) 106:15-24, 137:21-138:15; Ex. 13 (Brissey Decl.) ¶ 13; Ex. 14 (Cunningham Decl.) ¶ 13; Ex. 15 (DeCair Decl.) ¶ 12; Ex. 16

18 (Doerner Decl.) ¶ 12; Ex. 17 (Larsen Decl.) ¶ 12; Ex. 18 (Tillson Decl.) ¶ 12; Ex. 19 (Topp Decl.) ¶ 13.

19 106    Ex. 4 (Doyle Tr.) 251:3-252:14, 253:14-17; Ex. 7 (Avery Tr.) 99:8-23; Ex. 8 (Camilleri)

20 77:1-79:6; Ex. 9 (Rodgers Tr.) 110:11-24, 125:16-21, 138:12-15; Ex. 11 (Unverferth Tr.) 96:1-6; Ex. 13 (Brissey Decl.) ¶ 13; Ex. 14 (Cunningham Decl.) ¶ 13; Ex. 15 (DeCair Decl.) ¶ 12; Ex. 16

21 (Doerner Decl.) ¶ 12; Ex. 17 (Larsen Decl.) ¶ 12; Ex. 18 (Tillson Decl.) ¶ 12; Ex. 19 (Topp Decl.) ¶ 13; Ex. 88 (Oakland Welcome Packet) TEK-Recruiter_Lit-00424016.

22 107    Ex. 4 (Doyle Tr.) 252:5-253:17; Ex. 9 (Rodgers Tr.)  110:11-24.

23 108    Ex. 13 (Brissey Decl.) ¶¶ 40, 46; Ex. 14 (Cunningham Decl.) ¶¶ 40, 46; Ex. 15 (DeCair Decl.) ¶¶ 40, 45; Ex. 16 (Doerner Decl.) ¶¶ 39, 44; Ex. 17 (Larsen Decl.) ¶¶ 39, 44; Ex. 18

24 (Tillson Decl.) ¶¶ 39, 45; Ex. 19 (Topp Decl.) ¶¶ 40, 46; *infra* ns. 110-112.

25 109    Ex. 24 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386851.

110    Ex. 7 (Avery Tr.) 161:16-25; Ex. 8 (Camilleri) 42:16-20; Ex. 9 (Rodgers Tr.) 140:3-

26 141:1; Ex. 11 (Unverferth Tr.) 93:16-96:1.

111    Ex. 4 (Doyle Tr.) 238:16-240:5; Ex. 7 (Avery Tr.) 178:18-179:2; Ex. 8 (Camilleri Tr.)

27 42:16-20, 79:11-22, 108:4-8, 109:9-20; Ex. 9 (Rodgers Tr.) 27:13-24, 29:7-18, 53:2-13; Ex. 11 (Unverferth Tr.) 93:16-22.

28

work past 5:00 p.m.[112] TEK also expects Recruiters to respond to manager and potential candidate emails, texts, and calls in the evenings and on the weekends.[113] Recruiters work through lunch either taking consultants and/or job candidates out to lunch or soliciting potential candidates to meet TEK's aggressive quotas.[114] TEK's Connected data reflects that during their tenure, Plaintiff Avery took candidates out for meals 337 times, Plaintiff Camilleri did 142 times, Plaintiff Rodgers did 99 times, and Plaintiff Unverferth did 44 times.[115] Recruiters also do not receive rest breaks of 10 minutes for each four hours they work.[116]

TEK admits it does not pay Recruiters overtime premiums.[117] TEK also does not have a policy or practice of ensuring Recruiters are provided a meal or rest break,[118] and it does not provide Recruiters with any premium for missed meal and rest breaks.[119]

## PROPOSED CLASS DEFINITION

Plaintiffs request that this Court certify the following class asserting California state law claims for (1) failure to pay overtime compensation; (2) meal break violations; (3) rest break

---

[112]     Ex. 7 (Avery Tr.) 163:11-25, 179:1; Ex. 8 (Camilleri Tr.) 107:15-23, 108:20-111:19; Ex. 9 (Rodgers Tr.) 27:13-24, 53:2-13; Ex. 11 (Unverferth Tr.) 93:16-22.

[113]     Ex. 89 ("TEKsystems December 2020 Engagement Survey") TEK-Recruiter_Lit-00161021; Ex. 90 ("RE" Network Engineering Technical Lead Email") TEK-Recruiter_Lit-00516984; Ex. 7 (Avery Tr.) 179:3-12; Ex. 11 (Unverferth Tr.) 121:3-123:13; Ex. 13 (Brissey Decl.) ¶ 27; Ex. 14 (Cunningham Decl.) ¶ 27; Ex. 15 (DeCair Decl.) ¶ 26; Ex. 16 (Doerner Decl.) ¶ 26; Ex. 17 (Larsen Decl.) ¶ 26; Ex. 18 (Tillson Decl.) ¶ 26; Ex. 19 (Topp Decl.) ¶ 27.

[114]     Ex. 7 (Avery Tr.) 80:13-20, 162:5-179:2; Ex. 8 (Camilleri Tr.) 62:22-64:24, 113:2-21; Ex. 9 (Rodgers Tr.) 27:25-28:12, 130:8-21; Ex. 13 (Brissey Decl.) ¶¶ 41, 45; Ex. 14 (Cunningham Decl.) ¶¶ 41, 45; Ex. 15 (DeCair Decl.) ¶¶ 41, 44; Ex. 16 (Doerner Decl.) ¶¶ 40, 43; Ex. 17 (Larsen Decl.) ¶¶ 40, 43; Ex. 18 (Tillson Decl.) ¶¶ 40, 44; Ex. 19 (Topp Decl.) ¶¶ 41, 45; Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097836-38 ("AMs or RLs should Work with Recruiters to develop . . . Smart questions to ask during . . . lunches for current/former employees.").

[115]     Ex. 12 (Major Decl.) ¶¶ 20-23.

[116]     Ex. 9 (Rodgers Tr.) 132:8-20; Ex. 13 (Brissey Decl.) ¶ 43; Ex. 14 (Cunningham Decl.) ¶ 43; Ex. 15 (DeCair Decl.) ¶ 43; Ex. 16 (Doerner Decl.) ¶ 41; Ex. 17 (Larsen Decl.) ¶ 41; Ex. 18 (Tillson Decl.) ¶ 42; Ex. 19 (Topp Decl.) ¶ 43.

[117]     Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) Nos. 4, 8, 11.

[118]     Ex. 4 (Doyle Tr.) 260:18-262:23

[119]     Ex. 4 (Doyle Tr.) 263:2-264:11; Ex. 13 (Brissey Decl.) ¶ 44; Ex. 14 (Cunningham Decl.) ¶ 44; Ex. 16 (Doerner Decl.) ¶ 42; Ex. 17 (Larsen Decl.) ¶ 42; Ex. 18 (Tillson Decl.) ¶ 43; Ex. 19 (Topp Decl.) ¶ 44.

violations; and (4) violations of the California Unfair Competition Law:

> All current and former Recruiters employed by Defendant in California from January 28, 2018 to the final date of judgment.[120]  ("Class").

Plaintiffs also request that this Court certify the following Final Pay subclass:

> All Class Members who worked for Defendant as Recruiters on or after January 28, 2019 and who are no longer employed by Defendant and have not been employed by Defendant for more than 72 hours**.**

As discussed below, class certification under Rule 23 is appropriate because Plaintiffs easily meet the requirements of Rule 23(a) and 23(b)(3) with respect to the narrowly defined Class and Final Pay subclass. Because TEK uniformly classifies all Recruiters as exempt from overtime pay, and Recruiters all perform the same job duties, are evaluated on identical metrics, are subject to the substantially similar levels of supervision, use common tools to perform their work, and are subject to the same uniform policies and procedures, there is no shortage of common proof in this case. The common proof establishes that every factor relevant to the exemption analysis applies equally to all Class Members and the Final Pay subclass, and, as such, certification of the Class under Rule 23 is not only proper, but essential to promote efficiency and avoid a profusion of identical individual lawsuits.

## LEGAL ANALYSIS

## I.    Plaintiffs Meet All of the Rule 23(a) Requirements.

"Rule 23 provides a procedural mechanism for a 'federal court to adjudicate claims of multiple parties at once, instead of in separate suits.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (quoting *Shady Grove Orthopedic Assocs., P.A. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010)). Courts have broad discretion to determine whether to certify a Rule 23 class. *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 129 (N.D. Cal. 2021). "[T]he court must only determine if the plaintiffs have proffered enough evidence to meet the requirements of FRCP 23, not weigh competing evidence." *Chun-Hoon v.*

---

[120]     Excluded from the class are: Recruiting Leads, Recruiter IIs, Recruiting Lead IIs, Specialization Leads, Team Leads – Delivery, VMS Recruiters, Team Leads – Delivery II, Sourcing Specialists – Alt Del, and Specialization Leads II.

*McKee Foods Corp.*, No. 05 Civ. 620, 2006 WL 3093764, at *4 (N.D. Cal. Oct. 31, 2006).

Rule 23(a) requires plaintiffs to establish four prerequisites for a class to be certified: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. All four requirements are met here.

### A.    Plaintiffs Easily Meet the Numerosity Requirement.

A plaintiff will satisfy the numerosity requirement if "the class is so large that joinder of all members is impracticable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "[A]s a general matter, a class greater than forty often satisfies the requirement[.]" *DiMercurio v. Equilon Enter. LLC*, No. 19 Civ. 04029, 2021 WL 3885973, at *6 (N.D. Cal. Aug. 30, 2021) (Corley, J.)) (citation cleaned up). Here, there are over 450 class members and over 200 members in the Fina Payment subclass, so numerosity is easily satisfied.[121]

### B.    There Are Questions and Facts Common to the Class.

Rule 23 requires "questions of law or fact" to be common to the class. Fed. R. Civ. P. 23(a)(2). "Commonality requires that the class members' claims depend on a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Valenzuela v. Best-Line Shades, Inc.*, No. 19 Civ. 07293, 2021 WL 3514101, at *3 (N.D. Cal. Aug. 10, 2021) (Corley, J.) (citation cleaned up). "Rule 23(a)(2) has been construed permissively" such that "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon*, 150 F.3d at 1019. Even a single common question will satisfy Rule 23(a)(2). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Courts have found that "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common

---

[121]    Based on the data produced to Plaintiffs on June 14, 2023, there are approximately 476 exempt Recruiters and 252 Recruiters who fit the Final Pay subclass definition. Ex. 12 (Major Decl.) ¶¶ 32-33.   When TEK removed this matter to federal court, it represented has employed "382 exempt Recruiters in California who satisfy Plaintiffs' proposed class." ECF No. 1 at 7; ECF 1-3 at ¶ 10.

core of salient facts coupled with disparate legal remedies within the class." *Smith v. Cardinal Logs. Mgmt. Corp.*, No. 07 Civ. 2104, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) (citation cleaned up).

At the crux of this case is TEK's common practice of classifying all Recruiters as exempt from overtime and meal and rest break requirements under California law. Where, as here, an employer uniformly classifies employees as exempt, courts often find that the commonality prong is met and certify the class. *See Nelson v. Avon Prods., Inc.*, No. 13 Civ. 02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015) (certifying class of California recruiters alleging they were misclassified as exempt from overtime under the administrative exemption); *see also DeLuca v. Farmers Ins. Exchange*, No. 17 Civ. 00034, 2018 WL 1981393 (N.D. Cal. Feb. 27, 2018) (certifying class of employees alleging violations of California Labor Code based on defendant's misclassification of employees as administratively exempt from overtime).[122]

TEK bears the burden of proof that the exemption is lawful, and the exemption is narrowly construed against TEK under California law. *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 794 (1999). Whether a dispute can be resolved class-wide, the Rule 23 requirements must be viewed in light of the specific issues in dispute. *See Damassia*, 250 F.R.D. at 156 ("Whether [the executive and administrative exemption] are satisfied is the disputed issue and hence forms the backdrop for evaluating whether Rule 23 requirements are met."). Because TEK uniformly classifies Recruiters as exempt, requires them to engage in the same production duties, utilizes the same quotas and metrics to measure Recruiters' productivity, utilizes several

---

[122]     *See also Metrow v. Liberty Mut. Managed Care LLC*, No. 16 Civ. 1133, 2017 WL 4786093 (C.D. Cal. May 1, 2017); *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431 (C.D. Cal. 2014); *Greko v. Diesel U.S.A., Inc.*, 277 F.R.D. 419 (N.D. Cal. 2011); *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586 (E.D. Cal. 2008); *Krzesniak v. Cendant Corp.*, No. 05 Civ. 05156, 2007 WL 1795703 (N.D. Cal. June 20, 2007); *Alba v. Papa John's USA, Inc.*, No. 05 Civ. 7487, 2007 WL 953849 (C.D. Cal. Feb. 7, 2007); *Tierno v. Rite Aid Corp.*, No. 05 Civ. 02520, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006); *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474 (E.D. Cal. Apr. 19, 2006); *Robert Hendricks v. Total Quality Logs., LLC*, No. 10 Civ. 0649, 2023 WL 6217073 (S.D. Ohio Sept. 25, 2023); *Roseman v. Bloomberg L.P.*, No. 14 Civ. 2657, 2017 WL 4217150 (S.D.N.Y. Sept. 21, 2017); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008).

layers of hierarchy that subjects Recruiters to common and significant oversight, requires them to work overtime, and has no policy to ensure Recruiters have a reasonable opportunity to take lawful rest and meal breaks or pay for missed breaks, this case is well positioned to be adjudicated on a class-wide basis. *See Krzesniak*, 2007 WL 1795703, at *8.

### 1. The Applicability of the Administrative Exemption Raises Common Questions of Fact and Law.

In California, if the employee "is *primarily* engaged in the duties that meet the test of the exemption, customarily and regularly exercises discretion and independent judgment in performing those duties, and earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment," an employer may classify the employee as exempt from overtime pay. Lab. Code § 515(a) (emphasis added). The employer must establish each of the following factors regarding the employees' *primary job duty*: "(1) the employee's duties involve 'performance of office or non-manual work directly related to management policies or general business operations,' (2) the employee 'customarily and regularly exercises discretion and independent judgment,' [and] (3) the employee 'performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge.'" *Boyd*, 300 F.R.D. at 437 (quoting 8 Cal. Code Regs., tit. 8, § 11040(1)(A)(2)). To qualify for the exemption, the employer must demonstrate that the employees engage in the exempt duties "more than one-half of the employee's work time." Lab. Code § 515(e).[123]

Each of the administrative exemption factors will rise or fall on TEK's policies and practices and its uniform job expectations for Recruiters. As such, class treatment of the Recruiters' claims is proper.

---

[123]    California law incorporates federal regulations that were in effect at the time the Wage Order was enacted. Cal. Code Regs. tit., 8, § 11040(1)(A)(2)(f) ("The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Section 541.201-205, 541.207-208, 541.210, and 541.215.").

### a. Whether Recruiter Duties Are Generally Related to "Management Policies or General Business Operations" Is Subject to Common Proof.

Recruiters are frontline workers who do not engage in business that is "directly" related to TEK's management or business operations. *See Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 873 (C.D. Cal. 2012); SOF § III. Under California law, work qualifies as "directly related" to management if it is: qualitatively and quantitatively administrative. *Harris v. Superior Ct.*, 53 Cal. 4th 170, 181–82 (2011). "[O]nly duties performed at the level *of policy* or *general* operations is qualitatively administrative" because the employees' primary duty must be in "'running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business' affairs." *Harris v. Superior Ct.*, 144 Cal. Rptr. 3d 289, 297 (Ct. App. 2012) (unpublished). Work is quantitatively administrative where it is "of substantial importance to the management or operations of the business." *Harris*, 53 Cal. 4th at 181–82.

Wage Order 4-2001 incorporates 29 C.F.R. § 541.205 (2000), which provides guidance on the "directly related" prong of the administrative exemption. *Rieve*, 870 F. Supp. at 872. Section 541.205(a) explicitly distinguishes "activities relating to the administrative operations of a business" from "production" or "sales" work. 29 C.F.R. § 541.205(a) (2000). "In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." *Id.* Courts have defined "substantial important" to mean that "the employee's value directly flows 'to the management or operation of the business.'" *Rieve*, 870 F. Supp. 2d at 872-73 ("Such language indicates that the employee in question must hold a supervisory position instead of serving on the front lines of the business.").

An employees' work is production and not administrative where the job is "related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself." *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 851, 855 (9th Cir. 2017) ("the question is not whether an employee is essential to the business, but rather whether her primary duty goes to the heart of internal administration—rather

than marketplace offerings.") (citation cleaned up); *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) (work related to the goods and services which constitute the business' marketplace offerings does not qualify as administrative work subject to the exemption).[124] Whether Recruiters serve TEK's business purpose is well suited for class treatment because the key issue is the nature of its business. *Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 6 (1st Cir. 2023) (necessary to the exemption analysis is to identify "the business purpose of the employer").

Here, common evidence will establish that TEK's business purpose is to recruit IT employees and Recruiters work on the frontlines executing that purpose. SOF § III. TEK's policies and corporate testimony, as well as the testimony of Named Plaintiffs and declarants, all demonstrate that Recruiters execute TEK's market offering of recruitment services. *Id.* TEK requires all Recruiters to meet weekly production metrics, reflecting that production is their most important job duty. *Id.* § IV. Further, TEK consistently refers to Recruiters as "producers," which reflects that TEK views Recruiters as production employees and not administrators. *Id.* § III. However, the Court need not decide whether class members are administrative workers or production/sales workers. Rather, the Court must only determine if there is common evidence that would support Plaintiffs' contention that they performed the business's "principal production activity." *Walsh* 64 F.4th at 6; *Nelson*, 2015 WL 1778326, at *6. That standard is met here.

Because Recruiters are production employees, their primary job duties do not include "servicing" the company at a high level by "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research," as required by Section 541.205(b) to be classified as exempt. 29 C.F.R. § 541.205(b) (2000). Similarly, Section 541.205(c) specifies that "[e]mployees whose work is 'directly related' to management policies or to general business operations include those work affects policy or whose responsibility it is to execute or carry it out." 29 C.F.R. § 541.205(c) (2000). The Ninth Circuit has distinguished work

---

[124] "Employees engaged in an activity that constitutes the company's primary purpose are likely production workers." *Eicher v. Adv. Bus. Integrators, Inc.*, 151 Cal.App.4th 1363, 1372-73 (2007) (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991)); *see also Walsh*, 64 F.4th at 7.

that is directly related to management policies or general business operations from those who execute the business purpose of a company. *Metrow*, 2017 WL 4786093, at *11.

*Nelson v. Avon Prod., Inc.*, is particularly instructive. In *Nelson*, the court granted class certification in an overtime case brought on behalf of District Sales Managers, whose job was "recruiting Representatives to sell Avon products." 2015 WL 1778326, at *1. The *Nelson* court found Plaintiffs met the commonality requirement where defendant did not argue that some employees engaged in work directly related to management and others did not. *Id.* at *6 (rejecting defendant's argument that certification is defeated if there are differences in the amount of time employees spend on tasks because the overarching issue is whether the nature of the work is directly related to management and general operations).

Here, it is uncontroverted that Recruiters uniformly do not create or implement management or general business operation policies for TEK or its clients. SOF § III. They are not even included in communications regarding TEK's internal business practices. *Supra* n.52. Recruiters also have virtually no contact with TEK's clients. SOF § III. This common question is sufficient for the Court to certify the Class. *Metrow*, 2017 WL 4786093, at *10 (because the exemptions use conjunctive tests, class certification is proper if the court finds that one of the prongs is susceptible to common proof); *Pole v. Estenson Logistics*, LLC, 2016 WL 4238635, at *7 (C.D. Cal. Aug. 10, 2016) (same).

### b. Whether Recruiters Routinely Exercise "Discretion and Independent Judgment" on Matters of Significance is Subject to Common Proof.

Recruiters do not make hiring or termination decisions; in fact, they are two layers removed from such decisions. *Supra* ns.43, 51. Rather, they rely on TEK's client's requisition forms that are communicated to them through Account Managers to match the job requirements with candidates' job experiences. *Supra* ns. 20-22. Account Managers decide which candidates are submitted to the clients and the clients determine which candidates to interview and hire. As such, Recruiters do not customarily exercise discretion and independent judgement. Cal. Code

Regs. tit. 8, § 11040(1)(A)(2)(b).

The exercise of discretion and independent judgment "implies that the person *has the authority or power to make an independent choice*, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207(a) (2000) (emphasis added). Thus, if an employee's job duties involve "applying techniques, procedures, or specific standards" or "making decisions relating to matters of little consequence," the exemption does not apply. 29 C.F.R. § 541.207(b). Courts have held that employees that are required to adhere to corporate guidelines or procedures with minimal deviation do not qualify for the exemption. *See, e.g.*, *Metrow*, 2017 WL 4786093, at *13-14; *see also* 29 C.F.R.207(c)(1) ("An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow…is not exercising discretion and independent judgment").

Directly on point, Section 541.207(c)(5) explains:

Another type of situation where skill in the application of techniques and procedures is sometimes confused with discretion and independent judgment is the "screening" of applicants by a personnel clerk. Typically such an employee will interview applicants and obtain from them data regarding their qualifications and fitness for employment. These data may be entered on a form specially prepared for the purpose. The "screening" operation consists of rejecting all applicants who do not meet standards for the particular job or for employment by the company. The standards are usually set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials. It seems clear that such a personnel clerk does not exercise discretion and independent judgment as required by the regulations in Subpart A of this part.

29 C.F.R. § 541.207(c)(5).

Here, Recruiters are akin to the personnel clerks described in Section 541.207(c)(5). TEK's corporate documents and witnesses refer to Recruiters' primary job duties as "screening" candidates. SOF § III. Recruiters spend the vast majority of their time screening for candidates that match the minimum qualifications set forth in the job requisitions. TEK's own data shows that attempted calls, intake calls, and other calls accounted for 70% of Recruiters activities. Recruiters screen candidates using standardized recruiting tools, such as TEK's internal databases, and only screen out candidates who do not match the minimum requirements provided

to them. *Id.* Recruiters send any potential "matches" to Account Managers, who then decide which candidates to present to TEK's clients. *Id.* Recruiters do not have the authority to decide which candidates are sent to TEK's clients, nor can Recruiters override an Account Manager's decision not to send a particular candidate to a client. *Id.* Both Recruiters and TEK's corporate officers also testified that Account Managers, and not Recruiters, have the authority to determine which candidates will be presented to TEK's clients. *Id.* TEK's own Connected data supports Plaintiffs' contention that Recruiters spent most of their time searching databases for and contacting candidates. The Connected data shows that more than 70% of Plaintiffs activities are: (1) Attempted Contact; (2) G2 (Intake Call); and (3) Call.[125]

Further, all Recruiters were subject to uniform training where they are taught to utilize the same corporate policies and procedures to carry out their duties. For instance, all Recruiters were expected to perform G2s as part of the screening process. SOF § III. TEK monitors how Recruiters perform their screening duties on a weekly basis. *Id.* § IV. Thus, Recruiters do not have discretion to decide how to carry out their sourcing duties because they must meet certain quotas each week to avoid discipline or termination. *See Alba*, 2007 WL 953849, at *11 (certifying class of store managers who were required to ensure the employer's labor goals were met on a weekly basis).

Because Plaintiffs have pointed to ample common evidence that will determine whether Recruiters routinely exercise discretion and independent judgment as to matters of significance, the commonality prong is satisfied.

### c.   Whether Recruiters Perform Work Under Only General Supervision Is Subject to Common Proof.

Recruiters perform work under the close supervision of multiple levels of managers. In California, to be exempt from overtime under the third prong of the administrative test, an

---

[125]     Ex. 12 (Major Decl.) ¶   The Connected data also shows the activities that Plaintiffs performed the least. Internal Interviews (which are initial in-person meetings with candidate) constitute only 2.26% of Plaintiffs' activities, Submittals 1.31%, Service Touchpoints 1.28%, Interviewing 0.83%, and Started 0.16%.

employee must "work[] 'under only general supervision' while either: (1) performing work along specialized or technical lines requiring special training, experience, or knowledge, or (2) executing special assignments and tasks." *Federico v. Overland Contracting, Inc.*, No. 12 Civ. 2588, 2013 WL 5516187, at *16 (N.D. Cal. Oct. 4, 2013) (citing *Campbell*, 642 F.3d at 830-31).

Common evidence shows that Recruiters are subject to much more than "general supervision." As TEK's corporate officers have testified and organizational charts show, Recruiters are unified under the TEK's "talent delivery" team that operates under a standardized hierarchy where Recruiters are at the bottom. *See Tierno*, 2006 WL 2535056, at *5 (recognizing that a standardized hierarchy often shows similar levels of supervision across employees). Recruiters are supervised by Recruiter Leads, Account Managers, Delivery Managers, and DBOs. SOF § VII. Recruiters all sit in an open office space known as the "pit" surrounded by managerial employees' offices, who monitor Recruiters' work. *Id.* Common evidence also demonstrates that TEK requires all Recruiters to attend daily Red Zone meetings run by managers, at which Recruiters are expected to report the status of their work to their managers. TEK also subjects all Recruiters to the same quotas, and TEK monitors Recruiters compliance with these quotas through computer-generated weekly WIN Reports. *Id.* § IV; *see Nelson*, 2015 WL 1778326, at *7 (question of whether recruiters were subjected to more than general supervision could be answered on a class-wide basis where supervisors monitored key performance indicators of all class members). Further, all Recruiters are evaluated using a standardized performance evaluation form. *See Metrow*, 2017 WL 4786093, at *13 (common evidence including standardized hierarchy of supervision, uniform tracking metrics, and uniform performance evaluation criteria and forms was sufficient to raise common questions regarding the "general supervision" prong of the administrative exemption). Thus, whether Recruiters were subject to more than generalized supervision can be answered through common proof.

Finally, common evidence demonstrates that Recruiters do not perform "work along specialized or technical lines requiring special training, experience, or knowledge, or (2) executing special assignments and tasks." *See, e.g., Fogh v. Los Angeles Film Sch.*, No.

B230920, 2012 WL 6604709, at *6 (Cal. Ct. App. Dec. 18, 2012) (unpublished).

**2.    Plaintiffs' Claims Raise Common Questions.**

In addressing the propriety of TEK's classification of Recruiters, the Court will need to address four primary common questions: (1) What is TEK's business purpose; (2) Whether Recruiters' primary job duty relates to management policies or general business operations; (3) Whether Recruiters customarily and regularly exercise discretion and independent judgment in executing their primary duties; and (4) Whether Recruiters work only under general supervision. *See Nelson*, 2015 WL 1778326, at *4, *6-*7 (finding these common questions and common contentions supported class certification in a recruiter misclassification case).  For the reasons set forth *supra*, these common questions will all be resolved based on common evidence.

**C.    Plaintiffs' Claims Are Typical of the Class's Claims.**

"[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020 (citation omitted). The typicality inquiry focuses on "whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Humes v. First Student, Inc.*, 758 F. App'x 593, 596 (9th Cir. 2019) (citation cleaned up); *Wixon v. Wyndham Resort Dev. Corp.*, No. 07 Civ. 02361, 2009 WL 3353445, at *3 (N.D. Cal. Oct. 19, 2009) (typicality should focus on defendant's conduct). "Typicality is a permissive standard, and only requires that the named plaintiffs' claims are 'reasonably coextensive' with those of the class." *Dalton v. Lee Pub., Inc.*, 270 F.R.D. 555, 560 (S.D. Cal. 2010). "Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Smith v. Cardinal Logs. Mgmt. Corp.*, No. 07 Civ. 2104, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008).

Here Plaintiffs' claims are typical of the claims of the class because they all arise out of TEK's uniform conduct toward Plaintiffs and the class – namely, TEK's misclassification of

Recruiters.  Plaintiffs and the class all worked for TEK as Recruiters, and all performed the same job duties under substantially similar levels of supervision such that their claims can be resolved using common evidence. Thus, Plaintiffs' claims are not merely reasonably coextensive with those of absent class members, they are substantially identical to them. *See e.g.*, *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 605 (S.D. Cal. 2010) (noting that "[t]he injuries alleged – a denial of various benefits – and the alleged source of those injuries – a sinister classification by an employer attempting to evade its obligations under labor laws – are the same for all members of the putative class" and "[t]he typicality requirement is therefore satisfied").

### D.     Plaintiffs Will Adequately Protect the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy has two elements: (1) that the proposed representatives do not have conflicts of interest with the proposed class, and (2) Plaintiffs are represented by qualified and competent counsel. *See, e.g.*, *Hanlon*, 150 F.3d at 1020. The law governing adequacy is well-settled that "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." 7A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure, § 1768 (3d ed. 1986).

Here, both elements are met. First, there is no conflict between the Named Plaintiffs and members of the class. The Named Plaintiffs are pursuing the same claims as the class and are subject to the same exemption defenses. Further, the Named Plaintiffs have protected the class's interests by actively participating in discovery, including sitting for day-long depositions, and will continue to vigorously prosecute the case. *See DiMercurio*, 2021 WL 3885973, at *8 (Corley, J.) (involvement in the suit, including sitting for depositions suggests that named plaintiffs will vigorously prosecute the case); Abrahamson Decl. ¶¶ 22-24/

Second, Plaintiffs' counsel meets the adequacy requirement of Rule 23(a). Plaintiffs' counsel includes Werman Salas P.C., Lichten & Liss-Riordan, P.C., and Olivier & Schreiber LLP, three nationally recognized firms with robust wage and hour class action practices. *See* Abrahamson Decl. ¶¶ 1-18 (outlining Werman Salas's credentials); Schalman-Bergen Decl. ¶¶ 1-

13 (outlining Lichten & Liss-Riordan's credentials); Bien Decl. ¶¶ 1-8 (outlining Olivier & Schreiber's credentials).

## II.    Plaintiffs Meet All of the Rule 23(b) Requirements

Rule 23(b)(3) authorizes class certification where (1) questions of law or fact common to the class predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Both factors are met here, rendering class certification appropriate.

### A.    Common Questions Regarding Recruiters' Exempt Status Predominate Over Any Individualized Issues.

The existence of "uniform corporate policies," like classifying all Recruiters as exempt from overtime, "will often bear heavily on questions of predominance and superiority," and "courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes." *See In re Wells Fargo Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). Here, TEK classifies all Recruiters as exempt, TEK documents, like the job description, uniformly describe Recruiters' job duties, and TEK requires all Recruiters to meet the same production quotas subject to a common supervision structure. As such, TEK acknowledges Recruiters commonly perform the same primary job duties. *See id.* at 957 ("An internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees. This undercuts later arguments that the employees are too diverse for uniform treatment."); *see also Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013).

"Rule 23(b)(3) … does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof." *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 469 (2013) (citation cleaned up); *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016). Rather, Rule 23(b)(3) requires "questions of law or fact common to class members predominate over any questions affecting only individual members."

1    Fed. R. Civ. P. 23(b)(3). Plaintiffs need only demonstrate that "common questions present a

2    significant aspect of the case and they can be resolved for all members of the class in a single

3    adjudication." *Hanlon,* 150 F.3d at 1022.

4         When the administrative exemption is at issue, a plaintiff satisfies the predominance

5    requirement by showing that the defendant's failure to meet just one of the elements of the

6    exemption is susceptible to common proof. *Metrow,* 2017 WL 4786093, at *10; *Dobrosky v.*

7    *Arthur J. Gallagher Serv. Co., LLC,* No. 13 Civ. 0646 (C.D. Cal. July 30, 2014) 2014 WL

8    10988092, at *12*. Here, as discussed *supra*, Plaintiffs will defeat each administrative exemption

9    prong by relying on common evidence. While TEK will undoubtably point to minor differences

10   in Recruiters' execution of their job duties, any differences are insignificant compared to the

11   Recruiters' common primary duty and will not defeat predominance. *Roseman*, 2017 WL

12   4217150, at *7 (when all class members perform the same primary job duty, differences in how

13   they perform their primary duty or in the auxiliary duties they perform will not defeat

14   predominance); *Nelson,* 2015 WL 1778326, at *9 (finding that although "individual differences

15   exist among the named Plaintiffs and absent class – as they would in any case in which hundreds

16   of employees engage in the same job – the issues common to the class members predominate

17   over those differences."); *Tierno,* 2006 WL 2535056.

18        The common proof evidencing Recruiters' job duties, coupled with TEK's universal

19   classification, quotas, and job description, demonstrates that issues common to the class

20   predominate over minor differences among class members. *Metrow,* 2017 WL 4786093, at *10

21   (finding that class members were expected to perform substantially similar tasks in light of

22   evidence that class members shared the same job description, had the same number of case and

23   billable hour goals, and where the defendant's billing data showed class members spent 71% of

24   their time on the same five tasks).

25        **B.    Common Questions of Law and Fact Predominate Over Plaintiffs' Meal and
             Rest Break Claims.**

26

27        Plaintiffs' remaining claims flow from TEK's uniform misclassification of Recruiters and

28

1   can also be resolved on a class-wide basis. *DeLuca*, 2018 WL 1981393, at *11 (identifying

2   Plaintiffs' remaining claims as derivative that "turn on the viability of Defendants' administrative

3   exemption defense to Plaintiffs' overtime claims [and] because the Court has concluded that the

4   overtime claims meet the commonality and predominance requirements of Rule 23, the

5   derivative state law claims meet these requirements as well."). Section 512 of the California

6   Labor Code requires employers to provide non-exempt employees with a 30-minute meal break

7   for any shift spanning over five hours, and two 30-minute meal breaks for shifts exceeding ten

8   hours. *See* Lab. Code § 512; Cal. Code Regs. tit. 8, § 11040(11). California law requires every

9   employer to "authorize and permit all employees to take rest periods, which insofar as

10  practicable shall be in the middle of each work period." Cal Lab. Code § 226.7(c); Cal. Code

11  Regs. tit. 8, § 11040(12)(A). TEK has no policy or practice of providing meal and rest breaks to

12  Recruiters. SOF § VIII. TEK regularly deprives Recruiters of meal and rest breaks, and TEK

13  uniformly fails to pay them any premiums for the missed meal and rest breaks in violation of

14  Lab. Code §§ 226.7, 512. *Id.* TEK instructs Recruiters to take candidates out for lunch, depriving

15  them of a meal break free from job obligations. *Id.*[126] Further, TEK's aggressive quotas and

16  intense monitoring of spread requires Recruiters to work through lunch and not take any breaks

17  during the day.  *Id.*

18       Meal and rest break claims are well suited for class-wide treatment because an "employer

19  may be held liable under state law upon a determination that [its] uniform on-duty meal break

20  policy [is] unlawful." *Abdullah*, 731 F.3d at 963 (citation cleaned up). Under California law,

21  employers have an obligation to maintain a meal and rest break policy that relieves employees of

22  their job duties. *See Boyd*, 300 F.R.D. 431, 441 (C.D. Cal. 2014) (citing *Brinker Rest. Corp. v.*

23  *Sup. Ct.*, 53 Cal.4th 1004, 1017 (2012)). This requirement lends itself to common questions that

24  will be addressed on a class-wide basis: whether TEK has a class-wide policy or practice to

---

[126]       In fact, TEK's data shows Plaintiff Avery recorded 337 meals with candidates, Plaintiff Camilleri recorded 142 meals with candidates, Plaintiff Rodgers recorded 99 meals with candidates, and Plaintiff Unverferth recorded 44 meals with candidates. Ex. 12 (Major Decl.) ¶¶ 20-23.

relieve Recruiters of all duties. "A negative answer to any of these questions would mean that the employer failed to meet its affirmative obligation to provide—but not police—meal periods and rest breaks." *Boyd*, 300 F.R.D. at 441 (citing *Brinker Rest. Corp.*, 53 Cal.4th at 1017); *see also Valenzuela* 2021 WL 3514101, at *6.

### C.    Common Questions of Law and Fact Predominate Over Plaintiffs' Final Pay Penalties.

Because TEK failed to pay Recruiters overtime and missed meal and rest break premiums, it did not comply with Labor Code §§ 201-202's timely pay requirements for Recruiters who left its employment. Lab. Code § 203. Whether TEK's conduct violated the law and was willful is also a common question the predominates. *Boyd*, 300 F.R.D. at 442 ("questions such as willfulness will likely rise and fall based on common evidence"); *Valenzuela*, 2021 WL 3514101, at *5 (waiting time claim was subject to common proof where defendant admitted in its discovery responses that it failed to pay all non-exempt employees for work performed over an approximately two-week period).[127]

### D.    Defendant's Anticipated Arguments Do Not Defeat Predominance

Defendant will likely rely on *DeLodder v. Aerotek, Inc.*, No. 08 Civ. 06044, 2010 WL 11506881, at *1 (C.D. Cal. Aug. 16, 2010), *aff'd*, 471 F. App'x 804 (9th Cir. 2012) in support of its opposition. *DeLodder* declined to certify a class of recruiters who alleged their employer, Aerotek, misclassified them. *Id.*

However, *DeLodder* is distinguishable in several fundamental ways. Aerotek provides "technical, professional and industrial recruiting services" for a wide swath of industries ranging from aviation to commercial work. *Id.* at *2. Its recruiters are organized into divisions that correspond with the fields they service, and they place varying types of employees. *Id.* at *2–3. For instance, in *DeLodder*, one named plaintiff worked in "a subunit of the Scientific Division" and "recruited scientific professionals," whereas another worked "in the Commercial Division"

---

[127]    The UCL claim is derivative of the other claims. *Gregory v. Albertson's, Inc.*, 128 Cal. Rptr. 2d 389, 392 (Cal. Ct. App. 2002).

1    and "recruited manual laborers" such as "people who dig ditches." *Id.* at \*2. Still, the *DeLodder*

2    plaintiffs moved to certify a class including *all* Aerotek recruiters, regardless of the types of

3    candidates they screened. *Id.*

4         The district court denied the motion because of the distinctions among Aerotek's

5    recruiters. *Id.* at \*13. It noted the level of discretion recruiters exercised differed depending on

6    (1) the division in which they were employed and (2) the types of candidates they recruited. *Id.*

7    For example, recruiters in "non-technical divisions usually had short and formulaic interviews"

8    with job candidates, whereas those in "technical divisions usually had longer and more open-

9    ended interviews that depended more heavily on the Recruiter's discretion in steering the

10   conversation." *Id.* The "diversity" in the *DeLodder* class prevented certification. *Id.* at \*14.

11        There is no diversity in Plaintiffs' class. Plaintiffs narrowly tailored their class definition

12   to include only one type of Recruiter. And unlike in *DeLodder*, Recruiters here only screen IT

13   candidates working in the technology field. Because of this, the population TEK recruits is

14   streamlined, the tasks Recruiters perform are uniform, and the level of discretion Recruiters

15   exercise does not vary from person-to-person.

16        Additionally, the *DeLodder* decision issued before the California Supreme Court issued

17   *Harris v. Superior Ct.*, 53 Cal. 4th 170 (2011). In *Harris*, the California Supreme Court made

18   clear that in determining whether an administrative exempt classification is proper, a court must

19   examine all subparts of 29 C.F.R. § 541.205 (2000). 53 Cal. 4th 170, 188. The *DeLodder* court

20   did not analyze that regulation or whether recruiters were production employees.[128] Here, if the

21   Court finds that a determination can be made on a class-wide basis regarding whether Recruiters

22   are production employees, it would not matter if the Court finds disparity in the level of

23   discretion that Recruiters have (although Recruiters uniformly do not exercise discretion and

24   independent judgment). *See Su v. F.W. Webb Co.*, No. 20 Civ. 11450, 2023 WL 4043771, at \*9

25

26   ───────────────
     [128]    On appeal the Ninth Circuit similarly did not apply the *Harris* decision or engage in an
27   analysis of 29 C.F.R. § 541.205 and whether those requirements could be addressed on a class-
     wide basis. *DeLodder v. Aerotek Inc.*, 471 F. App'x 804, 807 (9th Cir. 2012).

28

(D. Mass. June 16, 2023) (noting that exercising discretion and judgment does not transform a sales or production employee into an administrator); *Robert Hendricks*, 2023 WL 6217073, at *5 ("it does not matter what level of discretion and independent judgment [employees] exercised as part of their primary duty if their primary duty is not directly related to TQL's management or general business operations"). However, as explained herein, Recruiters did not customarily and regularly exercise discretion and independent judgment.

TEK may also incorrectly argue that class certification is improper because the amount of overtime Recruiters work varied. However, in the Ninth Circuit "damages calculations alone cannot defeat certification. We have said that '[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (citation omitted). The need for individualized damages calculations does not obstruct the predominance requirement from being met so long as plaintiffs can establish that damages resulted from the defendant's conduct. *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016). "In a wage and hour case, … , the employer-defendant's actions *necessarily* caused the class members' injury." *Id.* "Defendants either paid or did not pay their [employees] for work performed." *Id.* "No other factor could have contributed to the alleged injury." *Id.* "Therefore, even if the measure of damages proposed here is imperfect, it cannot be disputed that the damages (if any are proved) stemmed from *Defendants'* actions." *Id*. The Ninth Circuit has recognized that nearly all wage and hour class actions require individual damages determinations so any rule that the need for individual damages assessments defeats the predominance requirement would effectively be the "death knell" for wage and hour class actions, thus, the amount of damages owed to each worker does not prevent certification of a class. *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013) (citing *Brinker Rest. Corp.*, 53 Cal.4th 1004).

### E.     A Class Resolution is Superior.

Class treatment is superior "whenever the actual interests of the parties can be served best

by settling their differences in a single action." *Hanlon*, 150 F.3d at 1022 (quotations omitted). The superiority requirement will be met "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valenzuela*, 2021 WL 3514101, at *6 (citation omitted). In evaluating superiority, courts consider: (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). The superiority requirement is designed to ensure the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all." *Amchem Prods., Inc. v. Windsor*, 512 U.S. 591, 617 (1997).

The superiority prong is met here because a class action will "serve to streamline time, effort, and expense." *DiMercurio*, 2021 WL 3885973, at *11 (citation cleaned up). "Litigation by class action has long been recognized as a superior method of resolving wage and hour claims in California." *DeLuca*, 2018 WL 1981393, at *12. A class action is more manageable than individual actions because all of Plaintiffs' claims turn on TEK's uniform policy of classifying Recruiters as exempt from overtime, and common evidence will be utilized to determine whether TEK's classification was improper. *See id.* at *13 (explaining that "The Ninth Circuit has recognized that class treatment is proper when there is a single significant issue of law or fact that is common to the class" in cases involving uniform exemption policy). Common questions and evidence will predominate and that there might be some individualization of damages calculations does not render a class action unmanageable. *See Tierno*, 2006 WL 2535056, at *11 (N.D. Cal. Aug. 31, 2006) ("[C]ourts in overtime cases such as this may properly couple uniform findings on common issues regarding the proper classification of the position at issue with innovative procedural tools that can efficiently resolve individual questions regarding eligibility and damages.") (citing *Sav-On Drug Stores v. Sup. Ct.*, 34 Cal.4th 319 (2004)).

There have been no indications that members of the class have a strong desire to pursue

their claims on an individual basis. *See DeLuca*, 2018 WL 1981393, at \*12 (absence of signs that class members had strong desire to pursue claims on their own weighed in favor of concluding class action was superior method of litigation). Where, as is the case here, the proposed class includes current employees, a class action is also superior because it allows employees to pursue their claims without fear of retaliation); *Nelson*, 2015 WL 1778326, at \*10.

### F.    The Court Should Appoint Plaintiffs' Lawyers as Class Counsel

If a class is certified, the Court must appoint class counsel. Fed. R. Civ. P. 23(g)(1). In appointing class counsel, courts must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigations, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1).

Plaintiffs' lawyers have been involved in this case since its inception and have performed extensive work bringing the claims forward. Abrahamson Decl. ¶ 19. To date, Plaintiffs' lawyers have attended seven depositions and actively participated in the exchange of over 450,000 pages of documents related to this case. *Id.* ¶ 20. As set forth in greater detail in the declarations of Plaintiffs' Counsel, all three of the law firms representing Plaintiffs are nationally recognized for wage and hour class action litigation and have experience litigating factually similar class actions involving Labor Code claims. *Supra*. Plaintiffs' lawyers have expended significant resources to litigate this case and will continue to do so. *Id.* ¶ 21. Plaintiffs' lawyers are particularly well suited to be appointed Class Counsel.

### <u>CONCLUSION</u>

The Court should certify the class of over 450 Recruiters, the Final Pay subclass of over 200 Recruiters, and appoint Plaintiffs and their counsel to represent the class, so that it can adjudicate in one action the lawfulness of TEK's policy of misclassifying Recruiters as exempt from overtime under California law.

Dated: October 6, 2023                    Respectfully submitted,

                                          /s/ Sally J. Abrahamson
                                          _____
                                          Sally J. Abrahamson (admitted *pro hac vice*)
                                          WERMAN SALAS P.C.
                                          335 18th Place NE
                                          Washington, D.C. 20002
                                          Tel: (202) 830-2016
                                          Email: sabrahamson@flsalaw.com

                                          Maureen A. Salas (admitted *pro hac vice*)
                                          WERMAN SALAS P.C.
                                          77 W. Washington St., Suite 1402
                                          Chicago, IL 60602
                                          Tel: (312) 487-5221
                                          Email: msalas@flsalaw.com

                                          Sarah Schalman-Bergen (*pro hac vice* pending)
                                          Krysten Connon (admitted *pro hac vice*)
                                          LICHTEN & LISS-RIORDAN, P.C.
                                          729 Boylston St., Suite 2000
                                          Boston, MA 02116
                                          Tel: 617-994-5830
                                          Email: ssb@llrlaw.com
                                          Email: kconnon@llrlaw.com

                                          Rachel Bien (SBN 315886)
                                          OLIVIER & SCHREIBER LLP
                                          595 E. Colorado Blvd., Suite 418
                                          Pasadena, CA 91101
                                          Tel: (213) 325-3430
                                          Email: rachel@os-legal.com

                                          *Attorneys for Plaintiffs*