SEYFARTH SHAW LLP
Brian P. Long (SBN 232746)
bplong@seyfarth.com
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017-5793
Telephone:     (213) 270-9600
Facsimile:     (213) 270-9601

Andrew L. Scroggins
(admission pro hac vice)
ascroggins@seyfarth.com
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:     (312) 460-5000
Facsimile:     (312) 460-7000

Attorneys for Defendant
TEKSYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BO AVERY, PHOEBE RODGERS, KRISTY CAMILLERI, AND JILL UNVERFERTH, individually, on behalf of themselves and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>TEKSYSTEMS, INC.,<br><br>          Defendant. | Case No. 3:22-cv-02733-JSC<br><br><u>CLASS ACTION</u><br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:     December 21, 2023<br>Time:     10:00 a.m.<br>Ctrm.:     8 – 19th Floor<br><br>Judge: Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.     RELEVANT FACTS ................................................................................................ 2

    A.      TEK's Business and the Role of the Putative Class Members ........................... 2

    B.      The Named Plaintiffs And Their Declarants Worked For Limited Periods Of Time And Their Training Duration Was Not Typical .................................. 3

    C.      TEK's Recruiter Declarants Span The Entire Relevant Period, Specialize In Different Areas, And Exercise Discretion In The Performance Of Their Job Duties .................................................................................................... 4

    D.      TEK's Reasonable Performance Expectations ................................................... 7

    E.      The Extent Discretion and Judgment Varies From Recruiter to Recruiter ...................... 9

        1.      Factors influencing the use of independent judgment and discretion vary ............ 9

            a.      Identifying and sourcing candidates ................................. 9

            b.      Recruiters do not uniformly use screening tools and checklists to determine how to perform each of their job duties ................................... 11

            c.      Engagement with customers varies ............................................. 14

            d.      Negotiation with candidates varies ............................................. 16

            e.      The engagement with candidates varies ................................... 17

            f.      Account Manager acceptance of Recruiter recommendations varies ....... 18

            g.      Training varies ........................................................................ 19

            h.      The industry recruiters focus on ................................................ 20

    F.      Supervision Varies From Recruiter to Recruiter ............................................. 21

    G.      Recorded Recruiter Activities Do Not Capture The Amount Of Time Spent On A Particular Task Or Whether The Recruiter Is Exercising Discretion And Judgment ....... 21

III.    LEGAL Argument ................................................................................................. 22

    A.      The Elements Of The Administrative Exemption Under California Law ...................... 22

    B.      Whether Recruiters Perform Work That Is "Directly Related" To The Management Policies Or General Business Operations Is Not A Certifiable Question ....................... 23

        1.      Employees need not set policy to meet the administrative exemption ................. 24

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 22-cv-02733-jsc

2.    Harris recognized the limitations of the administrative/production dichotomy ............................................................................ 25

B.    Common Questions Are Not Subject To Common Proof Because The Exemption Analysis Requires An Inquiry Into The Job Performance Of Recruiters ....................... 28

1.    Determining whether each Recruiter is exempt requires a week-by-week assessment of whether the worker was "primarily engaged" in exempt work .............................................................................. 28

2.    Classifying Recruiters as exempt fails to raise a common question ................... 31

C.    Individualized Issues Exist as to Whether Recruiters Customarily and Regularly Exercise Discretion and Judgment ........................................................ 32

1.    The use of screening and sourcing tools and checklists does not eliminate Recruiters' use of independent judgment and discretion ..................................... 34

2.    Reporting to supervisors does not eliminate the exercise of discretion and independent judgment ........................................................................ 36

3.    Whether Recruiters meet TEK's reasonable expectations raises individualized issues ........................................................................ 38

4.    Plaintiffs' seven form declarations have limited evidentiary value ..................... 38

D.    Adjudicating Plaintiffs' Claims On A Class Basis Would Not be Manageable .............. 39

IV.    CONCLUSION ............................................................................................. 40

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 22-cv-02733-jsc

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Andrade v. Aerotek,*
2010 U.S. Dist. LEXIS 117754 (D. Md. November 5, 2010) ..........................................................27

5

6

*Arredondo v. Delano Farms Co.,*
301 F.R.D. 493 (E.D. Cal. 2014) ..........................................................39

7

*Barker v. U.S. Bancorp.,*
2017 WL 2620676 (S.D. Cal. 2017) ..........................................................31

8

9

*Bothell v. Phase Metric, Inc.,*
299 F.3d 1120 (9th Cir. 2002) ..........................................................25

10

*Bucklin v. Am. Zurich Ins. Co.,*
2013 WL 3147019 (C.D. Cal. June 19, 2013), *aff'd* 619 F. App'x 574 (9th Cir. 2015) ...............35, 36

11

12

*Casida v. Sears Holdings Corp.,*
2012 WL 3260423 (E.D. Cal. Aug. 8, 2012) ..........................................................37

13

*Chavez v. AmeriGas Propane, Inc.,*
2015 WL 12859721 (C.D. Cal. Feb. 11, 2015) ..........................................................39

14

15

*Cheatham v. Allstate Ins. Co.,*
465 F.3d  578, 585 (5th Cir. 2006); ..........................................................34

16

*Comcast v. Behrend,*
133 S.Ct. 1426 (2012) ..........................................................39, 40

17

18

*Cruz v. Dollar Tree Stores, Inc.,*
2011 WL 2682967 (N.D.Cal. 2011) ..........................................................30

19

*Delodder v. Aerotek,*
471 Fed. Appx. 804 (9th Cir. 2012) ..........................................................27

20

21

*DeLodder v. Aerotek, Inc.,*
No. 08 Civ. 06044, 2010 WL 11506881 (C.D. Cal. Aug. 16, 2010), aff'd, 471 F.
App'x 804 (9th Cir. 2012) ..........................................................2, 35, 40

22

23

*In re Farmers Ins. Exch.,*
481 F.3d 1119 (9th Cir. 2007) ..........................................................32, 34

24

*Fjeld v. Penske Logistics, LLC,*
2013 WL 8360535 (C.D. Cal. 2013) ..........................................................28

25

26

*Foster v. Nationwide Mut. Ins. Co.,*
710 F.3d 640 (6th Cir. 2013) ..........................................................25

27

*Garcia v. Sun Pac. Farming Co-op, Inc.,*
359 F. App'x 724 (9th Cir. 2009) ..........................................................38

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 22-cv-02733-jsc

*Goff v. Bayada Nurses, Inc.*,
   424 F. Supp. 2d 816 (E.D. Pa. 2006) ...................................................................................27

*Guido v. L'Oreal, USA, Inc.*,
   2013 WL 3353857 (C.D. Cal. 2013) ...................................................................................40

*Hubbs v. Big Lots Stores, Inc.*,
   2017 WL 2304754 (C.D. Cal. May 23, 2017) ......................................................................39

*Hudkins v. Maxim Healthcare Servs.*,
   39 F. Supp. 2d 1349 (M.D. Fla. 1998) ................................................................................27

*Maddox v. Cont'l Cas. Co.*,
   2011 WL 6825483 (C.D. Cal. 2011) ..............................................................................32, 36

*Marlo v. United Parcel Serv., Inc.*,
   251 F.R.D. 476 (C.D.Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir.2011) ...............................30

*Marlo v. United Parcel Svc., Inc.*,
   639 F.3d 942 (9th Cir. 2011) ...........................................................................................31, 38

*Martin v. Cooper Elec. Supply Co.*,
   940 F.2d 896 (3rd Cir. 1991) ...........................................................................................26, 27

*McAllister v. Transamerica Occidental Life Ins.*,
   325 F.3d 997 (8th Cir. 2003) ...........................................................................................32, 34

*McKeen-Chaplin v. Provident Savings Bank, FSB*,
   862 F.3d 847 (9th Cir. 2017) ..............................................................................................25

*McLaughlin v. Nationwide Mut. Ins. Co.*,
   2004 WL 1857112 at *11 (D.Or. August 18, 2004*)* ...........................................................34

*Mekhitarian v. Deloitte & Touche (ICS), LLC*,
   2009 WL 6057248 (C.D. Cal. 2009) ....................................................................................36

*Metrow v. Liberty Mut. Managed Case LLC*,
   2017 U.S. Dist. LEXIS 73656 (C.D. Cal. May 1, 2017) ......................................................37

*Nelson v. Avon Prods.*,
   2015 U.S. Dist. LEXIS 51104 (N.D. Cal. April 17, 2015) ...................................................27

*Pedroza v. Petsmart, Inc.*,
   2013 WL 1490667 (C.D. Cal. 2013) ...........................................................................31, 37, 38

*Perry-Roman v. AIG Ret. Servs., Inc.*,
   2010 WL 8697061 (C.D. Cal. Feb. 24, 2010) ......................................................................37

*Rai v. CVS Caremark Corp.*,
   2013 WL 10178675 (C.D. Cal. Oct. 11, 2013) ....................................................................39

*Rieve v. Coventry Health Care, Inc.*,
   870 F. Supp. 2d 856 (C.D. Cal. 2012) ................................................................................24

*Rix v. Lockheed Martin Corp.*,
   2011 WL 890744 (S.D. Cal. 2011) ...................................................................32, 34

*Robinson-Smith v. Gov't Employees Ins. Co.*,
   590 F. 3d 894 (D.C. 2010) ..........................................................................................36

*Roe v.Midgett CC Services, Inc.*,
   512 F.3d 865 (7th Cir. 2008) ......................................................................................25

*Roth v. CHA Hollywood Med. Ctr., L.P.*,
   2013 WL 5775129 (C.D. Cal. 2013) ...........................................................................31

*Smith v. Gov't Employees Ins. Co.*,
   590 F.3d 886 (D.C. Cir. 2010) ....................................................................................36

*Soto v. Castlerock Farming & Transp., Inc.*,
   2013 WL 6844377 (E.D. Cal. Dec. 23, 2013) .............................................................39

*Tierno v. Rite Aid Corp.*,
   2006 WL 2535056 (C.D. Cal. Feb. 7, 2007) .........................................................36, 37

*Velazquez v. Costco Wholesale Corp.*,
   2011 WL 4891027 (C.D. Cal. 2011) ...........................................................................30

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) ......................................................................................32

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S.Ct. 2541 (2011) .................................................................................................38

*Walsh v. Unitil Serv. Corp.*,
   64 F.4th 1 (1st Cir. March 22, 2023) ....................................................................25, 26

*Weigele v. FedEx Ground Package Sys., Inc.*,
   267 F.R.D. 614 (S.D. Cal. 2010) ...........................................................................31, 37

*In re Wells Fargo Home Mortg. Overtime Pay Litigation*,
   571 F.3d 953 (9th Cir. 2009) ................................................................................30, 32

*Williams v. Lockheed Martin Corp.*,
   2011 WL 2200631 (S.D. Cal. 2011) ...........................................................................31

**State Cases**

*Arenas v. El Torito Restaurants, Inc.*,
   183 Cal. App. 4th 723, 734 (2010) .............................................................................29

*Dunbar v. Albertson's Inc.*,
   141 Cal. App. 4th 1422 (2006) ...................................................................................32

*Duran v. U.S. Bank Nat. Assn*,
   59 Cal.4th 1 (2014) .....................................................................................................31

*Eicher v. Advanced Business Integrators, Inc.*,
   151 Cal. App 4th 1363 (2007) ....................................................................................27

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 22-cv-02733-jsc

*Farmers Ins. Exchange v. Superior Court*,
  218 Cal. App. 4th 96 (2013) ..................................................................................24

*Harris v. Superior Court*,
  53 Cal. 4th 170 (2011) ................................................................................. *passim*

*Ramirez v. Yosemite Water Co.*,
  20 Cal.4th 785 (1999) ..................................................................28, 29, 38

*Soderstedt v. CBIZ S. Cal. LLC*,
  197 Cal.App.4th 133 (2011) ....................................................................29

*Wilson v. Farmers Ins. Exch.*,
  2016 Cal. App. Unpub. LEXIS 3903 (2016) ...........................................24

*Zelasko-Barrett v. Brayton-Purcell, LLP*,
  198 Cal. App. 4th 582 (2011) ..................................................................36

**Federal Statutes**

Fair Labor Standards Act ..................................................................22, 25, 26, 28

**Rules**

Rule 23 .........................................................................................28, 37, 38, 39, 40

**Regulations**

8 C.F.R. § 11040 ...........................................................................................22

29 C.F.R. § 541.201-05 .................................................................................22

29 C.F.R. § 541.205 ..............................................................................22, 23, 24, 25

29 C.F. R. § 541.207 ...............................................................................32, 36

29 C.F.R. § 541.210 .......................................................................................22

29 C.F.R. § 541.215 .......................................................................................22

29 C.F. R. § 541.270 ......................................................................................32

29 C.F. R. § 541.701 ......................................................................................32

IWC Wage Order No. 4–2001 .....................................................................22, 32

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Bo Avery, Phoebe Rodgers, Kristy Camilleri, and Jill Unverferth move to certify a class of more than 500 individuals who have worked for TEKsystems, Inc. ("TEK") in California as Recruiters ("Recruiters") since January 28, 2018, on the grounds that these Recruiters have been misclassified as exempt employees.  But misclassification cases are inherently unsuitable for class treatment because the analysis depends on what a particular employee *actually does*—the work performed, the time spent, and the level of discretion and judgment exercised—and the reasonable expectations of the employer.  Given the California Supreme Court's decision in *Harris v. Superior Court*, 53 Cal. 4th 170 (2011), this is particularly true for cases involving the application of the administrative exemption.

In their motion, however, Plaintiffs argue that all putative class members are "entry-level Recruiters" and perform uniform "mundane" tasks and that they only "work in a producing role."  To support this claim, Plaintiffs offer their own testimony and that of seven select declarants, none of whom are current employees and only two of whom have worked for TEK in the past year and a half.  As told by Plaintiffs and their declarants, Recruiters robotically relied on checklists as well as "search and match technology" to fill open job positions and never used their discretion or judgment regarding who to submit for an open position.  Plaintiffs and their declarants also testify that they never had any role in interacting with TEK's customers or evaluating whether candidates are a good fit for a particular role, always deferring to others in the role of Account Manager.  Plaintiffs and their declarants liken their work to that of a personnel clerk.

TEK disputes this testimony, but even if their testimony were true, it is not consistent with that of other putative class members.  Critically, even accepting the seven handpicked Plaintiffs' declarants' statements at face value, the experiences of putative class members are quite different.  Recruiters regularly use their discretion and judgment to source, screen, evaluate, negotiate with, and place candidates on assignment with TEK's customers.  Recruiters frequently interact directly with TEK's customers, including helping to craft the requirements a customer may identify to be well suited to fill a desired position.  Recruiters spend the majority of their time working on these significant placements and maintaining a network of highly qualified individuals who may be excellent matches to future job

opportunities.  Further, many Recruiters testify this is all done with little supervision or oversight.

Perhaps realizing this, Plaintiffs also assert that Recruiters are merely production employees, and that their work is of little significance to TEK, other than to produce TEK's "market offering." Plaintiffs are mistaken here as well.  As a matter of fact, the Recruiting services that putative class members perform unquestionably involve "matters of significance" not only for TEK, but also for TEK's **customers**.  Further, as a matter of law, the administrative/production dichotomy that Plaintiffs advocate, relying upon an **unpublished** California Court of Appeal decision, has been **expressly rejected by the California Supreme Court**.  When, as it must, this Court looks to the regulations regarding the administrative exemption as a whole, it is plain that there is no support for Plaintiffs' position and Plaintiffs' motion for class certification should be denied.

This same inevitable conclusion was reached in *DeLodder v. Aerotek, Inc.*, No. 08 Civ. 06044, 2010 WL 11506881, at *1 (C.D. Cal. Aug. 16, 2010), aff'd, 471 F. App'x 804 (9th Cir. 2012).  As Plaintiffs readily concede, *DeLodder* declined to certify a class of recruiters who alleged their employer, Aerotek, misclassified them. *Id.*  The reasoning in the *DeLodder* opinion is even more strongly supportive here in support of denying class certification.  TEK's Recruiters demonstrate great variety in the duties they perform, the methods they use to perform those duties, the discretion and judgment they exercise, and the supervision to which they are subjected.  There are simply no common facts or theories that can lead to the resolution of Plaintiffs' claims and certification must be denied.

## II.    RELEVANT FACTS

### A.    TEK's Business and the Role of the Putative Class Members

TEK is a global business and technology firm that assists its customers in achieving their business transformation, customer experience, and business goals.[1]  IT talent services are the core of TEK's business, and they involve staff augmentation, which means placing workers with specific skills on assignment at customer companies for a certain period of time.  Capacity solutions are another type of service that TEK offers.  This involves assembling teams of workers for customers who need a larger or more specialized workforce for a project. For example, TEK might provide a team of developers, testers and project managers for a customer who wants to upgrade their software system.  Total

---

[1] Haycock Dep. p. 134:6-13

management services are the most advanced and comprehensive type of service that TEK offers.  Total management involves outsourcing and managing an entire IT function or outcome for a customer. For example, TEK might build and maintain a website for a customer who does not have the internal resources or expertise to do so.[2]

At the heart of each of these functions is the Recruiter.  Recruiters start from the client's requirements for each of the business purposes outlined above, which can be complex and varied, and find and validate the qualifications of the best suited candidates to perform the work.  At its core, Recruiters function to locate the absolute best talent in the demanding IT marketplace and match those professionals to important roles that serve a variety of purposes for TEK's customers.[3]

**B.    The Named Plaintiffs And Their Declarants Worked For Limited Periods Of Time And Their Training Duration Was Not Typical**

Among the four named Plaintiffs, none worked following the onset of COVID in-person work restrictions in late March 2020, which brought on or accelerated a number of changes at TEK: Plaintiff Unverferth's employment with TEK ended on January 1, 2020; Plaintiff Avery's employment ended on April 27, 2019; Plaintiff Rodgers' employment ended on March 4, 2020; and Plaintiff Camilleri's employment ended on July 30, 2019.  None of the Plaintiffs have worked for TEK in more than three and a half years, which is nearly two-thirds of the class period.[4]  Plaintiffs' limited tenure, and the long gap of time between the end of their employment by TEK and the current day, confirm that Plaintiffs have little evidence on how Recruiters perform their job duties, including over the last several years.

Plaintiffs' declarants do not fill in this gap and simply are not representative of the putative class they seek to represent. Not a single declarant is a current employee.  In fact, only two of the declarants – Adam Topp and Brian Larsen – worked following the onset of COVID, though neither has been employed by TEK within the last year.[5]  Plaintiffs' declarants also differentiate themselves from the putative class based on short tenure:  Adam Topp was classified and worked as a Recruiter for a total of 3.5 months; Jessica Doerner for five months in 2019; Michael Tillson worked as a recruiter for seven

---

[2] Haycock Dep. p. 73:16-77:7
[3] Haycock Dep. p. 25:1-27:10, 60:22-61:16
[4] Avery Dep. p. 53:2-54:14, 58:2-24, Ex 8, Ex 12; Camilleri Dep. p. 21:4-6, 22:4-18, 33:15-35:1, Ex. 7, 9; Underferth Dep. p. 38:17-40:13, Ex. 7; Rodgers Dep. p. 11:23-12:24, 86:3-6.
[5] Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 3, 6, 8; Doc. 64-1 (Ex. 19) Larsen Decl. ¶ 3, 6, 8.

1    and a half months; Brian Larsen for slightly less than a year.[6]

2    Importantly, Plaintiffs and their limited number of declarants are also atypical in how long they

3    worked in the Recruiter Trainee role prior to assuming the role of an exempt recruiter. Recruiter Trainee

4    training lasts for 13 weeks, but elevation to the exempt Recruiter role also requires satisfying certain

5    performance benchmarks to demonstrate the capability to be a Recruiter.[7] Plaintiff Bo Avery was a

6    Recruiter Trainee for more than fourteen months; Jill Camilleri was a Recruiter Trainee for a little more

7    than a year; Jill Unverferth was a Recruiter Trainee for more than eight months; and Phoebe Rodgers

8    was a Recruiter Trainee for more than seven months. Among Plaintiffs' declarants, Michael Tillson was

9    a Recruiter Trainee for thirteen months; Jessica Doerner was a Recruiter Trainee for a little more than a

10   year; Jessica Decain was a Recruiter Trainee for eight and a half months; Jovon Cunningham was a

11   Recruiter Trainee for seven months; and Adam Brissey was a Recruiter Trainee for seven months.[8]  In

12   short, the time taken by Plaintiffs and their declarants to be placed in the exempt role of Recruiter was

13   atypically long, suggesting that they themselves are not typical of the other Recruiters they seek to

14   represent.

15       **C.**    **TEK's Recruiter Declarants Span The Entire Relevant Period, Specialize In**

16              **Different Areas, And Exercise Discretion In The Performance Of Their Job Duties**

17   In contrast to the Plaintiffs and their declarants, who describe their job duties in bland and

18   uniform ways, other Recruiters in the putative class have deep knowledge and skill in recruiting, which

19   they apply in unique ways in order to provide TEK's clients with talented, highly-paid IT professionals

20   to work on important projects.[9] These Recruiters include:

21       •    Lindzy McCarty, an exempt Recruiter from July 2020 to the present, did not go through

22   the Recruiter Trainee training program. Eighty percent of her work is with one TEK customer, where

23   she has ingrained relationships, and she often presents her chosen candidates directly to them. (Ex. 8.)

24

25   [6] Doc. 64-1 (Ex. 16) Dorner Decl. ¶¶ 3, 6, 8; Doc. 64-1 (Ex. 18) Tillson Decl. ¶¶ 3, 6, 8; Doc. 64-1 (Ex. 17) Larsen Decl. ¶¶ 3, 6, 8; Doc. 64-1 (Ex. 19) Larsen Decl. ¶¶ 3, 6, 8.
26   [7] Haycock Dep. p. 104:20-105:6.
     [8] Doc. 64-1 (Ex. 16) Dorner Decl. ¶¶ 3, 6, 8; Doc. 64-1 (Ex. 18) Tillson Decl. ¶¶ 3, 6, 8; Doc. 64-1 (Ex. 17) Larsen Decl. ¶¶ 3, 6, 8; Doc. 64-1 (Ex. 19) Larsen Decl. ¶¶ 3, 6, 8; Avery Dep. p. 53:2-54:14, 58:2-
27   24, Ex 8, Ex 12; Camilerri Dep. p. 21:4-6, 22:4-18, 33:15-35:1, Ex. 7, 9; Underferth Dep. p. 38:17-40:13, Ex. 7; Rodgers Dep. p. 11:23-12:24, 86:3-6.
28   [9] TEK's Witness Declarations are Exhibits 3-16 to the Declaration of Brian P. Long submitted with this Response.

•     Richelle Rothermich, an exempt Recruiter since July 2021, had 20 years of experience at creative agencies when she joined TEK and completed training in three months. Ms. Rothermich specializes in recruiting for product design roles. She sources from her personal network and does not use TEK's Connected database or make cold calls. She evaluates a candidate's portfolio of creative work against the customer's visual aesthetic, and she speaks directly with customers,. (Ex. 4.)

•     Nicole Whitman, an exempt Recruiter from November 2013 – February 2014, is part of a specialized national team that recruits people knowledgeable in the installation and upgrade of electronic health record software for healthcare systems. Ms. Whitman's knowledge allows her to make judgments about candidates tailored to the customer project and how much experience the the role requires. Account Managers follow her recommendations most of the time. (Ex. 6.)

•     Yasmine Yancey, an exempt Recruiter since March 2021, specializes in government service roles, which have unique characteristics that can make it more challenging to find qualified candidates. She speaks directly with customers, creates her own sourcing strategy centered around her personal network, and probes far past a candidate's resume to assess their skills. (Ex. 9.)

•     Berenice Mendez, an exempt Recruiter from September 2021 – December 2022, specializes in placing software development engineers at tech companies. She sources candidates through her extensive personal network, has developed her own list of screening questions, and partners with Account Managers who rely solely on her recommendations. (Ex. 7.)

•     Alana Levine-Gorelick, an exempt Recruiter from April 2018 – October 2019, specializes in placing software developers, project managers, and analysts. She chooses which reqs to which on, devises her own sourcing strategy, and regularly works directly with TEK's customers. (Ex. 11.)

•     Nicole Guffy, an exempt Recruiter from December 2016 – January 2019, specializes in technology enablement, i.e., the use of technology to make new things possible. She believes "there are almost a millions ways" to source talent. She has direct contact with clients, starts negotiating with during their first or second call, and delivers performance management messages. (Ex. 3.)

•     Alex Ferrari, an exempt Recruiter from December 2019 to the present, is part of a national team also focused on technology enablement. She works particularly closely with one TEK client. Through this repeated work, she is integrated with the client and has direct contact with hiring

managers up to the Director level, sharing her expertise about the labor market. (Ex. 15.)

• Paul Stryker, an exempt Recruiter from July 2017 – January 2018, specializes in recruiting those with design skill sets, like motion graphics designers and creative directors. Account Managers come to Mr. Stryker for his expertise, and he works with the same clients repeatedly, which gives him insight into their business. (Ex. 5.)

• Cristen Kehl, an exempt Recruiter from November 2016 – March 2020, first specialized in the applications industry vertical and primarily supported one customer, then switched to the digital and creative specialty supporting different clients. She sources candidates through channels like Slack, meetup.com, LinkedIn, and Connected, and believes no one at TEK cares what source she uses. She does not rely on what candidates say in their resumes, and has her own approach to validating the skills possessed by candidates. (Ex. 14.)

• Forest Compton, an exempt Recruiter from August 2019 – September 2021, specializes in recruiting software developers, including on customer projects like modernizing a financial services firm's trading platform for clients. He partners with Account Managers, such as joining initial calls with customers where he helps to gather more detailed requirements for roles TEK has been asked to fill, and to present candidates to the customer. (Ex. 10.)

• Brandon Harvey, an exempt Recruiter since September 2021, specializes in Microsoft's .NET technology. He conducts independent research into his client's projects before he begins recruiting. He starts sourcing from his own network and their referrals and only turns to Connected if his other sources have not turned up enough candidates. He has created his own set of questions that he asks candidates during interviews in order to judge their technical capabilities.  (Ex. 12.)

• Jessica Budde, an exempt Recruiter since June 2020, specializes in finding and placing software engineers for a specific TEK customer. She also can choose to work on job requisitions for different customers. She regularly has direct contact with TEK's clients. Her candidate evaluations go beyond confirming that they possess the right technical skills, to assesses their professionalism, communication skills, ability to work on a team, and other factors. Account Managers almost always follow her recommendations about which candidates to submit. (Ex. 16.)

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

### D.     TEK's Reasonable Performance Expectations

2          Plaintiffs and their declarants go to lengths to describe what they contend TEK requires from

3    Recruiters, including that they meet several performance metrics.  What Plaintiffs and their declarants

4    do not address are TEK's expectations as to ***how*** those metrics are achieved.  For example, TEK expects

5    that Recruiters meet metrics around the number of candidates successfully placed on assignment, and

6    the profitability ("spread") earned from those candidates. TEK also measures various activity metrics

7    that it has determined to be correlated to success in placements on assignment, such as number of calls

8    and outreaches to potential candidates.  Recruiters are expected to use their knowledge, experience, and

9    discretion and judgment when identifying, screening, and recruiting potential candidates for positions.

10   The Recruiters are also expected to negotiate pay rates and other terms and conditions of employment

11   with candidates as well as customers.[10]  The complexities of the Recruiters' job means that while TEK

12   tracked metrics for Recruiters, it understood and expected variation on how Recruiters accomplished

13   their jobs.[11]  As TEK's Senior Vice President of Talent Delivery describes its expectations:

14          Their job [Recruiter ] is to understand the customer, the customer's need, the customer's
            project, the outcomes that the customer is looking to achieve.
15
16          They need to understand the customer's environment, what type of culture do they have,
            and also understanding what are the skills necessary for them to be able to assist the
17          customer in achieving the outcomes that they're looking for.

18          They also have to understand the nuances and details associated with the contractual
            arrangements associated with that particular customer. And at times we have multiple
19          agreements with one customer, so they have to understand which agreement are we
            working under and what are the terms and conditions of that agreement. And ultimately
20          they have to know what are the details of what they can offer a consultant associated with
            the hourly bill rate that we might be billing a customer as well as any parameters or
21          necessary background investigations or screening that would be necessary for that
            particular customer.
22
            And once they have all that information, they will then have to understand the skills,
23          goals, and interests of the consultant to be able to make a very complex match between
            this person [who] has not only the skills, the technical skills, they have the level of
24          experience associated with those skills.

25          At times maybe need to understand the industry, is this a banking and finance customer,
            and do they need to have banking and finance experience, and what does that mean. If
26          they work for a bank, is that the same as working for an insurance company. Sometimes
            it doesn't matter; sometimes it does.

27   _____
     [10] Haycock Dep. p. 140:23-142:10
28   [11] Haycock Dep. p. 156:1-157:11, 153:4-18 ("Because the complexity of recruiting has increased to the
     degree that we needed to have a customized solution that allowed for the nuances and differences
     between individual recruiters.")

And so for them, they have to manage all of these complexities associated with the assignment and the skills to be able to make a match to be able to associate that consultant, not waste a customer's time sending over people that are not qualified for that requirement, and ensuring that that customer ultimately is satisfied.

Because they placed the person. Then they maintain the person; meaning, they are getting feedback from the customer, providing that feedback to the consultant -- So if they're working on the customer's site, the customer may tell them, Hey, you know, they're doing great technically. They're not getting along with their coworkers. They need to do a better job. Hey, Johnny was late three times in the past month. You need to talk to Johnny about their punctuality relative to the assignment.

And then ultimately the recruiter is responsible for continuing to work with that consultant, because many of our assignments are six months, nine months, 12 months, 18 months, whatever it is. But they are temporary in that nature, and in that case their responsibility is to help that person find another job once their current assignment comes to conclusion.[12]

Account Managers and Division Leads expect that Recruiters will use their own judgment and innovation to source appropriate candidates. Kelly Boland, a former Account Manager and now a Division Lead testifies:

A Recruiter's success in the position relies heavily on their own initiative and effort to develop successful ways to locate qualified candidates, deciding who are strong fits for the client requirements, and placing the candidates to work on specific positions. At TEK, Recruiters are the ones primarily responsible for finding quality candidates for positions provided by our clients, and they are considered the market experts in their area of specialization. To be valuable in their position, Recruiters are expected to continually be learning about current marketplace conditions in the tech industry, which is constantly changing. Recruiters use their knowledge of the marketplace to seek out candidates that best fit into positions that clients are seeking. Recruiters are responsible to find the best ways to develop this knowledge for themselves. . . Recruiters are expected to look beyond the skills listed on a candidate's resume and assess the candidate to make sure that the candidate has the necessary depth of knowledge in those skills, can apply their skills in the context relevant to the job requirements, and possesses the non-technical skills to succeed in the role. Recruiters have full responsibility to make their own assessment of the candidate's suitability based on all information available to them, and to make referrals to the Account Manager if they determine the candidate would be successful. . . .The Account Manager depends on the Recruiter's judgment about candidates, since Recruiters typically best understand the technology involved, the talent market, and the strengths and weaknesses of the candidates.[13]

Further, TEK expects that Recruiters are interacting directly with clients: "Typically one to two Recruiters join on the call with the hiring manager and the Account Manager. Account Managers lean on Recruiters to ask questions and help make the requisition as detailed as possible, particularly as it relates to the technical needs of the role, since Recruiters have deeper technical and market expertise." Boland Decl. ¶ 9. Finally, TEK expects that Recruiters operate with little supervision: "Recruiters work

---

[12] Haycock Dep. p. 27:14-30:2
[13] Boland Decl. ¶¶ 7-8, 12-14.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  in partnership with Account Managers. Recruiters and Account Managers typically touch base at the

2  beginning and the end of the day to discuss the status and challenges they are facing their efforts, but

3  otherwise they work independently." Boland Decl. ¶ 16.

4      **E.      The Extent Discretion and Judgment Varies From Recruiter to Recruiter**

5          There are significant variations in the roles and duties of Recruiters based on the industry they

6  support, the roles they typically recruit to fill, and the time period when they worked for TEK (the

7  remote work that became commonplace in response to the COVID-19 pandemic changed many

8  practices, as did business-driven changes to job duties). Additional differences include, among others,

9  the level of interaction with a customer, personal strategies for finding candidates and deciding whether

10 they are well-matched to a position, input on which candidates are presented to the customer for the job

11 being fulfilled, preparing candidates to make the strongest presentation of their credentials to the hiring

12 manager, and approach to negotiating pay and other terms and conditions of employment.

13         Moreover, there is significant variation regarding Recruiters' reported exercise of independent

14 discretion and judgment. Furthermore, the level of supervision of Recruiters varies, based on both the

15 customer being served, the position being filled, and the supervisor involved.[14] Finally, the impact of

16 the Recruiters' duties and decisions on TEK and its customers varies greatly. The jobs TEK Recruiters

17 fill are for skilled and valuable IT employees, often earning $90-$120 per hour, working in roles that

18 may range from working as one team member on a team of individuals performing IT support services

19 for a customer to providing highly technical and mission critical IT skills that are necessary to creating,

20 improving, or maintaining the customer's core product.

21      **1.      Factors influencing the use of independent judgment and discretion vary**

22          **a.      Identifying and sourcing candidates**

23         Recruiters devise their own sourcing strategies to find candidates in ways that vary significantly.

24 Plaintiffs' declarants testify, in identical language, that they robotically searched Connected (a TEK

25 internal database) or LinkedIn and looked for people whose resumes shared keywords with the

26

27 ───────────────

[14] Plaintiffs and their declarants each assert that they worked under the supervision of Account
28 Managers. However, many Recruiters have never been supervised by Account Managers, or only for
limited periods of time, and have been supervised only by other Recruiters. Rothermich Decl. ¶ 11;
McCarty Decl. ¶ 10.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

requisition.[15]  Yet, many Recruiters testify that is simply not how they performed their jobs, nor was it the expectation that they do so.  Indeed, it is suggested to Recruiter Trainees to start sourcing from people they already have relationships with, and people who those contacts may refer.[16]

Ms. Rothermich testifies to a similar approach: "I do not find Connected to be a useful source for the kinds of roles that I am trying to fill, and I do not use it to search for candidates." Ms. Rothermich has built up her own network of potential candidates over time.  She keeps them in her network and cross-recruits them for different potential job openings based on what she believes is their design aesthetic and whether they would be a good fit for a particular opening.  Rothermich Decl. ¶¶ 19-22.  Mr. Stryker confirms that he sourced candidates while he was a Recruiter by building his own network of professionals.  Stryker Decl. ¶¶ 17-20.  Ms. Levine-Gorelick testifies that she has built up her network over a number of years, and views finding the right candidate as akin to a "treasure hunt."  Levine-Gorelick Decl. ¶ 15. Mr. Compton testifies that his "first source is always my personal network, followed by referrals from people in my network, then people who have worked with TEK in the past. My philosophy is to start where the strong relationships are." Compton Decl. ¶ 17.  Only after exhausting those sources does Mr. Compton turn to database searches. *Id*.

Those Recruiters who use Connected or LinkedIn do so in considered and strategic ways. For example, like those cited above, Ms. Whitman testifies that she has developed her own network of potential candidates to submit for open job requisitions.  When she goes outside of her network, she primarily utilizes LinkedIn Recruiter, though she uses TEK's internal Connected database occasionally. Whitman Decl. ¶¶ 8, 18.  Importantly, Ms. Whitman builds her own searches, and she has developed those searches over years of working: "I created searches that would find the resumes of candidates who had the skills needed for the req." *Id*. ¶ 8.  Ms. Whitman also went beyond a candidate's resume and validated the skills they possessed: "When I found candidates, I would call them to learn more about

---

[15] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 18 ("I followed TEKsystems' procedures and searched employment databases, including TEKsystems' internal database and LinkedIn Recruiter. When searching employment databases, TEKsystems instructed me to utilize the Requirement, including the "top three job skills," and match it to candidates' resumes. I then added candidates that might match the requirements of the job Requirement to a call list."); Doc. 64-1 (Ex. 14) Cunningham Decl. ¶ 18 (exact same quote as Brissey); Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 17 (exact same quote as Brissey); Doc. 64-1 (Ex. 16) Doerner Decl. ¶ 17 (exact same quote as Brissey); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 17 (exact same quote as Brissey); Doc. 64-1 (Ex. 18) Tillson Decl. ¶ 17 (exact same quote as Brissey); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 18 (exact same quote as Brissey).
[16] DiBenedetto, Dep. p. 201:14-205:2.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

their skills and decide whether they were a close enough match to continue in the process. If so, I would

schedule a longer interview to gather more in depth information and contact their references to learn

more about their work history." *Id*.

Bernice Mendez testifies that "I have to be creative and resourceful to locate good candidates for

a position. I maintain an extensive network of hundreds of potential candidates to reach out to for

positions, which is the most productive way to find candidates who will be successful in obtaining the

position.  I have to do more than just review a candidate's resume to determine if the qualifications

listed by the candidate match the requirements on the requisition.  Once I find someone that has the base

level qualifications for the position I am filling, I still have to interview them so I can assess them and

determine if their actual skill set is a good fit for a particular role." Mendez Decl. ¶ 13.[17]

### b.   Recruiters do not uniformly use screening tools and checklists to determine how to perform each of their job duties

Screening of candidates is highly variable, depending on each Recruiter's own methodology.

Plaintiffs' declarants again contend that they did little screening beyond a surface identification of listed

skills on a resume.[18]  TEK's expectations are that screening demands much more than just matching

---

[17] See also; Guffy Decl. ¶¶ 10-11 ("When I am working on a requirement, I create my own strategy to source talent, and I expect other Recruiters to do the same. . . What sets a good Recruiter apart when it comes to sourcing is the ability to be strategic and innovative about how they find talent. Search filters alone are not enough to find the best candidates. It is up to the Recruiter to interpret and use the details they find about candidates."); Yancey Decl. ¶ 14 ("I use several different strategies to source candidates. Finding quality candidates is challenging for the positions I am trying to fill, so I take initiative to locate and connect with candidates through various creative means."); Compton Decl. ¶ 17; Harvey Decl. ¶¶ 9-10; Kehl Decl. ¶ 10 (""I have the autonomy to choose how I source my job candidates – it's my business. I have multiple resources to use for sourcing, and I choose one or a combination based on the skills that I am searching for. For example, sometimes I will create searches in databases like LinkedIn or a TEK internal database called Connected. Other times I may use Slack or another channel to network with people I already know. In the past, I have gone to meetups through meetup.com in order to meet candidates. No one at TEKsystems really cares what source, I use as long as I'm not wasting time and finding the right candidates."); Ferrari Decl. ¶ 9 ("My strategy for sourcing candidates is to start with LinkedIn. I create Boolean search strings based on job titles, position, location, and other filters to find profiles of people who seem to have done well in similar roles. When I find them, I analyze their profiles carefully, then reach out by direct message or phone to ask if they can recommend anyone. If that approach does not turn up candidates, I will create new Boolean search strings in LinkedIn.")

[18] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 28 ("If a candidate's listed skills matched the Requirement, I sent the candidate's resume and information about the candidate to the Account Manager or Account Lead."); Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 28 (exact same quote as Brissey); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 27 (exact same quote as Brissey); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 28 (exact same quote as Brissey).

buzz words on a resume to a particular job requirement.[19]  Many recruiters testify to their individualized approaches, where identifying relevant skills was the very beginning of a screening inquiry.  For example, Ms. Rothermich testified that she specializes in creative design.  She places employees in roles that include visual design, motion graphics, and production design.  Because the employees she places have a creative side, she reviews their portfolios as well as their personality to determine if the candidate would be a good fit for a particular customer.  She testified that she does not use, nor is she expected to follow scripts or checklists with the candidates she recruits.  The candidates she recruits all require different messaging that is tailored to them as well as the job position that she is trying to fill.  She evaluates their portfolios from an aesthetic perspective and determines whether the "vibe" of the candidate's work is a good fit for a particular customer.  Rothermich Decl. ¶¶ 3-10.  Mr. Stryker states that Recruiters check references, assess the technical prowess of a candidate.  He states that it is much more than matching a resume to bullet points."  The Recruiter is evaluating team fit and cultural fit for a company.  Stryker Decl. ¶ 20.

Mr. Compton testifies that when he identifies a potential candidate, he takes "additional steps to validate their credentials," such as calling the candidate, asking probing questions about their skills and the projects they have worked on, contact professionals references who are familiar with the person's work, and asking the candidate to complete a technical assessment. Compton ¶ 18.

Ms. Whitman testifies: "I evaluate the candidates to decide whether to move forward with them. It is not enough to find people with experience who have experience with Epic or Cerner software, for example. I make sure that they have experience with the specific modules (components) in the software that are relevant to the customer's project, and I consider whether they have earned special credentials in any relevant areas. I also make judgements based on what I know about the client and the project. For example, if the requisition is for someone to maintain a system that is relatively straightforward, a less

---

[19] Haycock Dep. p. 40:7-41:4 ("The art of recruiting is all of the things that I was saying before. It's not just do the  buzz words match, because many buzz words match, and  the person is absolutely positively not the right person for the role. Because they also know, because  they're IT professionals, that you have to have the right buzz words on your resume to get hits in search and match. It's just a very common thing, because everybody understands if you have the right information in your resume, well, then it's going get me more or less opportunities based on how well I do that. So a recruiter has to be able to discern between this person has all the right buzz words and jargon and they can actually do the job. And it's really difficult for technology. . . So there is also the process of the recruiter going through and understanding how is it that I'm going to be able to make the match between the client requirement and the actual person that we are considering for that role.")

experienced candidate may satisfy the requirements. On the other hand, a project that is at the point of doing a complex integration between existing software and new components will usually demand someone with more experience and a track record of completing similar projects."  Whitman Decl. ¶ 20.

Bernice Mendez testifies: "Through my years of experience, I have developed a particular expertise with positions for software development engineers at tech companies.  In order to ensure that I am successful at my job and can identify the best prospects for specific positions, I have developed specific technical knowledge so that I can understand and assess the qualifications of the front end engineers that I place. In my experience, front end engineers have their own language, including around Java script and React and Angular computing languages used in their work, and I have had to learn how to communicate in their language as well. . . . Based on my experiences with different clients, over time I have developed and compiled screening questions unique to each client to ensure I can locate the most qualified candidate for the position.  I have to evaluate the candidate's skill level and importantly determine if the candidate is a good fit for the specific client, since each client has different types of needs.  I do this by, among other things, assessing the candidate's communications skills, how they respond to various social cues, and their overall personality, as well as probing their skill level with specific tech tools and their knowledge of certain technologies." Mendez Decl. ¶¶ 9, 14.[20]

---

[20] See also Guffy Decl. ¶ 12; McCarty Decl. ¶ 15 ("A Recruiter should not just hand an Account Manager a candidate resume because it includes the top skills in the job requirement. In my view, every candidate a Recruiter brings to an Account Manager is a reflection of the Recruiter's personal brand. If the Recruiter has not done a thorough screening, it is going to reflect poorly on the Recruiter if it does not work out."); Yancey Decl. ¶ 17, 18 ("When I interview candidates, I weigh a variety of factors to determine if they are the best fit for a position. I analyze their presentation skills and their technical knowledge. It is also important that I determine if the candidate is a good cultural fit for the specific position, and evaluate their desire to work in the office or remotely, their willingness to travel, and their flexibility with the pay rate. I may gauge issues such as whether they can handle a micro-manager or would need to work with a more hands off manager, as well as if they could be the only IT person in a small office and be willing to work overtime as needed. . . I need to do more than just review the candidate's resume to see if they would be qualified for the position. I need to assess how they handle a conversation, approach questions, and their overall attitude."); Compton Decl. ¶ 18; Kehl Decl. ¶ 11 ("I and other Recruiters cannot just rely on what a candidate puts on their resume or posts on LinkedIn. I always talk to candidates and ask lots of questions to make sure that they have the skills that are listed on their resumes, that they have the necessary depth of knowledge in those skills to be able to perform the job requirements. I also assess whether the candidate has the soft skills that might be needed for the role. For example, many of the job requirements that I work on need people who can work on teams, so I ask questions about other team projects they have worked on and evaluate their communication skills through our interactions on the phone and by email."); Ferrari Decl. ¶ 11 (""After I find a potential candidate, the best way to decide if they are a good match is to talk to them and ask lots of questions. I asking probing questions to really understand the projects they have worked on and the skills they had to apply so I can understand the depth of their experience."); Budde Decl. ¶ 18 ("My assessment of whether a candidate is a good match for a customer's job requirements goes beyond just confirming that

13

A Recruiter's job duties related to screening are not and cannot be scripted.  Ms. Levine-Gorelick testifies that when she was a Recruiter, she was never given a script.  Instead she was given the information she needed to learn, but that there are "no rule books."  In coaching other Recruiters on how to screen and prepare candidates, Ms. Levine-Gorelick testifies that "the job is what you make of it. Different people can have completely different ways of doing this job and still be successful in their own way."  In selecting coaches who will work with Recruiters, she is focused on choosing Recruiters who are really good at the 'why.' They are people with their own style, not people who do it strictly by the book.  Levine-Gorelick Decl. ¶¶ 4, 27.

### c.    Engagement with customers varies

Plaintiffs' declarants testify in nearly identical language that they very rarely if ever interacted with TEK's customers.[21]  Yet, again, many Recruiters testify to a different experience.  Ms. Whitman testifies that she has focused on three to four customers, and as a result has come to know them well. That knowledge impacts who she would submit as a candidate and her assessment of whether a candidate is a good fit for a role.  Ms. Whitman will even present her candidates directly to the customers, as her Account Managers are confident in her presenting directly to the customers.  Whitman Decl. ¶¶ 9, 13-16, 24.   Lindzy McCarty testifies that she works directly with the hiring teams at a Fortune 100 tech client and participates in calls with them.  She states that it benefits her to join calls with the customers regarding their open roles.  It helps her focus on what is important for the new open position.  Similarly, when she joins calls with customers to receive feedback on submitted candidates, it allows her to give pushback on any hesitations that the customer may have with a particular candidate. McCarty Decl.  ¶¶ 19-23.  Ms. Levine-Gorelick testifies that she schedules calls with customer if they would like to discuss the open role.  Also, she states that she has placed a lot of employees who are now

---

they have the right technical skills. Through my interactions with a candidate, I am also assessing their communication style, how they present themselves, whether they conduct themselves professionally, and whether they will be able to work well with others on the customer's project or team.")
[21] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 31 ("It was the Account Manager and Account Lead's job to communicate with the Hiring Managers at TEKsystems' clients. I never spoke to TEKsystems' clients without an Account Manager or Account Lead present.."); Doc. 64-1 (Ex. 14) Cunningham Decl. ¶ 31 ("As a Recruiter, I had little to no interaction with TEKsystems' clients. It was the Account Manager's job to communicate with the Hiring Managers at TEKsystems' clients."); Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 31 (exact same quote as Cunningham); Doc. 64-1 (Ex. 16) Doerner Decl. ¶ 30 (exact same quote as Cunningham); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 30 (exact same quote as Cunningham); Doc. 64-1 (Ex. 18) Tillson Decl. ¶ 30 (exact same quote as Cunningham); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 31 (exact same quote as Cunningham).

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

hiring managers in their jobs, and she interacts with them directly when the Account Manager is unavailable, and even covered that aspect of an Account Manger's job when the Account Manager was on maternity leave. Levine-Gorelick Decl. ¶¶ 23-25

Bernice Mendez testifies: "Depending on the position, I sometimes get on a call with the Hiring Manager and the Account Manager to ask questions specific about the project so I can determine the needs of the position that are not evident on the requisition, such as the depth of knowledge required for the various technologies and how the teams work together at the company.  I try to fully gauge what the client is looking for in a new requisition and one of the best ways to do that is by speaking with the Hiring Manager." Mendez Decl. ¶ 11. [22]

---

[22] *See also*,; Guffy Decl. ¶ 16; Compton Decl. ¶ 15 ("I like to join the Account Manager for a call with the customer to gather the requirements for the position. One of the benefits of this is getting the opportunity to hear about the customer's business and get a better understanding. Another benefit is that I can ask questions and help put together a more detailed requirement. For example, if the requirement says that a developer will need to use certain software tools, I will ask questions about what will be the context for the developer to use the tools. With that information, I can have a more specific sourcing strategy and screen candidates to find people with the best matched skills."); Harvey Decl. ¶ 8 ("The reason I am involved in the call is because I am the market expert, and I can help assess what the client's needs are for the position. I listen and try to fully gauge what the client is looking for.  During those calls I may suggest to the client's hiring manager changes to the requisition based on what I am hearing about their needs and what the market is currently for the skill set they are seeking."); Cristen Kehl Decl. ¶¶ 6, 7 ("One of the values that I bring to TEK's relationships with its clients is my understanding of the market and what clients want. It is common for me to join an Account Manager for their call with a client to gather the job requirement details, because I can speak with the client hiring manager about the technical skills the job requires, the relevant context to performing the role, and the market for people with the necessary skills, which is knowledge that TEK Account Managers do not have. . . I have contacted clients directly in my role as a Recruiter for other reasons and in other contexts as well. Sometimes I already know the client's hiring manager, so it is easier to communicate directly. Other times the Account Manager may ask me to contact the hiring manager directly, rather than explaining information to the Account Manager and expecting them to pass it along to the hiring manager. I have also stepped in to run the business when an Account Manager is out the office for some reason, like vacation or leave"); Ferrari Decl. ¶ 8, 19 ("I often joined his calls with hiring managers at a tech client to learn about the positions they needed to fill and the job requirements. I am the expert on the technical skillsets that TEK's clients are looking for, so I can ask questions that ensure the job requirement includes everything we need to fill the position. Recruiters add value to those conversations because Account Managers do not have expertise in the relevant labor market. I was the Recruiter who filled almost all of the requisitions that Dante got from that client. . . . Because I focus very closely on specific clients, I am able to become very integrated with them. I have direct contact with hiring managers at the Manager and Director level. I join calls with the clients to share my expertise about the labor market, such as trends that I see in the skillsets that are available to be recruited, and advice on what billing rates are necessary to attract excellent candidates."); Budde Decl. ¶ 10, 14 ("At a high level, my job duties as a Recruiter are to work with TEK Account Managers and hiring managers at TEK's customers to define the requirements for open positions at the customer . . . At least one or two times a month, I will join an Account Manager on a call with a hiring manager at a TEK client. Account Managers include me on these calls because I have expertise in the labor market for technical jobs. When we meet with a customer's technical hiring manager, I can ask expert-level questions to identify specifically what skills the customer needs from a candidate in order to have a successful project. I sometimes join calls with a customer's hiring manager to present the credentials of specific candidates that I have identified[.]")

#### d.    Negotiation with candidates varies

Plaintiffs and their declarants assert that they were unable to negotiate rates, benefits, or other compensation issues with candidates.[23]  In contrast, many Recruiters' experience varied substantially from that.  For example, Ms. Rothermich testifies that she is able to push back on requisitions drafted by Account Managers and argue for changes to the requisitions based on market conditions.  Further, Ms. Rothermich discusses rates with candidates.  If after hearing that a candidate is seeking a particular rate, but in her experience that rate will make the candidate uncompetitive for placement, she lets the candidate know.  She further testifies that she will discuss and get agreement with a candidate not only on their hourly rate, but also whether they can agree to the role being a hybrid work environment, the length of the contract that they will be hired under, the amount of PTO, and other central employment terms before she ever submits a candidate for potential placement.  Ms. Rothermich is negotiating these items, and including them in her placement presentation so that the items do not need to be negotiated later.  Rothermich Decl. ¶ 15, 21-23.

Nikki Whitman, also in contrast to the declarations submitted by Plaintiffs, confirms that she negotiates with candidates based on her own judgment: "I ask candidates what they are targeting to earn. I also ask them, what pay rate is too low, so you would not even want me to call you even if I thought everything else is a great fit. Most people will share these numbers with me, which lets me know not only whether their goal falls within the range of a job, but also where in the range I can make an offer that is attractive to them without offering more than is necessary." Whitman Decl. ¶ 22.[24]

---

[23] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 33 ("When a client wanted to hire a candidate, I relayed the offer. I did not negotiate the terms of a candidate's employment. Account Managers or Account Leads and TEKsystems' clients determined the pay range and terms of the contract. If a candidate had a question or a counteroffer, I relayed that information to the Account Manager or Account Lead, who decided how to proceed."); Doc. 64-1 (Ex. 14) Cunningham Decl. ¶ 33 (exact same quote as Brissey); Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 33 (exact same quote as Brissey); Doc. 64-1 (Ex. 16) Doerner Decl. ¶ 32 (exact same quote as Brissey); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 32 (exact same quote as Brissey); Doc. 64-1 (Ex. 18) Tillson Decl. ¶ 32 (exact same quote as Brissey); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 33 (exact same quote as Brissey).

[24] See also, Mendez Decl. ¶ 18 ("Sometimes I have to get creative to meet their compensation goals if the rate negotiated with the client will not meet the expectations of the candidate. If a candidate is given an offer and I know that the compensation will not meet the candidate's expectation, I will collaborate with the Account Manager to determine if we can get flexibility from the client on the wages or if we can make internal adjustments on the compensation to the candidate. I know the market for people with the skills that clients are looking for, and I can provide information to clients about what they should expect to pay for certain people with the skill sets they need."); Guffy Decl. ¶ 15; Yancey Decl. ¶ 21; Kehl Decl. ¶ 14 ("I and other Recruiters routinely negotiate the pay with a candidate. Most job requirements include a pay range, but it is my call to negotiate the final pay for the candidate within that

16

### e.    The engagement with candidates varies

The amount of interaction between Recruiters and candidates for placements varies substantially. While Plaintiffs and their declarants testify that they have little interaction with candidates other than to gauge their interest in accepting a role and conduct basic screening[25], others testify to detailed relationships.  TEK has the expectation that "Recruiters are always managing" the consultants they place.[26] That is what Ms. Rothermich does. Ms. Rothermich testifies that the success of a candidate comes down to the number of conversations she has with them prior to a potential assignment, and the preparation she gives them.  Ms. Rothermich will have a number of conversations with potential candidates regarding company culture and work environment before ever submitting them for assignment.  Further, she will call their references and judge their credibility in comparison to what she has heard from the candidate, research the customer's hiring manager and others who have interviewed in the past for the role, and then prepare the candidate for the potential interview.  She even will make suggestions to the candidate on potential changes to their resume or even their design portfolios. Critically, Ms. Rothermich also will deliver performance feedback to candidates that she has placed.  At times she has had to deliver negative feedback to candidates.  She states "If someone needs a kick in the pants, I'll give it to them."  For others, she continues to advocate for them and keep them in mind for future assignments. Rothermich Decl. ¶ 37.  Lindzy McCarty also states that she has had to give negative feedback to candidates, and that doing so requires her to balance that task with potentially keeping the candidate with TEK if the job was simply not a good fit.  McCarty Decl. ¶ 18.  Ms. Levine-Gorelick frequently gives feedback to candidates, and that she has been involved, although not the final decision maker, in taking someone off of an assignment. Levine-Gorelick Decl. ¶¶ 21-22.[27]

---

range. There is some incentive to negotiate a pay rate so that it maximizes the "spread" a Recruiter earns. "Spread" is the difference between what a candidate is paid and TEK's costs to place the candidate on assignment, compared to what the client pays TEK for the candidate's services. However, I have never negotiated pay for a candidate simply to increase spread. My experience is that it is best to negotiate based on what is fair to the candidate, the client, and TEK. Other Recruiters may have different negotiation strategies."); Ferrari Decl. ¶ 14.

[25] Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 22, 32; Doc. 64-1 (Ex. 14) Cunningham Decl. ¶ 21, 32; Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 20, 32; Doc. 64-1 (Ex. 16) Doerner Decl. ¶ 20, 31; Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 20, 31; Doc. 64-1 (Ex. 18) Tillson Decl. ¶ 20, 31; Doc. 64-1 (Ex. 19) Topp Decl. ¶ 21, 32.
[26] Haycock Dep. p. 36:9-38:1
[27] See also Guffy Decl. ¶ 17-18; Budde Decl. ¶ 20-21.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

f.   **Account Manager acceptance of Recruiter recommendations varies**

2   Plaintiffs and their declarants state that they have little to no say on whether an Account Manager

3   accepts the candidates they present and in turn submit to a client.[28]  That is not the experience of many

4   Recruiters.  Ms. Rothermich testifies that, while Account Managers do not always agree with her

5   candidate recommendations, those with whom she has a long relationship typically will agree with her

6   recommendations for candidates and submit them for consideration by the customer.  In fact, Ms.

7   Rothermich will even help a Lead Recruiter with whom she is paired to stack and order (i.e., rank)

8   candidates for design roles because she has more experience and expertise in selecting people to perform

9   within those roles. Rothermich Decl. ¶ 29. Lindzy McCarty testifies that after a couple years in the role,

10  Account Managers very rarely push back on her recommended candidates  and trust that the candidate

11  should be submitted to TEK's customer.  McCarty Decl. ¶ 14.  Ms. Mendez was clear that "Because I

12  am more knowledgeable than the Account Manager about the various technologies that clients expect

13  candidates to have, I work in partnership with the Account Managers to locate and present the best

14  candidates to the hiring managers.  I have developed trusted relationships with many of the Account

15  Managers I work with, and they rely solely on my recommendations to forward the candidate to the

16  client, as they trust my judgment on the quality of the candidates."  Mendez Decl. ¶ 17.

17  Similarly, Ms. Levine-Gorelick states that "[i]f after meeting the candidate and contacting their

18  references my judgement is that they are a great candidate for the requirement, then I will present the

19  candidate's credentials to the Account Manager. Account Managers generally follow my

20  recommendations, especially if we have worked together before." Levine-Gorelick Decl. ¶ 19.[29]

21  [28] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 29 ("Account Managers and Account Leads often received

22  potential matches from multiple Recruiters. Account Managers and Account Leads reviewed the
    candidate information and decided which candidates, if any, would be forwarded to TEKsystems'

23  client."); Doc. 64-1 (Ex. 14) Cunningham Decl. ¶ 29 (exact same quote as Brissey); Doc. 64-1 (Ex. 15)
    DeCair Decl. ¶ 29 (exact same quote as Brissey); Doc. 64-1 (Ex. 16) Doerner Decl. ¶ 28 (exact same

24  quote as Brissey); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 28 (exact same quote as Brissey); Doc. 64-1 (Ex.
    18) Tillson Decl. ¶ 28 (exact same quote as Brissey); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 29 (exact same

25  quote as Brissey).
    [29] See also, Guffy Decl. ¶ 13; Yancey Decl. ¶ 19; Compton Decl. ¶¶ 21-22 ("I only present a candidate

26  to an Account Manager if the candidate has been fully qualified by me through my vetting process, and
    if the candidate is excited about the opportunity. I create a package for the Account Manager that

27  explains why the candidate is a good fit, what the candidate's references had to say, and the results of
    any technical assessment that the candidate completed. After I send the package to the Account

28  Manager, I will call to tell them to verbally explain why the candidate is a good fit for the requirement.
    Account Managers I have worked with in the past take my recommendations more often than not. As I
    mentioned before, the Account Manager and Recruiter relationship is a partnership. If the Account

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

g.      **Training varies**

Plaintiffs also characterize training as uniform.  This is not the case according to several putative class members, however.  Recruiter Trainees start with thirteen weeks of training, but much of that training involves observing more experienced Recruiters and engaging in role-playing as a way for the Recruiter Trainee to discover their own style and approach to the role.[30]

As set forth above, Plaintiffs' own declarants belie their contention that training was a standard thirteen-week process to impose a standardized approach.  The vast majority of Plaintiffs' declarants spent between seven months to over a year in the Recruiter Trainee role.  In contrast, Lindzy McCarty did not go through Recruiter Trainee training at all, and Ms. Rothermich, Ms. Whitman, Ms. Mendez, and Yasmine Yancy completed their trainee period and became Recruiters in about three months.[31] Further, the testimony from other Recruiters is clear that what occurred during that training varied substantially.  For example, Ms. Rothermich testifies that the company set training was very remedial for her, but also focused on TEK culture and core values.  Ms. Rothermich states that her real training was watching YouTube videos on the technology issues she would be recruiting for, as well as shadowing other more experienced recruiters.  Rothermich Decl. ¶¶ 7-8.  Mr. Stryker, who is a Delivery Manager, but previously worked in the role of a Recruiter states that training is more about learning

---

Manager and I are aligned that the candidate is a good match for the requirement, it is common for us to call the customer together to explain why we've come to that conclusion "); Harvey Decl. ¶ 19; Kehl Decl. ¶ 13 ("If I am convinced that a candidate is a good match to a job requirement, I will tell the Account Manager why I have decided that a candidate is a good fit. If the Account Manager needs more information, we'll hop on a call to discuss the candidate in further detail. Putting a candidate up for a job for a client is a collaboration between the Recruiter and Account Manager, and once we are on the same page, we will send the candidate over to a client. Account Managers take my recommendation about a candidate most of the time."); Budde Decl., ¶ 19 ("If I decide that a candidate is a good match for a customer's job requirements, I will present the candidate's credentials to the Account Manager. I only do this if I believe that I can provide my personal stamp of approval for the candidate. The Account Manager makes the final decision whether to submit the candidate to the customer, but Account Managers I have worked with before almost always follow my recommendation.")

[30] See, DiBenedetto Dep. p. 106:5-107:16 ("Now, if we give the recruiters the ability to select how they hold their conversation, in my experience, if you were to follow the script for a bull's-eye, it makes it extremely robotic.  My direction and my peer's direction in the classroom has always been, here's a platform that will give you the ability to focus in on things that can assist you in your conversation. Now, ideally, you want to start broad and then get your way into the personal side of things. Because, remember, we don't know this individual at this particular point and it would be very hard for, let's say, you and I to meet and I go straight into your personal life.  I don't think that that conversation's going to go very far. So in terms of this, it's not that it's expected, but it is a tool to leverage, maybe keep it handy on your desk.  So it gives you prompts to have conversations and valuable conversations with your consultants.")

[31] Rothermich Decl. ¶¶ 1, 3; Whitman Decl. ¶¶ 1, 3; Mendez Decl. ¶¶ 1, 4; Yancey Decl. ¶¶ 1, 3.

19

what it is like to walk a mile in the candidate's shoes and that the goal is to have Recruiters get a sense

of the different recruiting styles used and develop their own style.  The training he describes from more

senior Recruiters to Recruiter Trainees is essentially: here are the things that worked for me. Try it out,

if it works for you, great, if not, try something different.  Stryker Decl.  ¶ 5.  Essentially, Recruiters

testify that Training is a vehicle to help them develop their own style of recruiting.[32]

### h.    The industry recruiters focus on

The industries that Recruiters support, as well as the roles they assist in filling vary substantially.

For example, Ms. Rothermich came to TEK with over twenty years of experience at creative agencies.

She was hired to specialize in Design.  That involves assisting tech companies to find product, UX/UI

designers, graphic designer and other creative individuals.  Rothermich Decl. ¶ 3-4.  By contrast, Lindzy

McCarty focuses entirely in placing candidates involved with Adobe software.   McCart Decl. ¶¶ 19-23.

Ms. Whitman specializes in healthcare and specifically electronic health record / electronic medical

record software systems.  She testifies that '[t]here are unique aspects to work in this specialized area

that impact the way the team learns about and help create reqs. If a project is just beginning, the Account

Manager might join the Recruiting team on a call to provide more background and detail about the

customer and the project. It is common for the Account Manager to ask people from the team to speak

directly with the customer to help develop the requirements, since Recruiters are the experts in the

market for talent. I usually have at least two calls like that per month, and other Recruiters on the team

are doing the same." Whitman Decl. ¶ 15.  Ms. Yancey specializes in government contracts in a wide

variety of IT services.  She testifies that "[g]overnmental contracts have unique characteristics which set

them apart from contracts with businesses in the private sector, which can make it challenging to find

qualified candidates."  Yancey Decl. ¶¶ 10-12.

---

[32] See also, Mendez Decl. ¶ 6 ("I learned the recruiting basics through the training, but I also understand that to be successful as a Recruiter, I needed to develop my own strategies to attract quality candidates for the various opportunities provided by clients."); Yancey Decl. ¶ 6 ("I understood the purpose of the training period to be to provide me an opportunity to see how different Recruiters do their work at TEK, to roleplay the work of Recruiters, and to determine my areas of strengths and areas of improvement. Based on the Recruiters' different perspectives and my assessment of my skills, I determined what techniques and approaches worked best for me to be a successful Recruiter."); Compton Decl. ¶¶ 6-8; Budde Decl., ¶ 8 ("I viewed the purpose of the training period as an opportunity to see how different Recruiters do their work at TEK, and from these different perspectives I would find my own voice and my own way to do things"); DiBenedetto Dep. p. 106:5-107:16.

20

### F.    Supervision Varies From Recruiter to Recruiter

The amount of supervision Recruiters had also varied.  Plaintiffs' declarants testify to close supervision of their work.[33]  Yet, many recruiters testified to little if any oversight on how they performed their jobs.  For example, Ms. Levine-Gorelick testified that while some Recruiters were initially supervised by Account Managers during the beginning of the class period, that is not the case anymore.  Levine Gorelick Decl. ¶ 8.  Ms. Whitman testifies that she reported to an Account Manager when she first began working as a Recruiter, but that changed in 2016 and she has only reported to other Recruiters since that time. Her observation is that it has become uncommon for Recruiters to be supervised by Account Managers. Whitman Decl. ¶¶ 5, 11-12.[34]

### G.    Recorded Recruiter Activities Do Not Capture The Amount Of Time Spent On A Particular Task Or Whether The Recruiter Is Exercising Discretion And Judgment

Plaintiffs focus on the purported fact that 70% of the activities recorded by Recruiter involve G2s or "calls."  What Plaintiffs utterly fail to do is quantify the time spent on those activities.  "Calls" as a category are full of variability that is not captured in the activity data; an unanswered call may take 30 seconds or a minute, while a call to screen a candidate for an open position could take an hour or more. Plaintiff have not attempted to determine the time Recruiters spend on activities that are recorded, and the available data does not support such an analysis. What the data does reveal is substantial variation of

---

[33] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 12 (""I worked under the daily and constant supervision of TEKsystems' managers.); Doc. 64-1 (Ex. 14) Cunningham Decl. ¶ 12; Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 11; Doc. 64-1 (Ex. 16) Doerner Decl. ¶ 11 (exact same quote as Brissey); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 11 (exact same quote as Brissey); Doc. 64-1 (Ex. 18) Tillson Decl. ¶ 11 (exact same quote as Brissey); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 12 (exact same quote as Brissey).

[34] See also Harvey Decl. ¶¶ 12-13 ("The Account Manager is not my supervisor. I treat it as a partnership to determine how to best address the clients' hiring needs. The Account Manager manages the network of clients, and I specialize in various types of technologies and develop a network of candidates who have the requisite skills in those technologies. . . My direct supervisor is Josh Gurin, who is a Recruiter Lead. I manage my own day and touch base with him only once or twice a week. I decide on my own how to source candidates, which candidates to interview, which candidates are best qualified for the reqs I am working on, and which candidates to present to an Account Manager. I do not need my Recruiter Lead's approval to do so."); Yancey Decl. ¶ 9 ("The Recruiting Lead that I report to is Casey Corley. I check in with her a couple times a week in a small group meeting and have a one-on-one meeting with her every other week. I also reach out to her as needed for assistance with technical questions and to develop the relationship with Account Managers, since she is more familiar with some of them than I am. I work with three to five different Account Managers in a given week."); Ferrari Decl. ¶ 7-8; Budde Decl. ¶¶ 13-14 (""I have the luxury of choosing which customer job requirements I want to spend time working on. If there is more than one Account Manager with a job requirement to fill for Apple, I can choose which one to partner with. Even though I focus primarily on Apple, I can and do choose to work with other customers at times . . . I do not report to an Account Manager, but I do partner with Account Managers frequently.")

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    activities recorded even by the four named Plaintiffs.

2    **III.    LEGAL ARGUMENT**

3        **A.    The Elements Of The Administrative Exemption Under California Law**

4        Employees are administratively exempt from overtime if:  (1) their duties and responsibilities

5    involve the performance of office or non-manual work "directly related" to the management policies or

6    general business operations of their employer or their employer's customers; (2) they "customarily and

7    regularly exercise discretion and independent judgment;" (3) they "perform under only general

8    supervision work along specialized or technical lines requiring special training, experience or

9    knowledge;" (4) they are "primarily engaged" in duties meeting the test of the exemption; and (5) they

10   earn a monthly salary of at least twice the state's minimum wage for full-time employment.

11   Wage Order 4-2001 §1(A)(2)(f).[35]

12       Examining the federal regulations incorporated into Wage Order 4-2001,[36] the California

13   Supreme Court described the first two subparts of 29 C.F.R. section 541.205 as the "qualitative" prong:

14           (a) The phrase "directly related to management policies or general business operations of
15           his employer or his employer's customers". describes those types of activities relating to
             the administrative operations of a business as distinguished from "production" or, in a
16           retail or service establishment, "sales" work.  In addition to describing the types of
             activities, the phrase limits the exemption to persons who perform work of substantial
17           importance to the management or operation of the business of his employer or his
             employer's customers.
18           (b) The administrative operations of the business include the work performed by so-
             called white-collar employees engaged in "servicing" a business as, for example,
19           advising the management, planning, negotiating, representing the company, purchasing,
             promoting sales, and business research and control.  An employee performing such work

---

20   [35]   The current IWC Wage Order No. 4–2001 is codified at 8 C.F.R. § 11040. The Wage Order and the
21   incorporated federal regulations include within the scope of "exempt work," "all work that is directly
     and closely related to exempt work and work which is properly viewed as a means for carrying out
22   exempt functions."  *Id.;* 8 C.F.R. § 11040(1)(A)(2)(f) (expressly adopting the federal regulations, but
     also the manner in which those regulations have been "construed"); IWC, Statement as to Basis, § 1
23   ("The activities constituting exempt work and non-exempt work shall be construed in the same manner
     as such terms are construed in the following regulations under the Fair Labor Standards Act effective as
24   of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215…"); *see*
     https://www.dir.ca.gov/iwc/statementbasis.htm (accessed October 10, 2017). The only difference is the
25   definition of "primary" duty, which includes a "50% of work" time rule.
     [36]   As *Harris* explains, Wage Order 4-2001 not only closely tracks the FLSA administrative exemption, it
26   adopts the regulations issued by the Secretary of Labor.  *Id*. at 179-80.  IWC's "Statements As to the
     Basis" accompanying Wage Order 4-2001 at pp. 2-3.  The activities constituting exempt work and non-
27   exempt work "shall be construed in the same manner as such terms are construed in the following
     regulations under the Fair Labor Standards Act: 29 C.F.R. sections 541.201-05, 541.207-08, 541.210,
28   and 541.215."  *Harris*, 53 Cal.4th at 178.  In other words, in applying Wage Order 4–2001, "just as the
     [labor] statute is understood in light of the wage order, the wage order is construed in light of the
     incorporated federal regulations."  *Id.*

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   is engaged in activities relating to the administrative operations of the business
2   notwithstanding that he is employed as an administrative assistant to an executive in the
    production department of the business.

3   *Harris*, 53 Cal.4th at 181-82.

4       The Court described subpart (c) of section 541.205, which further explains the term "substantial

5   importance" in subpart (a), as the "quantitative" prong. *Id.* at 181.

6       (c) As used to describe work of substantial importance to the management or operation of
7       the business, the phrase "directly related to management policies or general business
        operations" is not limited to persons who participate in the formulation of management
8       policies or in the operation of the business as a whole. Employees whose work is
        "directly related" to management policies or to general business operations include those
9       work affects policy or whose responsibility it is to execute or carry it out. The phrase
        also includes a wide variety of persons who either carry out major assignments in
10      conducting the operations of the business, or whose work affects business operations to a
        substantial degree, even though their assignments are tasks related to the operation of a
11      particular segment of the business.

12  Significantly, section 541.205(c)(5) provides that "[t]he test of 'directly related to management

13  policies or general business operations' is also met by many persons employed as advisory specialists

14  and consultants of various kinds, credit managers, safety directors, claim agents and adjusters, wage-rate

15  analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange

16  firms, promotion men, and many others." 29 C.F.R. 541.205(c)(5) (emphasis added). None of the

17  referenced positions "formulat[e] policy" or "set[] [the company's] strategic course." To determine

18  whether work is "administrative," the California Supreme Court directs that **the incorporated subparts**

19  **of section 541.205 must be read together as a whole.** *Harris*, 53 Cal.4th at 188.

20      **B.    Whether Recruiters Perform Work That Is "Directly Related" To The Management**

21          **Policies Or General Business Operations Is Not A Certifiable Question**

22      Plaintiffs argue that certification is appropriate because one element of the administrative

23  exemption—whether Recruiters meet the "qualitative" component of the "directly related to" portion of

24  the regulation—can be adjudicated on a classwide basis. Plaintiffs take the erroneous position that

25  meeting the "directly related to" prong requires employees to be formulating policy or setting TEK's

26  strategic course, and Plaintiffs argue that Recruiter's work only goes to TEK's "business purpose" and

27  "market offering." Plaintiffs' theory is not a certifiable question. Importantly, Plaintiffs' proposed

28  theory that Recruiters do not perform duties that can meet the qualitative prong of the exemption cannot

1    be a common question upon which certification is based because Plaintiffs' argument ignores the

2    California Supreme Court's explicit directive that the regulations interpreting the administrative

3    exemption—29 C.F.R. 541.205(a), (b) and (c)—must be read as a whole.

4         Plaintiffs' theory—that an employee does not meet the "qualitative prong" unless the employee

5    sets policy—is the same reasoning used by the California Court of Appeal that was reversed and

6    depublished by the California Supreme Court in *Harris*. Any citation to the **unpublished** second Court

7    of Appeal decision in *Harris* is also without merit and cannot support certification in this case. The point

8    is underscored by the precedent applying *Harris*. The California Supreme Court's decision in *Harris*

9    generally "does away with the administrative-production dichotomy previously utilized by courts."

10   *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 869 (C.D. Cal. 2012). [37]

11        Critically, Plaintiffs ignore the fact that the appropriate analysis, even if the Court were to accept

12   the administrative/production dichotomy, is not limited to the employee's direct employer (in this case,

13   TEK) but must also be conducted as to "**the employer's customers.**" Here, Plaintiffs do not even

14   attempt to argue, and therefore concede that Recruiters are not production employees for TEK's

15   customers. Instead, Recruiters are unquestionably directly involved in the running and servicing of

16   TEK's clients' businesses. Recruiters serve as **personnel management and human resources**

17   recruiters to staff critical positions for a variety of TEK's customers in a variety of industries. The

18   recruitment services that TEK Recruiters provide are not the primary business of the technology

19   companies, bio engineering, education institutions, non-profits, or any other company that TEK provides

20   services for and thus the holding only supports denial of certification in this case.

21                    **1.    Employees need not set policy to meet the administrative exemption**

22        Despite the overruling of the first decision and the depublication of the second, Plaintiffs

23   nonetheless ask the Court to adopt the reasoning advanced by the California Court of Appeal in *Harris*

---

24   [37] Also of note is that reliance on the unpublished Court of Appeal decision in *Harris* has been found to
25   be a basis for reconsideration of an order to certify an exemption class analyzed under the administrative
     exemption. See, *Farmers Ins. Exchange v. Superior Court*, 218 Cal. App. 4th 96 (2013) (denial of
26   reconsideration of class certification order reversed and mandate issued where the certification order
     relied on the then published *Harris* Court of Appeal decision, and that its depublication by the California
27   Supreme Court constituted a "change in the law," holding "Because depublication renders the opinion
     noncitable and removes its precedential value, it nullifies the opinion and renders it nonexistent");
28   *Wilson v. Farmers Ins. Exch.*, 2016 Cal. App. Unpub. LEXIS 3903 (2016) (affirming denial of
     certification of proposed class of exempt employees analyzed under the administrative exemption
     following mandate issued after depublication of Court of Appeal decision in *Harris*).

1    and require that administrative work be performed only at a policy-making level in order to meet the

2    exemption. *Harris*, 53 Cal.4th at 189. This rationale is at odds with the express language of the

3    regulations and the California Supreme Court's directive in *Harris*. The qualitative "directly related to"

4    element describes "activities relating to the administrative operations of a business" which are "of

5    substantial importance to the management or operation of the business." 29 CFR § 541.205(a). The

6    regulations expressly state that an administratively exempt **employee need not "participate in the**

7    **formulation of management policies or in the operation of the business as a whole;"** rather, the

8    exemption is satisfied by those whose "work affects policy or **whose responsibility it is to execute or**

9    **carry it out**." 29 C.F.R. § 541.205(c) (emphasis added).

10            **2.**    ***Harris* recognized the limitations of the administrative/production dichotomy**

11            Relying on *McKeen-Chaplin v. Provident Savings Bank, FSB*, 862 F.3d 847 (9th Cir. 2017),

12    Plaintiffs erroneously argue that whether or not Recruiters satisfy the administrative/production

13    dichotomy presents a common question subject to certification. Critically, the California Supreme Court

14    in *Harris* made clear "the limitations of the administrative/production worker dichotomy itself as an

15    analytical tool." *Harris,* 53 Cal.4th at 181-82.[38] "[T]he dichotomy is a judicially created creature of the

16    common law" and "has been effectively superseded in this context by the more specific and detailed

17    statutory and regulatory enactments." Courts must "apply[] the language of the relevant wage order and

18    regulations," and avoid providing "its own gloss to the administrative/production worker dichotomy."

19    *Id*. at 188. *McKeen-Chaplin* addressed mortgage underwriters allegedly misclassified as exempt under

20    the FLSA, but not California law, meaning the Ninth Circuit had no occasion to consider the impact of

21    *Harris*. *Harris* is binding on this Court's application of the Wage Order's administrative exemption.

22    Because the administrative/production dichotomy is not a dispositive test, it cannot form the basis for

23    class certification.

24            Similarly, Plaintiffs' citation to *Walsh v. Unitil Serv. Corp.*, 64 F.4th 1 (1st Cir. March 22, 2023),

25    ─────────────────
[38] *See also Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 650 (6th Cir. 2013) ("not all work is
26    classified as either production or administrative, as this dichotomy does not fit all cases"); *Bothell v.
Phase Metric, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002)(the dichotomy is "but one analytical tool, to be
27    used only to the extent that it clarifies the analysis [and o]nly when work falls squarely on the
production side of the line has the administrative/production dichotomy been determinative."); *Roe-*
28    *Midgett CC Services, Inc.*, 512 F.3d 865, 872-73 (7th Cir. 2008)(The "typical example" of the dichotomy
is a "factory setting," "an analogy that is not terribly useful" in a service context, , much less a high-tech
one.)

is also without merit.  *Walsh* involved the appeal of summary judgment in favor of the employer

regarding the exempt classification under the FLSA of electric grid controllers and utility gas

dispatchers.  *Id.* at *4-5.  The Court of Appeal reversed the summary judgment ruling and noted that the

second prong of the exemption applies:

> [I]f he or she "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." And separately, the regulations state that "[w]ork directly related to management or general business operations" can include, "but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; **personnel management; human resources**; employee benefits; labor relations; public relations[;] government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

*Id.* (Citations omitted, emphasis added).  The Court continued on that "it is often useful to identify and

articulate the business purpose of the employer and **(if necessary) the employer's customers**. By

"business purpose" we mean the production or provision of 'the very product or service that the'

employer or its customers 'offers to the public.'  Plaintiffs construe this holding to support their view

that TEK offers recruitment services, and Recruiters provide that very same service.  In that way,

Plaintiffs contend that Recruiters fail to meet the second prong of the exemption.  Moreover, as

discussed, *Walsh* simply doubles down on the administrative/production dichotomy that was expressly

rejected by the California Supreme Court in *Harris*.

Plaintiffs' reliance on *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3rd Cir. 1991) for the

same proposition is also misplaced.  In *Martin*, the court was presented with the question of whether

inside salespersons qualified as exempt from overtime under the FLSA.  The court found that the

plaintiffs were not properly classified as exempt.  In support of its ruling, the court relied on the

administrative/production dichotomy, and further based its decision on the fact that the parties in that

case stipulated that the core business of the employer was to produce sales, which the court found is

exactly what the plaintiffs did.  *Martin*, 940 F.2d at 903-904.  *Martin* is distinguishable, first, because it

does not involve questions of California law, and because it was decided prior to the California Supreme

Court's decision in *Harris*, and thus fails to take into account the Supreme Court's guidance.  Second,

even if the dichotomy were improperly applied to this case in contravention of the Supreme Court's

guidance, it still does not lend support to Plaintiffs.  Unlike in *Martin*, where the parties stipulated that the core business of the employer was to "produce sales," it is patently clear that TEK's ***customers'*** core business is ***not*** to recruit candidates.[39]

Similarly, Plaintiffs' reliance on *Nelson v. Avon Prods*., 2015 U.S. Dist. LEXIS 51104 (N.D. Cal. April 17, 2015), is also misplaced.  *Nelson* involved the classification of District Sales Managers whose job was in part to recruit sales representatives for the company.  In that case, the plaintiffs testified that their duties were to "recruit anyone with a pulse."  *Id*. at *6.  The Court ultimately granted certification of the proposed class, but focused on the regulations as a whole, finding common issues related to supervision, judgment and discretion, and whether the work performed was directly related to the management of Avon's business.  *Id*. at *19.

Critically, the Court in *Nelson* did not evaluate whether the putative class in that case was servicing the general business operations of Avon's **customers**.  As discussed, here, the inquiry must also extend to TEK's customers and whether Recruiters are servicing their general business operations.  Plaintiffs cannot dispute that is the case.[40]  The case law is clear that such activity qualifies as administratively exempt.  *See  Delodder v. Aerotek*, 471 Fed. Appx. 804, 807 (9th Cir. 2012) (District Court did not err in finding that "all class members were engaged in 'meeting the needs of Aerotek's customer companies,' a role that is 'directly related to . . . [Aerotek's] general business operations,' and therefore exempt"); *Andrade v. Aerotek,* 2010 U.S. Dist. LEXIS 117754 (D. Md. November 5, 2010) (work as a Recruiter was directly related to the management or business operations of Aerotek's customers); *Goff v. Bayada Nurses, Inc.*, 424 F. Supp. 2d 816, 824 (E.D. Pa. 2006) (holding that the job of supervisor at a provider of in-home nurses who "matched nurses to patients" and was involved in "case managing to ensure that the employee retains a positive relationship with the client" was directly related to the management or business operations of the employer or its clients); *Hudkins v. Maxim*

---

[39] Plaintiffs citation to *Eicher v. Advanced Business Integrators, Inc*., 151 Cal. App 4th 1363 (2007), is also without merit.  The case was decided before *Harris*, analyzed the employee's job duties as a computer professional through the lens of the administrative/production dichotomy, a method of analysis specifically rejected by *Harris* in this context.

[40] See Compton Decl. ¶ 16 ("For example, one of my largest customers is a financial services firm. I have worked with that firm to find people to work on a contract-to-hire as part of a project team that is modernizing the firm's main trading platform from legacy code into a modern tool. This is a project that impacts every person who invests through that firm, and the project has the attention of the highest levels of leadership.")

1  *Healthcare Servs.*, 39 F. Supp. 2d 1349, 1350 (M.D. Fla. 1998) (holding that the primary duty of a

2  recruiter at a company that placed nurses in hospitals "was directly related to the Defendant's general

3  business operation"). The same is true here.

4      Consequently, Plaintiffs' federal authorities interpreting the FLSA and resurrecting the

5  dichotomy present neither binding nor persuasive authority on the issue of certification of the proposed

6  California Rule 23 class.

7      **B.    Common Questions Are Not Subject To Common Proof Because The Exemption**

8          **Analysis Requires An Inquiry Into The Job Performance Of Recruiters**

9      Plaintiffs' arguments contradict the California Supreme Court's dictates in *Harris*. "[I]n

10  resolving whether work qualifies as administrative, courts must consider the particular facts before them

11  and apply the language of the statutes and wage orders at issue." *Id.* at 190.

12      **1.    Determining whether each Recruiter is exempt requires a week-by-week**

13          **assessment of whether the worker was "primarily engaged" in exempt work**

14      Reading the regulations as a whole requires an analysis that starts with what a particular

15  Recruiter actually does and ***how*** the Recruiter performs those tasks. For example, in *Fjeld v. Penske*

16  *Logistics, LLC*, 2013 WL 8360535 (C.D. Cal. 2013), the district court denied certification to a putative

17  class of exempt operations supervisors working for a logistics company. The court applied the

18  reasoning of *Harris* and denied certification because common issues did not predominate as to whether a

19  core set of duties or tasks qualified for the administrative exemption. An individual inquiry was

20  required to determine *how* the tasks were performed by each putative class member:

21      In other words, to conduct the relevant analyses, **it's not enough to know what tasks the**
        **Operations Supervisors are performing,** we also need to know **how they are doing it**.
22      For there to be classwide answers on whether the relevant tasks are exempt, Plaintiff
        must make a threshold showing that the putative class members are performing the tasks
23      in a substantially similar manner, e.g., by taking into account a similar set of factors.

24  *Id.* at *14 (emphasis added).

25      Determining whether each Recruiter is exempt requires examining both the work performed and

26  "realistic employer expectations." *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 802 (1999); Wage

27  Order 4-2001 § 2(K). "[C]ourts have routinely concluded that an individualized inquiry is necessary

28  even where the alleged misclassification involves application of a uniform classification policy because

1  the policy may properly classify some employees as exempt but not others." *Arenas v. El Torito*

2  *Restaurants, Inc.*, 183 Cal. App. 4th 723, 734 (2010) (claim that managers were misclassified on the

3  basis of their job descriptions was not amenable to common proof where the evidence showed that

4  managers' duties and the time spent on individual tasks varied significantly from one restaurant to

5  another); *Soderstedt v. CBIZ S. Cal. LLC,* 197 Cal. App. 4th 133, 152-153  (2011) (explaining

6  application of *Ramirez* in the class action context).

7       Plaintiffs' claim that every Recruiter performs the same job duty—screening candidates for

8  placement in the IT field—even if true, gets them nowhere.  Plaintiffs are therefore left to argue that no

9  Recruiter exercises discretion and independent judgment.  Even if Plaintiffs and their seven declarants

10  testified that they mechanically followed checklists and job requisition requirements rather than using

11  their independent discretion and judgment in the evaluation and screening candidates, numerous other

12  Recruiters disagree.  As discussed, multiple Recruiters testify that they use their discretion and judgment

13  to decide which job requisitions to work on[41], use their discretion and judgment to create sourcing

14  strategies that will find potentially qualified candidates[42], use their discretion and judgment to screen

15  and evaluate candidates[43], use their discretion and judgment to determine which candidates to submit for

16  a position, use their discretion and judgment to prepare candidates for consideration by TEK's

17  customers[44], use their discretion and judgment to determine what compensation to offer candidates, and

18

19  [41] Harvey Decl. ¶ 8; Stryker ¶ 16; Levine-Gorelick ¶ 14; McCarty ¶ 26.

20  [42] See, Mendez Decl. ¶ 13 ("I have to be creative and resourceful to locate good candidates for a
position. I maintain an extensive network of hundreds of potential candidates to reach out to for

21  positions, which is the most productive way to find candidates who will be successful in obtaining the
position"); Harvey Decl. ¶¶ 9-10 ("My experience with sourcing candidates is that I need to be creative

22  and resourceful to locate good candidates. I manage a personal network of about 300 individuals who
are in different stages of employment and are a primary source for candidates. I try to reach out to them

23  about once a week or once a month to determine their needs and qualifications. I also use referrals from
my network to find qualified individuals. If I do not have enough candidates from the personal network

24  and referrals, then I will use the Connected database to search for additional candidates. In Connected, I
create my own search strings and use filters to narrow in on candidates meet the basic qualifications for

25  the req. I decide which candidates should continue in the process"); Guffy Decl. ¶¶ 10-11 ("When I am
working on a requirement, I create my own strategy to source talent, and I expect other Recruiters to do

26  the same. . . What sets a good Recruiter apart when it comes to sourcing is the ability to be strategic and
innovative about how they find talent. Search filters alone are not enough to find) the best candidates. It

27  is up to the Recruiter to interpret and use the details they find about candidates."); Ferrari Decl. ¶ 11;
Budde Decl. ¶ 18.

28  [43] Rothermich Decl. ¶¶ 3-10; Stryker Decl. ¶ 20; Whitman Decl. ¶ 20 ("I also make judgements based on
what I know about the client and the project"); Mendez Decl. ¶ 9, 14; Guffy Decl. ¶ 12; McCarty Decl. ¶
15; Budde Decl. ¶¶ 18, 20-21.
[44] Rothermich Decl. ¶ 31; McCarty Decl. ¶ 16; Levine-Gorelick Decl. ¶  21; Guffy Decl. ¶¶ 17-18.

29

use their discretion and judgment to manage consultants placed on assignment.[45]  Thus, there are significant variations in Recruiters' individual experiences that are fundamentally at odds with a finding that their job duties are subject to common proof.  Whether putative class members customarily and regularly exercise "discretion and independent judgment," and whether they are engaged in "duties and responsibilities" that meet the test of the exemption for more than fifty percent of their working hours, present individualized questions of fact.

Plaintiffs must put forth *common evidence* to support a claim for class-wide misclassification under California law, either "that deliberate misclassification was [TEK's] policy or practice or similarly, that classification based on job descriptions alone resulted in widespread de facto misclassification." *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 481 (C.D.Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir.2011) (denying class certification).  Determining exempt classification is a fact-intensive inquiry that requires an individualized analysis of the actual hours worked, percentage of exempt versus non-exempt work performed, and particular job experiences. *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d 953, 956-959 (9th Cir. 2009). Moreover, neither a common reporting structure nor a common classification decision "eliminate[s] the need to make a factual determination as to whether class members are actually performing similar duties." *Id.*; *Velazquez v. Costco Wholesale Corp.*, 2011 WL 4891027, *8 (C.D. Cal. 2011) ("vague nature" of duties in job description means "inquiry into whether or not an [employee] is property classified as exempt because individual in nature"); *citing Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967, *8 (N.D.Cal. 2011) (uniform policies and training materials do not "provide common proof of whether the [employees] were spending more than fifty percent of their time performing exempt tasks").

Here, Plaintiffs have not established that any particular policy had a uniform impact on Recruiters' duties and time spent on those duties.  For example, Plaintiffs' declarations imply that training and checklists, as well as the use of screening tools deprived them of discretion and judgment. Plaintiffs assert that recruiters operated as entry level personnel clerks deprived of any discretion on who to submit for an open position.  But the evidence demonstrates that many Recruiters did not use these same tools, checklists, or other technology **at all**, or used them merely as a starting point for an in-depth

---

[45] Rothermich Decl. ¶¶ 15, 21-23; Whitman Decl. ¶ 22; Mendez Decl. ¶ 15; Guffy Decl. ¶ 15

1  evaluation and screening of a candidate.[46]  The evidence demonstrates that Recruiters frequently gain in-

2  depth knowledge of TEK's clients, coordinate the needs of those clients and their industries, and

3  evaluate candidates using their experience and judgment.[47]  Moreover, the evidence demonstrates that

4  Recruiters do not simply submit every potential candidate to an open role, but instead determine whether

5  the candidate is a good fit for the job requisition beyond merely looking at their resume and LinkedIn

6  profile.[48] Thus, a major piece of Plaintiffs' "common evidence" actually requires individualized

7  inquiries to determine what, if any, impact screening tools and checklists had on their performance.

8      Moreover, Plaintiffs' broad refrain that their main job duty is to screen candidates cannot amount

9  to common evidence of misclassification because it is not *per se* evidence of misclassification.  As a

10 result, this general description does not override the need to perform individualized analyses of what

11 work Recruiters actually performed week-by-week. *Weigele v. FedEx Ground Package Sys., Inc.*, 267

12 F.R.D. 614, 622 (S.D. Cal. 2010) (denying certification of allegedly misclassified employees because

13 common issues did not predominate); *Barker v. U.S. Bancorp.*, 2017 WL 2620676, at *3 (S.D. Cal.

14 2017) (question of whether class members spent over 50% of their time performing non-exempt duties

15 "requires an individualized inquiry into how each [employee] spent her time working").[49]

16      ## 2.    Classifying Recruiters as exempt fails to raise a common question

17      As the California Supreme Court stressed, "unless an employer's uniform policy or consistent

18 practice violate wage and hour laws, California courts have been reluctant to certify class actions

19 alleging misclassification."  *Duran v. U.S. Bank Nat. Assn*, 59 Cal.4th 1, 30-31 (2014).  Here, Plaintiffs

20 argue there are uniform policies based on the uniform classification of all Recruiters as exempt

21 employees.  California and federal courts, however, have rejected the theory that a uniform classification

22

23 [46] Rothermich Decl. ¶¶ 19-24; Levine-Gorelick Decl. ¶¶ 18-19; Mendez Decl. ¶¶ 9, 14; Harvey Decl. ¶¶ 11-15; Guffy Decl. ¶ 12; McCarty Decl. ¶¶ 12-15.

24 [47] Rothermich Decl. ¶¶ 15-18; McCarty Decl. ¶¶ 14, 19-23; Levine-Gorelick Decl. ¶¶ 23, 24; Guffy Decl. ¶¶ 17-18; Whitman Decl. ¶¶ 22-24; Mendez Decl. ¶ 11; Harvey Decl. ¶ 8.

25 [48] Mendez Decl. ¶¶ 8, 15; Harvey Decl. ¶ 19; Guffy Decl. ¶ 13; Compton ¶ 21; Levine-Gorelick ¶ 19. Budde Decl., ¶ 19.

26 [49] *See also Roth v. CHA Hollywood Med. Ctr., L.P.*, 2013 WL 5775129, at *7 (C.D. Cal. 2013) (class certification not appropriate "[w]hen the impact of an employer's policies depends on each individual employee's circumstances…"); *Williams v. Lockheed Martin Corp.*, 2011 WL 2200631, *15 (S.D. Cal. 2011) ("the need for individual inquiry is not reduced by the presence of centralized control or standard policies governing how employees spend their time"); *Pedroza v. Petsmart, Inc.*, 2013 WL 1490667, *7 (C.D. Cal. 2013) (denying class certification because scheduling system, staffing reports, and other business records had "limited value" as proof of class-wide misclassification).

27

28

31

1    of recruiters as exempt creates a common issue. *Marlo v. United Parcel Svc., Inc.*, 639 F.3d 942, 948

2    (9th Cir. 2011) ("policy classifying [managers] as exempt from overtime-pay requirements does not

3    necessarily establish that [managers] were misclassified, because the policy may have accurately

4    classified some employees and misclassified others"); *In re Wells Fargo*, 571 F.3d at 959 (reversing

5    certification based on the uniform classification of the position as exempt).[50]

6        **C.    Individualized Issues Exist as to Whether Recruiters Customarily and Regularly**

7            **Exercise Discretion and Judgment**

8        The exercise of discretion and independent judgment "involves the comparison and the

9    evaluation of possible courses of conduct and acting or making a decision after the various possibilities

10   have been considered." Wage Order 4-2001(A).[51]  This phrase "implies that the person has the authority

11   or power to make an independent choice, free from immediate direction or supervision and with respect

12   to matters of significance." *Id*. at §541.207(a). The regulations "do not require the exercise of discretion

13   and independent judgment at so high a level." *Id.* at (d). "Customarily and regularly" means a task is

14   performed on a recurring basis each week, as opposed to being performed only sporadically. *Id.* at

15   §541.701.  For example, exempt employees can make use of a "best practices" manual, but the use of

16   even a detailed manual does not eliminate discretion and independent judgment.[52] Indeed, even where a

17   supervisor "regularly speaks" to the employee, courts have found that fact alone insufficient to override

18   the application of the administrative exemption.[53]

19       Despite Plaintiffs' assertions that TEK's sourcing and screening tools and their interactions with

20

21   _____

22   [50] *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946-47 (9th Cir. 2009) (abuse of discretion to
     reply on  "internal uniform exemption policy to the near exclusion of other factors relevant to the
     predominance inquiry"); *Dunbar v. Albertson's Inc.*, 141 Cal. App. 4th 1422, 1427-28 (2006) (evidence

23   of standardized or uniform policy or practice to classify employees as exempt did not compel class
     certification as "that single policy decision may be improper as to some putative class members but
     proper as to others").

24   [51] 29 C.F.R. § 541.207(a) ("the comparison and the evaluation of possible courses of conduct and acting
     or making a decision after the various possibilities have been considered").

25   [52] *See In re Farmers Ins. Exch.*, 481 F.3d at 1129-1130; *McAllister*, 325 F.3d 997, 1001 (8th Cir. 2003)
     ("just because McAllister was required to follow detailed manuals does not mean she did not exercise

26   discretion and independent judgment"); *Rix v. Lockheed Martin Corp.*, 2011 WL 890744, *8 (S.D. Cal.
     2011) (denying class certification because uniform guidelines were "not policies that provide insight as

27   to how each [class member] actually spends his or her time").

28   [53] *Maddox v. Cont'l Cas. Co.*, 2011 WL 6825483, *7 (C.D. Cal. 2011) ("Although Plaintiff's supervisor
     regularly spoke to Plaintiff about the status of his accounts, conducted periodic meetings, and audited
     Plaintiff's files, those activities do not constitute more than general supervision.").

Account Managers deprived them of discretion and judgment[54], other Recruiters testified that the screening tools were only a starting point for their duties, and further many had little oversight from Account Managers, and instead independently developed their own network of highly qualified candidates.[55] Testimony also reveals sharp contrasts in the way Recruiters performed their jobs on tasks such as evaluating potential candidates, responding to particular job requisitions, interacting with TEK's clients, and oversight of a candidate's career. Many Recruiters operated independently and worked with a variety of Account Managers from across the county, leaving Recruiters with great discretion and judgment on how to evaluate and source candidates as well as which candidates to submit for a particular job requisition.[56]

Plaintiffs argue they had no discretion and judgment when performing their duties, and simply checked for minimum qualifications and submitted any candidate that met them and answered the phone.[57] Yet, many other Recruiters say the opposite. In fact, several Recruiters even testified that they would be failing to do their job if they submitted every potential match to an Account Manager and let the Account Manager decide. Such conduct would run contrary to expectations regarding how Recruiters are relied upon to screen and evaluate candidates, and a Recruiter that does so "will not last long."[58] The precise level of discretion and judgment used by each Recruiter depends on, among other things, the client who has provided the job requirements, the industry the job requisition is in, and the specific job to be filled, the network and expertise developed by the Recruiter, the marketplace for a

---

[54] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 13-21; Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 3, 6, 8; Doc. 64-1 (Ex. 16) Dorner Decl. ¶ 3, 6, 8; Doc. 64-1 (Ex. 18) Tillison Decl. ¶ 3, 6, 8; Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 3, 6, 8; Doc. 64-1 (Ex. 19) Larsen Decl. ¶ 3, 6, 8.

[55] Levine Gorelick Decl. ¶ 8; Whitman Decl. ¶¶ 8-9, 20-21; Compton ¶¶ 13, 22, 28; Boland ¶ 3 (as an Account Manager, Boland partners with Recruiters); Harvey Decl. ¶ 12-13 ("The Account Manager is not my supervisor. I treat it as a partnership to determine how to best address the clients' hiring needs. The Account Manager manages the network of clients, and I specialize in various types of technologies and develop a network of candidates who have the requisite skills in those technologies. . . My direct supervisor is Josh Gurin, who is a Recruiter Lead. I manage my own day and touch base with him only once or twice a week. I decide on my own how to source candidates, which candidates to interview, which candidates are best qualified for the reqs I am working on, and which candidates to present to an Account Manager. I do not need my Recruiter Lead's approval to do so.")

[56] McCarty Decl. ¶¶ 11-12; Mendez Decl. ¶ 12; Harvey Decl. ¶ 19; Guffy Decl. ¶ 13.

[57] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 28 ("If a candidate's listed skills matched the Requirement, I sent the candidate's resume and information about the candidate to the Account Manager or Account Lead."); Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 28 (exact same quote as Brissey); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 27 (exact same quote as Brissey); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 28 (exact same quote as Brissey).

[58] Rothermich Decl. ¶¶ 20-28; Stryker Decl. ¶ 20.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

particular set of skills, the depth of knowledge a candidate can relay to the recruiter beyond their resume, and the cultural fit for a particular employer, among other things.  As demonstrated above, there is a wide variation among Recruiters on how they accomplish these tasks.  Some Recruiters evaluate highly specific technical skills, and the depth of experience applying those skills; some evaluate aesthetic and artistic portfolios; some evaluate the candidate's personal presentation and potential team and culture fit; and some evaluate whether the actual experience set forth in the candidate's resume aligns with the job requisition at hand.

### 1.    The use of screening and sourcing tools and checklists does not eliminate Recruiters' use of independent judgment and discretion

Plaintiffs and their declarants asserts that Recruiters are obligated to mechanically utilize checklists and screening tools to screen candidates, and that there is little thought or discretion in doing so.[59]  Yet, multiple Recruiters testified that the checklists, sourcing tools, and screening tools were only a starting point to their job (if they even used them at all), and that the evaluation of potential candidates for a specific role, or even for placement in a role chosen specifically for that candidate takes additional insight, judgment, and discretion.[60]  Regardless, it is well established that exempt employees can make use of a "best practices" manual, and that the use of even a detailed manual does not eliminate discretion and independent judgment.  *See In re Farmers Ins. Exch.*, 481 F.3d 1119, 1129-1130 (9th Cir. 2007); *McAllister v. Transamerica Occidental Life Ins.*, 325 F.3d 997, 1001 (8th Cir. 2003) ("just because McAllister was required to follow detailed manuals does not mean she did not exercise discretion and independent judgment"); *Cheatham v. Allstate Ins. Co.*, 465 F.3d  578, 585 (5th Cir. 2006); *McLaughlin*

---

[59] See Doc. 64-1 (Ex. 13) Brissey Decl. ¶ 28 ("If a candidate's listed skills matched the Requirement, I sent the candidate's resume and information about the candidate to the Account Manager or Account Lead."); Doc. 64-1 (Ex. 15) DeCair Decl. ¶ 28 (exact same quote as Brissey); Doc. 64-1 (Ex. 17) Larsen Decl. ¶ 27 (exact same quote as Brissey); Doc. 64-1 (Ex. 19) Topp Decl. ¶ 28 (exact same quote as Brissey).

[60] Whitman Decl. ¶ 20 ("I evaluate the candidates to decide whether to move forward with them. It is not enough to find people with experience who have experience with Epic or Cerner software, for example. I make sure that they have experience with the specific modules (components) in the software that are relevant to the customer's project, and I consider whether they have earned special credentials in any relevant areas. I also make judgements based on what I know about the client and the project. For example, if the requisition is for someone to maintain a system that is relatively straightforward, a less experienced candidate may satisfy the requirements. On the other hand, a project that is at the point of doing a complex integration between existing software and new components will usually demand someone with more experience and a track record of completing similar projects."); Mendez Decl. ¶ 9, 14; Harney Decl. ¶¶ 11-15; Guffy Decl. ¶ 12; McCarty Decl. ¶¶ 12, 15.

34

*v. Nationwide Mut. Ins. Co.*, 2004 WL 1857112 at *11 (D.Or. August 18, 2004)("virtually every employee in America ... must follow company policies, procedures and guidelines"); *Rix v. Lockheed Martin Corp.*, 2011 WL 890744, *8 (S.D. Cal. 2011) (in denying class certification, the court rejected the plaintiff's argument that manuals and uniform training programs could overcome individual inquiries because they were "not policies that provide insight as to how each [class member] actually spends his or her time"). Here, the fact that Recruiters may use tools to identify potential candidates that meet, at a surface level, the job requirements for a new requisition is only the starting point of the inquiry. What is necessary is then to ask: then what? As demonstrated above, if the Recruiter even used sourcing tools the next step involved a more detailed, nuanced decision process that factors in the Recruiter's judgment, knowledge about a particular customer or market for a particular skill, and ultimately their discretion on how to operate.[61] As the Court in *DeLodder* aptly stated: "Even if all Recruiters share a common duty to source and screen, it does matter if Recruiters carry out that duty by using discretion and independent judgment as opposed to serving as mere functionaries, or, similarly, if Recruiters carry out their duties under general as opposed to specific supervision." *DeLodder* at *15.

Further, while Account Managers may be involved in deciding which candidates to submit to a customer, many Recruiters testify that their recommendations are accepted most of the time, as Account Managers trust in the candidates that the Recruiters present and will submit those candidates to TEK's customers.[62] That analysis is inherently not subject to common proof. Simply because the Account Manager or even the customer has a final say in whether a candidate submitted or begins an assignment does not mean that recruiters are not utilizing independent discretion and judgment in which candidates

---

[61] See Mendez Decl. ¶¶ 9, 14 "Through my years of experience, I have developed a particular expertise with positions for software development engineers at tech companies. In order to ensure that I am successful at my job and can identify the best prospects for specific positions, I have developed specific technical knowledge so that I can understand and assess the qualifications of the front end engineers that I place. In my experience, front end engineers have their own language, including around Java script and React and Angular computing languages used in their work, and I have had to learn how to communicate in their language as well. . . . Based on my experiences with different clients, over time I have developed and compiled screening questions unique to each client to ensure I can locate the most qualified candidate for the position. I have to evaluate the candidate's skill level and importantly determine if the candidate is a good fit for the specific client, since each client has different types of needs. I do this by, among other things, assessing the candidate's communications skills, how they respond to various social cues, and their overall personality, as well as probing their skill level with specific tech tools and their knowledge of certain technologies."

[62] Rothermich Decl. ¶¶ 29, 30; McCarty Decl. ¶¶ 14, 15; Mendez Decl. ¶¶ 16, 17; Harvey Decl. ¶ 19; Guffy Decl. ¶ 13.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

they are recommending.  *See, e.g., Bucklin v. Am. Zurich Ins. Co.*, 2013 WL 3147019 (C.D. Cal. June

19, 2013), *aff'd* 619 F. App'x 574 (9th Cir. 2015).  As the *Bucklin* court described in a case finding

claims adjusters to be exempt:

> Although plaintiffs have adduced evidence that their supervisors exerted some oversight over their tasks, it did not eliminate the substantial independence plaintiffs otherwise enjoyed.  To be sure, certain decisions required supervisory approval, including denials of claims, hiring a private investigator, setting reserves, or entering settlement above personal authority limits, and referring claims to the subrogation or fraud unit.  Nevertheless, . . . even where such decision required pre-approval, **plaintiffs were expected to offer a reasoned recommendation for the action**, which was accepted the vast majority of the time….

*Id.* (emphasis added).  *See also Maddox v. Continental Casualty Co.*, 2011 WL 6825483 at * 6 (C.D.

Cal. 2011) (adjusters were not misclassified based on supervisory oversight "simply because plaintiff

was required to seek approval from a manager or director when a decision exceeded his underwriting

authority"); *Robinson-Smith v. Gov't Employees Ins. Co.*, 590 F. 3d 886, 894 (D.C. 2010)(freedom from

immediate supervision "does not necessarily imply that the decisions made by the employee must have a

finality that goes with unlimited authority and a complete absence of review").

## 2. Reporting to supervisors does not eliminate the exercise of discretion and independent judgment

Similarly, contrary to Plaintiffs' assertion, "[t]he fact that an employee's decision may be subject

to review and that upon occasion the decisions are revised or reversed after review does not mean that

the employee is not exercising discretion and independent judgment…."  *Zelasko-Barrett v. Brayton-*

*Purcell, LLP*, 198 Cal. App. 4th 582, 591 (2011).  Indeed, section 541.207(e) states this explicitly:

> (e) *Final Decisions not necessary.*  (1) The term "discretion and independent judgment" as used in the regulations . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review.  The decisions made as a result of the exercise of discretion and judgment may consist of recommendations for action rather than the actual taking of action.  The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and judgment.

In short, the fact that all Recruiters have a supervisor is meaningless.  *See*, *e.g.*, *Smith v. Gov't*

*Employees Ins. Co.*, 590 F.3d 886, 894-95 (D.C. Cir. 2010) (employees' exempt status was not defeated

simply because they routinely communicated with supervisors); *Mekhitarian v. Deloitte & Touche*

*(ICS), LLC*, 2009 WL 6057248, *4 (C.D. Cal. 2009) ("Virtually every employee—no matter how high

1    ranking—is subject to some degree of supervision by a superior.  It is the degree of supervision that is

2    key, and the degree of supervision of class members cannot be determined on common proof because

3    the evidence indicates that they had significantly different experiences while working for Defendants.").

4        Plaintiffs' citation to *Tierno v. Rite Aid Corp.*, 2006 WL 2535056 (C.D. Cal. Feb. 7, 2007) for

5    the proposition that "standardized hierarchy often shows similar levels of supervision across employees"

6    is misplaced.  In *Tierno*, the employer established extremely specific and rigid policies that left little, if

7    any, room to exercise discretion or manage.  See, *Pedroza v. PetSmart, Inc.*, 2013 WL 1490667, at * 10

8    (C.D. Cal. Jan. 28, 2013)("But more importantly, in [*Tierno*], the plaintiffs sufficient established that the

9    company policies at issue tightly controlled the universe of duties performed by the employees");

10    *Casida v. Sears  Holdings Corp.*, 2012 WL 3260423, at *21-22 (E.D. Cal. Aug. 8, 2012) (*Tierno* is

11    distinguishable because of the companies' centralized control or authority in almost every aspect of store

12    operations"; *Perry-Roman v. AIG Ret. Servs., Inc.*, 2010 WL 8697061, at *4 (C.D. Cal. Feb. 24, 2010)

13    (Stating that *Tierno* was inapplicable because "putative class members [were] subject[ed] to

14    mechanized, top-down, and uniform supervision with defined sets of tasks and little for flexibility");

15    *Wiegele v. FedEx Group Package Sys, Inc.*, 267 F.R.D. 614, 622 (S.D. Cal. 2010) ("However, factual

16    differences, such as the scope of the relevant policies and the defendant's close supervision of the

17    plaintiffs, lead the Court to conclude that it should not follow *Tierno*.")

18        Plaintiffs' reliance on *Metrow v. Liberty Mut. Managed Case LLC*, 2017 U.S. Dist. LEXIS

19    73656 (C.D. Cal. May 1, 2017), fails for the same reasons.  In *Metrow* the Court was addressing the

20    exempt status of nurse care managers.  The Court found that predominance under Rule 23(b) could be

21    found because "all NCMs must perform these tasks chronologically based on a uniform schedule and the

22    tasks must be completed within a specified time period. Also, every NCMs' performance of each task is

23    evaluated based on the same standardized criteria. The record shows that every NCM completes their

24    assignment based on standardized step-by-step instructions."  *Id* at *29.  As set forth above and below,

25    that is simply not applicable to the facts of this case.

26        Here, the evidence regarding the degree of oversight varies significantly.  Some Recruiters

27    testify that while supervisors were frequently involved in evaluating whether the Recruiters met

28    underlying production metrics, they were not being supervised regarding how they were evaluating,

1   screening, and selecting candidates for submission.[63]  Essentially, Recruiters were held to account and

2   overseen on whether they got results, but not as to **how** those results were achieved.  That is the critical

3   difference that makes common proof in this case impossible on the issue of supervision.  Moreover,

4   even if that were not true, multiple Recruiters testified that they operate independently, and in fact are

5   subject to little to no supervision, other than to review whether they got the job done.

### 3.     Whether Recruiters meet TEK's reasonable expectations raises individualized issues

8   Even if a Recruiter were found not to have performed the job in a way that meets the

9   administrative exemption, an issue remains as to whether that Recruiter's performance meets TEK's

10  reasonable expectations.  Indeed, courts must "consider whether the employee's practice diverges from

11  the employer's realistic expectations, whether there was any concrete expression of employer

12  displeasure over an employee's substandard performance, and whether these expressions were

13  themselves realistic given the actual overall requirements of the job."  *Ramirez v. Yosemite Water Co.,*

14  *Inc.*, 20 Cal.4th 785, 802 (1999).  The Recruiter's job descriptions, which identify exempt duties,

15  supports a realistic expectation that Recruiters primarily engage in exempt duties.  To the extent a

16  Recruiter may claim that he/she has no discretion and judgment due to screening tools or Account

17  Manager oversight or otherwise, that runs contrary to TEK's reasonable expectations articulated through

18  policy and management.

### 4.     Plaintiffs' seven form declarations have limited evidentiary value

20  Plaintiffs' declarations do not support a class-wide finding for Rule 23 certification. *Marlo v.*

21  *United Parcel Serv., Inc.*, 639 F.3d 942, 949 (9th Cir. 2011) (affirming district court's determination that

22  plaintiff's declarations and deposition testimony "did not support a class-wide determination").

23  "[U]nder *Dukes*, for anecdotal evidence to give rise to an inference of a common practice, the evidence

24  should be representative in number and in geography." *Pedroza*, 2013 WL 1490667, at *8; *citing Wal-*

25  *Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (2011).  Here, however, the seven declarants worked

26  for a limited period of time for only a few Account Managers (a model that was going away even during

27  their employment and which now is uncommon), which is not representative of the proposed California

28

---

[63] Levine Gorelick Decl. ¶¶ 8, 9; Whitman Decl. ¶¶ 9-12.

1    class.  In contrast, TEK has submitted 14 declarations that make abundantly clear that the administrative

2    exemption applied to numerous, if not all Recruiters.  The discrepancy by Plaintiffs' evidence and

3    TEK's evidence warrant denial of certification here.[64]

4         **D.     Adjudicating Plaintiffs' Claims On A Class Basis Would Not be Manageable**

5         Plaintiffs have not and cannot describe a coherent trial plan.  Plaintiffs make no effort to explain

6    how this case could be tried with collective proof.  They appear to suggest that a trial will be

7    unnecessary because the Court can ignore *Harris*'s directive to apply the regulations as a whole and can

8    grant summary judgment as to the "directly related to" prong.  But even if this could be done, they make

9    no mention of what happens if Recruiters meet this prong.  There is no collective proof for the other

10    elements of the exemption and thus the case would have to be decertified.  Even if the question of

11    whether Recruiters' work meets the "directly related to" prong were an appropriate question for

12    certification, Plaintiffs cannot offer any plan as to how the issues of whether Recruiters customarily and

13    regular exercise discretion and judgment could be tried with collective proof.

14         Here, a class action is not a superior means of conducting this litigation because individual

15    inquiries into the hundreds of class members' assignments, work schedules, and hours would overwhelm

16    the court and render a class action unmanageable.  Plaintiffs offer no method to manage a class action

17    where the existence, type, and extent of damage varies from person to person and therefore individual

18    damages issues predominate.  As the United States Supreme Court held: "[q]uestions of individual

19    damage calculations will inevitably overwhelm questions common to the class."  *Comcast v. Behrend,*

---

20    [64] *See Garcia v. Sun Pac. Farming Co-op, Inc.*, 359 F. App'x 724, 726 (9th Cir. 2009) (class

21    certification denied; "the record evidence—in particular, the conflicting employee declarations
submitted by each party—does not establish common wage and hour practices, … but rather the

22    '[in]consistent application of the wage and hour laws between and among the [proposed class]'") ; *Hubbs
v. Big Lots Stores, Inc.*, 2017 WL 2304754 at *8 (C.D. Cal. May 23, 2017) (class certification denied

23    based on conflicting evidence of "contrary declarations"); *Chavez v. AmeriGas Propane, Inc.*, 2015 WL
12859721 at *21 (C.D. Cal. Feb. 11, 2015) (class certification denied based on "conflicting testimony");

24    *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 507, 527 (E.D. Cal. 2014) (granting decertification
based on "conflicting and contrary evidence submitted by each side"); *Soto v. Castlerock Farming &*

25    *Transp., Inc.*, 2013 WL 6844377, at *17, 19 (E.D. Cal. Dec. 23, 2013) (class certification denied;
holding that "conflicting testimony poses a significant concern for managing [a] class action" and

26    "conflicting evidence . . . defeats a finding of commonality for purposes of class certification;" "In light
of the dissimilarities and conflicting testimony of putative class members, the Court is unable to find a

27    contention 'capable of classwide resolution'") (internal citations omitted); *Rai v. CVS Caremark Corp.*,
2013 WL 10178675, at *9 (C.D. Cal. Oct. 11, 2013) (class certification denied based on conflicting

28    testimony potential class members; "This competing testimony is insufficient for the Court to find that
CVS had a common practice or policy . . ., and the Court cannot find that common issues
predominate.").

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   133 S.Ct. 1426, 1433 (2012) (rejecting Court of Appeals' acceptance of plaintiffs' damages

2   methodology without analyzing whether that model was "speculative," because "[u]nder that logic, at

3   the class-certification stage *any* method of measurement is acceptable so long as it can be applied

4   classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule

5   23(b)(3)'s predominance requirement to a nullity.")[65]

6   **IV.    CONCLUSION**

7          Plaintiffs insist that the exempt status of Recruiters can be determined in one fell swoop.  The

8   record demonstrates otherwise.  As the Court made clear in in *DeLodder*, "t]he record here makes clear

9   that this question can only be answered on an individualized basis. The degree of discretion exercised by

10  Recruiters varies at nearly every step of the recruiting process.  The record shows broad diversity in the

11  discretion exercised by Recruiters at various steps in the recruiting process on an office-by-office,

12  division-by-division, and Recruiter-by-Recruiter basis. Given that diversity, determining whether a

13  Recruiter exercised discretion and independent judgment sufficient to satisfy the second condition of the

14  administrative exemption requires an individualized factual inquiry, and does not lend itself to common

15  proof on a class-wide basis." *DeLodder* at *13-14.  For all the foregoing reasons, Defendant

16  respectfully requests that Plaintiffs' motion for class certification be denied in its entirety.

17  DATED:  November 17, 2023                          SEYFARTH SHAW LLP

18

19                                                     By: */s/ Brian P. Long*

20                                                         Andrew L. Scroggins
                                                           Brian P. Long
21                                                     Attorneys for Defendant
                                                       TEKSYSTEMS, INC.

22

23

24

25  [65]  Other courts following *Comcast* agree that certification in such instances is only appropriate if "there
    is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with
26  the plaintiffs' theory of liability." *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, *15 (C.D. Cal. 2013)
    ("As the Supreme Court reemphasized in *Comcast*, in order for…[the] predominance requirement to be
27  satisfied, a plaintiff must bring forth a measurement method that can be applied classwide and that ties
    the plaintiff's legal theory to the impact of the defendant's allegedly illegal conduct."). "Otherwise, the
28  plaintiffs have not met their burden of introducing evidence showing that common questions
    predominate regarding classwide relief." *Guido*, *15; *citing Comcast*, 133 S.Ct. at 1432 ("The party
    must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).")