Rachel Bien (SBN 315886)
OLIVIER & SCHREIBER LLP
595 E. Colorado Blvd., Suite 418
Pasadena, CA 91101
Tel: (213) 325-3430
Email: rachel@os-legal.com

Sally J. Abrahamson (admitted *pro hac vice*)
WERMAN SALAS P.C.
335 18th Place NE
Washington, D.C. 20002
Tel: (202) 830-2016
Email: sabrahamson@flsalaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BO AVERY, PHOEBE RODGERS, KRISTY CAMILLERI AND JILL UNVERFERTH, individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>TEKSYSTEMS, INC.,<br><br>　　　　　　　Defendant. | Case No. 3:22-cv-02733-JSC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date: February 1, 2024<br>Time: 10:00 a.m.<br>Ctrm.: 8 – 19th Floor<br><br>Judge: Hon. Jacqueline Scott Corley |

**TABLE OF CONTENTS**

Introduction...........................................................................................................................1

Argument .............................................................................................................................1

I.      Class Certification Is Not the Appropriate Time to Weigh the Merits of TEK's
        Affirmative Defense........................................................................................................1

II.     TEK Misstates the Holding in *Harris* ...................................................................2

III.    Common Questions of Law and Fact Predominate ...............................................3

        A.      TEK Does Not Dispute that Common Evidence Will Show that All
                Recruiters Have the Same Primary Job Duty ............................................3

        B.      Common Evidence Demonstrates that All Recruiters Perform the Same
                Primary Duty...............................................................................................4

        C.      Common Evidence Demonstrates Recruiters' Primary Job Duties Are
                Not Directly Related to Management Policies or General Business
                Operations ...................................................................................................8

        D.      Common Evidence Demonstrates Recruiters' Primary Job Duties Do
                Not Include Customarily and Regularly Exercising Discretion and
                Independent Judgment on Matters of Significance Subject Only to
                General Supervision...................................................................................12

IV.     The Court Should Disregard Defendant's Happy Camper Declarations or Give
        Them Little Weight .........................................................................................................14

        A.      TEK's Declarations Contain Irrelevant Information and Raise Concerns
                About the Circumstances in Which They Were Obtained ........................15

        B.      TEK's Declarations Do Not Contradict Plaintiffs' Common Evidence....17

V.      This Case Is Triable As a Class Action .................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                **Page(s)**

3

*Alba v. Papa John's USA, Inc.,*
4
   No. 05 Civ. 7487, 2007 WL 953849 (C.D. Cal. Feb. 7, 2007)...................................... 14

5

*Ambrosia v. Cogent Commc'ns, Inc.,*
   312 F.R.D. 544 (N.D. Cal. 2016) ................................................................................. 12

6

*Amgen v. Connecticut Retirement Plans and Trust Funds,*
7
   568 U.S. 455 (2013) ..................................................................................................... 2

8

*Andrade v. Aerotek, Inc.,*
   700 F. Supp. 2d 738 (D. Md. 2010).............................................................................. 12

9

*Arenas v. El Torito Restaurants, Inc.,*
10
   183 Cal. App. 4th 723 (2010) ...................................................................................... 7

11

*Avilez v. Pinkerton Gov't Servs.,*
   286 F.R.D. 450 (C.D. Cal. 2012)................................................................................. 16

12

13

*Avilez v. Pinkerton Gov't Servs., Inc.,*
   596 F. App'x 579 (9th Cir. 2015) ............................................................................... 16

14

*Ayala v. Antelope Valley Newspapers, Inc.,*
   59 Cal.4th 522 (2014)................................................................................................... 13

15

16

*Barker v. U.S. Bancorp,*
   No. 15 Civ. 1641, 2017 WL 2620676 (S.D. Cal. June 16, 2017)................................ 8

17

*Bothell v. Phase Metrics, Inc.,*
18
   299 F.3d 1120 (9th Cir. 2002) ..................................................................................... 10

19

*Boyd v. Bank of Am. Corp.,*
   300 F.R.D. 431 (C.D. Cal. 2014)................................................................................. 3

20

*Brinker Rest. Corp. v. Superior Court,*
21
   53 Cal.4th 1004 (2010)................................................................................................. 2

22

*Bucklin v. Am. Zurich Ins. Co.,*
   No. 11 Civ. 05519, 2013 WL 3147019 (C.D. Cal. June 19, 2013) ........................... 14

23

*Bucklin v. Zurich Am. Ins. Co.,*
24
   619 F. App'x 574 (9th Cir. 2015) ............................................................................... 14

25

*Campbell v. PricewaterhouseCoopers, LLP,*
   287 F.R.D. 615 (E.D. Cal. 2012)................................................................................. 3

26

*Cruz v. Dollar Tree Stores, Inc.,*
27
   No. 07 Civ. 2050, 2011 WL 2682967 (N.D. Cal. July 8, 2011) ................................ 8

28

*DeLodder v. Aerotek, Inc.*,
  No. 08 Civ. 806044, 2010 WL 11506881 (C.D. Cal. Aug. 16, 2010) ................................ 11, 12

*DeLuca v. Farmers Ins. Exch.*,
  No. 17 Civ. 00034, 2018 WL 1981393 (N.D. Cal. Feb. 27, 2018) ............................................ 3

*DiMercurio v. Equilon Enterprises LLC*,
  No. 19 Civ. 04029, 2021 WL 3885973 (N.D. Cal. Aug. 30, 2021)........................................... 12

*Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*,
  No. 13 Civ. 130646, 2014 WL 10988092 (C.D. Cal. July 30, 2014) ........................................ 2

*Eicher v. Advanced Bus. Integrators, Inc.*,
  151 Cal.App.4th 1363 (2007)................................................................................................... 12

*Fjeld v. Penske Logistics, LLC*,
  No. 12 Civ. 3500, 2013 WL 8360535 (C.D. Cal. Aug. 9, 2013) ................................................ 4

*Goff v. Bayada Nurses, Inc.*,
  424 F. Supp. 2d 816 (E.D. Pa. 2006) ...................................................................................... 12

*Harris v. Superior Ct.*,
  53 Cal.4th 170 (2011) ................................................................................................ 2, 9, 10, 11

*Hudkins v. Maxim Healthcare Servs., Inc.*,
  39 F. Supp. 2d 1349 (M.D. Fla. 1998) .................................................................................... 12

*Humes v. First Student, Inc.*,
  758 F. App'x 593 (9th Cir. 2019) .............................................................................................. 3

*Kress v. PricewaterhouseCoopers LLP*,
  No. 08 Civ. 0965, 2013 WL 140102 (E.D. Cal. Jan. 10, 2013)................................................. 3

*Maddox v. Cont'l Cas. Co.*,
  No. 11 Civ. 2451, 2011 WL 6825483 (C.D. Cal. Dec. 22, 2011)............................................ 14

*Marlo v. United Parcel Serv., Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008).............................................................................................. 7

*Martin v. Cooper Elec. Supply Co.*,
  940 F.2d 896 (3d Cir. 1991) ..................................................................................................... 2

*Martinez v. Joe's Crab Shack Holdings*,
  231 Cal.App.4th 362 (2014)...................................................................................................... 9

*McKeen-Chaplin v. Provident Sav. Bank, FSB*,
  862 F.3d 847, 851 (9th Cir. 2017) ........................................................................................ 2, 4

*Mekhitarian v. Deloitte & Touche (ICS), LLC*,
  No. 07 Civ. 412, 2009 WL 6057248 (C.D. Cal. Nov. 3, 2009) ............................................... 14

*Metrow v. Liberty Mut. Managed Care LLC*,
    No. 16 Civ. 1133, 2017 WL 4786093 (C.D. Cal. May 1, 2017) ............................................... 2, 7

*Mevorah v. Wells Fargo Home Mortg., Inc., a div. of Wells Fargo Bank*,
    No. 05 Civ. 1175, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005) ........................................... 16

*Morden v. T-Mobile USA, Inc.*,
    No. 05 Civ. 2112, 2006 WL 2620320 (W.D. Wash. Sept. 12, 2006) ..................................... 16

*Nash v. Horizon Freight Sys., Inc.*,
    2020 WL 7640878 (N.D. Cal. Dec. 23, 2020) ................................................................. 15, 16

*Nelson v. Avon Prod., Inc.*,
    No. 13 Civ. 02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015)...................................*passim*

*O'Connor v. Uber Techs., Inc.*,
    904 F.3d 1087 (9th Cir. 2018) ............................................................................................... 17

*O'Connor v. Uber Techs., Inc.*,
    No. 13 Civ. 3826, 2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) ........................................... 17

*Ramirez v. Yosemite Water Co.*
    20 Cal.4th 785 (1999) ............................................................................................................... 9

*Rieve v. Coventry Health Care, Inc.*,
    870 F. Supp. 2d 856 (C.D. Cal. 2012) ...................................................................................... 8

*Roseman v. Bloomberg L.P.*,
    No. 14 Civ. 2657, 2017 WL 4217150 (S.D.N.Y. Sept. 21, 2017) ............................. 3, 9, 19, 20

*Roseman v. Bloomberg L.P.*,
    No. 14 Civ. 2657, 2018 WL 1470587 (S.D.N.Y. Mar. 23, 2018) ............................................ 3

*Sherman v. Trinity Teen Solutions, Inc.*,
    -- F.4th --, 2023 WL 7138509 (10th Cir. Oct. 31, 2023) ....................................................... 12

*Smith v. Cardinal Logs. Mgmt. Corp.*,
    No. 07 Civ. 2104, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ........................................... 17

*Smith v. Gov't Employees Ins. Co.*,
    590 F. 3d 886 (D.C. 2010) ...................................................................................................... 14

*Sobolewski v. Boselli & Sons, LLC*,
    No.16 Civ. 01573, 2018 WL 3838140 (D. Colo. June 13, 2018) ........................................... 16

*Su v. F.W. Webb Co.*,
    No. 20 Civ. 11450, 2023 WL 4043771 (D. Mass. June 16, 2023) ......................................... 10

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .................................................................................................................. 9

*Velazquez v. Costco Wholesale Corp.*,
  No. 11 Civ. 00508, 2011 WL 4891027 (C.D. Cal. Oct. 11, 2011) .............................................. 8

*Walsh v. Unitil Serv. Corp.*,
  64 F.4th 1 (1st Cir. 2023) ................................................................................................... 2, 10

*Weigele v. FedEx Ground Package Sys., Inc.*,
  267 F.R.D. 614 (S.D. Cal. 2010) .............................................................................................. 7

*In re Wells Fargo Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009) .................................................................................................... 7

*Zelasko-Barrett v. Brayton-Purcell, LLP*,
  198 Cal. App. 4th 582 (2011) ................................................................................................. 14

**Statutes**

Cal. Lab. Code § 515 ................................................................................................................... 3

**Regulations**

29 C.F.R. § 541.205 ........................................................................................................ 2, 9, 10, 11

29 C.F.R. § 541.207 ................................................................................................................... 13

Cal. Code Regs. § 11040 ........................................................................................................ 3, 8

**Other Authorities**

Wage Order No. 4–2001 ........................................................................................................ 2, 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Unless TEK can prove its administrative employee exemption defense, Recruiters are entitled to overtime pay. But the *merits* of TEK's affirmative defense are for the future, not now. The different question this motion presents is whether TEK's administrative employee exemption defense can be resolved class-wide. The answer is plainly yes. The robust evidentiary record demonstrates that the overtime claims rise or fall on common evidence that predominates over any individual inquiries. Notwithstanding TEK's merits arguments, TEK's corporate documents, corporate witness testimony, and data, combined with Plaintiffs' cross-examined testimony and Recruiter declarations will show that Recruiters are production workers whose primary job duty does not relate to the management policies or general business operations of TEK or its clients.

TEK's challenges to the commonality and predominance factors rely on a handful of untested declarations from captive current employees. These declarations fail to defeat class certification because most of the declarants testify about their duties as *Recruiter Leads*, and not in the entry-level *Recruiter* position that is the subject of Plaintiffs' motion. Contrary to TEK's characterization of the testimony in its brief, all declarants describe a common set of duties that do not deviate meaningfully from the duties that Plaintiffs and their declarants describe. Class-wide adjudication is the best mechanism to resolve the common question of whether TEK properly classified Recruiters as exempt from overtime requirements under the administrative exemption.

For these reasons, as well as those in Plaintiffs' opening brief, the Court should grant Plaintiffs' Motion for Class Certification.[1]

**ARGUMENT**

**I.     Class Certification Is Not the Appropriate Time to Weigh the Merits of TEK's Affirmative Defense.**

At the class certification stage, the Court's proper focus is on whether there is common evidence that supports "plaintiff's theory of recovery." *Brinker Rest. Corp. v. Superior Court*, 53

---

[1]    Plaintiffs Exhibits 1 - 92 were filed with their moving brief. Exhibits 93 - 97 were filed in support of Plaintiffs' Reply Brief. A chart identifying their ECF Number and page number is annexed to the Declaration of Sally J. Abrahamson.

Cal.4th 1004, 1025 (2010). The Court should not "engage in free-ranging merits inquiries at the certification stage." *Amgen v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013). And notably, even if the Court were to consider TEK's merits theory, its position that all Recruiters were properly classified as exempt and performed the same primary duties undermines its contention that the claims should not be resolved in a class proceeding.

## II.     TEK Misstates the Holding in *Harris*.

TEK misstates the California Supreme Court's holding in *Harris v. Superior Ct.*, 53 Cal. 4th 170 (2011), claiming that the Court rejected the administrative/production analysis. But, the *Harris* Court *expressly* declined to "hold that the administrative/production worker dichotomy . . . . . can never be used as an analytical tool." *Id*. at 190. Rather, *Harris* stands for the proposition that courts should consider not just the administrative/production dichotomy but all of the factors in 29 C.F.R. § 541.205, as Plaintiffs have done here. *See* ECF No. 63 ("Pls.' Br.") at 25-27.[2] As the Court noted, Wage Order 4-2001—the applicable wage order here—incorporates certain federal regulations, including 29 C.F.R. § 541.205 (2000), which embraces the administrative/production analysis, distinguishing "activities relating to the administrative operations of a business" from "production" or "sales" work. *Id*. at 180.

Importantly, *Harris* does not bar certification in administrative exemption cases, as TEK argues. Multiple courts have certified classes in cases arising under California's administrative exemption post-*Harris*. *See, e.g., Metrow v. Liberty Mut. Managed Care LLC*, No. 16 Civ. 1133, 2017 WL 4786093, at *11 (C.D. Cal. May 1, 2017) (applying *Harris* and certifying the class); *Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*, No. 13 Civ. 130646, 2014 WL 10988092 (C.D. Cal. July 30, 2014) (same); *Kress v. PricewaterhouseCoopers LLP*, No. 08 Civ. 0965, 2013 WL

---

[2]     TEK admits that the Wage Order 4-2001 incorporates certain FLSA regulations, but then argues that Plaintiffs are somehow barred from citing case law that examines these federal regulations. *See* Def.'s Br. at 23-26 (incorrectly arguing that *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 851, 855 (9th Cir. 2017), *Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 6 (1st Cir. 2023), and *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991) should be disregarded because they examine federal regulations).

140102, at *10 (E.D. Cal. Jan. 10, 2013) (same).[3]

**III.   Common Questions of Law and Fact Predominate.**

TEK does not dispute that Plaintiffs have satisfied the Rule 23(a) elements of numerosity, typicality and adequacy.[4] Its arguments concerning commonality and predominance are meritless and should be rejected.

**A.     TEK Does Not Dispute that Common Evidence Will Show that All Recruiters Have the Same Primary Job Duty.**

Under California law, to classify an employee as exempt, the employer must establish that the employee's *primary* job duty meets the exemption requirements set forth in 8 Cal. Code Regs. § 11040(1)(A)(2).[5] Pls.' Br. at 24. TEK does not meaningfully dispute that Recruiters' **primary job duty** is to screen and match job candidates to third-party companies' job requisitions.

At class certification, the appropriate inquiry is whether common evidence can be used to evaluate the primary duty. *Roseman v. Bloomberg L.P.*, No. 14 Civ. 2657, 2017 WL 4217150, at *7 (S.D.N.Y. Sept. 21, 2017), *aff'd*, 2018 WL 1470587 (S.D.N.Y. Mar. 23, 2018) (when all class members perform the same primary job duty, differences in *how* they perform their primary duty or in the auxiliary duties they perform will not defeat predominance); *Nelson*, 2015 WL 1778326, at *9 (finding that although "individual differences exist among the named Plaintiffs and absent class – as they would in any case in which hundreds of employees engage in the same job – the issues common to the class members predominate over those differences."); *see also McKeen-*

---

[3]     *See also DeLuca v. Farmers Ins. Exch.*, No. 17 Civ. 00034, 2018 WL 1981393, at *1 (N.D. Cal. Feb. 27, 2018); *Nelson v. Avon Prod., Inc.*, No. 13 Civ. 02276, 2015 WL 1778326, at *9 (N.D. Cal. Apr. 17, 2015) ; *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431 (C.D. Cal. 2014); *Campbell v. PricewaterhouseCoopers, LLP*, 287 F.R.D. 615, 628 (E.D. Cal. 2012).

[4]     TEK only argues that Recruiters' tenure and their tenure in the Recruiter Trainee position was "not typical," without providing any supporting data, and it makes no Rule 23(a)(3) argument on "whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Humes v. First Student, Inc.*, 758 F. App'x 593, 596 (9th Cir. 2019) (citation cleaned up).

[5]     Lab. Code § 515(a) (if the employee "is *primarily* engaged in the duties that meet the test of the exemption. . . .") (emphasis added).

---

*Chaplin v. Provident Sav. Bank*, *FSB*, 862 F.3d 847, 855 (9th Cir. 2017) ("the question is not whether an employee is essential to the business, but rather whether her primary duty goes to the heart of internal administration—rather than marketplace offerings.") (citation cleaned up).

TEK's argument that the Court must look at every task that Recruiters perform every week is unsupported by case law, including the cases that TEK cites, and it also fails as a matter of common sense.[6]  In *Fjeld v. Penske Logistics, LLC*, No. 12 Civ. 3500, 2013 WL 8360535, at *3 (C.D. Cal. Aug. 9, 2013), the court denied certification because the plaintiff only presented evidence about how *he* performed his tasks. Unlike the *Fjeld* plaintiff, Plaintiffs here rely on corporate documents and testimony, TEK's data, Plaintiffs' depositions, *and* declarations to demonstrate that all Recruiters share the same primary job duty.

### B.    Common Evidence Demonstrates that All Recruiters Perform the Same Primary Duty.

Tellingly, TEK does not address the testimony of its Rule 30(b)(6) designees Robert Doyle, Director of Strategic Specialization, and Leonardo DiBenedetto, Lead Training Facilitator, and the testimony of corporate witnesses Garrett Haycock, Senior Vice President of Talent Delivery, and Alex Pulido, Executive Director – Application Services and TEK's Rule 30(b)(6) deponent in *TEKsystems v. Andiamo*, who admitted that Recruiters share all of the following job features that are relevant to their primary duty:

- **Recruiters match or "screen"[7] candidates against requirements determined by TEK's clients.** Ex. 4 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17 (Q: "But it's still the recruiter's job, then, to see if the information on the G2 matches a requirement?" A: "Completely, yeah. They're going to look through the requirement and say this might fit or this might not."), 181:19-21 (Q: "So recruiters shouldn't generally be matching G2s or candidates with requisitions that are not

---

6    In classifying all Recruiters as exempt, TEK does not engage in a week-by-week analysis of all Recruiters' tasks.

7    Multiple corporate documents describe Recruiters' primary duty as "screening." *See e.g.,* Ex. 48 (LA Welcome Packet) TEK-Recruiter_Lit-00539864-65; Ex. 49 (Sacramento Welcome Packet) TEK-Recruiter_Lit-00107557-58; Ex. 50 (San Diego Welcome Packet) TEK-Avery-00488750-51; Ex. 51 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. Screens consultants . . . ."); Ex. 52 (Coaches Guide Recruiter 1 Participant Guide) at TEKRecruiter_Lit-00529902; Pls.' Br. at 6, n.18.

qualified yet?" A: "It would largely be a huge waste of time to do so."); Ex. 6 (Haycock Tr.) 32:10-13 (Recruiters' "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs"), 59:2-11, 60:7-12 (Q: Recruiters' "job is to try to bring . . . the appropriate people in by finding that appropriate match . . .?" A: "Yes."); Ex. 3 (DiBenedetto Tr.) 162:18-163:7 (listing Recruiter "high value activities" as "understanding the requirement and sourcing it"); Ex. 23 (Andiamo Rule 30(b)(6) Tr.) 165:18-24 ("All of the recruiters are going to be soliciting the same talent pool . . . -- in the industry of IT.").

- **Recruiters work in a "producing role," which TEK considers to be a sales position and not a human resources position.** Ex. 3 (DiBenedetto Tr.) 90:13-91:8 (distinguishing Recruiters from human resources and noting Recruiters must have good sales skills); Ex. 6 (Haycock Tr.) 60:7-12; 68:1-16 ("Anyone that is in a role that is a salesperson account manager or recruiter, we consider those as producing roles. Meaning that they are producing for the company.  . . . they are a recruiter that is producing.  Meaning that they are a – they're a recruiter that produces what recruiters produce . . . They find people for jobs."), 123:21-24, 136:13-23; Ex. 4 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct.").[8]

- **TEK requires all Recruiters to meet the same production quotas.** Ex. 4 (Doyle Tr.) 130:17-20 (Q: "But those expectations were the same in every branch office in TEKsystems for recruiters, correct?" A: "Yes"); Ex. 6 (Haycock Tr.) 157:19-21 (Q: "And these 25 points . . . that applies to recruiters nationwide?" A: "Yes.").

- **Recruiters do not require specialized IT knowledge or training.** Ex. 3 (DiBenedetto Tr.) 121:1-7 ("The Recruiter is not [] an individual that has a technical background per se."); Ex. 4 (Doyle Tr.) 79:16-20 (Q: "Recruiters don't have any prerequisites before they're hired to have any sort of technical knowledge, is that true?" A: "That's correct."), 208:23-210:17.

- **TEK's clients, not Recruiters, determine the job requirements for job openings.** Ex. 4 (Doyle Tr.) 58:22-59:3 (Q: "[T]he customer is determining what the customer needs for that position; is that correct?" A: "Correct." Q: "And that's

---

[8]    TEK's corporate documents also show that the Recruiter position is a sales job and not a human resources job.  *See* Ex. 33 (Mason Oct. 24, 2019 Email) at TEK-Avery-00492061 ("we are looking for sales focused individuals"); Ex. 64 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sale"); *see also* Pls.' Br. at 11 n.48.

true for all skill specializations?" A: "Yeah."); Ex. 3 (DiBenedetto Tr.) 91:17-22 ("we get customers . . . send us job requirements . . . and we are supporting them").

- **Account Managers, not Recruiters, directly communicate with clients regarding their hiring needs.** Ex. 3 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 115:9-14 ("[Recruiters] consistently remain in communication with the consultant while our account managers remain in consistent communication with the customers"), 121:25-122:13 (customer requisitions are provided to Account Managers); Ex. 4 (Doyle Tr.) 150:8-10 (A: "And generally it's the Account Manager who contacts the client." A: "I'd say generally, yes."), 178:14-15 ("So generally Account Managers working with the customers"), 186:10-188:5, 189:11-25, 191:3-7, 191:22-192:4.

- **Recruiters do intakes, or "G2s," that prompt Recruiters to gather specific information from candidates.** Ex. 6 (Haycock Tr.) 60:19-21 ("A G2 is an information form that we use to be able to collect information about the candidate"), 151:1-12 (Recruiters expected to input G2 information into TEK's database, Connected); Ex. 3 (DiBenedetto Tr.) 87:12-88:5 (same); Ex. 4 (Doyle Tr.) 130:25-152:18.

- **Recruiters undergo the same training.** Ex. 3 (DiBenedetto Tr.) 47:10-16 (Q: "The training on Degreed that's provided to Recruiters, is that the same training that's provided to all Recruiters nationwide . . .?" A: "Yes."), 61:7-63:10, 68:13-69:10, 129:7-25; Ex. 4 (Doyle Tr.) 55:15-18 (Q: "Do Recruiters . . . go through the same 13-week training . . . ? A: "They do, with a little bit of nuance"); Ex. 6 (Haycock Tr.) 129:17-132:12.

- **TEK's clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them.** Ex. 3 (DiBenedetto Tr.) 167:9-14 (testifying that Recruiters do not make hiring and firing decisions); Ex. 4 (Doyle Tr.) 158:1-12 (client interviews the candidates), 192:13-193:8 (TEK's clients make hiring decisions), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes.").

- **TEK does not consider Recruiters to be "managers" who "oversee[] the actual work getting done."** Ex. 6 (Haycock Tr.) 36:16-17.

- **Recruiters do not evaluate the work performed by hirees.** Ex. 3 (DiBenedetto Tr.) 167:19-168:7; Ex. 6 (Haycock Tr.) 121:20-122:16, 144:18-145:12.

TEK's corporate documents and data, Plaintiffs' deposition testimony, and Plaintiffs' declarants corroborate this corporate testify. *See* Pls.' Br. at 3-20. TEK maintains an internal database where Recruiters enter their activities in real time. *Id.* at 14-15. The data demonstrates

that the vast majority of Plaintiffs' activities—approximately 72%—involved attempting to make contact with candidates, conducting intakes, and making calls. *Id*. Critically, an analysis of the Connected data for TEK's Recruiter declarants shows that approximately 66% of their activities were dedicated to attempted calls, conducting intakes, and making calls.[9] The below chart demonstrates how, like Plaintiffs' data, TEK's Recruiter happy camper declarants' outreach grossly outnumbers their submittals and starts, and represents more than 50% of their work:[10]

|  | Attempted Contact | G2 | Call | Submitted | Started |
|---|---|---|---|---|---|
| **TEKsystems Declarants** | 19,664 | 20,232 | 18,622 | 3,379 | 424 |

Courts have found this type of common evidence to be sufficient to grant certification in administrative exemption cases. *See, e.g.*, *Nelson*, 2015 WL 1778326, at *2 (granting certification in a recruiter case relying on defendants' corporate documents and deposition testimony, among other evidence); *Metrow*, 2017 WL 4786093, at *1 (granting certification on similar evidence).

The cases on which TEK relies do not support its position that Plaintiffs' compelling common evidence can be overcome by a small set of cherry-picked, captive employee declarations. No. 68 ("Def.'s Br.") at 30-31. For instance, in *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 483 (C.D. Cal. 2008), the court decertified the class where plaintiffs relied primarily on declarations and a survey. In *In re Wells Fargo Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009), the Ninth Circuit found that while "uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes," a certification decision cannot rest solely on an employer's exemption decision. Likewise, the court in *Weigele v. FedEx Ground Package Sys., Inc.*, 267 F.R.D. 614, 620-22 (S.D. Cal. 2010), decertified a class based on the same principle—that the plaintiffs had relied almost exclusively on defendant's classification policy. Plaintiffs provide substantially more evidence than TEK's uniform classification decision.[11]

---

[9] Ex. 95 (Major Decl. 2) ¶ 17.
[10] Ex. 95 (Major Decl. 2) ¶¶ 15-23, Attachment 6.
[11] TEK's reliance on *Arenas v. El Torito Restaurants, Inc.*, 183 Cal. App. 4th 723, 729 (2010) is similarly misplaced because unlike here, the *Arenas* plaintiffs relied almost exclusively on declarations and not common evidence.

In *Velazquez v. Costco Wholesale Corp.*, No. 11 Civ. 00508, 2011 WL 4891027, at *7 (C.D. Cal. Oct. 11, 2011), the court found that the job duty evidence was "vague." Here, there is detailed evidence of what Recruiters do that is maintained in TEK's database showing virtually every task that Recruiters engage in and what they must do to meet their weekly production quotas. In *Cruz v. Dollar Tree Stores, Inc.*, No. 07 Civ. 2050, 2011 WL 2682967, at *7 (N.D. Cal. July 8, 2011), the court decertified a class where plaintiffs and class member testimony contradicted the common evidence upon which plaintiffs relied. Plaintiffs' testimony here is consistent with the corporate testimony that Recruiters' primary job duty is sourcing and matching job candidates.

In *Barker v. U.S. Bancorp*, No. 15 Civ. 1641, 2017 WL 2620676, at *3 (S.D. Cal. June 16, 2017), the court denied class certification because it found plaintiffs could not point to common evidence that would show what the class spent the majority of their time performing. Here, TEK's data shows what Recruiters spent the majority of their time on—attempting to call candidates, speaking with candidates on the phone, and conducting G2 intakes. Pls.' Br. at 12-14.

Finally, none of TEK's cases require the Court to engage in a week-by-week analysis.

## C.  Common Evidence Demonstrates Recruiters' Primary Job Duties Are Not Directly Related to Management Policies or General Business Operations.

To avoid paying overtime under the administrative exemption, TEK must prove each element of its exemption defense. The first prong requires TEK to prove that employees' primary "duties and responsibilities involve . . . the performance of office or nonmanual work directly related to the management or general business operations of his/her employer or his employer's customers." 8 Cal. Code Regs. § 11040 (1)(A)(2)(a)(I).

TEK does not argue that some Recruiters engage in "administrative" work, while others do not. It explicitly argues that "Recruiters are unquestionably directly involved in the running and servicing of TEK's clients' businesses." Def.'s Br. 24.[12] TEK argues a purported "fatal similarity"

---

[12]    TEK's assertion that Recruiters are exempt because they "staff critical positions" for TEK's customers is also a strawman because "all employees of a business must serve some essential function, or their respective positions would not exist," the correct inquiry is does "the employee's value flow[] 'to the management or operation of the business.'" *Rieve v. Coventry Health Care,*

that does not prevent certification but rather supports it. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016). TEK cannot (and does not) credibly argue that class certification is not appropriate with respect to the question of whether Recruiters' duties involve work directly related to the management or general business operations of TEK or its customers. *See Nelson*, 2015 WL 1778326, at *6 ("Defendant does not argue that some DSMs engage in work directly related to management policies while others do not . . . Both parties thus offer a single class-wide argument on the merits of the 'directly related' prong.").

At class certification, the question of whether TEK satisfies the first prong of the administrative exemption is susceptible to common proof. *See Roseman*, 2017 WL 4217150, at *7. The crucial question of fact (what is Recruiters' primary job duty) and law (whether that job meets the exemption) are common to the class. Further, the exemption requires that workers primarily— meaning more than 50% of the time—perform exempt work. All evidence demonstrates that Recruiters spent more than 50% of their day sourcing and matching potential job candidates to third-party job requisitions. Therefore, if sourcing and matching are not exempt activities, as Plaintiffs contend, Recruiters are eligible for overtime, and TEK is liable for unpaid wages. In other words, "by classifying all [Recruiters] as exempt, [TEK] violated mandatory overtime wage laws." *See Martinez v. Joe's Crab Shack Holdings*, 231 Cal.App.4th 362, 380 (2014). This theory is "'by nature a common question eminently suited for class treatment.'" *Id.* (citation cleaned up).

Pursuant to *Harris*, at the merits stage, it is *TEK's* burden to show that Recruiters' work is "directly related" to management by showing that the work is *both* qualitatively administrative *and* quantitatively administrative pursuant to the 29 C.F.R. § 541.205 (2000). *Harris*, 53 Cal. 4th at 181-82 ("Because the test is conjunctive, plaintiffs need only show that defendants cannot meet their burden as to either part of the test in order to succeed on their motion for summary adjudication.") (citing *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794–795)). As a preliminary matter, TEK does not rebut the significant case law that employees on the frontlines,

---

*Inc.*, 870 F. Supp. 2d 856, 872-73 (C.D. Cal. 2012).

producing what a company offers the marketplace, are not performing work of the requisite "substantial importance to the management or operation of the business of his employer or his employer's customers." 29 C.F.R. § 541.205(a) (2000) (noting that "production" and "sales" work is not administrative exempt work); Pls.' Br. at 25-27. TEK also admits that common evidence also exists that Recruiters are "production" or "sales" employees and, therefore, not engaged in work directly related to management. Def.'s Br. at 37 (admitting that Recruiters are evaluated on "production metrics"); *see also* Pls.' Br. at 4-15.

In determining if the work is qualitatively administrative, *Harris* notes that 29 C.F.R. § 541.205(b) is the regulation to determine if the employees' primary duty is "running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002); *Harris*, 53 Cal. 4th at 182. Common evidence here demonstrates that Recruiters are engaged in the day-to-day business of TEK, sourcing and matching candidates. In fact, TEK assigns the same customer requisition to multiple Recruiters.[13] In doing so, TEK can then pitch a wider net of candidates to customers so it will not "get beat on a requirement" by a competitor's candidate.[14] In fact, only 31.8% of the job requirements that TEK works to fill get filled by TEK's candidates.[15] Recruiters are not acting in some administrative role directly related to management with TEK or TEK's customers but are helping TEK sell its candidates to customers. *See Walsh*, 64 F.4th at 8 (noting that dispatchers did not meet this management prong of the exemption because they provided day-to-day services to the employer's customers and did not "analyze how [systems] work or how they can be improved"); *Su v. F.W. Webb Co.*, No. 20 Civ. 11450, 2023 WL 4043771, at *9 (D. Mass. June 16, 2023) (finding employer's administrative exemption argument undercut where job description included "previous sales experience").[16]

---

[13]    Ex. 4 (Doyle Tr.) 139:8-14 (multiple Recruiters work on the same requisition).
[14]    Ex. 26 (Haycock Email October 26, 2020) at TEK-Recruiter_Lit-00386105.
[15]    Ex. 5 (Doyle Sealed Tr. Portion) 237:20-238:9; Pls.' Br. at 3, n.4.
[16]    In fact, some recruiting firms classify their recruiters as inside sales employees. *See, e.g.* Ex. 96 (*Brain v. The Execu-Search Group, LLC* Letter to Court) at 2 (employer argued it correctly

*Harris* notes that 29 C.F.R. § 541.205(c) "relates to the quantitative component of the test." *Harris*, 53 Cal. 4th at 182. Common evidence shows that Recruiters' primary job duty is not quantitatively administrative because it does not involve carrying out "major assignments in conducting the operations of the business," nor does their work "affect[] business operations to a substantial degree." 29 C.F.R. § 541.205(c). In fact, TEK's corporate witnesses testified that:

- **Recruiters are not involved in creating or implementing management, operational or human resources policies for TEK or TEK's customers.** Ex. 6 (Haycock Tr.) 158:20-162:5 (testifying that Recruiters do not create or implement human resource, operational, or management policies for TEK or its clients), 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives and not Recruiters because the executives are "running [the] business."); Ex. 3 (DiBenedetto Tr.) 167:15-18.

- **Recruiters do not have the authority to negotiate or bind TEK or its customers with respect to significant matters.** Ex. 2 (Def.'s Resp. to Pls.' 2nd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters."); Ex. 3 (DiBenedetto Tr.) 109:23-110:3; Ex. 4 (Haycock Tr.) 161:3-5 (Recruiters cannot bind TEK in legal proceedings); Ex. 4 (Doyle Tr.) 194:13-16 (Q: But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate" A: Correct. Yes.).

- **Recruiters do not provide human resource services, employee benefit functions, or quality control services for TEK or its clients.** Ex. 6 (Haycock Tr.) 123:1-24, 158:20-161:15; Ex. 4 (Doyle Tr.) 198:19-25, 209:2-12.

Notably, in *DeLodder v. Aerotek, Inc.*, the court found that common questions regarding whether Recruiters "perform office or non-manual work directly related to management policies or general business operations of the employer or its customers" predominated over individualized inquiries. No. 08 Civ. 806044, 2010 WL 11506881, at *13 (C.D. Cal. Aug. 16, 2010). The court denied class certification because it found substantively against plaintiffs on the merits of the issue. *Id.* However, the record here is distinguishable in material ways that change the merits evaluation but not the fact that common issues predominate over individualized issues. Plaintiffs point to common evidence that: (1) Recruiters are entry level employees far removed from the administration of TEK or its clients; (2) Recruiters are engaging in the services that TEK offers

---

classified recruiters as an inside sales exempt employee pursuant to 29 U.S.C. § 207(i)).

the marketplace; (3) Recruiters have the same *primary job duty*; and (4) only about a third of the requisitions on which TEK works get filled by TEK candidates. None of these facts were before the *DeLodder* court and the Court did not examine how the competitive sales nature of a recruiting business affected the Recruiters' job.[17] Whether Recruiters' primary job duty is production is an issue in which common evidence predominate, as the *DeLodder* court noted.[18] This is particularly true because Rule 23(b) "does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof, so long as one or more common questions predominate." *DiMercurio v. Equilon Enterprises LLC*, No. 19 Civ. 04029, 2021 WL 3885973, at *8 (N.D. Cal. Aug. 30, 2021) (Corley, J.) (citation cleaned up).[19]

**D.    Common Evidence Demonstrates Recruiters' Primary Job Duties Do Not Include Customarily and Regularly Exercising Discretion and Independent Judgment on Matters of Significance Subject Only to General Supervision.**

To avoid liability, TEK must *also* prove that the employees "customarily and regularly exercise discretion and independent judgment," *and* "perform[ ] under only general supervision work along specialized or technical lines requiring special training" or "execute . . . under only general supervision special assignments and tasks." *Ambrosia v. Cogent Commc'ns, Inc.*, 312 F.R.D. 544, 553 (N.D. Cal. 2016). To meet the exemption, TEK must show that employees are "primarily engaged" in exempt work, meaning the workers are "engaged in the activities meeting the test for the exemption at least 50 percent of the time." *Id.* (citing *Eicher v. Advanced Bus.*

---

[17]    *Andrade v. Aerotek, Inc.*, 700 F. Supp. 2d 738, 746 (D. Md. 2010), *Goff v. Bayada Nurses, Inc.*, 424 F. Supp. 2d 816, 821 (E.D. Pa. 2006), *Hudkins v. Maxim Healthcare Servs., Inc.*, 39 F. Supp. 2d 1349, 1350 (M.D. Fla. 1998) are not certification decisions and do not include quantitative evidence regarding Recruiters' production works and are, therefore, distinguishable.

[18]    TEK does not rebut the other distinctions Plaintiffs note between this case and *DeLodder. See* Pls.' Br. at 36-37.

[19]    The Tenth Circuit recently vacated a district court's denial of class certification in *Sherman v. Trinity Teen Solutions, Inc.* because the district court "misapplied Rule 23(a)'s commonality requirement by scrutinizing the proposed class for noncommon issues, rather than common ones." -- F.4th --, 2023 WL 7138509, *7 (10th Cir. Oct. 31, 2023) *Id.* at *7. The district court erred by assessing whether any individualized inquiries were necessary to resolve the putative class's claims instead of whether the proposed classes shared "*at least one common question of law or fact*, the resolution of which would drive the litigation." *Id.*

*Integrators, Inc.*, 151 Cal.App.4th 1363, 1371–72 (2007) (quoting Wage Order No. 4–2001)).

TEK does not rebut Plaintiffs' common evidence that Recruiters' *primary job duty* does not include customarily exercising discretion over *matters of significance*. TEK does not rebut the common evidence that TEK's client's requisition forms dictate the qualifications job candidates must have and that Recruiters' primary job is to screen and match job candidates. Recruiters are multiple levels away from any staffing or hiring decisions (matters of significance) – multiple Recruiters submit multiple candidates for a single job to Account Managers, who in turn decide which candidates to submit to a third-party company, and that company's hiring manager makes decisions on who to interview and hire. *Supra*. In engaging in intakes, TEK requires all Recruiters to perform G2 intakes and to enter that information into prompts in TEK's database. *Supra*. Recruiters' job duties do not rise to the level of discretion on matters of significance required by 29 C.F.R. § 541.207(c)(5) (2000) (where an employee is screening potential job candidates by standards "set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials[,] [i]t seems clear that such a personnel clerk does not exercise discretion and independent judgment"). This is particularly true where the decision to hire rests with TEK's customers and for the majority of requisitions that TEK works on, its customers do not hire *any* candidates provided by TEK. Ex. 5 (Doyle Sealed Tr. Portion) 237:20-238:9; *supra*.

TEK makes the mistake of "focus[ing] too much on the substantive issue" of whether Recruiters exercise discretion, "instead of whether that question could be decided using common proof." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 537 (2014). The relevant question is not whether there were any individual variations in how much discretion Recruiters exercised, but rather, whether the extent of discretion, "whatever it might be, is susceptible to classwide proof." *Id.* Common evidence demonstrates that Recruiters' primary job duty does not involve regularly exercising discretion over matters of significance.

TEK does not dispute that it uniformly subjects Recruiters to multiple levels of supervision, that it monitors Recruiters' compliance with the uniform "production metrics" on a weekly basis,

1    that Recruiters' annual reviews are based on the same metrics, and that it has uniform discipline

2    procedures based on the metrics. Pls.' Br. at 17-19. These extensive "production metrics" far

3    exceed simply providing Recruiters with the company's "best practices." Def.'s Br. at 34; Pls.' Br.

4    at 12-14. Rather, TEK admits that it even exercises control over the specific job duties "such as

5    number of calls and outreaches to potential candidates" that Recruiters make on a weekly basis.

6    Def.'s Br. at 7; *see Nelson,* 2015 WL 1778326, at *7 (question of whether recruiters were subjected

7    to more than general supervision could be answered on a class-wide basis where supervisors

8    monitored key performance indicators of all class members); *Alba v. Papa John's USA, Inc.*, No.

9    05 Civ. 7487, 2007 WL 953849, at *11 (C.D. Cal. Feb. 7, 2007). As such, TEK subjects Recruiters

10   to a high level of similar supervision.

11        The cases upon which TEK relies are distinguishable. *See* Def.'s Br. at 36-37. In *Bucklin v.*

12   *Am. Zurich Ins. Co.*, a summary judgment decision, the Court found that it was "undisputed that

13   plaintiffs had the authority to make certain binding, affirmative decisions on behalf of Defendant

14   . . ." No. 11 Civ.  05519, 2013 WL 3147019, at *6 (C.D. Cal. June 19, 2013), *aff'd sub nom.*

15   *Bucklin v. Zurich Am. Ins. Co.*, 619 F. App'x 574 (9th Cir. 2015). Here, the common evidence

16   demonstrates that *TEK's clients* determine the job opening, requirements, hiring, firing, and pay.[20]

17   **IV.    The Court Should Disregard Defendant's Happy Camper Declarations or Give**
18   **        Them Little Weight.**

19        As discussed above and in Plaintiff's Brief, TEK's corporate documents, data, and

20   testimony show that Recruiters perform a common primary job duty, are judged according to

21   certain, uniform "production metrics," and do not create policy or advise TEK or its clients as to

22   their management policies or general business operations. TEK disregards this evidence and

---

23
24   [20]    The other cases TEK relies on for this point are similarly distinguishable because the
     employees had the authority to bind the companies on matters of significance. *See Maddox v.*
25   *Cont'l Cas. Co.*, No. 11 Civ. 2451, 2011 WL 6825483, at *5 (C.D. Cal. Dec. 22, 2011) (plaintiffs
     could financially bind their employer); *Smith v. Gov't Employees Ins. Co.*, 590 F. 3d 886, 894 (D.C.
26   2010) (same); *Zelasko-Barrett v. Brayton-Purcell, LLP*, 198 Cal. App. 4th 582, 590 (2011)
     (plaintiff made litigation preparation decisions); *Mekhitarian v. Deloitte & Touche (ICS), LLC*, No.
27   07 Civ. 412, 2009 WL 6057248, at *1 (C.D. Cal. Nov. 3, 2009) (plaintiff prepared tax forms).

28

instead cites to a small number of current employee declarations to make its merits argument that all Recruiters were properly classified as administrators. TEK fails to explain why the corporate-level evidence on which Plaintiffs rely does not raise common legal and factual questions as to the principal merits issue or why it should be disregarded. *See* Def.'s Br. at 38-39.

    **A.    TEK's Declarations Contain Irrelevant Information and Raise Concerns About the Circumstances in Which They Were Obtained.**

    TEK's declarations do not overcome Plaintiffs' class-wide evidence or raise issues that predominate. *First*, the declarations are primarily from individuals who have been promoted to the *Recruiter Lead* position or who are not Recruiters and describe their current job duties and not specifically their duties as Recruiters. In fact, one of the declarations is from an Account Manager who did not work as a Recruiter during the class period,[21] six are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties,[22] one does not identify the declarant's current job title but her LinkedIn profile states that she is a "Senior Specialized Recruiter,"[23] and one held the position of Recruiter II for a period of time but did not disclose that in the declaration.[24] Only six of the 13 declarations actually discuss Recruiters' duties (including the Senior Specialized Recruiter and the Recruiter II).

    *Second*, the declarants are all current employees. "[C]ourts have expressed skepticism about the use of these 'happy camper' declarations to defeat a motion for class certification in wage and hour cases." *Nash v. Horizon Freight Sys., Inc.*, 2020 WL 7640878, at *1 (N.D. Cal. Dec.

---

[21]    ECF No. 68-6 (Stryker Dec.) ¶¶ 6, 10-11, 26-27 (Stryker became a Recruiter Lead in January 2018 and Delivery Manager in May 2021).

[22]    ECF No. 68-4 (Guffy Dec.) ¶ ECF No. 68-8 (Mendez Dec.) ¶ 4; ECF No. 68-9 (McCarty Dec.) ¶¶ 24-25; ECF No. 68-11 ¶ 6; (Compton Dec.) ¶ 29; ECF No. 68-12 (Levine-Gorelick Dec.) ¶¶ 26-28; ECF No. 68-15 (Kehl Dec.) ¶¶ 16-17. TEK's brief is misleading as it states Lindzy McCarty is currently a Recruiter, when in fact McCarty has been a Recruiter Lead since November 2021. ECF No. 68-9 (McCarty Decl.) ¶ 25.

[23]    ECF No. 68-15 (Ferrari Dec.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 93 (Ferrari Linkedin Profile).

[24]    *Compare* ECF No. 68-7 (Whitman Decl.) ¶ 4 ("On February 23, 2014 . . ., I was promoted to Recruiter, and I have been in different recruiting roles ever since.") *with* Ex. 95 (Major Decl. 2) ¶ 11.

23, 2020) (collecting cases). Courts generally give little weight to employers' current employee declarations because they "reveal more about [the declarant's] loyalty than whether or not they had an . . . experience that would render them class members." *Avilez v. Pinkerton Gov't Servs.*, 286 F.R.D. 450, 458-59 (C.D. Cal. 2012), *vacated and remanded sub nom.*, *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015) (citation cleaned up).[25] Happy camper declarations are even more suspect where, as here, defendants rely almost exclusively on them and largely ignore the voluminous evidence supporting certification. *See Sobolewski v. Boselli & Sons, LLC,* No.16 Civ. 01573, 2018 WL 3838140, at *4 (D. Colo. June 13, 2018).

In addition, the "Acknowledgment and Agreement" Forms (collectively, "Forms") attached to all the declarations raise further concerns about the manner in which TEK obtained them. There is no evidence that declarants were provided with neutral information about the lawsuit. The Forms do not state that declarants were provided with a copy of the complaint, do not identify the court or case number, such that declarants could conceivably access documents filed in this case, and do not note whether employees were advised that they could recover unpaid wages and other damages if the Plaintiffs prevail. The Forms also suggest that the declarants were specifically identified by TEK as people who would be willing to talk to its attorneys, which put undue pressure on these employees to comply with TEK's wish that they participate in its defense.[26] It also shows that these employees were not randomly selected but were cherry-picked by TEK.

Under similar circumstances, courts have assigned little weight to happy camper declarations, particularly those derived from current employees and where the record does not demonstrate transparency in the employers' communications about the lawsuit. *Nash*, 2020 WL

---

[25]     *See also Morden v. T-Mobile USA, Inc.*, No. 05 Civ. 2112, 2006 WL 2620320, at *3 (W.D. Wash. Sept. 12, 2006) (discounting 99 declarations from current employees who were potential collective action members "because of the risk of bias and coercion inherent in that testimony."); *Mevorah v. Wells Fargo Home Mortg., Inc., a div. of Wells Fargo Bank*, No. 05 Civ. 1175, 2005 WL 4813532, at *4 (N.D. Cal. Nov. 17, 2005) (explaining that "it is still reasonable to assume that an employee would feel a strong obligation to cooperate with his or her employer in defending against a lawsuit").

[26]     *See, e.g.,* ECF No. 68-13 at 8 ("We have asked TEKsystems to identify employees who might be willing to talk with attorneys so they can investigate the case.").

7640878, at *2 (assigning little evidentiary value to current employee declarations because, "[b]eyond the fact that happy camper declarations are submitted by companies with potentially significant influence over the workers who signed them," there was further concern that the declarants were "relying on incomplete, or even false, information" related to the potential legal ramifications of what would happen if plaintiffs prevailed in their case).[27] In *O'Connor v. Uber Techs., Inc.*, the court expressed extreme distrust of defendant Uber's current driver declarations where, like here, there was no evidence that the drivers were selected at random and neither the script Uber's attorneys used to solicit the declarations, nor the declarations themselves, provided the court with any assurance that "the[] drivers were free from the taint of biased questions." *O'Connor v. Uber Techs., Inc.*, No. 13 Civ. 3826, 2015 WL 5138097, at *12-13 (N.D. Cal. Sept. 1, 2015), *rev'd on other grounds*, 904 F.3d 1087 (9th Cir. 2018).[28]

## B.    TEK's Declarations Do Not Contradict Plaintiffs' Common Evidence.

To the extent that TEK's happy camper declarations have any probative value, they corroborate Plaintiffs' testimony and demonstrate that common issues of fact predominate. *First*, TEK's declarants confirm that the Recruiter job title, one of 46 different recruiting job titles,[29] is an entry level position.[30] Ten of TEK's 14 declarants were promoted out of the Recruiter position into higher level positions.[31]

---

[27]    *Smith v. Cardinal Logs. Mgmt. Corp.*, No. 07 Civ. 2104, 2008 WL 4156364, at *7 (N.D. Cal. Sept. 5, 2008) (affording less weight to "happy camper" declarations where "the declarations demonstrate an incomplete grasp of the nature of Plaintiffs' lawsuit").

[28]    The *O'Connor* court found it particularly concerning that, while the solicitation script suggested "generically that class members might be entitled to restitution . . . – no possible dollar figure [was] mentioned" and there was no evidence that they were told that "were Plaintiffs to prevail, they might be entitled to thousands of dollars." *Id.* at *12, n.11.

[29]    Ex. 1 (Def.'s Resp. to Pls.' 1st Interrogatories) No. 2.

[30]    *Infra* n.30.

[31]    ECF No. 68-4 (Guffy Decl.) ¶¶ 5-6 (promoted from Recruiter to Recruiter Lead and then to Team Lead – Delivery); ECF No. 68-6 (Stryker Decl.) ¶¶ 10, 26-27(promoted from Recruiter to Account Manager and then to Recruiting Lead and Delivery Manager); ECF No. 68-8 (Mendez Decl.) ¶ 5 (promoted from Recruiter to Recruiter Lead); ECF No. 68-9 (McCarty Decl.) ¶¶ 24, 25 (promoted from Recruiter to Recruiter Lead and then to Specialization Lead); ECF No. 68-11 (Compton Decl.) ¶¶ 11, 29 (promoted from Recruiter to Recruiter Lead); ECF No. 68-12 (Levine-Gorelick Decl.) ¶¶ 7, 26, 27 (promoted from Recruiter to Recruiter Lead and then to Team Lead);

*Second*, TEK's declarations describe the same primary job duty that Plaintiffs and their declarants describe—searching for and contacting potential job candidates to fill open positions with TEK's clients.[32] Specifically, they receive requisitions that identify the necessary skills and experience a candidate must have, search for candidates who fit the requisitions, and screen candidates to see if their experience and preferences match the requisitions.[33] If the Recruiter finds a match, the Recruiter informs the Account Manager, and the Account Manager decides whether the candidate will be presented to the client.[34] TEK emphasizes minor differences in how Recruiters perform their primary duty, such as whether Recruiters first search their personal networks, LinkedIn, or TEK's internal database, and how they screen candidates and determine if their skills and preferences match a requisition.[35] These differences, even if they were relevant, do

---

ECF No. 68-14 (Jones Decl.) ¶¶ 3-5 (promoted from Recruiter to retention Program Lead then to Account Manager then to Account Manager Recruiting Lead and then to Division Lead); ECF No. 68-15 (Kehl Decl.) ¶ ¶ 4, 16 (promoted from Recruiter to Recruiter Lead and then to Team Lead Delivery II); *supra* ns. 23-24; Pls.' Br. at 4-5.

[32]    ECF No. 68-5 (Rothermich Decl.) ¶ 13 ("My objective as a Recruiter is to help TEK's customers find the best candidates to fill the positions"); ECF No. 68-8 (Mendez Decl.) ¶ 20 ("When I became a Recruiter Lead, I became responsible for two Recruiters one who works in the San Diego office and one who works in the Orange County office. Their job duties and expectations are similar to mine as a Recruiter."); ECF No. 68-7 (Whitman Decl.) ¶¶ 5 ("The other Recruiters and I were responsible to find candidates whose skills were the right match for the job"); ECF No. 68-10 (Yancy Decl.) ¶ 8 (same); ECF No. 68-13 (Harvey Decl.) ¶ 7("[I] locate suitable candidates for the requirement from a variety of sources [and] contact the potential candidates and interview them to determine if they are a good fit for the position"); ECF No. 68-16 (Ferrari Decl.) ¶ 6 ("a job of a Recruiter is to find candidates who fit the requirements of TEK's customers").

[33]    ECF No. 68-5 (Rothermich Decl.) ¶ 14, 19, 21, 22, 27, 28 (attesting that the starting point for her work as a Recruiter is the requisition or the description of the role that TEK's customer needs to fill and describing how she searches for candidates, and speaks to candidates to see if they match the job req); ECF No. 68-7 (Whitman Decl.) ¶¶  5, 8, 17, 18, 21 (same); ECF No. 68-10 (Yancy Decl.) ¶¶ 8, 14, 15 (same); ECF No. 68-13 (Harvey Decl.) ¶¶ 8, 10-11 (same); ECF No. 68-16 (Ferrari Decl.) ¶¶ 6, 9 11 (same); ECF No. 68-17 (Budde Decl.) ¶¶ 15-18  (same).

[34]    ECF No. 68-5 (Rothermich Decl.) ¶ 12, 13, 15, 29; ECF No. 68-7 (Whitman Decl.) ¶¶ 9, 14; ECF No. 68-10 (Yancy Decl.) ¶¶ 8, 19; ECF No. 68-13 (Harvey Decl.) ¶¶ 6, 17, 19, 21; ECF No. 68-17 (Budde Decl.) ¶ 19.

[35]    ECF No. 68-11 (Compton Decl.) ¶ 20 ("Sometimes I will speak with a candidate who is not the best match for the req I am working on but who I think will fit somewhere else. What that happens, I will add them to my network and look for other opportunities that need their skill and are a better fit."); ECF No. 68-15 (Kehl Decl.) ¶ 12 ("If a candidate does not fit the job requirement I am working on, I typically still keep them in my network because they could be a fit for another

not undermine the common evidence that Recruiters' *primary* duty is the same. *Roseman*, 2017 WL 4217150, at *7; *Nelson*, 2015 WL 1778326, at *9.

*Third*, TEK's declarants acknowledge that all Recruiters complete TEK's training program. Like Plaintiffs, TEK's declarants began their employment as Recruiter Trainees and then became salaried, exempt Recruiters only after they successfully completed TEK's training program.[36] This is consistent with corporate witness testimony.[37]

*Fourth*, TEK's declarants confirm that Recruiters receive direction and supervision from a variety of sources, including through regular Red Zone meetings, communications with their supervisors, and daily communications with Account Managers "to discuss the status and challenges they are facing."[38]

*Fifth*, TEK's declarants confirm that TEK evaluates all Recruiters based on the same "production metrics"—spread and activity goals. *See* Def.'s Br. at 37.[39] Recruiters who do not meet TEK's "production metrics" are subject to coaching and discipline.[40] This testimony corroborates the common evidence in Plaintiffs' opening brief regarding TEK's close supervision and

---

job.").

[36]     ECF No. 68-5 (Rothermich Decl.) ¶¶ 5-10; ECF No. 68-7 (Whitman Decl.) ¶¶ 3-4; ECF No. 68-10 (Yancy Decl.) ¶¶ 3-6; ECF No. 68-13 (Harvey Decl.) ¶¶ 3-4; ECF No. 68-16 (Ferrari Decl.) ¶¶ 3-4; ECF No. 68-17 (Budde Decl.) ¶¶ 4-9. TEK's attempt to distinguish Lindzy McCarty's training is disingenuous because she began working for TEK as a Sourcing Specialist, a now defunct position that was the same as what is now Recruiter Trainee.  Ex. 94 (Haycock Dec. 23, 2019 Email) TEK-Recruiter_Lit-00392464 ("All Sourcing Specialists will become Recruiter Trainees effective 1/5/202").

[37]     Ex. 23 (Andiamo Rule 30(b)(6) Tr.) 192:16-193:6; Ex. 3 (DiBenedetto Tr.) 47:10-16 (Q: "The training on Degreed that's provided to Recruiters, is that the same training that's provided to all Recruiters nationwide . . .?" A: "Yes."), 61:7-63:10, 68:13-69:10, 129:7-25; Ex. 4 (Doyle Tr.) 55:15-18 (Q: "Do Recruiters . . . go through the same 13-week training . . . ? A: "They do, with a little bit of nuance"); Ex. 6 (Haycock Tr.) 129:17-132:12.

[38]     ECF No. 68-14 (Boland Jones Decl.) ¶ 17 ("Recruiters and Account Managers typically touch base at the beginning and the end of the day to discuss the status and challenges they are facing"); *see also* ECF No. 68-5 (Rothermich Decl.) ¶¶ 16, 18; ECF No. 68-7 (Whitman Decl.) ¶ 6, 26, 27; ECF No. 68-10 (Yancy Decl.) ¶ 9, 10;; ECF No. 68-16 (Ferrari Decl.) ¶¶ 7-8, 20; ECF No. 68-17 (Budde Decl.) ¶ 21.

[39]     ECF No. 68-6 (Stryker Decl.) ¶¶ 28-29; ECF No. 68-7 (Whitman Decl.) ¶ 10, 29; ECF No. 68-17 (Budde Decl.) ¶¶ 24-25.

[40]     ECF No. 68-6 (Stryker Decl.) ¶¶ 27-30; ECF No. 68-17 (Budde Decl.) ¶ 27.

---

monitoring of Recruiters. Pls.' Br. at 12-19.

*Finally*, TEK's declarants all describe the same auxiliary duties that Recruiters perform on an as needed basis. For example, although Account Managers are responsible for the relationship with TEK's clients, Recruiters occasionally sit in on Account Managers calls with clients.[41] Likewise, Recruiters sometimes meet with candidates in advance of their client interviews,[42] and periodically check in with and relay performance messages from clients to placed candidates.[43] TEK argues that there are differences in how Recruiters perform these auxiliary duties, but the differences are immaterial in light of the overwhelming evidence that all Recruiters perform the same primary job duty. *Roseman,* 2017 WL 4217150, at * 7 ("The evidence of differences among the daily routines of the proposed class members or the differences in their auxiliary duties do not overcome the plaintiffs' evidence that the primary duty of the class members can be determined through generalized proof because that primary duty is consistent across the class.").

## V.    This Case Is Triable As a Class Action.

As a preliminary matter, Plaintiffs anticipate this case will be adjudicated at the summary judgment stage because there is no factual dispute that Recruiters' work is not directly related to TEK's or its customers' management or operations. However, should this case proceed to trial, all aspects of liability can be determined based on the common evidence. Attached as Exhibit 97 is a summary of the common evidence presented by Plaintiffs. Plaintiffs also plan to hire an expert to determine Recruiters' overtime hours based on their electronic footprint with TEK's software.[44]

---

[41]    ECF No. 68-5 (Rothermich Decl.) ¶¶ 12, 15; ECF No. 68-7 (Whitman Decl.) ¶ 5, 7, 14; ECF No. 68-10 (Yancy Decl.) ¶¶ 8, 13; ECF No. 68-13 (Harvey Decl.) ¶¶ 6, 8; ECF No. 68-16 (Ferrari Decl.) ¶ 8; ECF No. 68-17 (Budde Decl.) ¶ 14.

[42]    ECF No. 68-5 (Rothermich Decl.) ¶ 33; ECF No. 68-10 (Yancy Decl.) ¶ 20; ECF No. 68-16 (Ferrari Decl.) ¶ 13; ECF No. 68-17 (Budde Decl.) ¶ 20.

[43]    ECF No. 68-5 (Rothermich Decl.) ¶¶ 36, 37; ECF No. 68-7 (Whitman Decl.) ¶ 25; ECF No. 68-10 (Yancy Decl.) ¶ 22, 23; ECF No. 68-13 (Harvey Decl.) ¶ 18; ECF No. 68-14 (Boland Jones Decl.) ¶ 20 ("TEK's expectation is that the Recruiter will engage with the consultant about once a month to gather information about any concerns or issues the consultant may have."); ECF No. 68-16 (Ferrari Decl.) ¶ 15.

[44]    Ex. 4 (Doyle Tr.) 115:14-132:20 (listing various electronic programs that can be used for proxy time records and noting that the computer system logs Recruiters off after 15 minutes).

Dated: December 14, 2023

Respectfully submitted,

/s/ Sally J. Abrahamson
Sally J. Abrahamson (admitted *pro hac vice*)
WERMAN SALAS P.C.
335 18th Place NE
Washington, D.C. 20002
Tel: (202) 830-2016
Email: sabrahamson@flsalaw.com

Maureen A. Salas (admitted *pro hac vice*)
Anne Kramer (SBN 315131)
WERMAN SALAS P.C.
77 W. Washington St., Suite 1402
Chicago, IL 60602
Tel: (312) 487-5221
Email: msalas@flsalaw.com
Email: akramer@flsalaw.com

Sarah Schalman-Bergen (admitted *pro hac vice*)
Krysten Connon (admitted *pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
Tel: 617-994-5830
Email: ssb@llrlaw.com
Email: kconnon@llrlaw.com

Rachel Bien (SBN 315886)
OLIVIER & SCHREIBER LLP
595 E. Colorado Blvd., Suite 418
Pasadena, CA 91101
Tel: (213) 325-3430
Email: rachel@os-legal.com

*Attorneys for Plaintiffs*