1

2

3

4            UNITED STATES DISTRICT COURT

5           NORTHERN DISTRICT OF CALIFORNIA

6

7   BO AVERY, et al.,                          Case No.  3:22-cv-02733-JSC

8                      Plaintiffs,

9         v.                                   **ORDER RE: PLAINTIFFS' MOTION TO CERTIFY CLASS**

10   TEKSYSTEMS, INC.,                          Re: Dkt. No. 63

11                      Defendant.

12

13          Bo Avery, Phoebe Rodgers, Kristy Camilleri, and Jill Unverferth all worked as Recruiters

14   for TEKsystems, Inc. ("TEK"), an IT staffing company.  Plaintiffs allege TEK improperly

15   classifies Plaintiffs and other Recruiters as exempt from California overtime, wage, and hour laws

16   and therefore illegally underpays Recruiters.  Now pending before the Court is Plaintiffs' motion

17   to certify a class of all current and former Recruiters employed by TEK from January 28, 2018 to

18   the final date of judgment and a subclass of all the class members who worked for TEK on or after

19   January 28, 2019 and are no longer employed by TEK and have not been employed by TEK for

20   more than 72 hours.  (Dkt. No. 63.)[1]  Having carefully considered the briefing, and with the

21   benefit of oral argument on February 8, 2024, the Court certifies the class and subclass and

22   appoints Plaintiffs' counsel as class counsel.  Plaintiffs provide sufficient evidence for each

23   requirement of Federal Rule of Civil Procedure 23.  TEK classifies all Recruiters as exempt from

24   overtime and other wage and hour laws, all Recruiters perform the same basic job duty, all work

25   under similar supervision, and all exercise similar amounts of independence and discretion.

26

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**BACKGROUND**

TEK is an Information Technology "IT" staffing services company. (Dkt. No. 68-2 at 3.) TEK provides "staff augmentation" services, in which TEK finds "a worker," known as a consultant, "to go work for a client" at the client's office, either virtually or in person. (*Id.* at 4-5, 20.) Nearly all TEK's employees are involved in "recruiting job positions" meaning they "identify potential candidates who meet the requirements for an open position"—indeed, TEK has 46 job titles for recruiting positions in California. (Dkt. No. 64-1 at 6-7.) These job titles include "Lead Recruiter," "Lead Professional Recruiter," "Lead Senior Recruiter," "Professional Recruiter," "Recruiter II," "Recruiting Lead," "Account Recruiting Manager," "Team Lead," "Recruiter Trainee," and "Recruiter." (*Id.*) Except for Recruiter Trainees, TEK classifies all of its Recruiter job titles as exempt. (*Id.* at 9.) "Employees remain in the position of Recruiter Trainee until they have completed all required training and demonstrated their ability to perform the job titles of Recruiter." (*Id.*)

Plaintiffs seek to certify a class and subclass consisting of only one of those job titles: Recruiter. Recruiters "find people for jobs" for staff augmentation. (*Id.* at 4, 321.) Essentially, Recruiters screen possible consultants to find those who match the provided job requirements. ((Dkt. No. 64-5 at 32 (Recruiters "[s]creen[] consultants to gain insights into their skills, goals, interests and provide[] aligned opportunities"); 48 (same); 72 (same); 96 (same); 127 (same).)

Account Managers decide whether to approve Recruiters' chosen candidates. "Account Managers are responsible for maintaining relationships with TEK's clients." (Dkt. No. 68-6 ¶ 8.) Though Recruiters sometimes join the initial call with the client to learn about job openings, Account Managers generally create the "requirement," or "a description of a role that one of [TEK's] customers needs to fill." (Dkt. Nos. 64-1 at 183-184; 68-4 ¶ 7.) Recruiters then find candidates who match that "requirement," and present those candidates to the Account Manager. (Dkt. No. 64-1 at 56.) The Account Manager decides whether to present that candidate to the client. (Dkt Nos. 68-5 ¶ 29; 68-7 ¶¶ 9, 23; 68-10 ¶ 19; 68-13 ¶ 17; 68-17 ¶ 19.) The client then decides whether to interview the candidate. (Dkt. Nos. 64-1 at 625; 68-4 at ¶ 14; 68-9 ¶ 16.) If the client interviews the candidate, the Recruiter will go over interview tips with the candidate in

2

United States District Court
Northern District of California

1    preparation for that interview.  (Dkt. Nos. 64-1 at 429, 623; 68-9 ¶ 16l; 68-10 ¶ 20.)  If the client

2    hires the candidate (now called a "consultant"), TEK encourages Recruiters to check-in with that

3    consultant around once a month to see how the consultant is doing at the job.  (Dkt. Nos. 64-1 at

4    1029; 68-10 ¶ 22; 68-9 ¶ 17.)  Recruiters may also relay information to consultants or even inform

5    consultants they are fired from a position, though Recruiters do not play a role in hiring or firing

6    decisions.  (Dkt. Nos. 64-1 at 1029; 68-4 ("I had to fire a consultant . . . While I am not the

7    decision maker, I am the messenger.")

8         The Recruiter position is an entry level role.[2]  (Dkt. No. 64-4 at 154 (TEK's "Recruiter

9    Interview Guide Job Aid" describing the Recruiter position as "an entry level role"), 278

10   (explaining most Recruiters are hired straight out of college and describing them as "Entry Level

11   College Grads").)  Recruiters are not required to have any sort of technical knowledge to be hired.

12   (Dkt. No. 64-1 at 157.)  The average tenure of an employee who works as a Recruiter in California

13   is 1.21 years.  (*Id.* at 986.)

14        All Recruiters' performance is measured according to the same standards.  TEK monitors

15   Recruiters according to "numerous metrics" including required weekly numbers of "G2s," or

16   informational calls with candidates, "reference checks, meetings or meals with candidates, and the

17   number of candidates that Account Managers submitted to a TEKsystems client."  (Dkt. No. 64-1

18   at 1027, 1036. 1044, 1052, 1061, 1069, 1077.)  The required numbers "were the same in every

19   branch in TEKsystems for recruiters."  (*Id.* at 170.)  Supervisors closely tracked Recruiters'

20   "spread"—or the net profit from each successfully placed consultant, indicating the difference

21   between what TEK bills the customer and what TEK pays, including the consultant's salary and

22   the costs associated with finding the consultant for the position—and in some cases displayed

23   spread amounts in the office "from best to worst for everyone to see."  (*Id.* at 1027, 1036, 1052,

24   1061, 1069, 1077.)  TEK's internal database allows for Recruiters' supervisors to see metrics such

26   _____

27   [2] At oral argument, TEK asserted the Recruiter position is not an entry level role because some
     Recruiters remain in the Recruiter role for many years.  However, while some Recruiters stay in
     the role longer than the average Recruiter tenure of 1.21 years, that does not change the evidence
28   indicating TEK considers the Recruiter role to be an entry level position and does not require
     technical knowledge or job experience to be hired as a Recruiter.

as "spread," "how many consultants" Recruiters talk to, and candidate "submittals" to clients "on a daily basis." (*Id.* at 201.) Each week Recruiters' supervisors get a report on how each Recruiter is doing. (*Id.* at 165.)

Recruiters are all paid according to a uniform pay scale: Recruiters receive an annual salary and can receive commission and bonuses based on their achievement of standardized performance metrics. (Dkt. Nos. 64-1 at 330; 64-4 at 37-38.) TEK uses the same job description for all Recruiters. (Dkt. Nos. 64-1 at 333-34; 64-7 at 11-18.)

Plaintiffs move to certify: (1) a class of "[a]ll current and former Recruiters employed by Defendant in California from January 28, 2018 to the final date of judgment;" and (2) a subclass of "[a]ll Class Members who worked for Defendant as Recruiters on or after January 28, 2019 and who are no longer employed by Defendant and have not been employed by Defendant for more than 72 hours." (Dkt. No. 63 at 8.)

**DISCUSSION**

Plaintiffs, as the party seeking class certification, "bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Here, Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual class members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Class-certification analysis must be "rigorous" and "may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (cleaned up). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## I.      SUBSTANTIVE CLAIMS OF PROPOSED CLASS

"California's Labor Code generally requires overtime pay for employees working more

1    than 40 hours in a given workweek." *Mies v. Sephora U.S.A., Inc.*, 234 Cal. App. 4th 967, 976

2    (2015) (citing Cal. Lab. Code, § 510(a)) (cleaned up). "It also generally provides employees with

3    meal periods and rest breaks." *Id.* However, California labor law excepts certain employees from

4    these requirements—both through statutes and orders of the Industrial Wage Commission. *Id.*

5          Plaintiffs contend they, along with proposed class and subclass members, have been denied

6    overtime pay, and related benefits, in violation of California Labor Code §§ 510, 1194, and 1198.

7    (Dkt. No. 1-2.) Defendant does not dispute that it did not pay overtime or provide meal periods

8    and rest breaks to purported class members, but instead assert all purported class members are

9    exempt from these provisions of the California Labor Code.

10         California law provides:

11              The Industrial Welfare Commission may establish exemptions from
                the requirement that an overtime rate of compensation be paid . . . for
12              executive, administrative, and professional employees, if the
                employee is primarily engaged in the duties that meet the test of the
13              exemption, customarily and regularly exercises discretion and
                independent judgment in performing those duties, and earns a
14              monthly salary equivalent to no less than two times the state minimum
                wage for full-time employment.
15

16   Cal. Labor Code § 515; *see also* Cal. Indus. Welfare Comm'n, Wage Order No. 4-2001, Cal. Code

17   Regs. tit. 8, § 11040(1)(A) (explaining the Wage Order's overtime compensation requirements

18   "shall not apply to persons in administrative, executive, or professional capacities"). TEK asserts

19   its Recruiters are exempt from overtime requirements because they fall under the "administrative

20   exemption." (Dkt. No. 68 at 29.)

21         The California Industrial Welfare Committee defines "[a] person employed in an

22   administrative capacity" as:

23              any employee:

24              (a) Whose duties and responsibilities involve . . . . :

25                   (I) The performance of office or non-manual work directly
                     related to management policies or general business operations
26                   of his/her employer or his employer's customers; . . .

27                   and

28              (b) Who customarily and regularly exercises discretion and

United States District Court
Northern District of California

independent judgment; and . . .

(d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

(e) Who executes under only general supervision special assignments and tasks; and

(f) Who is primarily engaged in duties that meet the test of the exemption. . . . The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job . . .

(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment.

Cal. Code Regs. tit. 8, § 11040(1)(A)(2).  For purposes of the administrative exemption, "primarily" "means more than one-half the employee's work time."  Cal. Code Regs. tit. 8, § 11040(2)(N).

Defendant bears the burden of establishing the administrative exemption applies to its Recruiters.  *See Harris v. Superior Ct.*, 53 Cal. 4th 170, 182 (2011) (describing the administration exemption to overtime compensation requirements as an "affirmative defense").  So, for Recruiters to qualify as "administrative" employees and therefore be exempt from overtime, meal, and rest break requirements, TEK must establish, among other things, (1) Recruiters' duties and responsibilities involve the performance of work "directly related to management policies or general business operations of his/her employee or his employer's customers;" (2) Recruiters "customarily and regularly exercise discretion and independent judgment;" and (3) Recruiters "perform[] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge" or "execute[] under only general supervision special assignments and tasks."  Cal. Code Regs. tit. 8, § 11040(1)(A)(2).  Further, TEK must establish Recruiters perform such duties "primarily," or more than half of their work time and Recruiters' salary meets minimum salary requirements.  *Id.*

## II.    RULE 23(A)

"A representative plaintiff may sue on behalf of a class when the plaintiff affirmatively

1   demonstrates the proposed class meets the four threshold requirements of Federal Rule of Civil

2   Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation." *Sali v.*

3   *Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018).

4           **A.      Numerosity**

5           First, Plaintiffs must establish "the class is so numerous that joinder of all members is

6   impracticable." Fed. R. Civ. P. 23.  Plaintiffs have established as of June 14, 2023, there were

7   approximately 476 proposed class members and 252 proposed subclass members.  (Dkt. No. 64-1

8   ¶¶ 32-33.)  Defendant does not contest numerosity. So, Plaintiff has satisfied the numerosity

9   prerequisite.

10          **B.      Commonality**

11          "To show commonality, Plaintiffs must demonstrate that there are questions of fact and

12  law that are common to the class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir.

13  2011) (citing Fed. R. Civ. P. 23(a)(2)).  "What matters to class certification . . . is not the raising of

14  common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to

15  generate common answers apt to drive the resolution of the litigation." *Ruiz Torres v. Mercer*

16  *Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564

17  U.S. 338, 350 (2011)).  To satisfy Rule 23(a)(2)'s commonality requirement, "[e]ven single

18  [common] question" is sufficient.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)

19  (cleaned up).

20          In this case, both parties agree TEK classifies all purported class members as exempt.

21  (Dkt. Nos. 63 at 46 ("TEK's uniform policy of classifying Recruiters as exempt from overtime");

22  68 at 11 (describing the Recruiter role as "exempt").)  So, the central dispute is whether purported

23  class members were properly characterized as exempt.  Resolving that dispute involves at least the

24  common question of whether all Recruiters' work is "directly related to management policies or

25  general business operations" of TEK or TEK's customers.

26          California's Industrial Welfare Commission's Wage Order 4 incorporates the Code of

27  Federal Regulations § 541.205(a) (2001), which defined the "directly related" phrase in Wage

28  Order 4.  In *Harris v. Superior Court*, the California Supreme Court explained the "directly

7

1    related" phrase "distinguishes between 'administrative operations' and 'production' or 'sales'

2    work." 53 Cal. 4th 170, 181 (2011) (quoting C.F.R. § 541.205(a) (2001)). Specifically, "[w]ork

3    qualifies as 'directly related' if it" is both "qualitatively administrative," such as "advising

4    management, planning, negotiating, and representing the company," and "quantitatively, it must

5    be of substantial importance to the management or operations of the business." *Id.*

6          This question can be answered on a class-wide basis. Plaintiffs provide evidence

7    indicating all Recruiters have the same primary job duties. TEK's internal documents indicate a

8    Recruiter's primary duty is to match or "screen" candidates against requirements determined by

9    TEK's clients. (Dkt. No. 64-5 at 32 (Recruiters "[s]creen[] consultants to gain insights into their

10   skills, goals, interests and provide[] aligned opportunities"); 48 (same); 72 (same); 96 (same); 127

11   (same).) These internal documents are supported by the testimony of TEK's corporate executives,

12   who also describe Recruiters' role as finding a "match" between job descriptions and individuals

13   looking for work. (Dkt. No. 64-1 at 172, 312, 319.) Defendant's declarants confirm the same

14   primary duties. (Dkt. Nos. 68-4-17.) For example, Paul Stryker writes when he worked as a

15   Recruiter, his role "was to understand the exact skills and experience that the clients needed and to

16   find candidates who were well suited to perform that work." (Dkt. No. 68-6 ¶ 7.) Similarly,

17   Yasmin Yancey, who is currently a Recruiter, describes her role as "find[ing] the best candidates

18   to fill the client's job requirements." (Dkt. No. 68-10 ¶ 7.)

19         TEK asserts "whether Recruiters perform work that is 'directly related' to the management

20   or policies or general business operations is not a certifiable question" because "Plaintiffs'

21   argument ignores" California Supreme Court precedent. (Dkt. No. 68 at 30-31.) The thrust of

22   TEK's argument is the "directly related" analysis includes when activity is "directly related to

23   management policies or general business operations of his/her employer **or his employer's**

24   **customers**." Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(a) (emphasis added). So, according to

25   TEK, since Recruiters act as "personnel management and human resources" for TEK's

26   "customers" (e.g., the companies in which TEK is placing employees), TEK's Recruiters' work is

27   directly related to the management policies of those customers.

28         Even accepting TEK's argument as true, TEK is arguing the merits of whether the

1    administrative exemption applies to all Recruiters' claims; TEK is not asserting the "directly

2    related" analysis is not subject to class-wide proof.  To the contrary, TEK's argument for why all

3    its Recruiters' work is directly related to its customers management policies or general business

4    operations is premised on treating all Recruiters the same.

5           So, Plaintiffs have satisfied the commonality perquisite to class certification.

6           **C.     Typicality**

7           The typicality requirement is satisfied if "the claims or defenses of the representative

8    parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The test of

9    typicality serves to ensure that the interest of the named representative aligns with the interests of

10   the class." *Ruiz Torres*, 835 F.3d at 1141 (quotations and citations omitted).  "Under the Rule's

11   permissive standards, representative claims are 'typical' if they are reasonably coextensive with

12   those of absent class members; they need not be substantially identical." *Id.* (cleaned up).

13   "Measures of typicality include 'whether other members have the same or similar injury, whether

14   the action is based on conduct which is not unique to the named plaintiffs, and whether other class

15   members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts

16   Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

17          Plaintiffs have demonstrated their claims are typical of the purported class.  Plaintiffs all

18   worked as Recruiters and are seeking to represent a class of Recruiters.  (Dkt. No. 64-1 at 421

19   (Avery), 534 (Camilleri), 604 (Rodgers (Raras)), 811 (Unverforth).)  TEK classified Plaintiffs and

20   all other class members as exempt from overtime, meal, and rest break requirements.  (*Id.* at 8,

21   12).  Plaintiffs allege they were misclassified as exempt, and therefore are entitled to overtime pay

22   and penalties for meal break and rest break violations.  (Dkt. No. 1-1.)  So, Plaintiffs and the

23   purported class members have the same alleged injuries resulting from that classification.

24          TEK asserts the four named Plaintiffs are not typical because (1) "none worked following

25   the onset of COVID in-person work restrictions in late March 2020, which brought on or

26   accelerated a number of changes at TEK;" (2) "[n]one of the Plaintiffs have worked for TEK in

27   more than three and a half years, which is nearly two-thirds of the class period;" and (3) Plaintiffs

28   "worked in the Recruiter Trainee role" for much longer than was typical.  (Dkt. No. 68 at 10-11.)

*United States District Court*
*Northern District of California*

But TEK does not explain what changes TEK implemented post-COVID, how any such changes impacted the work of Recruiters, or what a "typical" length of time for a Recruiter Trainee is. And, most importantly, TEK does not explain how any of these facts are relevant to the claims or defenses of this case.

So, Plaintiffs meet the typicality requirement of Rule 23(a)(3).

### D.   Adequacy

Finally, Rule 23(a)(4) requires the Court to determine if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quotations and citations omitted).

Plaintiffs have established they will fairly and adequately protect the interests of the class. There is no evidence of any conflicts of interest between the named parties and purported classes. (Dkt. No. 64 ¶ 22.)  Plaintiffs' counsel provide evidence indicating they have experience litigating class actions and have sufficient resources to vigorously represent the purported class and subclass.  (*Id.* ¶¶ 4-21.)  Thus far, Plaintiffs have "actively participat[ed] in discovery."  (*Id.* ¶ 24.) Further, Defendant does not contest adequacy.  So, Plaintiffs have satisfied the adequacy prerequisite of Rule 23(a).

## III.   RULE 23(B)(3)

Rule 23(b)(3) requires: (1) the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### A.   Whether Common Issues Predominate Over Individual Issues

Plaintiffs have the burden "by a preponderance of the evidence" to "marshal facts showing . . . class issues predominate" over individualized ones.  *Miles v. Kirkland's Stores Inc.*, No. 22-55522, 2024 WL 74698, at *3 (9th Cir. Jan. 8, 2024) (citing *Olean Wholesale Grocery Coop., Inc.*

10

*v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022) (en banc)).  "For purposes of this analysis, [a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Ruiz Torres*, 835 F.3d at 1134 (cleaned up).  The predominance inquiry is not just a matter of the quantity of individualized questions versus the quantity of common questions, but also weighs the relative importance of each category of question.  *See id.* ("[M]ore important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class.").

TEK's treatment of all Recruiters as exempt is relevant to the court's analysis, though far from dispositive.  *See In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 571 F.3d 953, 957, 959 (9th Cir. 2009) (holding "[a]n internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees," but "relying on that policy to the near exclusion of other factors relevant to the predominance inquiry" is an abuse of discretion).  The Court's analysis "focuse[s] on "whether the employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009).

In determining whether class issues predominate, the Court will consider each element of California's administrative exemption, and whether proving that element relies on common proof or an individualized inquiry.

1

**1.      Whether Recruiters' Work Is Directly Related to Management Polices or General Business Operations of TEK or TEK's Customers**

As discussed above, the resolution to this question relies on common legal and factual determinations.  So, this issue weighs in favor of a finding common issues predominate.

**2.      Whether Recruiters Exercise Discretion and Independent Judgment**

California's Industrial Welfare Commission's Wage Order 4 incorporates the Code of Federal Regulations § 541.207 (2001), which defines "the exercise of discretion and independent judgment" as:

> involv[ing] the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

29 C.F.R. § 541.207(a)(2001).  So, if an employee "merely applies his knowledge in following prescribed procedures or determining which procedures to follow, or who determines whether specific standards are met" that employee "is not exercising discretion and judgment." *Id.* § 541.207(b).  The regulations give the example of an "inspector" who "perform[s] specialized work along standardized lines," but also "rel[ies] on technique and skills acquired by special training or experience." *Id.* § 541.207(c)(1).  Such an inspector "may make recommendations on the basis of the information they develop in the course of their inspections . . . but these recommendations are based on the development of facts as to whether there is conformity with the prescribed standards." *Id.*  Accordingly, "[t]he inspector is engaged in exercising skill rather than discretion and independent judgment." *Id.*

Similarly, the federal regulations give the example of a personnel clerk who "screen[s]" applicants.  *Id.* § 541.207(c)(5).  The Federal Regulations explain:

> Typically such an employee will interview applicants and obtain from them data regarding their qualifications and fitness for employment. . . . The ''screening'' operation consists of rejecting all applicants who do not meet standards for the particular job or for employment by the company. The standards are usually set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials. It seems clear that such a personnel clerk does not exercise discretion and independent judgment.

*Id.* However, the term "discretion and independent judgment" does "not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." *Id.* § 541.207(e). Instead, "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.*

Plaintiffs provide evidence establishing all Recruiters have the same primary job duties— allowing for resolution of this issue on a class-wide basis. TEK's internal documents indicate Recruiters' primary duty is to match or "screen" candidates against requirements determined by TEK's clients. (Dkt. No. 64-5 at 32, 48, 72, 96, 127.) These internal documents are supported by the testimony of TEK's corporate executives. (Dkt. No. 64-1 at 172, 312, 319.) Further, nearly all Recruiters are paid under the same salary structure (Dkt. Nos. 68-2 at 22; 64-7 at 53), and all Recruiters' job performance is measured by the same metrics (Dkt. No. 64-1 at 170), which indicates TEK considers all Recruiters to be engaged in substantially similar work. *Ambrosia v. Cogent Commc'ns, Inc.*, 312 F.R.D. 544, 557–58 (N.D. Cal. 2016) (granting class certification for employees seeking overtime compensation based on evidence "corporate policies . . . transform the individualized issues into common ones" since "all of the putative class members sell roughly the same products, are recruited and hired using the same job description, and are paid under the same compensation plan").

TEK's Recruiter declarations do not establish individual issues predominate. Both at briefing and oral argument, TEK argued the wide variation among Recruiters in how they accomplish their tasks of finding employees for clients means whether Recruiters exercise discretion and independent judgment is not subject to common proof. As evidence, TEK submits 14 employee declarations. (Dkt. Nos. 68-4-17.) However, TEK has not identified any corporate testimony or company-wide policies evidencing such variation. "[A] smattering of examples involving a few isolated cases does not automatically defeat class certification if, as here, the overwhelming evidence shows" a consistent policy or practice of the employer. *Miles*, 89 F.3d at 1223-24 (citing *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 938 (9th Cir. 2019) ("Predominance in employment cases is rarely defeated on the grounds of differences among

United States District Court
Northern District of California

1    employees so long as liability arises from a common practice or policy of an employer.")).

2         Moreover, most of TEK's declarations are not relevant to the question of whether

3    Recruiters—as opposed to other, supervisory employees at TEK—exercise discretion and

4    independent judgment.  Of TEK's 14 declarants, four are currently Recruiter Leads.  (Dkt. Nos.

5    68-6 (Stryker) ¶¶ 7, 10-11; 68-8 (Mendez) ¶ 5; 68-9 (McCarty) ¶ 24; 68-11 (Compton) ¶ 29.).

6    Three are Team Leads.  (Dkt. Nos. 68-4 (Guffy) ¶ 6; 68-12 (Levine-Gorelick) ¶¶ 26-27; 68-15

7    (Kehl) ¶ 16.)  One is a Division Lead.  (Dkt. No. 68-14 (Boland Jones) ¶ 5.)  Another states she

8    has held "different recruiting roles" since December of 2017, but does not specify her current role

9    (though her LinkedIn Profile as of December of 2023 indicates she is a "Senior Specialized

10   Recruiter).  (Dkt. Nos. 68-16 (Ferrari) ¶ 4; 72-2.)  Further, while nine of the 14 declarants are not

11   presently Recruiters, the declarations almost universally use the present tense when describing job

12   duties and activities.  The declarations of individuals who are not presently Recruiters are, for the

13   most part, not relevant because they do not provide evidence of the job duties of Recruiters rather

14   than other, upper-level positions.[3]

15        The remaining five Recruiter declarations do not persuade the Court individual questions

16   predominate.  (Dkt Nos. 68-5 (Rothermich); 68-7 (Whitman); 68-10 (Yancey); 68-13 (Harvey);

17   and 68-17 (Budde).)  TEK's five Recruiter declarants' job descriptions align with TEK's internal

18   documents and Plaintiffs' Recruiter declarants.  For example, Nicole Whitman, who is one of

19   Defendant's declarants and has been a Recruiter at TEK since February of 2014, explains after she

20   finds a candidate who is "the right match for a requirement," she then "present[s]" that candidate

21   to the Account Manager.  (Dkt. No. 68-7 ¶ 23.)  If the Account Manager "agree[s] with [her]

22   recommendation," then "[t]ypically," the Account Manager "present[s] the candidates to the

23   customer"—though, on occasions, Account Managers "have trusted [her] to present candidates to

24   _____

25   [3] At oral argument, TEK asserted the declarations from employees in supervisory positions were
     relevant to the class certification analysis because those individuals still spend time recruiting.
26   (*See, e.g.*, Dkt. No. 68-6 ¶ 26 (explaining when employee was a Recruiting Lead their "main focus
     was still recruiting" and recruiting took up about "80%" of the employee's time).)  However, even
27   if such individuals perform similar roles to Recruiters, only those in the Recruiter role are putative
     class members.  Moreover, Defendant put forth no evidence indicating TEK has the same
28   expectations of supervisory employees and Recruiters, or that supervisory employees and
     Recruiters have similar levels of supervision.

14

the customer."  (*Id.* ¶¶ 23-24.)  She also "deliver[s]" the client's performance feedback to the consultant when required.  (*Id.* ¶ 25.)  Her testimony thus aligns with that of Brian Larsen, one of Plaintiffs' declarants, who worked as a Recruiter for TEK form July 2021 until September 2022. (Dkt. No. 64-1 at 1058.)  He also describes his job as "to search for, contact, and screen candidates whose job experience and skill sets matched the criteria listed in the Requirement."  (*Id.* at 1060.) If he found a match, he "sent the candidate's resume and information about the candidate to the Account Manager," and the Account Manager then decided "which candidates, if any, would be forwarded to TEKsystems' client."  (*Id.* at 1062.)  Another of Plaintiffs' declarants explained he was a "middleman" and would "communicate the orders of the client" to consultants on the job. (*Id.* at 1071.)  Variations in how TEK's Recruiters accomplish their primary job duty of screening candidates and finding matches for job requirements do not overcome Plaintiffs' evidence indicating all Recruiters' primary job duties can be determined through common proof.  *See Roseman v. Bloomberg L.P.,* No. 14-CV-2657 (DLC), 2017 WL 4217150, at *7 (S.D.N.Y. Sept. 21, 2017), *aff'd*, No. 14-CV-2657 (DLC), 2018 WL 1470587 (S.D.N.Y. Mar. 23, 2018) ("The evidence of differences among the daily routines of the proposed class members or the differences in their auxiliary duties do not overcome the plaintiffs' evidence that the primary duty of the class members can be determined through generalized proof because that primary duty is consistent across the class."); *Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*, No. ED-CV-130646-JGB-SPx, 2014 WL 10988092, at *13 (C.D. Cal. July 30, 2014) (in analyzing whether exercising discretion and independence leads itself to class-wide proof, holding "variations" that "do not modify the tasks performed by the Class Members" are "not material to the class certification analysis").

TEK also argues the Recruiter role has changed in a variety of ways since the start of the proposed class period, January 28, 2018, and these changes mean the question of whether Recruiters exercise independent discretion and judgment cannot be answered on a class-wide basis.  Indeed, Recruiters have become more specialized over time, (Dkt. Nos. 64-4 at 119; 64-1 at 211 (explaining prior to 2021, Recruiters "weren't as specialized" as they are "now")), and have moved from geographic-based teams to specialty-based teams.  (Dkt. No. 64-4 at 122.)   In

15

1    November of 2020, TEK's senior vice president of talent delivery, Garrett Haycock (Dkt. No. 64-1

2    at 309), indicated Recruiters would begin "skill specialization." (Dkt. Nos. 64-4 at 119; 64-1 at

3    211 (explaining prior to 2021, Recruiters "weren't as specialized" as they are "now").)  He

4    explained previously, recruiting was "mainly handled by local recruiters" and recruiting was

5    "treated like an entry-level role." (Dkt. No. 64-4 at 120.)  However, TEK was moving into the

6    "new reality" of a "virtual environment." (*Id.* at 121.)  In doing so, TEK planned to develop

7    "hyper-specialized recruiters" who "aren't limited by geography." (*Id.* at 122.)  By September of

8    2023, "all" the "recruiters in California" were "aligned to specialized teams." (Dkt. No. 64-1 at

9    158.)  Such specialized Recruiters may exercise marginally more discretion and independent

10   judgment than non-specialized Recruiters. (Dkt. No. 68-7 ¶ 15 ("There are unique aspects to work

11   in this specialized area that impact the way the team learns about and help create [requirements]. .

12   . as I have established my knowledge and competency as a specialized Recruiter with the Account

13   Managers I work with, they have trusted me to present candidates to the customer on my own.").)

14        However, the evidence suggests even Specialized Recruiters perform the same general

15   tasks, with about the same amount of independence and discretion, as non-specialized Recruiters.

16   (Dkt. No. 68-16 ¶ 21 ("Even though I am part of a specialized team now, I still take the same

17   approach I did before in terms of sourcing and deciding which candidates to move forward

18   with.").)  And even if Specialized Recruiters search for candidates using different methods than

19   non-specialized Recruiters, Recruiters uniformly must present their selected candidates to Account

20   Managers, who decide whether to move forward with that candidate. (Dkt Nos. 68-5 ¶ 29; 68-7 ¶¶

21   9, 23; 68-10 ¶ 19; 68-13 ¶ 17; 68-17 ¶ 19.)  Recruiters, as a class, "lack discretion to take any

22   affirmative action that could bind others." *Metrow v. Liberty Mut. Managed Care LLC*, No. ED-

23   CV-161133-JGB-KKx, 2017 WL 4786093, at *14 (C.D. Cal. May 1, 2017).

24        Further, to satisfy the administrative exemption, Recruiters must "primarily," meaning

25   more than half their time, exercise independence and discretion.  Cal. Code Regs. tit. 8, §

26   11040(2)(N).  Even those Recruiter declarants who describe exercising independence and

27   discretion in speaking directly to clients about candidates indicate such interactions constitute a

28   small part of their time working for TEK. (Dkt. Nos. 68-7 ¶ 15 (explaining she speaks "directly

United States District Court
Northern District of California

16

with the customer . . . [on] at least two calls . . . per month, and other Recruiters on the team are doing the same"; 68-10 ¶ 13 ("Depending on the situation, I will join the Account Manager for calls with TEK clients to gather information about requirements" ); 68-13 ¶ 8 ("I routinely participate in the calls that an Account Manager has with the client's hiring manager to go over the requisitions, and I sometimes contact the hiring manager myself."); 68-17 ¶ 14 ("At least one or two times a month, I will join an Account Manager on a call with a hiring manager at a TEK client. . . I sometimes join calls with a customer's hiring manager to present the credentials of specific candidates that I have identified as well").)  So, while Plaintiffs' Recruiter declarants may never interact directly with clients and Defendant's Recruiter declarants may work directly with clients once or twice a month, that difference is not material to the answer of whether Recruiters *primarily* exercise independence and discretion.  *See Metrow*, 2017 WL 4786093, at *12 ("The Court does not find the variation in the complexity of potential cases or client preferences sufficient to defeat predominance since the Parties agree that 71% of [proposed class members] spend their time on the same five tasks.").

TEK's citation to *DeLodder v. Aerotek, Inc.*, No. CV-0806044-DMG-AGRx, 2010 WL 11506881, at *2 (C.D. Cal. Aug. 16, 2010), *aff'd*, 471 F. App'x 804 (9th Cir. 2012), is also unavailing.  The defendant in *DeLodder* was "an international staffing company that provides technical, professional and industrial recruiting and staffing services to customer companies in eight different industries." *DeLodder*, 2010 WL 11506881, at *2.  Much like this case, the plaintiffs alleged the defendant misclassified Recruiters as exempt, and therefore the defendant illegally failed to pay the Recruiters overtime compensation or provide meal and rest periods.  *Id.*  The plaintiffs moved to certify a class of "individuals employed by Aerotek as Recruiters in California, regardless of their office location or their functional division." *Id.*  The court considered whether such Recruiters exercised discretion and independent judgment according to the California Industrial Welfare Commission Wage Order.[4]  *Id.* at * 13.  The court concluded the

---

[4] As described by the Ninth Circuit memorandum affirming *DeLodder*, the district court in *DeLodder* appears to cite the 2004 version of the federal regulations rather than the 2001 version which is incorporated into the Wage Order.  *See Delodder v. Aerotek Inc.*, 471 F. App'x 804, 806 (9th Cir. 2012) (describing the two versions as "similar but not identical.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "question can only be answered on an individualized basis" because the "degree of discretion

2    exercised by Recruiters varies at nearly every step of the recruiting process." *Id.* The court

3    explained Recruiters had different processes for finding candidates, some Recruiters conducted

4    phone interviews using "stock questions" while others were "more freewheeling," some Recruiters

5    "had the discretion to negotiate pay rates with a candidate," some "Recruiters were at liberty to

6    make recommendations to clients as to the pay rates clients proposed to offer," and "some

7    Recruiters recommended candidates to customer companies without any oversight" while others

8    "presented candidates to their [supervisors] only and made no recommendations to clients." *Id.*

9         This case differs in several respects from *DeLodder.* First, the proposed class in *DeLodder*

10   involved Recruiters finding candidates for a wide variety of jobs in various industries, including

11   both technical and non-technical roles. Indeed, much of the diversity among Recruiters identified

12   by the *DeLodder* court resulted from different practices in different industries. *See id.* ("In-person

13   interviews varied widely depending on the functional office in which the Recruiter worked; non-

14   technical divisions usually had short and formulaic interviews, while technical divisions usually

15   had longer and more open-ended interviews that depended more heavily on the Recruiter's

16   discretion in steering the conversation."). In contrast, TEK Recruiters are all recruiting for IT

17   positions, eliminating much of those variations. Further, the record shows Recruiters' experience

18   at TEK is far more uniform than in *DeLodder.* For example, the *DeLodder* court found some

19   Recruiters "recommended candidates to customer companies without any oversight." *Id.* In

20   contrast, the declarations submitted by Defendant indicate Recruiters uniformly present candidates

21   to Account Managers, who decide whether to move forward with that candidate. (Dkt. Nos. 68-5

22   ¶ 29 ("I start by presenting the candidate to the Account Manager"); 68-7 ¶¶ 9, 23 ("If I decided

23   the candidate was a good fit for the [requirement], I would present their credentials to the Account

24   Manager."); 68-10 ¶ 19 ("I just show [the Account Managers] the resumes of the candidates I have

25   chosen and they will trust me on the assessment of the individual. . . . The Account Manager many

26   times agrees with my recommendation whether to present the candidate to TEK's client."); 68-13

27   ¶ 17 ("When I meet with the Account Manager to present a candidate, I summarize my assessment

28   of the candidate . . . Account Managers agree with my recommendations most of the time."); 68-

17 ¶ 19 ("If I decide that a candidate is a good match for a customer's job requirements, I will present the candidate's credentials to the Account Manager. . . . The Account Manager makes the final decision whether to submit the candidate to the customer.").)

So, while some variation exists between Recruiters, that variation does not impact the answer to whether Recruiters customarily and regularly exercise discretion and independent judgment.  So, this question can be answered on a class-wide basis.

### 3.   Whether Recruiters Perform under Only General Supervision

For the administrative exemption to apply, TEK must also establish Recruiters are "'under only general supervision' while either: (1) performing work along specialized or technical lines requiring special training, experience, or knowledge, or (2) executing special assignments and tasks." *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 831 (9th Cir. 2011) (quoting Cal. Code Regs. tit. 8, § 11040(1)(A)(2)).  "The 'general supervision' requirement has not received much interpretation." *Campbell*, 642 F.3d at 831; *see also Lopez v. Liberty Mut. Ins. Co.*, No. 2:14-CV-05576-AB-JCx, 2019 WL 4605706, at *5 (C.D. Cal. July 25, 2019) (quoting *Campbell* to explain the lack of authority on "general supervision," and explaining "[s]ince [*Campbell*], the Ninth Circuit has issued several memorandum dispositions applying *Campbell* but distinguishing the cases on the facts.")  Courts have considered factors such as whether the employees "are expected to, and do, perform their work with little or no daily oversight; plan and prioritize their own work and daily schedules; and make decisions . . . independently." *Lopez*, 2019 WL 4605706, at *6; *see also Gallardo v. AIG Domestic Claims, Inc.*, 629 F. App'x 783, 785 (9th Cir. 2015) (concluding an employee worked under only general supervision because he "spent most of his time working independently with little day-to-day oversight," and the "majority of [employee's] work provided significant freedom and latitude to act.").

Plaintiffs' Recruiter declarants' testimony and TEK's corporate testimony support a finding by a preponderance of the evidence that Recruiters were all supervised to a similar degree. The Recruiters state they "worked under the daily and constant supervision of TEKsystems' managers," including Account Managers and Recruiter Leads.  (Dkt. No. 64-1 at 1025, 1034, 1042, 1050, 1059, 1067, 1075.)  Many describe working "in close proximity" to such managers.

1   (*Id.* at 200 ("All California offices have a pit where recruiters sit" and Account Managers talk with

2   recruiters "multiple times per day"), 1025, 1034, 1042, 1050, 1059, 1067.)  Further, all describe

3   "Red Zone" meetings occurring either every day or three times per week in which managers

4   assigned requirements to Recruiters and required Recruiters to "report[] on the work activities

5   [they] performed the prior day."  (*Id.* at 197 (Red Zone meetings are either daily or three times per

6   week), 1025-26, 1034-35, 1042. 1050, 1059, 1067, 1075.)  They indicate they "never spoke to

7   TEKsystems' clients without an Account Manager or Account Lead present."  (*Id.* at 184

8   (explaining the Account Manager is "almost always involved" with the discussion to get

9   requirements from the client and Recruiters "sometimes" get to be a part of that conversation),

10  1025, 1037, 1045, 1053, 1062, 1070, 1078.)

11      While the way performance metrics for Recruiters was calculated changed over the

12  proposed class period, (Dkt. No. 64-1 at 170-177 (explaining the shift in July 2022 from requiring

13  "30 interactions," to "a Recruiter Score Card" which weighed at the most "meaningful

14  expectations")), Recruiters' activities were closely monitored throughout the period.  Plaintiffs'

15  Recruiter declarants describe being measured by "numerous metrics" including required weekly

16  numbers of "G2s," or informational calls with candidates, "reference checks, meetings or meals

17  with candidates, and the number of candidates that Account Managers submitted to a TEKsystems

18  client."  (*Id.* at 1027, 1036. 1044, 1052, 1061, 1069, 1077.)  The required numbers "were the same

19  in every branch in TEKsystems for recruiters."  (*Id.* at 170.)  Supervisors closely tracked

20  Recruiters' "spread"—or the net profit from each successfully placed consultant, indicating the

21  difference between what TEK bills the customer and what TEK pays, including the consultant's

22  salary and the costs associated with finding the consultant for the position—and in some cases

23  displayed spread amounts in the office "from best to worst for everyone to see."  (*Id.* at 1027,

24  1036, 1052, 1061, 1069, 1077.)  TEK's internal database allows leaders to see metrics such as

25  "spread," "how many consultants" Recruiters talk to, and candidate "submittals" to clients "on a

26  daily basis."  (*Id.* at 201.)  Each week Recruiters' supervisors get a report on how each Recruiter is

27  doing.  (*Id.* at 165.)

28      TEK argues Recruiters "were not being supervised regarding how they were evaluating,

United States District Court
Northern District of California

1    screening, and selecting candidates for submission" so "Recruiters were held to account and

2    overseen on whether they got results, but not as to **how** those results were achieved." (Dkt. No. 68

3    at 44-45.) Even accepting this as true, Defendant has put forth no evidence that this is true on an

4    individualized, as opposed to class-wide basis. Indeed, the evidence suggests *all* Recruiters were

5    held to the same performance metric standards, all California Recruiters did their work in a "pit,"

6    with supervisors "close by,"[5] all Recruiters were assigned requirements from supervisors, and

7    supervisors, rather than Recruiters, decided which candidates got sent to the clients.

8        Defendant also contends "the degree of oversight varies significantly" between Recruiters,

9    (Dkt. No. 68 at 44); however, while TEK has established the supervision structure changed over

10   the class period, TEK has not established the level of supervision ever meaningfully changed. In

11   2018, many Recruiters directly reported to an Account Manager. (Dkt. No. 68-12 ¶ 8.) But in

12   more recent years, "TEK has moved away from the model of having a Recruiter supervised by an

13   Account Manager," and now most Recruiters are supervised by Recruiter Leads or Specialization

14   Leads. (*Id.*; Dkt. Nos. 68-6 ("About a year or so" after July 2017, a "structure where Recruiters

15   are managed by other Recruiter[ Leads], and not Account Managers, was put in place across all of

16   TEK"); 68-7 ¶¶ 5, 11, 12; 64-1 at 161 (explaining the "specialization lead . . . used to be referred

17   to as the recruiter lead"), 164 (since 2021, Recruiters have been supervised by "specialization

18   lead[s]," a role that was previously referred to as Recruiter Leads).) Much like Account Managers

19   and Recruiter Leads before them, "[s]pecialization leads have two to four recruiters aligned to

20   them." (Dkt. No. 64-1 at 164.) While the title of the supervisor varies across the class period and

21   class members, Defendants provide no evidence that the amount of supervision varies according to

22   these differences. All Recruiters continued to be measured according to standardized, uniform

23   metrics. All Recruiters must show any potential candidates to Account Managers before sending

24

25   _____

26   [5] Some of Defendant's declarants indicate post-COVID, some work conditions changed and now
     some Recruiters work some days remotely. (*See, e.g.* Dkt. Nos. 68-6 ¶¶ 31-32; 68-17 ¶ 22.) In its
     briefing, Defendant asserts "remote work . . . became commonplace in response to the COVID-19
27   pandemic" and "changed many practices." (Dkt. No. 68 at 16.) However, Defendant presents no
     evidence of the prevalence of such remote work at TEK as a whole or among Recruiters, and
28   Defendant and does not otherwise explain what policy changes Defendant implemented post-
     COVID.

1   those candidates to clients. Moreover, it is always the client, not the Recruiter, who has the final

2   say over which candidates to hire.

3        So, the determination of whether Recruiters are subject to only general supervision while

4   either: (1) performing work along specialized or technical lines requiring special training,

5   experience, or knowledge, or (2) executing special assignments and tasks is subject to common

6   proof.

7                **4.        Whether Recruiters Primarily Perform Administrative Duties**

8        Finally, to be administratively exempt from overtime requirements, TEK must demonstrate

9   Recruiters are "primarily engaged in duties that meet the test of the exemption," which requires

10  examining "[t]he work actually performed by the employee during the course of the workweek . . .

11  and the amount of time the employee spends on such work, together with the employer's realistic

12  expectations and the realistic requirements of the job." Cal. Code Regs. tit. 8, § 11040(1)(A)(2).

13  For purposes of the administrative exemption, "primarily" "means more than one-half the

14  employee's work time." Cal. Code Regs. tit. 8, § 11040(2)(N). So, the Court must consider the

15  actual, day-to-day activities of Recruiters, and consider whether more than half of their work time

16  meets the three requirements of the exemption. In conducting this analysis, the Court will

17  consider "uniform corporate policies" which "often bear heavily on questions of predominance

18  and superiority" and "carry great weight for certification purposes." *In re Wells Fargo Home*

19  *Mortgage Overtime Pay Litigation*, 571 F.3d at 958. "Such centralized rules, to the extent they

20  reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to

21  common proof. *Id.* at 958–59.

22       Plaintiffs provide sufficient evidence indicating time Recruiters spent on various activities

23  can be determined class wide. For example, Recruiters log their activities into an internal database

24  at TEK. (Dkt. No. 64-1 at 11.) TEK uses uniform metrics for assessing Recruiters' work, no

25  matter the specialization or management structure. (*Id.* at 169-70, 1027, 1036. 1044, 1052, 1061,

26  1069, 1077.) The required numbers "were the same in every branch in TEKsystems for

27  recruiters." (*Id.* at 170.) As a result, it is likely determining the amount of time Recruiters spend

28  on various tasks will be subject to common proof—using TEK's internal data and performance

United States District Court
Northern District of California

22

metrics for Recruiters.

TEK asserts this data is inconclusive because, while TEK's internal data indicates the number of each activity performed, "Plaintiffs utterly fail to quantify the time spent" on each activity.  (Dkt. No. 68 at 28.)  However, the preliminary data provided by Plaintiffs matches other available evidence about the amount of time Recruiters devote to various tasks.  TEK's internal data indicates approximately 72% of Plaintiffs' activities involved attempting to contact candidates, conduct intakes (or "G2s"), and making calls. (Dkt. No. 64-1 at 984.)  Similarly, about 66% of Defendant's Recruiter declarants' activities were attempting calls, conducting intakes, and making calls.  (Dkt. No. 72-4 ¶ 17.)  This data is buttressed by the testimony of TEK's corporate executives, who agree most of Recruiters' "interactions" are "calling [] consultant[s]."  (Dkt. No. 64-1 at 205.)  Plaintiffs' declarants agree most of their time was spent "searching for candidates whose skills and job experiences matched a Requirement and reaching out to those candidates to get basic information."  (*Id.* at 1027 (indicating those actions represented 75% of declarant's workday, 1036 ("bulk" of workday), 1044 ("greater part" of workday), 1053 ("vast majority" of workday), 1061 (75%), 1069 ("majority" of workday), 1077 ("largest part" of workday).)  TEK provides no evidence indicating some Recruiters spent most of their time in tasks other than attempting to contact candidates, conducting intakes, or making calls.  For example, while TEK's Recruiter declarants indicate they interacted with clients more frequently than Plaintiffs' Recruiter declarants, TEK's Recruiter declarants nevertheless indicated such interactions were infrequent. (Dkt. No. 68-17 ¶ 14 (meets with hiring managers at TEK clients "[a]t least one or two times a month").)  Finally, TEK does not suggest there is any other superior way to determine how Recruiters spend their time on a day-to-day basis other than their internal data.

Thus, the determination of whether Recruiters "primarily" engage in administrative duties is likely to be subject to class-wide proof.

* * *

In sum, Plaintiffs have shown by a preponderance of the evidence the applicability of California's administrative exemption to members of the putative class and subclass is susceptible to generalized class-wide proof such that common issues predominate.

### B.     Whether Class Action Is Superior to Other Available Methods

Federal Rule of Civil Procedure 23(b)(3) requires Plaintiffs demonstrate "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3).  In making this decision, the Rule instructs courts to consider:

> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

*Id.*  "This list is not exhaustive and other factors may be considered."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  "The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy."  *Id.*

Plaintiffs have established a class action is a superior means of adjudicating this action.  First, there is no indication members of the proposed class or subclass desire to individually litigate their claims.  Nor does the record show class members have an incentive to do so given the intensive resources required to prosecute these claims.  Indeed, "class actions are preferred in wage-and-hour actions when individual employees may forgo pursuing their claims due to fear of retaliation."  *Uschold v. NSMG Shared Servs., LLC*, 333 F.R.D. 157, 169 (N.D. Cal. 2019).  Second, TEK does not argue there is pending other litigation that counsels against the superiority of this class action.  Third, the Northern District of California is appropriate for resolving the claims of a California class.

TEK asserts "a class action is not a superior means of conducting this litigation because individual inquiries into the hundreds of class members' assignments, work schedules, and hours would overwhelm the court and render a class action unmanageable."  (Dkt. No. 68 at 46.)  Plaintiff's proposed class and subclass contain 476 proposed class members and 252 proposed subclass members.  (Dkt. No. 64-1 ¶¶ 32-33.)  "[C]ourts routinely certify larger and more complex classes."  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 515 (9th Cir. 2013).  TEK has not shown

1    any reasons why this case will be particularly complex or difficult to manage.

2           TEK further insists the "existence, type, and extent of damage varies from person to person

3    . . . therefore individual damages issues predominate." (Dkt. No. 68 at 46.) However, in the Ninth

4    Circuit, "damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat. Life*

5    *Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010). "So long as the plaintiffs were harmed by the same

6    conduct, disparities in how or by how much they were harmed [does] not defeat class

7    certification." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014) (citing *In re*

8    *Deepwater Horizon*, 739 F.3d 790, 810–11 (5th Cir. 2014)); *see also Leyva v. Medline Industries,*

9    *Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (holding the district court applied the wrong legal standard

10   in wage and hour action by denying class certification on the grounds individual issues

11   predominated as to damages calculations). Further, Plaintiffs do not intend to rely on individual

12   testimony to establish work hours, but instead the class members' electronic footprint with TEK's

13   software. So, even though class and subclass members may have different amounts of damages,

14   individual issues will not overwhelm the common ones and a class action is superior for resolution

15   of this case.

16                                                        ***

17          In sum, Plaintiffs have satisfied by a preponderance of the evidence all the requirements of

18   Rule 23(a) and Rule 23(b)(3). So, the Court certifies Plaintiffs' proposed class and subclass.

19   **IV.    APPOINTMENT OF CLASS COUNSEL**

20          If a class is certified, the Court "must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In

21   appointing class counsel, courts must consider:

22

23          (i) the work counsel has done in identifying or investigating potential claims in the
            action;

24
            (ii) counsel's experience in handling class actions, other complex litigations, and
25          the types of claims asserted in the action;

26          (iii) counsel's knowledge of the applicable law; and

27
            (iv) the resources that counsel will commit to representing the class.
28

1  *Id.*  Plaintiffs' lawyers, Werman Salas P.C., Lichten & Liss-Riordan, P.C., and Olivier &

2  Schreiber LLP, request appointment as class counsel.  Plaintiffs' attorneys have been involved

3  with this case since its start and have already devoted significant time and resources to this case.

4  (Dkt. No. 64 ¶¶ 19-21.)  They have sufficient experience and knowledge to handle this case.  (Dkt.

5  Nos. 64, 65, 66.)  So, the Court appoints Plaintiffs' lawyers as class counsel.

6  **CONCLUSION**

7          For the reasons discussed above, the Court certifies (1) a class of all current and former

8  Recruiters employed by Defendant in California from January 28, 2018 to the final date of

9  judgment; and (2) a subclass of all class members who worked for Defendant as Recruiters on or

10  after January 28, 2019 and who are no longer employed by Defendant and have not been

11  employed by Defendant for more than 72 hours.  Werman Salas P.C., Lichten & Liss-Riordan,

12  P.C., and Olivier & Schreiber LLP are appointed as class counsel.

13          The parties are directed to meet and confer regarding a proposed class notice.  The Court

14  sets a further case management conference for March 14, 2024 at 1:30 p.m.  An updated joint case

15  management conference statement is due one week in advance.

16          This Order disposes of Docket No. 63.

17          **IT IS SO ORDERED.**

18  Dated: February 13, 2024

19

20

21  JACQUELINE SCOTT CORLEY

United States District Judge

22

23

24

25

26

27

28

United States District Court
Northern District of California

26