Rachel Bien (SBN 315886)
OLIVIER & SCHREIBER LLP
595 E. Colorado Blvd., Suite 418
Pasadena, CA 91101
Tel: (213) 325-3430
Email: rachel@os-legal.com

Sally J. Abrahamson (admitted *pro hac vice*)
WERMAN SALAS P.C.
335 18th Place NE
Washington, D.C. 20002
Tel: (202) 830-2016
Email: sabrahamson@flsalaw.com

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BO AVERY, PHOEBE RODGERS, KRISTY CAMILLERI AND JILL UNVERFERTH, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>TEKSYSTEMS, INC.,<br><br>               Defendant. | Case No. 3:22-cv-02733-JSC<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: August 8, 2024<br>Time: 10:00 a.m.<br>Ctrm.: 8 – 19th Floor<br><br>Judge: Hon. Jacqueline Scott Corley |

Plaintiffs' Motion for Partial
Summary Judgment

Case No. 3:22-cv-02733-JSC

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ............................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES....................................................................... 1

I.    INTRODUCTION ................................................................................................................... 1

II.   RELEVANT PROCEDURAL HISTORY ............................................................................... 1

III.  STATEMENT OF FACTS ...................................................................................................... 2

      A.    TEK Is a Recruiting Firm ............................................................................................ 2

      B.    Recruiters Are Entry-Level Employees Whom TEK Subjects to Multiple
            Levels of Supervision and Who Do Not Require Specialized Training ................. 3

      C.    Recruiters' Primary Job Duty Is Producing IT Job Candidates for Account
            Managers .................................................................................................................... 5

            1.    TEK's Connected Data Shows Recruiters Overwhelmingly Spend
                  Their Time Contacting Candidates ............................................................... 12

            2.    TEK Requires Recruiters to Meet Production Quotas.............................. 12

            3.    Recruiters' Compensation Is Tied to Their Production Tasks.................. 14

      D.    Recruiters' Work Is Not Related to the General Business Operations of
            TEK or Its Customers ............................................................................................... 14

IV.   ARGUMENT............................................................................................................................. 15

      A.    TEK Bears a Heavy Burden to Show that It Properly Classified Recruiters as
            Exempt ........................................................................................................................ 16

      B.    Recruiters' Primary Duties Are Not Directly Related to the Management or
            General Business Operations of TEK or Its Customers....................................... 17

      C.    Recruiters Do Not Routinely Exercise "Discretion and Independent Judgment"
            on Matters of Significance ........................................................................................ 21

      D.    Recruiters Are Closely Supervised and Do Not Require Specialized Training
            or Knowledge............................................................................................................. 24

V.    CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 15

*Avery v. TEKsystems, Inc.*,
No. 22 Civ. 02733, 2024 WL 590364 (N.D. Cal. Feb. 13, 2024) ............................................ 16

*Ballaris v. Wacker Siltronic Corp.*,
370 F.3d 901 (9th Cir. 2004) ................................................................................................ 16

*Bothell v. Phase Metrics, Inc.*,
299 F.3d 1120 (9th Cir. 2002) ...................................................................................... 18, 20, 22

*Boyd v. Bank of Am. Corp.*,
300 F.R.D. 431 (C.D. Cal. 2014) ............................................................................ 16, 21, 22, 25

*Bratt v. County of L.A.*,
912 F.2d 1066 (9th Cir. 1990) ................................................................................................ 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................ 15

*Deluca v. Farmers Ins. Exch.*,
386 F. Supp. 3d 1235 (N.D. Cal. 2019) ...................................................................... 21, 22

*Eicher v. Advanced Bus. Integrators, Inc.*,
151 Cal. App. 4th 1363 (2007) ...................................................................................... 16, 18

*Federico v. Overland Contracting, Inc.*,
No. 12 Civ. 2588, 2013 WL 5516187 (N.D. Cal. Oct. 4, 2013) ........................................ 15, 24

*Fogh v. Los Angeles Film Sch.*,
No. B230920, 2012 WL 6604709 (Cal. Ct. App. Dec. 18, 2012) ............................................ 25

*Fowler v. OSP Prevention Grp., Inc.*,
38 F.4th 103 (11th Cir. 2022) ................................................................................................ 18

*Gordon v. Model N, Inc.*,
705 F. App'x 647 (9th Cir. 2017) ............................................................................................ 19

*Gordon v. Model N, Inc.*,
No. 15 Civ. 01423, 2016 WL 3194240 (N.D. Cal. June 9, 2016) ............................................ 19

*Harris v. Superior Ct.*,
53 Cal. 4th 170 (2011) ...................................................................................... 17, 18, 20, 21

*Martin v. Cooper Elec. Supply Co.*,
    940 F.2d 896 (3d Cir. 1991) ............................................................................................ 18

*McKeen-Chaplin v. Provident Sav. Bank, FSB*,
    862 F.3d 847 (9th Cir. 2017) ..................................................................................... 18, 20

*Ramirez v. Yosemite Water Co.*,
    20 Cal. 4th 785 (1999)............................................................................................... 15, 16

*Rieve v. Coventry Health Care, Inc.*,
    870 F. Supp. 2d 856 (C.D. Cal. 2012)............................................................................ *passim*

*Sav-On Drug Stores, Inc. v. Superior Ct.*,
    34 Cal. 4th 319 (2004)..................................................................................................... 16

*Su v. F.W. Webb Co.*,
    No. 20 Civ. 11450, 2023 WL 4043771 (D. Mass. June 16, 2023) ...................................... 19-20

*Walsh v. Unitil Serv. Corp.*,
    64 F.4th 1 (1st Cir. 2023)........................................................................................... 18, 19

**Statutes**

Cal. Lab. Code § 515 ........................................................................................................ 17

**Rules**

Fed. R. Civ. P. 56............................................................................................................. 15

**Regulations**

29 C.F.R. § 541.205 (2000)............................................................................... 17, 18, 19, 20

29 C.F.R. § 541.207 ............................................................................................... 17, 22, 23

Cal. Code Regs. tit. 8, § 11040(1)(A)(2) ............................................................................. 17

<u>**NOTICE OF MOTION AND MOTION**</u>

**PLEASE TAKE NOTICE** that on August 8, 2024 at 10:00 a.m. or soon thereafter as the counsel may be heard, before the Honorable Jacqueline Scott Corley in Courtroom 8—19th Floor, Plaintiffs will and hereby do move the Court for an order of partial summary judgment.

Plaintiffs ask the Court to rule that, as a matter of law, Defendant cannot meet its burden to establish the administrative exemption defense.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

Plaintiffs Bo Avery, Phoebe Rodgers, Kristy Camilleri, and Jill Unverferth ("Plaintiffs"), on behalf of themselves and a class of entry-level Recruiters, move for summary judgment against Defendant TEKsystems, Inc. ("TEK" or "Defendant") on its affirmative defense that it properly classified Recruiters as exempt from overtime under California law.

TEK bears the burden to show that each requirement of the administrative exemption applies to Recruiters, including that Recruiters' work is "directly related to [the] management or general business operations" of TEK or its customers, that their primary duty involves the exercise of discretion and independent judgment, and that Recruiters work under only general supervision performing tasks that require special training, experience, or knowledge. Here, the undisputed evidence shows that Recruiters' primary duty—screening and matching potential job candidates— is entry-level production work that does not meet the administrative exemption requirements. Accordingly, the Court should grant summary judgment to Plaintiffs and the class on TEK's administrative exemption affirmative defense and rule that they are entitled to all the protections of non-exempt employees under California law.

**II.      RELEVANT PROCEDURAL HISTORY**

Plaintiffs filed this lawsuit in San Francisco Superior Court on January 28, 2022. ECF No. 1-1. On April 4, 2022, Plaintiffs filed their First Amended Class Action Complaint, adding a claim under the Private Attorneys General Act ("PAGA"). ECF No. 1-2. Defendant removed the case to this Court on May 6, 2022. ECF No. 1.

On February 13, 2024, the Court granted Plaintiffs' motion for class certification and certified: (1) a class of all current and former Recruiters employed by Defendant in California from January 28, 2018 to the final date of judgment; and (2) a subclass of all class members who worked for Defendant as Recruiters on or after January 28, 2019 and who are no longer employed by Defendant and have not been employed by Defendant for more than 72 hours. ECF No. 84. Notice issued to 542 class members on April 16, 2024 with a deadline of June 15, 2024 to opt out.[1]

## III.    STATEMENT OF FACTS[2]

### A.    TEK Is a Recruiting Firm.

TEK is an IT staffing company.[3] TEK's principal business purpose is to recruit IT workers to work for third-party companies.[4] TEK competes with other recruiting firms to place candidates and ultimately is only successful at placing less than one-third of the candidates it submits to third-party companies.[5] To compete against other companies, TEK often submits multiple candidates for a single requirement, submits one candidate for multiple requirements, and has multiple Recruiters work on the same requirement in order to increase the chances that one of its candidates will be selected.[6] TEK claims that it has an "exhaustive search, training, and matching process"

---

[1]    Abrahamson Decl. ¶ 4.

[2]    Because all facts must be viewed in the light most favorable to TEK on Plaintiffs' motion for partial summary judgment, Plaintiffs cite exclusively to TEK's own documents and the testimony of TEK's employees and witnesses for purposes of this motion.

[3]    Ex. 1 (TEK Senior Vice President of Talent Delivery Haycock Tr. ("Haycock Tr.")) 25:6-26:6; Ex. 2 (*TEKsystems, Inc. v. Andiamo Consulting, LLC* ("Andiamo") Complaint) at ¶ 2.

[4]    *Id.*; Ex. 1 (Haycock Tr.) 60:2-6; Ex. 5 (Rule 30(b)(6) Deposition DiBenedetto Tr. ("DiBenedetto Tr.")) 134:5-13; Ex. 6 (*Andiamo* Rule 30(b)(6) Dep. Tr. of Alexander Pulido ("*Andiamo* Rule 30(b)(6) Tr.")) 24:14-25:5, 153:13-23; Ex. 7 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 3.

[5]    Ex. 8 (Rule 30(b)(6) Doyle Deposition Sealed Tr. Portion) 237:20-238:9 (of the candidates TEK submits to companies for consideration, only 31.8% were actually hired); Ex. 5 (DiBenedetto Tr.) 96:2-6 (testifying that part of the customer service goal with potential job candidates is to get them to utilize TEK over its competitors); Ex. 9 (Rule 30(b)(6) Deposition Doyle Tr. ("Doyle Tr.")) 199:18-200:2; Ex. 1 (Haycock Tr.) 44:22-45:4 ("There's always a war for talent."); 48:1-7 ("[T]here are many, many, many competitors out there"); 48:10-49:12; Ex. 6 (*Andiamo* Rule 30(b)(6) Tr.) 181:12-17; Ex. 10 (Haycock Email October 26, 2020) at TEK-Recruiter_Lit-00386105 (discussing getting "beat on a requirement.").

[6]    *Id.*; Ex. 9 (Doyle Tr.) 139:8-14, 140:3-11; Ex. 11 (Perrault Sept. 27, 2017 Email) TEK-

---

Plaintiffs' Motion for Partial          2          Case No. 3:22-cv-02733-JSC
Summary Judgment

and that the process was "developed and fine-tuned over 20-plus years in the market."[7]

## B. Recruiters Are Entry-Level Employees Whom TEK Subjects to Multiple Levels of Supervision and Who Do Not Require Specialized Training.

Recruiters are entry-level employees.[8] TEK hires Recruiters early in their career and it has an average annual Recruiter attrition rate of approximately 38% to 47%.[9] The average tenure for Recruiters at TEK in California is only a little over one year.[10] TEK intends for Recruiters to be promoted to Account Manager or Recruiter Lead.[11] Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team.[12] TEK employs people in 46 different recruiting job titles

Recruiter_Lit-00248137; Ex. 12 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520227 ("Is this a marketable candidate that can be submitted to multiple other opportunities?"); Ex. 13 (Multiple Submittals) TEK-Recruiter_Lit-000000303; Ex. 14 (Bhasin Email May 27, 2022) at TEK-Recruiter_Lit-00127828 ("A candidate can be submitted by multiple producers"); Ex. 15 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307 (coaching recruiters to determine whether a candidate is a match for multiple requirements or TEK clients); Ex. 16 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467 (describing a coaching opportunity to ask Recruiters what other requirement a candidate Auto-Matches or fits).

[7] Ex. 2 (Andiamo Compl.) at ¶ 22.

[8] Ex. 1 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; Ex. 17 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At an entry level role"); Ex. 18 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 2 ("Recruiting is also treated like an entry-level role."); Ex. 19 (Tabor July 31, 2018 Email) TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 (474 of Recruiters are new graduates, 75 had six months to one year of experience, and 110 of Recruiters had 1-2 years of experience. Therefore, approximately 74% of the 892 Recruiters had less than two years of experience); Ex. 20 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 21 (Maltese Feb. 19, 2018 Email) TEK-Recruiter_Lit-00616402.

[9] Ex. 9 (Doyle Tr.) 266:23-268:10; *see also* Ex. 6 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 20 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738.

[10] Ex. 22 (Major Dec.) ¶¶ 49-50.

[11] Ex. 4 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 ("TEKsystems promotes from within. More than 90 percent of current leaders began their careers as recruiters."); Ex. 23 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045215 ("We offer . . .a promote from within growth model"); Ex. 24 (Mason Oct. 24, 2019 Email) TEK-Avery-00492061; Ex. 25 (Sales Trainee Program) at TEK-Recruiter_Lit-00527262 (discussing promotions from Recruiter to Account Manager); Ex. 5 (DiBenedetto Tr.) 27:14-17 (describing his promotion to recruiter lead/retention lead); Ex. 9 (Doyle Tr.) 50:8-14 ("promoting recruiter leads"), 106:12-16.

[12] Ex. 1 (Haycock Tr.) 21:13-22:16; 103:6-104:1;.

Plaintiffs' Motion for Partial    3    Case No. 3:22-cv-02733-JSC
Summary Judgment

in California.[13] With the exception of Recruiter Trainees, all of TEK's recruiting job titles are classified as exempt.[14] This lawsuit only concerns one of those 46 recruiting job titles: Recruiter.

TEK employs multiple layers of supervisors for Recruiters – Director of Business Operations ("DBOs"), Director of Regional Operations, Delivery Managers, Team Leads, Specialization Leads, and Recruiter Leads – who closely supervise Recruiters.[15] Recruiters and their supervisors attend daily Red Zone meetings where Recruiters receive work assignments and report on their work activities.[16] Recruiters' managers receive weekly reports on Recruiters' performance with respect to their production metrics, and monitor Recruiters' job performance.[17] Corporate officers also monitor Recruiters' quota compliance and spread (profit) attainment.[18]

Recruiters are also aligned to Account Managers, whose job is to "provide solutions to [their] clients' business and technology needs and ensure [they] place quality (technical and

---

[13]    Ex. 26 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.
[14]    *Id.* No. 4.
[15]    Ex. 1 (Haycock Tr.) 65:14-18; Ex. 9 (Doyle Tr.) 78:3-12, 101:2-102:20; Ex. 4 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 (Identifying leaders above "Recruiter."); Ex. 27 (Recruiter Lead Lighthouse PowerPoint) TEK-Recruiter_Lit-00469833 (describing supervisory tasks performed by Recruiter Leads); Ex. 28 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00156629-30; Ex. 29 (LA Welcome Packet) at TEK-Recruiter_Lit-00539864-65; Ex. 30 (Sacramento Welcome Packet) at TEK-Recruiter_Lit-00107557-58; Ex. 31 (San Diego Welcome Packet) TEK-Avery-00488750-52.
[16]    Ex. 5 (DiBenedetto Tr.) 136:17-137:16; Ex. 9 (Doyle Tr.) 123:25-124:8, 238:16-246:4, 255:3-256:8; Ex. 32 (Running an Effective Red Zone) TEK-Recruiter_Lit-00665469; Ex. 33 (Ligouri Oct. 31, 2018 Email) TEK-Recruiter_Lit-00111237 (memorializing Red Zone assignments); Ex. 34 (DBO Operations: Red Zone) TEK-Recruiter_Lit-00426755; Ex. 35 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.
[17]    Ex. 9 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead . . . [and contains] certain key performance indicators"), 44:2-18, 84:1-14, 91:21-92:2, 94:17-20, 108:9-16,  247:12-248:10; Ex. 1 (Haycock Tr.) 158:2-14; Ex. 5 (DiBenedetto Tr.) 136:11-137:16; Ex. 12 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Using the weekly report, a Lead should be able to identify which activities a recruiter needs to focus on."); Ex. 36 (WIN narratives) TEK-Recruiter_Lit-00392430.
[18]    Ex. 1 (Haycock Tr.) 70:13-71:22; Ex. 37 (Executive Dashboard) at TEK-Recruiter_Lit-00161741-65; Ex. 38 (Haycock Jan. 25, 2018 Email) TEK-Recruiter_Lit-00253346.

Plaintiffs' Motion for Partial          4          Case No. 3:22-cv-02733-JSC
Summary Judgment

cultural fit) consultants."[19] Recruiters talk to Account Managers multiple times a day.[20] Recruiters' desks are located in the "pit," an open office set up with cubicles, with managers' offices surrounding them, which allows managers to monitor Recruiters.[21] TEK does not require Recruiters to have prior IT knowledge or experience, or any specialized training or education.[22] TEK assigns Recruiters to "verticals" and also refers to "verticals" as "specializations."[23] TEK refers to the specific industry and/or job category that Recruiters work in as a "specialization," but those Recruiters do not have any specific training or experience adjacent to that field.[24]

### C.     Recruiters' Primary Job Duty Is Producing IT Job Candidates for Account Managers.

Recruiters are production employees.[25] Recruiters' primary job duty is to screen and match

---

[19]     Ex. 28 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156629; Ex. 31 (San Diego Welcome Packet) TEK-Avery-00488750; Ex. 9 (Doyle Tr.) 101:15-102:7, 137:19-138:4, 169:18-170:5; Ex. 5 (DiBenedetto Tr.) 114:23-25

[20]     Ex. 9 (Doyle Tr.) 251:3-253:17.

[21]     Ex. 9 (Doyle Tr.) 251:3-252:14 ("All California offices have a pit where recruiters sit"), 253:14-17; Ex. 29 (LA Welcome Packet) TEK-Recruiter_Lit-00539870, Ex. 39 (Oakland Welcome Packet) TEK-Recruiter_Lit-00424016; Ex. 9 (Doyle Tr.) 251:3-253:17; Ex. 40 (Week 10: Value Messaging) at TEK-Recruiter_Lit-00041666 at 6; *see also* Ex. 41 (New Recruiter Onboarding) TEK-Recruiter_Lit-00395436 (Recruiter Leads listen to Recruiter phone calls); Ex. 42 (Manage & Develop Your Team) at TEK-Recruiter_Lit-00395328-29 ("You can't own the pit if you aren't there").

[22]     Ex. 5 (DiBenedetto Tr.) 121:1-7 ("The Recruiter is not . . . an individual that has a technical background per se."); Ex. 9 (Doyle Tr.) 59:4-17, 79:16-20 (Q: "Recruiters don't have any prerequisites before they're hired to have any sort of technical knowledge, is that true?" A: "That's correct."), 208:23-210:17; Ex. 1 (Haycock Tr.) 121:12-17; Ex. 43 (Job Description) at TEK-Recruiter_Lit-00588313 (not requiring IT knowledge or a college degree, under some circumstances); Ex. 44 (Rule 30(b)(6) Deposition of Johnson Tr. ("Johnson Tr.")) 87:16-88:9.

[23]     Ex. 5 (DiBenedetto Tr.) 46:6-21; Ex. 9 (Doyle Tr.) 19:20-25, 59:1-17, 81:8-21, 297:4-20 ("we've had our recruiters specialized to that level for – for probably at least, I don't know, 15 years."), 242:22-244:20; Ex. 44 (Johnson Tr.) 220:3-18.

[24]     Ex. 9 (Doyle Tr.) 79:16-80:23, 244:8-17 (Q: "And when you're saying the specialized -- like, we have new recruiters are joining these teams that haven't done any of this training, but what they're doing is they're focusing on who they're placing, the skills that the job candidates have?" A. "Correct."), 244:18-20 (Q. "If you're in financial service team, you didn't come from a financial services background?" A. "No. Correct."); Ex. 1 (Haycock Tr.) 113:8-12 (Q: "What is the difference between a recruiter and a specialized recruiter?" A: "A specialized recruiter has one contest win and 60 percent of their starts aligned in their specialty area."), 114:4-115:10; Ex. 43 (Job Description) at TEK-Recruiter_Lit-00588313 (not requiring IT knowledge).

[25]     Ex. 1 (Haycock Tr.) 60:7-12; 68:1-16 ("Anyone that is in a role that is a salesperson account

---

Plaintiffs' Motion for Partial     5     Case No. 3:22-cv-02733-JSC
Summary Judgment

IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's Account Managers.[26]  Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates.[27]  *See* Section III.C.1.

As the initial recruiting step, TEK's clients fill out a form that the employees refer to as

---

manager or recruiter, we consider those as producing roles. Meaning that they are producing for the company. Our products and services are associated with putting people to work, and those producers are – it's just a generic term that's used to say you're either a salesperson or a recruiter. . . . Again, as I've stated before, they are a recruiter that is producing. Meaning that they are a – they're a recruiter that produces what recruiters produce . . . They find people for jobs."), 86:9-19 (SPP means "spread per producer" and refers to "recruiters"); Ex. 5 (DiBenedetto Tr.) 158:4-12; Ex. 9 (Doyle Tr.) 65:24-66:5 128:16-18, 213:4-7; Ex. 45 (Haycock Dep. Ex. 15) TEK-Recruiter_Lit-00124518 (email attaching "*Producer* EOY Performance Reviews" and "*Producer* Performance Reviews 2021" for Recruiters) (emphasis added); Ex. 46 (Haycock Dep. Ex. 5 (Project Lighthouse Communication Plan)) at TEK-Recruiter_Lit-00614413 (referring to Recruiters as "production focused"); Ex. 47 (Alvather Email Oct. 2, 2019) at TEK-Recruiter_Lit-00392555-56; Ex. 48 (Bhasin May 17, 2022 Email) at TEK-Recruiter_Lit-00125213; Ex. 49 (Fullerton July 10, 2020 Email) TEK-Recruiter_Lit-00194291 ("our producers must document in a consistent, timely manner"); Ex. 37 (Executive Dashboard) TEK-Recruiter_Lit-00161739; Ex. 50 (Recruiter Excellence: Scorecard FAQs) at TEK-Recruiter_Lit-00095089 ("many of our top producers are not maintaining 30 interactions."); Ex. 51 (Role Impact Summary: Producers (AM and Recruiters)) TEK-Recruiter_Lit-00004483; Ex. 52 (Performance Review Guide 2021) at TEK-Recruiter_Lit-00528423 (referring to Recruiters as "Producers"); Ex. 53 (Producer Documentation Guide) TEK-Recruiter_Lit-00125601; Ex. 54 (Producer Performance KPI 8-4-2020) TEK-Recruiter_Lit-00281725 (Recruiter metric summaries are referred to "Producer Performance KPI"); Ex. 55 (Annual Operating Plan) TEK-Recruiter_Lit-00583663 at 3, 8 ("Producer Enablement Technology").

[26]    Ex. 6 (*Andiamo* Rule 30(b)(6) Tr.) 165:15-24; Ex. 5 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 162:18-163:7; Ex. 9 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 1 (Haycock Tr.) 21:13-22:16, 32:5-13, 59:2-11, 60:7-12; Ex. 4 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386846; Ex. 28 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156629-30; Ex. 29 (LA Welcome Packet) TEK-Recruiter_Lit-00539864-65; Ex. 30 (Sacramento Welcome Packet) TEK-Recruiter_Lit-00107557-58; Ex. 31 (San Diego Welcome Packet) TEK-Avery-00488750-51; Ex. 56 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. *Screens* consultants . . . ."); Ex. 57 (Coaches Guide Recruiter 1 Participant Guide) at TEK-Recruiter_Lit-00529902.

[27]    Ex. 9 (Doyle Tr.) 252:24-253:2, 271:8-272:5 (Recruiters spend "the majority of the time . . . talking to consultants"); Ex. 1 (Haycock Tr.) 59:2-11; Ex. 58 (Recruiter Success Profile) TEK-Recruiter_Lit-00020276 ("high call volume environment"); Ex. 59 (Colavito Email June 19, 2018) TEK-Avery-00521319 ("Our minimum expectations per recruiter is that they make about 25 calls a day").

---

Plaintiffs' Motion for Partial                    6                    Case No. 3:22-cv-02733-JSC
Summary Judgment

"job requisitions," "job requirements," or "job reqs."[28] Job requisitions outline the clients' requirements for particular positions.[29] The clients, not Recruiters, determine the job requirements for job openings.[30] TEK's managers assign the job requisitions to Recruiters.[31]

Account Managers, not Recruiters, are responsible for directly communicating with clients regarding their hiring needs.[32] If Recruiters have questions about the job requisition, they ask the Account Managers.[33] Account Managers provide information regarding the necessary

[28]   Ex. 1 (Haycock Tr.) 175:18-176:1; Ex. 5 (DiBenedetto Tr.) 91:9-22; Ex. 60 (Requisition Form) TEK-Recruiter_Lit-00281942.

[29]   Ex. 5 (DiBenedetto Tr.) 91:9-22, 154:11-155:17; Ex. 9 (Doyle Tr.) 58:5-25; Ex. 1 (Haycock Tr.) 59:2-6, 140:13-15; Ex. 61 (SW Delivery Road Map) at TEK-Recruiter_Lit-00426820; Ex. 60 (Requisition Form) TEK-Recruiter_Lit-00281942.

[30]   Ex. 9 (Doyle Tr.) 58:22-59:3 (Q: "[T]he customer is determining what the customer needs for that position; is that correct?" A: "Correct." Q: "And that's true for all skill specializations?" A: "Yeah."); Ex. 5 (DiBenedetto Tr.) 91:17-22 ("we get customers . . . send us job requirements . . . and we are supporting them"), 120:15-21.

[31]   Ex. 5 (DiBenedetto Tr.) 122:10-13, 136:24-137:16; Ex. 9 (Doyle Tr.) 78:3-12, 81:11-21, 94:21-96:15, 101:2-103:2, 123:25-124:8, 140:5-11 (allocate means assign); Ex. 62 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 (". . . we should fully qualify each req in order for the DBO to prioritize business and evaluate where to allocate recruiters in the office.").

[32]   Ex. 5 (DiBenedetto Tr.) 115:9-14, 121:25-122:13; Ex. 9 (Doyle Tr.) 150:8-10, 197:6-10, 178:14-15, 185:4-188:5, 189:11-25, 191:3-7, 191:22-192:4; Ex. 6 (*Andiamo* Rule 30(b)(6) Tr.) at 16:2-4; Ex. 64 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741 (Recruiters are evaluated if they "[o]btain missing information about the requirement from their Account Manager"), TEK-Recruiter_Lit-00152744 (Recruiters evaluated on the "ability to gather the appropriate client information from the Account Manager"); Ex. 65 (Delivery Qualification Form) at TEK-Recruiter_Lit-00413296 ("Recruiters "should come to the AM meeting PREPARED just like an AM would with their client."); Ex. 66 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and Account Managers communicating with TEK's customers.).

[33]   *Id.*; Ex. 5 (DiBenedetto Tr.) 110:22-112:4, 123:2-14; Ex. 9 (Doyle Tr.) 176:9-19; Ex. 67 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at slides 25, 33; Ex. 68 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at p. 71 ("these are the questions that you must have the answers to in order to have a better understanding of the req. If you do not have this information you need to hold your AM accountable to providing you with the answers."), 72 ("Call the AM to better understand the Req that the Recruiter is working on."); Ex. 16 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129468 (describing that Account Managers must ensure Recruiters have all the information necessary); Ex. 62 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("account managers should work very closely with their recruiting partners to develop a strategy for filling qualified reqs."); Ex. 67 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at pp 36 ("Identify the right questions to ask the AM to get a fully qualified req"), 39-40, 103.

Plaintiffs' Motion for Partial Summary Judgment            7            Case No. 3:22-cv-02733-JSC

qualifications, job details, and target pay for the position to Recruiters.[34]

Recruiters then search TEK's internal database and external sources, like LinkedIn, to match potential candidates with clients' requirements.[35] To do this, Recruiters review resumes and LinkedIn profiles to make sure candidates' experience and skills meet the clients'' minimum qualifications.[36] TEK provides Recruiters with "search and match" technology that helps automatize the screening process.[37] TEK also provides Recruiters with step-by-step guidance on how to search and match candidates.[38] TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs."[39] Once

[34]   *Id.*; Ex. 9 (Doyle Tr.) 101:15-24, 137:19-138:4, 141:15-20, 169:5-170:17, 187:9-189:25; Ex. 69 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501733 (there should be "[h]igh accountability for AMs to have qualified requirements for recruiter allocation").

[35]   Ex. 5 (DiBenedetto Tr.) 92:6-93:25; Ex. 9 (Doyle Tr.) 143:17-144:22, 148:2-17, 151:9-152:18, 172:12-185:3; Ex. 1 (Haycock Tr.) 21:13-22:16, 32:5-13, 59:2-11, 60:7-12.

[36]   Ex. 5 (DiBenedetto Tr.) 92:6-93:25; Ex. 9 (Doyle Tr.) 139:15-140:8, 143:17-144:22, 148:2-17, 151:9-152:18, 158:1-159:24, 172:12-17 (Q: "But it's still the recruiter's job, then, to see if the information on the G2 matches a requirement?" A: "Completely, yeah. They're going to look through the requirement and say this might fit or this might not."), 181:19-21 (Q: "So recruiters shouldn't generally be matching G2s or candidates with requisitions that are not qualified yet?" A: "It would largely be a huge waste of time to do so."); Ex. 1 (Haycock Tr.) 21:13-22:16, 32:10-13 (Recruiters' "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs"), 59:2-11, 60:7-12 (Q: Recruiters' "job is to try to bring . . . the appropriate people in by finding that appropriate match . . .?" A: "Yes."); Ex. 5 (DiBenedetto Tr.) 162:18-163:7 (listing Recruiter "high value activities" as "understanding the requirement and sourcing it"); Ex. 6 (Andiamo Rule 30(b)(6) Tr.) 165:18-24; Ex. 66 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (Recruiters "screening" candidates and Account Managers communicating with TEK's customers.).

[37]   Ex. 1 (Haycock Tr.) 39:17-40:24 ("Technology is getting better obviously every day to be able to do those matches by themselves"), 139:22-140:22; Ex. 9 (Doyle Tr.) 141:15-142:9, 143:3-14; Ex. 70 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065 (describing Mock Red Zone exercise in which Recruiters are instructed to "auto match each candidate to ANY req that's currently open, regardless of location."); Ex. 15 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307 ("What other reqs does this candidate Auto-Match or fit?").

[38]   Ex. 5 (DiBenedetto Tr.) 140:8-146:11; Ex. 9 (Doyle Tr.) 130:25-152:18; Ex. 71 (Connected User Guide) TEK-Recruiter_Lit-00175558; Ex. 72 (Degreed Pathway) TEK-Recruiter_Lit-00078540.

[39]   Ex. 3 (Andiamo Preliminary Injunction) at 1; *see also* Ex. 73 (Andiamo Aff. Of Alexander Pulido) at ¶ 7 ("In support of its staffing and recruitment efforts, TEK uses a proprietary and confidential candidate database . . . TEKsystems uses the Database to identify candidates who are

Plaintiffs' Motion for Partial        8        Case No. 3:22-cv-02733-JSC
Summary Judgment

Recruiters have matched potential job candidates to the job requisition, Recruiters contact potential candidates in the hope of reaching them to complete an initial intake.[40] TEK's own documents describe a primary duty for Recruiters as "[s]creen[ing] consultants."[41] Recruiters face obstacles in reaching candidates – including consultants not answering their phone calls because, for one reason, they get on average 34 solicitation calls a week.[42]  Because it is hard to reach candidates, more than 39% of the activities the Named Plaintiffs recorded in TEK's internal database "Connected" are "attempted contact."[43] An "attempted contact" "means the recruiter made a phone call and the consultant did not answer."[44]

When Recruiters are able to connect with candidates, they do an intake, internally referred to as a "G2."[45] TEK's internal database prompts Recruiters to gather specific information from candidates during the G2.[46] TEK provides Recruiters with detailed training and instructions about

likely to prove a strong match for the prospective client's needs.").

[40]    Ex. 9 (Doyle Tr.) 134:5-22, 271:14-18, 278:22-279:7; Ex. 5 (DiBenedetto Tr.) 180:13-182:13.

[41]    Ex. 28 (Silicon Valley Welcome Packet) TEK-Recruiter_Lit-00156630 (Recruiters "Screens consultants"); Ex. 29 (LA Welcome Packet) TEK-Recruiter_Lit-00539865 (same); Ex. 30 (Sacramento Welcome Packet) TEK-Recruiter_Lit-00107558 (same); Ex. 31 (San Diego Welcome Packet) TEK-Avery-00488751 (same); see also Ex. 64 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152743 (evaluated on "screen[ing]" candidates); Ex. 66 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK business cycle as including Recruiters "screening" candidates.).

[42]    Ex. 40 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 2 (consultants get on average 34 "solicitation" calls a week); Ex. 63 (Welcome to the H.V.A. Workshop Series) at TEK-Recruiter_Lit-00000343 (same); Ex. 66 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097858 (same); Ex. 62 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("Consultants tell us time and again that they're getting inundated with insignificant phone calls regarding jobs that they aren't even right for, and they're not interested in."); Ex. 5 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact), 180:13-182:13; Ex. 74 (Recruiter Lead Video Script) at TEK-Recruiter_Lit-00056681 ("Not everyone will answer the first time you call and persistence is important.").

[43]    Ex. 22 (Major Dec.) ¶ 11; Ex. 1 (Haycock Tr.) 140:19-22; Ex. 26 (Def.'s Resp. to Pls. 1st Interrogatories) No. 7 (TEK's database before Connected was RWS).

[44]    Ex. 5 (DiBenedetto Tr.) 180:15-22.

[45]    Ex. 5 (DiBenedetto Tr.) 84:11-85:13; Ex. 9 (Doyle Tr.) 144:25-145:10; Ex. 1 (Haycock Tr.) 60:19-21 ("A G2 is an information form that we use to be able to collect information about the candidate").

[46]    Ex. 71 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 148-157; Ex. 5

Plaintiffs' Motion for Partial                    9                    Case No. 3:22-cv-02733-JSC
Summary Judgment

how to conduct a G2 with a candidate.[47] Recruiters face additional barriers to finding candidates who match the open job position. The candidate's skills and experience may not match the client's prerequisites.[48] Additionally the candidate may not be interested in the position for a variety of reasons, including: the pay is too low, the location is not appealing, the position is for a contract term and the candidate wants a permanent job, the candidate may not like the company, or the candidate may not want to leave their current position.[49]

If the candidate's experience and skills match the client's requirements, and is interested in the position, Recruiters forward their resume and information to the Account Managers.[50] Account Managers then determine which candidates to forward on to the client.[51] The clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them.[52] TEK's

(DiBenedetto Tr.) 87:12-88:5, 148:1-18; Ex. 9 (Doyle Tr.) 130:25-152:18; Ex. 1 (Haycock Tr.) 151:1-12.

[47] Ex. 5 (DiBenedetto Tr.) 80:14-84:10, 90:13-91:8, 105:2-107:8, 148:1-18; Ex. 72 (Degreed Pathway) TEK-Recruiter_Lit-00078540; Ex. 75 (DiBenedetto Nov. 22, 2020 Email) TEK-Recruiter_Lit-00041158; Ex. 71 (Connected User Guide) TEK-Recruiter_Lit-00175558.

[48] Ex. 9 (Doyle Tr.) 169:5-17, 171:13-172:17, 173:10-24.

[49] Ex. 9 (Doyle Tr.) 145:25-148:17 (enumerating the reasons candidates may not be interested in a job), 172:20-173:24; Ex. 1 (Haycock Tr.) 30:18-32:3.

[50] Ex. 5 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 127:4-25, 162:18-163:7; Ex. 1 (Haycock Tr.) 60:7-12; Ex. 4 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 66 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097923 ("Ask your coach to show you how they present candidates to AMs in your office"); Ex. 68 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 74 ("sell/present the candidate to AM in person"); Ex. 84 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952; ECF Nos. 68-5 ¶ 29; 68-7 ¶¶ 9, 23; 68-10 ¶ 19; 68-13 ¶ 17; 68-17 ¶ 19.

[51] Ex. 5 (DiBenedetto Tr.) 162:18-163:17; Ex. 9 (Doyle Tr.) 133:16-23, 137:10-139:14; Ex. 76 (Operations Playbook) TEK-Recruiter_Lit-00019675 ("AMs must thoroughly screen or disqualify candidates."); Ex. 69 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets"); Ex. 35 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325 ("the Account Manager has submitted this person to the customer."); ECF No. 68-6 ¶ 8; ECF No. 68-5 ¶ 29; ECF No. 68-7 ¶¶ 9, 23, ECF No. 68-10 ¶ 19, ECF No. 68-13 ¶ 17; ECF No. 68-17 ¶19.

[52] Ex. 5 (DiBenedetto Tr.) 154:2-7, 167:9-14 (testifying that Recruiters do not make hiring and firing decisions), 188:2-9; Ex. 9 (Doyle Tr.) 158:1-12 (client interviews the candidates), 192:13-193:15 (TEK's clients make hiring decisions), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes."); Ex. 5 (DiBenedetto Tr.) 167:12-14 (Q: Do recruiters make the ultimate [termination] decisions for

Plaintiffs' Motion for Partial          10          Case No. 3:22-cv-02733-JSC
Summary Judgment

clients, not Recruiters, interview the candidates.[53] If the client decides to make an offer, Recruiters relay the offer to the candidate.[54] Recruiters do "not oversee[] the actual work getting done."[55] Recruiters are not evaluating the substance of consultants' work.[56]

TEK views the Recruiter as a production employee, which it considers to be sales and not human resources.[57] In its own internal recruiting documents, TEK states: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales."[58]

---

the consultants? A: No."); Ex. 71 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 142 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview."); ECF Nos. 68-4 ¶ 14; 68-17 ¶ 16; 68-4 ¶ 18.

[53] Id.; Ex. 9 (Doyle Tr.) 158:1-12, 159:3-10, 199:4-17; Ex. 77 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at slides 14-15 (TEK's clients interview candidates); Ex. 78 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted your screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 35 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.

[54] Ex. 9 (Doyle Tr.) 277:13-20.

[55] Ex. 1 (Haycock Tr.) 36:16-17.

[56] Ex. 5 (DiBenedetto Tr.) 167:19-168:7; Ex. 1 (Haycock Tr.) 121:20-122:16, 144:18-145:12.

[57] Ex. 5 (DiBenedetto Tr.) 90:13-91:8 (distinguishing Recruiters from human resources and noting Recruiters must have good sales skills); Ex. 1 (Haycock Tr.) 60:7-12; 68:1-16 ("[T]hey are a recruiter that is producing."), 123:21-24, 136:13-23; Ex. 9 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."); Ex. 4 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386851 ("We work in a sales environment"); Ex. 23 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045214; Ex. 24 (Mason Oct. 24, 2019 Email) at TEK-Avery-00492061 ("we are looking for sales focused individuals"); Ex. 79 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sale"); Ex. 84 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952 ("You're an inside sales person!").

[58] Ex. 23 (Ligouri Dec. 6, 2018 Email) TEK-Recruiter_Lit-00045214; *see also* Ex. 24 (Mason Oct. 24, 2019 Email) at TEK-Avery-00492061 ("we are looking for sales focused individuals"); Ex. 79 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sale"); Ex. 80 (Alvarado July 27, 2021 Email) TEK-Recruiter_Lit-00225566; Ex. 81 (DeGeus Sept. 1, 2022

### 1.    TEK's Connected Data Shows Recruiters Overwhelmingly Spend Their Time Contacting Candidates.

Recruiters use TEK's Connected database to search for potential candidates, review information about candidates, and record the work activities they perform.[59] TEK expects Recruiters to enter their activities into Connected in real time.[60] Defendant produced Connected data for the four Named Plaintiffs.[61] The Connected data identifies the work activities the Named Plaintiffs performed and the dates and times the activities were performed.[62] The data shows that 39.98% of Plaintiffs' activities recorded in Connected were "Attempted Contact," followed by "G2" at 21.39%, and "Call" at 15.29%, which altogether comprise approximately 76.66% of the total work activities.[63] The Connected data further shows that the number of attempted contacts, G2 intake calls, and calls the Named Plaintiffs made dwarfed their submittals and starts:[64]

| | Attempts Contacts | G2s | Calls | Submitted | Starts |
|---|---|---|---|---|---|
| Bo Avery | 4,070 | 1,972 | 2,429 | 120 | 21 |
| Kristy Camilleri | 3,389 | 1,915 | 1,241 | 133 | 22 |
| Phoebe Rodgers | 5,682 | 2,338 | 1,603 | 142 | 6 |
| Jill Unverferth | 1,950 | 1,850 | 497 | 132 | 16 |

The Connected data for TEK's declarants also shows that the number of attempted contacts, G2 intake calls, and calls accounted to well over 50% of their activities.[65]

### 2.    TEK Requires Recruiters to Meet Production Quotas.

TEK requires Recruiters to meet weekly production quotas.[66] Currently, the quota for

Email) TEK-Recruiter_Lit-00178029; Ex. 82 (Stadler Dec. 20, 2018 Email) TEK-Avery-00433138; Ex. 83 (Murrell April 2, 2018 Email) TEK-Avery-00500049.
[59]    Ex. 1 (Haycock Tr.) 140:19-22, 150:21-152:2; Ex. 26 (Def.'s Resp. to Pls. 1st Interrogatories) No. 7.
[60]    Ex. 5 (DiBenedetto Tr.) 180:13-181:10; Ex. 9 (Doyle Tr.) 124:25-126:20; Ex. 49 (Fullerton July 10, 2020 Email) TEK-Recruiter_Lit-00194291.
[61]    Ex. 22 (Major Decl.) ¶ 4.
[62]    Ex. 5 (DiBenedetto Tr.) 180:13-181:10; Ex. 9 (Doyle Tr.) 124:25-126:20; Ex. 22 (Major Decl.) ¶ 5, attachment 1; Ex. 49 (Fullerton July 10, 2020 Email) TEK-Recruiter_Lit-00194291.
[63]    Ex. 22 (Major Decl.) ¶ 11, attachment 5.
[64]    Ex. 22 (Major Decl.) ¶¶ 19-22, attachment 6.
[65]    Ex. 22 (Major Decl.) ¶ 36, Attachment 12.
[66]    Ex. 9 (Doyle Tr.) 129:16-130:20; Ex. 1 (Haycock Tr.) 157:19-158:1; Ex. 85 (Haycock Ex.

Recruiters is 25 points a week based on the following activity points: G2s (intakes); reference checks; submittals (when an Account Manager submits a candidate to a client that the Recruiter has solicited); interviews (when the client interviews the candidate); and starts (when a candidate ultimately starts a job with a TEK's client).[67] Prior to July 2022, TEK required Recruiters to maintain a weekly average of 30 "interactions" a week, such as reference checks, G2s, and meals (lunches) with candidates.[68] TEK requires all Recruiters to meet the same "spread" levels, which align to their tenure at the company and is referred to as the "performance management line."[69]

TEK closely monitors Recruiters' compliance with their quotas and performance management line.[70] Every week, TEK generates a WIN Report for each Recruiter and their managers, which tracks how well Recruiters are meeting their quotas and spread compared to their peers.[71] TEK executives also receive weekly Executive Dashboards, which provide "a snapshot on the various operations of the business."[72] Included in the Executive Dashboard are summaries about how well Recruiters are meeting their quotas.[73] TEK's offices have "spread boards" that publicize the amount of spread for each Recruiter.[74] If Recruiters fail to hit their quotas and meet

16) TEK-Recruiter_Lit-00081069-71.

[67] Ex. 9 (Doyle Tr.) 159:18-161:6; Ex. 1 (Haycock Tr.) 153:19-158:1; Ex. 85 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71; Ex. 86 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512.

[68] Ex. 9 (Doyle Tr.) 129:16-130:20, 153:5-19, 154:19-155:12; Ex. 1 (Haycock Tr.) 152:3-153:10; Ex. 85 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069; Ex. 49 (Fullerton July 10, 2020 Email) at TEK-Recruiter_Lit-00194292.

[69] Ex. 9 (Doyle Tr.) 92:3-94:20, 299:8-21.

[70] Ex. 9 (Doyle Tr.) 92:3-94:20, 112:6-113:21, 162:14-164:13, 255:3-256:8; Ex. 1 (Haycock Tr.) 147:5-11, 158:2-15; Ex. 36 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 37 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-65.

[71] Ex. 9 (Doyle Tr.) 112:6-113:21; Ex. 1 (Haycock Tr.) 158:2-15; Ex. 36 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 12 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("The report will be emailed to every person who is directly managing Recruiters as well as Production Delivery Managers, Delivery Director, and DBOs each week.").

[72] Ex. 1 (Haycock Tr.) 69:13-71:19; Ex. 37 (Executive Dashboard) at TEK-Recruiter_Lit-00161739.

[73] Ex. 1 (Haycock Tr.) 91:15-93:14; Ex. 37 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-65.

[74] Ex. 88 (New Hire Checklist) TEK-Recruiter_Lit-00571397 ("Name on spread board");

Plaintiffs' Motion for Partial Summary Judgment     13     Case No. 3:22-cv-02733-JSC

their spread requirements, TEK puts them on a performance improvement plan.[75] TEK evaluates Recruiters annually based on their satisfaction of TEK's quotas and spread requirements.[76]

### 3. Recruiters' Compensation Is Tied to Their Production Tasks.

TEK pays Recruiters a salary and commission based on their spread.[77] In other words, the more Recruiters produce candidates for TEK, the more TEK pays them.[78]

### D. Recruiters' Work Is Not Related to the General Business Operations of TEK or Its Customers.

Recruiters do not create or implement management or operational policies for TEK or its customers.[79] Recruiters have no authority to: waive or deviate from TEK's policies and procedures in performing their work; formulate, interpret, or enforce management policies or operating procedures; or negotiate or enter into contracts on behalf of TEK or its clients.[80] Recruiters do not have the authority to negotiate or bind TEK or its clients with respect to significant matters.[81] They

---

Ex. 89 (Avery May 17, 2018 Email) ("I just wanted to say that I am proud to see your perseverance and quietly moving up the spread board"); *see also* Ex. 87 (Spread: Overview & Problem Resolution) at TEK-Recruiter_Lit-00240020.

[75] Ex. 9 (Doyle Tr.) 162:14-164:9; Ex. 44 (Johnson Tr.) 104:19-105:4.

[76] Ex. 9 (Doyle Tr.) 212:20-216:11; Ex. 45 (Haycock Dep. Ex. 15) TEK-Recruiter_Lit-00124518; Ex. 52 (Performance Review Guide 2021: For Leaders and Leads) TEK-Recruiter_Lit-00528422.

[77] Ex. 26 (Def.'s Resp. to Pls. 1st Interrogatories) Nos. 4, 8, 11.

[78] Ex. 1 (Haycock Tr.) 105:7-106:20; Ex. 87 (Spread: Overview & Problem Resolution) at TEK-Recruiter_Lit-00240021.

[79] Ex. 1 (Haycock Tr.) 158:20-162:5 (testifying that Recruiters do not create or implement human resource, operational, or management policies for TEK or its clients), 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives and not Recruiters because the executives are "running [the] business."); 98:12-100:8 (Recruiters not part of the team "responsible for driving business"), 159:1-160:14; Ex. 5 (DiBenedetto Tr.) 167:15-18.

[80] Ex. 90 (Def.'s Resp. to Pls. 2nd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters."); Ex. 5 (DiBenedetto Tr.) 167:15-18; Ex. 9 (Doyle Tr.) 30:11-23 (testifying that he negotiated contracts as an Account Manager and Director of Business Operations), 194:13-16 (Q: But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate" A: "Correct. Yes."); Ex. 1 (Haycock Tr.) 159:1-162:5 (Recruiters cannot bind TEK in legal proceedings).

[81] Ex. 90 (Def.'s Resp. to Pls. 2nd Interrogatories) No. 1; Ex. 5 (DiBenedetto Tr.) 109:23-110:3; Ex. 1 (Haycock Tr.) 123:1-24, 158:20-161:15; Ex. 9 (Doyle Tr.) 194:13-16, 198:19-25, 209:2-12.

Plaintiffs' Motion for Partial          14          Case No. 3:22-cv-02733-JSC
Summary Judgment

do not supervise anyone; represent TEK or its clients in formal grievance proceedings; advise TEK or its clients on how to more efficiently run their operations; or study or recommend changes to the operations or corporate structure of any business.[82] Nor do Recruiters provide human resource services, public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients.[83]

## IV.    ARGUMENT

Summary judgment is appropriate where, as here, the evidence shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Summary judgment should be granted unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Here, *TEK* bears the burden of proving the administrative exemption applies to Recruiters. *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 794–95 (1999) ("the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption."). "When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the nonmoving party has failed to present any genuine issue of material fact." *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 861 (C.D. Cal. 2012). There is no "express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis in original).

Under California law, the "issue of what Plaintiff did as an employee for Defendant is a question of fact, while the precise scope of the exemptions is a question of law." *Federico v. Overland Contracting, Inc.*, No. 12 Civ. 2588, 2013 WL 5516187, at *8 (N.D. Cal. Oct. 4, 2013) (citing *Ramirez*, 20 Cal. 4th at 794). Because the facts of what Recruiters do are undisputed, whether those duties meet the test for exempt status is a question of law that must be decided by

---

[82]    *Supra*; Ex. 1 (Haycock Tr.) 34:3-6, 69:9-71:22, 122:17-123:25, 160:15-162:5.
[83]    Ex. 1 (Haycock Tr.) 123:21-24, 158:20-161:15; Ex. 9 (Doyle Tr.) 198:19-25, 209:2-12.

the Court. *See Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004). Recruiters are not properly classified as administratively exempt because they are screening and matching potential job candidates and producing the candidates for TEK's client-facing employees' (Account Mangers') consideration. Recruiting is what TEK offers to the marketplace. There is also no genuine issue of fact that Recruiters do not create or implement administrative or management policies for TEK or its customers, do not have discretion over matters of significance, are subjected to multiple levels of supervision, and have no specialized training nor do they work on special projects – rather they are engaged in routine work TEK offers the marketplace. As such, there is no way for TEK to plausibly show that its Recruiters were administratively exempt.

A.    **TEK Bears a Heavy Burden to Show that It Properly Classified Recruiters as Exempt.**

TEK carries a heavy burden on its administrative exemption affirmative defense. Because of the "remedial nature" of California's wage and hour law, "exemptions from statutory mandatory overtime provisions are narrowly construed." *Ramirez*, 20 Cal. 4th 785, 794 (1999).[84] TEK must prove each prong of the administrative exemption applies. *Eicher v. Advanced Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363, 1372 (2007). As this Court previously explained,

> [F]or Recruiters to qualify as "administrative" employees and therefore be exempt from overtime, meal, and rest break requirements, TEK must establish, among other things, (1) Recruiters' duties and responsibilities involve the performance of work "directly related to management policies or general business operations of his/her employee or his employer's customers;" (2) Recruiters "customarily and regularly exercise discretion and independent judgment;" and (3) Recruiters "perform[ ] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge" or "execute[ ] under only general supervision special assignments and tasks."

*Avery v. TEKsystems, Inc.*, No. 22 Civ. 02733, 2024 WL 590364, at *4 (N.D. Cal. Feb. 13, 2024) (Corely, J.).[85]  And "[f]urther, TEK must establish Recruiters perform such duties "primarily," or

---

[84]    *See also Sav-On Drug Stores, Inc. v. Superior Ct.*, 34 Cal. 4th 319, 340 (2004) ("California's overtime laws are remedial and are to be construed so as to promote employee protection.").

[85]    *Accord Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 437 (C.D. Cal. 2014)  (quoting 8

more than half of their work time and Recruiters' salary meets minimum salary requirements." *Id.; see also* Lab. Code § 515(e).[86]

### B.   Recruiters' Primary Duties Are Not Directly Related to the Management or General Business Operations of TEK or Its Customers.

To meet the first element of the exemption, TEK must prove that Recruiters' "duties and responsibilities involve . . . work *directly related* to management policies or general business operations of his/her employer or his employer's customers." 8 Cal. Code Regs. § 11040(1)(A)(2) (emphasis added). TEK cannot make this showing. Recruiters are entry-level employees who serve on the front lines of TEK's business and do not have duties that relate to management policies or general business operations of TEK or its customers. *See Rieve*, 870 F. Supp. 2d at 873; Statement of Facts ("SOF") §§ III(C)-(D).

Under 29 C.F.R. § 541.205, which California has incorporated into its Wage Orders, TEK must show that Recruiters' work is *both* qualitatively (meaning that "the work must be administrative in nature") *and* quantitatively administrative (meaning that "it must be of substantial importance to the management or operations of the business"). *Harris v. Superior Ct.*, 53 Cal. 4th 170, 180-82 (2011). As a preliminary matter, Section 541.205(a) distinguishes "activities relating to the administrative operations of a business" from "production" or "sales" work. *Id.* at 180 n.6 (quoting 29 C.F.R. § 541.205(a)). "[T]he phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." *Id.* Courts have defined "substantial importance" to mean that "the employee's value directly flows 'to the management or operation of the business.'" *Rieve*, 870 F. Supp. 2d at 872-73 ("Such language indicates that the employee in

---

Cal. Code Regs. § 11040(1)(A)(2)).

[86]   California law incorporates federal regulations that were in effect at the time the Wage Order was enacted (2000). Cal. Code Regs. tit., 8, § 11040(1)(A)(2)(f) ("The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Section 541.201-205, 541.207-208, 541.210, and 541.215."). Accordingly, Plaintiffs citations to the C.F.R. in this brief are to the 2000 version.

question must hold a supervisory position instead of serving on the front lines of the business.").

Employees perform production work where the job is "related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself." *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 851, 855 (9th Cir. 2017) ("the question is not whether an employee is essential to the business, but rather whether her primary duty goes to the heart of internal administration—rather than marketplace offerings.") (citation cleaned up); *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) (work related to the goods and services which constitute the business' marketplace offerings does not qualify as administrative work subject to the exemption).[87] Here, Recruiters engage in exactly the service that TEK offers the market place – recruiting. SOF §§ III(A), (C). TEK requires Recruiters to meet weekly production metrics, reflecting that production is their most important job duty. *Id.* § III(C)(2). Further, TEK consistently refers to Recruiters as "producers," which reflects that TEK views Recruiters as production employees and not administrators. *Id.* § III(C). Notably, "[p]roduction employees who perform the core function of the business are not transformed into administrative employees just because the work they do is essential to what the company sells — its 'marketplace offerings.'" *Fowler v. OSP Prevention Grp., Inc.*, 38 F.4th 103, 110 (11th Cir. 2022) (citing *Bothell*, 299 F.3d at 1127).

To be qualitatively administrative, the work must relate to the "running [of] the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs." *Bothell*, 299 F.3d at 1125; *Harris*, 53 Cal. 4th at 182. Examples of such work include: "management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." *Harris*, 53 Cal. 4th at 180 n.6 (quoting 29 C.F.R. § 541.205(b)). It is undisputed that Recruiters engage in the day-to-day carrying out of TEK's business—screening and matching candidates. Recruiters do not perform *any* of the tasks that are

---

[87]    "Employees engaged in an activity that constitutes the company's primary purpose are likely production workers." *Eicher*, 151 Cal. App. 4th at 1372-73 (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991)); *see also Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 7 (1st Cir. 2023) .

listed as examples of "servicing" the business in 29 C.F.R. § 541.205(b). *See* SOF §§ III(A)-(D).

Moreover, TEK cannot show that Recruiters are its clients' administrators. *See Gordon v. Model N, Inc.*, No. 15 Civ. 01423, 2016 WL 3194240, at *3 (N.D. Cal. June 9, 2016), *aff'd*, 705 F. App'x 647 (9th Cir. 2017) (finding employee non-exempt where discretion he exercised was "based on the already-established needs of the customers, not based on any responsibility in crafting [the employer's] or its client's business strategy."). As with TEK, Recruiters do not contribute to the running of TEK's clients' business, but rather Recruiters produce job candidates for TEK's clients' hiring consideration. SOF §§ III(C)-(D). Recruiters are part of the sales process for TEK to pitch job candidates to third-party companies, and they receive commissions based on the revenue TEK generates from the candidates TEK's clients decide to hire. *Id.* § III(D). Reflecting the sales nature of Recruiters' job, TEK assigns the same customer requisition to multiple Recruiters.[88] In doing so, TEK can pitch a wider net of candidates to customers so it will not "get beat on a requirement" by a competitor's candidate.[89] Only 31.8% of the job requirements that TEK works to fill get filled by TEK's candidates.[90] TEK competes with other recruiting firms to place candidates. SOF §§ III(C)-(D). None of Recruiters' job duties, production metrics, or annual evaluation even remotely include interacting with, let alone managing, TEK's customers.[91] Thus, Recruiters perform only a production role for TEK's customers and are not their administrators. *See Walsh*, 64 F.4th at 8 (noting that dispatchers did not meet this management prong of the exemption because they provided day-to-day services to the employer's customers and did not "analyze how [systems] work or how they can be improved"); *Rieve*, 870 F. Supp. 2d at 860 (finding employee non-exempt under the California administrative exemption where she "provide[d] ongoing, day-to-day case management services for Defendants' customers by documenting the costs of care, preparing reports regarding a plan of care, and identifying and implementing medical services to meet the needs of Defendants' customers"); *Su v. F.W. Webb Co.*,

---

[88] Ex. 8 (Doyle Tr.) 139:8-14 (multiple Recruiters work on the same requisition); n.6.
[89] Ex. 10 (Haycock Email October 26, 2020) at TEK-Recruiter_Lit-00386105.
[90] Ex. 8 (Doyle Sealed Tr. Portion) 237:20-238:9; Pls.' Br. at 3, n.5.
[91] *Supra* n.17.

No. 20 Civ. 11450, 2023 WL 4043771, at *9 (D. Mass. June 16, 2023) (inside sales representatives who "produce the product or provide the service that the company is in business to provide" did not provide administrative services to the company's customers).

Recruiters do not advise TEK's customers in any manner that the administrative exemption contemplates. In *Bratt v. County of L.A.*, 912 F.2d 1066 (9th Cir. 1990), the Ninth Circuit held that probation officers who produced factual investigations about criminal defendants to aid courts in making sentencing determinations were not "advising" the courts' management within the meaning of the administrative exemption because "'advising the management' as used in [Section 541.205(b)] is directed at advice on matters that involve policy determinations, i.e., how a business should be run or run more effectively, not merely providing information in the course of the customer's daily business operation." *Id.* at 1070.

With respect to the quantitative requirement of Section 541.205(c), the work "must be of substantial importance to the management or operations of the business." *Harris*, 53 Cal. 4th at 181. Courts have defined "substantial importance" to mean that "the employee's value directly flows 'to the management or operation of the business.'" *Rieve*, 870 F. Supp. 2d at 872-73 ("Such language indicates that the employee in question must hold a supervisory position instead of serving on the front lines of the business."). This includes employees whose work affects company policy or who have responsibility for executing or carrying out company policy as well as employees who "carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." *Harris*, 53 Cal. 4th at 180-81 & n.6 (quoting 29 C.F.R. § 541.205(c)). The Ninth Circuit has distinguished work that is directly related to management policies or general business operations from execution of the business purpose of a company. *Bothell*, 299 F.3d at 1125 (applying 29 C.F.R. § 541.2); *see also McKeen-Chaplin*, 862 F.3d at 851-52.

TEK's corporate witnesses conceded that Recruiters are not quantitatively administrative because:

- **Recruiters are not involved in creating or implementing management, operational or human resources policies for TEK or TEK's customers.** Ex. 1 (Haycock Tr.) 158:20-162:5 (testifying that Recruiters do not create or implement human resource, operational, or management policies for TEK or its clients), 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives and not Recruiters because the executives are "running [the] business."); Ex. 5 (DiBenedetto Tr.) 167:15-18.

- **Recruiters do not have the authority to negotiate or bind TEK or its customers with respect to significant matters.** Ex. 90 (Def.'s Resp. to Pls.' 2nd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters."); Ex. 5 (DiBenedetto Tr.) 109:23-110:3; Ex. 1 (Haycock Tr.) 161:3-5 (Recruiters cannot bind TEK in legal proceedings); Ex. 8 (Doyle Tr.) 194:13-16 (Q: But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate" A: Correct. Yes.).

- **Recruiters do not provide human resource services, employee benefit functions, or quality control services for TEK or its clients.** Ex. 1 (Haycock Tr.) 123:1-24, 158:20-161:15; Ex. 8 (Doyle Tr.) 198:19-25, 209:2-12.

At the very least, an employee must have "[t]he ability to take action on behalf of the employer" to be an exempt administrator. *Rieve*, 870 F. Supp.2d at 874. "[I]n most cases, for an employee's work to affect policy or for him to carry out policy, it seems likely that he would be tasked with decision-making authority, such that the absence of such authority is a relevant factor in the *Harris* inquiry." *Id.*; *see also Deluca v. Farmers Ins. Exch.*, 386 F. Supp. 3d 1235, 1256–57 (N.D. Cal. 2019) (conducting factual investigations regarding whether to pay a claim "does not qualify as 'directly related' to running [defendant's] business or formulating or helping to execute policy"). TEK admits that Recruiters cannot commit TEK or its customers to particular job candidates or job requirements, or to take any particular courses of action as to the candidates they have sourced. Thus, Recruiters are not exempt under the "directly related" requirement of the administrative exemption, and TEK's defense must fail as a matter of law.

### C. Recruiters Do Not Routinely Exercise "Discretion and Independent Judgment" on Matters of Significance.

The Court need not reach the discretion requirement if it finds that TEK cannot meet its burden under the "directly related" requirement. *Boyd*, 109 F. Supp. 3d at 1292. If the Court reaches this issue, TEK's administrative exemption argument also fails because Recruiters do not exercise

discretion and independent judgment over matters of significance because they do not have "*the authority or power to make an independent choice*, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207(a) (emphasis added). The "Ninth Circuit has clarified that courts must assess not only whether an employee exercised discretion over decisions, but 'the importance of the decisions over which [the employee] had control.'" *Boyd*, 109 F. Supp. 3d at 1293 (quoting *Bothell*, 299 F.3d at 1129). While TEK may argue that Recruiters have some minimal discretion regarding certain inconsequential items such as whether they use an internal database or LinkedIn—this does not rise to the level of importance necessary for the administrative exemption. *Boyd*, 109 F. Supp. 3d at 1294 (finding appraiser to be non-exempt even where they had "some discretion" over how they conducted appraisals because they had specific standards and were limited in their ability to exercise discretion).

Here, Recruiters' job duties involve "applying techniques, procedures, or specific standards" or "making decisions relating to matters of little consequence," and, therefore, the exemption does not apply. 29 C.F.R. § 541.207(b); SOF §§ III(B)-(C). Courts have held that employees that are required to adhere to corporate guidelines or procedures with minimal deviation do not qualify for the exemption. *See, e.g.*, *Boyd*, 109 F. Supp. 3d at 1294; *see also Deluca*, 386 F. Supp. 3d at 1260 (investigators did not hold the requisite level of discretion for the administrative exemption even though they acted "independently in planning and carrying out their investigations" because this type of discretion is "more appropriately viewed as choices among established techniques, procedures or specific standards described in manuals or other sources, that are not considered exercises of discretion and independent judgment with respect to matters of significance for purposes of the administrative exemption.") (citation cleaned up); 29 C.F.R. § 541.207(c)(1) ("An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow . . . is not exercising discretion and independent judgment").

Directly on point, Section 541.207(c)(5) explains:
Another type of situation where skill in the application of techniques and procedures is

sometimes confused with discretion and independent judgment is the "screening" of applicants by a personnel clerk. Typically such an employee will interview applicants and obtain from them data regarding their qualifications and fitness for employment. These data may be entered on a form specially prepared for the purpose. The "screening" operation consists of rejecting all applicants who do not meet standards for the particular job or for employment by the company. The standards are usually set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials. It seems clear that such a personnel clerk does not exercise discretion and independent judgment as required by the regulations in Subpart A of this part.

29 C.F.R. § 541.207(c)(5).

Here, Recruiters are akin to the personnel clerks described in Section 541.207(c)(5). TEK's corporate documents and witnesses refer to Recruiters' primary job duties as "screening" candidates. SOF § III(C). Recruiters spend the vast majority of their time screening for candidates that match the minimum qualifications set forth in the job requisitions. TEK's own data shows that attempted calls, intake calls, and other calls accounted for the vast majority of Recruiters' activities, which match the task in Section 541.207(c)(5).[92] Recruiters screen candidates using standardized recruiting tools, such as TEK's internal databases and the G2 intake fields housed in it, and screen out candidates who do not match the minimum requirements provided to them. SOF § III(C).[93] Because consultants receive a barrage of recruiter calls, from TEK and its competitors,[94] and because there are a variety of reasons people are not interested in jobs (travel, remote work), Recruiters spend most of their time engaged in outreach – including attempted contacts, which

---

[92]    Ex. 22 (Major Decl.) ¶¶ 11, 36. The Connected data also shows the activities that Plaintiffs and TEK's declarants performed the least. Internal Interviews (which are initial in-person meetings with candidate) constitute only 2.41% of Plaintiffs' activities, Submittals 1.40%, Service Touchpoints 1.37%, Interviewing 0.88%, and Started 0.17%. *Id.* ¶¶ 13-17. Internal Interviews constitute only 2.91% of TEK's declarants' activities, Submittals 3.82%, Service Touchpoints 3.66%, Interviewing 1.73%, and Started 0.48%. *Id.* ¶¶ 38-42.

[93]    *Supra* ns.36-40; Ex. 71 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 148-157.

[94]    Ex. 40 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 2 (consultants get on average 34 "solicitation" calls a week); Ex. 63 (Welcome to the H.V.A. Workshop Series) at TEK-Recruiter_Lit-00000343 (same); Ex. 66 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097858 (same); Ex. 62 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("Consultants tell us time and again that they're getting inundated with insignificant phone calls regarding jobs that they aren't even right for, and they're not interested in.");

Plaintiffs' Motion for Partial              23              Case No. 3:22-cv-02733-JSC
    Summary Judgment

accounts for more than a third of Recruiters' activities because connecting with potential job candidates is challenging. SOF § III(C).[95] When they find potential "matches" Recruiters must send them to Account Managers, who then decide which candidates to present to TEK's clients. *Id.* Recruiters do not have the authority to decide which candidates are sent to TEK's clients, nor can Recruiters override an Account Manager's decision not to send a particular candidate to a client. *Id.* Therefore, Recruiters do not have discretion over matters of significance.

### D. Recruiters Are Closely Supervised and Do Not Require Specialized Training or Knowledge.

Additionally, TEK will be unable to meet the third prong of the exemption test because Recruiters perform work under the close supervision of multiple levels of managers. To be exempt under the third prong, an employee must "work[] 'under only general supervision' while either: (1) performing work along specialized or technical lines requiring special training, experience, or knowledge, or (2) executing special assignments and tasks." *Federico*, 2013 WL 5516187, at *16.

TEK subjects Recruiters to substantially more than "general supervision." As TEK's corporate officers have testified and organizational charts show, Recruiters are unified under the TEK's "talent delivery" team with multiple layers supervising them. SOF § III(B). Recruiters are entry-level employees who generally stay in the position for a little over a year.[96] Because they are an entry level position, Recruiters are supervised by multiple positions, including: Recruiter Leads, Team Leads, Account Managers,[97] Delivery Managers, and DBOs. SOF § III(B). Recruiters all sit in an open office space known as the "pit" surrounded by managerial employees' offices, who monitor Recruiters' work. *Id.* TEK requires Recruiters to attend daily Red Zone meetings run by

---

[95]   *Supra* ns.64-66.
[96]   *Supra* ns.8-10.
[97]   While TEK may argue that Account Managers are no longer Recruiters' official supervisors, it is uncontroverted that Account Managers determine which candidates ultimately get submitted to TEK's clients. *Supra* ns.19-20, 27, 33-35, 51-52; Ex. 9 (Doyle Tr.) 251:3-253:17 (Account Managers and Recruiters talk "multiple times" a day); Ex. 67 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at p. 103 ("Work with your Account Manager to develop a weekly and daily plan"). Therefore, as a practical matter, Account Managers are very much involved in and supervising the day-to-day tasks of Recruiters.

managers, at which Recruiters are expected to report to their managers. *Id.* TEK also subjects all Recruiters to production quotas, and TEK monitors Recruiters compliance with these quotas through computer-generated weekly WIN Reports. *Id.* §§ III(B)-(D)[98]; *see Boyd*, 109 F. Supp. 3d at 1296 (finding employees subjected to "immediate direction or supervision" where employer manually reviewed 30% of appraisal reports). Recruiters who do not meet their quotas are put on performance improvement plans.[99]

Recruiters also do not perform "work along specialized or technical lines requiring special training, experience, or knowledge, or (2) executing special assignments and tasks." *See, e.g., Fogh v. Los Angeles Film Sch.*, No. B230920, 2012 WL 6604709, at *6 (Cal. Ct. App. Dec. 18, 2012) (unpublished). TEK does not require Recruiters to have any specialized training or even a college degree.[100] While TEK refers to Recruiters as "specialized," in reality it is just a label as TEK's witnesses admitted that this only means Recruiters search for candidates in certain industries and with certain job skills. SOF § III(B). In fact, TEK boasts about its routines recruiting process, which it claims it "developed and fine-tuned over 20-plus years in the market."[101] Recruiters are not working on specialized projects – they are engaging in TEK's routine marketplace offerings.

## V.    CONCLUSION

For the forgoing reasons, the Court should grant summary judgment to Plaintiffs and the class on TEK's administrative exemption affirmative defense and rule that they are entitled to all the protections of non-exempt employees under California law.

---

[98]    Ex. 12 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Using the weekly report, a Lead should be able to identify which activities a recruiter needs to focus on.").

[99]    *Supra* n.76.

[100]    *Supra* n.23.

[101]    Ex. 2 (Andiamo Compl.) at ¶ 22; *see also* Ex. 3 (Andiamo Preliminary Injunction) at 1 (TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs.").

Dated: May 14, 2024                 Respectfully submitted,

                                    /s/ Sally J. Abrahamson
                                    Sally J. Abrahamson (admitted *pro hac vice*)
                                    WERMAN SALAS P.C.
                                    335 18th Place NE
                                    Washington, D.C. 20002
                                    Tel: (202) 830-2016
                                    Email: sabrahamson@flsalaw.com

                                    Douglas M. Werman (admitted *pro hac vice*)
                                    Maureen A. Salas (admitted *pro hac vice*)
                                    Anne Kramer (SBN 315131)
                                    WERMAN SALAS P.C.
                                    77 W. Washington St., Suite 1402
                                    Chicago, IL 60602
                                    Tel: (312) 487-5221
                                    Email: dwerman@flsalaw.com
                                    Email: msalas@flsalaw.com
                                    Email: akramer@flsalaw.com

                                    Sarah Schalman-Bergen (admitted *pro hac vice*)
                                    Krysten Connon (admitted *pro hac vice*)
                                    LICHTEN & LISS-RIORDAN, P.C.
                                    729 Boylston St., Suite 2000
                                    Boston, MA 02116
                                    Tel: 617-994-5830
                                    Email: ssb@llrlaw.com
                                    Email: kconnon@llrlaw.com

                                    Rachel Bien (SBN 315886)
                                    OLIVIER & SCHREIBER LLP
                                    595 E. Colorado Blvd., Suite 418
                                    Pasadena, CA 91101
                                    Tel: (213) 325-3430
                                    Email: rachel@os-legal.com

                                    *Attorneys for Plaintiffs and the Class*