UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BO AVERY, et al.,

           Plaintiffs,

    v.

TEKSYSTEMS, INC.,

           Defendant.

Case No.  3:22-cv-02733-JSC

**ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**REDACTED VERSION**

Re: Dkt. Nos. 100, 102, 112, 122

A certified class of Recruiters for TEKsystems, Inc. ("TEK") allege TEK improperly classifies them as exempt from California overtime, wage, and hour laws and therefore illegally underpays Recruiters.  Now pending before the Court are Plaintiffs' motion for partial summary judgment on TEK's administrative exemption affirmative defense (Dkt. No. 100)[1], and related motions (Dkt. Nos. 102, 112, 122).  Having carefully considered the briefing, and with the benefit of oral argument on August 15, 2024, the Court GRANTS Plaintiffs' motion for partial summary judgment.  Interpreting all the evidence in the light most favorable to TEK, a reasonable trier of fact could not find TEK's Recruiters meet all the requirements of California's administrative exemption.

I.     **FACTUAL BACKGROUND**

     TEK is an "IT [Information Technology] staffing and services company."  (Dkt. No. 101-4 at 10; *see also* Dkt. No. 101-27 at 5 (TEK describing itself "as in the staffing business"); Dkt. No. 101-5 ("Our goal is to become the most dominant recruiting workforce on the planet").)  TEK

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

employs persons in dozens of different recruiting positions.  (Dkt. No. 101-27 at 5-6.)  This lawsuit involves just one of those positions—Recruiters.

Recruiters source and screen possible IT consultants to find those who match the job requirements provided by TEK's clients.  (Dkt. No. 101-1 at 9; *see also* Dkt. Nos. 101-29 at 31; 101-30 at 13; 101-31 at 13; 101-32 at 18; 101-57 at 27.)  TEK's clients—third-party companies—create a "requisition," "requirement," or "req" form.  (Dkt. No. 101-5 at 25.)  The "requirement is a job description" from the client seeking a new employee or some service.  (*Id.*; *see also* Dkt. Nos. 101-10 at 17; 101-61 (example "Req").)  TEK Account Managers directly communicate with TEK's clients regarding their hiring needs and requirements.  (Dkt. Nos. 5 at 31; 10 at 40, 47; 65 at 4; Ex. 67 at 58.)

Recruiters "work to solicit candidates that meet the needs specified in the requisition." (Dkt. No. 101-1 at 17.)  Recruiters search TEK's internal database ("Connected"), or other sources to find potential candidates that match clients' requirements.  (Dkt. Nos. 101-5 at 25; 101-10 at 38.)  Recruiters present candidates that match the client's requirements to Account Managers. (Dkt. Nos. 101-5 at 31; 101-85 at 2.  Account Managers decide which individuals to submit for consideration to TEK's clients, although the Recruiter's recommendation is often accepted.  (Dkt. Nos. 119-1 ¶ 19; 119-3 ¶ 17; 119-5 ¶ 23; 119-6 ¶19.)  The client then decides which candidates to hire.  (Dkt. Nos. 101-5 at 44; 101-10 at 50.)  Sometimes TEK has an exclusive contract with a client to find potential IT professionals, other times TEK is competing with other talent recruiters to fill positions for clients.  (Dkt. No. 101-1 at 14).

Most of Recruiters' time is spent screening and matching candidates to requirements. "Recruiters . . . generally speak[] with candidates on a daily basis."  (Dkt. No. 101-1 at 17.)

███████████████████████████████████████████████████████

████████████████████████████████████████     ███████████

███████████; *see also* Dkt. Nos. 101-59 at 4 ("The Technical Recruiter must have the ability to effectively communicate with potential employees  . . . This individual will be expected to thrive in a fast-paced, high call volume environment."); 101-10 at 70 ("For our recruiters, most of their interactions is calling a consultant."); 101-29 (describing Recruiter's job duty: "Partners with AM

United States District Court
Northern District of California

[Account Manager] to understand requirements and culture of a client.  Screens consultants to gain insight into their skills, goals, interests and provides relevant opportunities.").)

In 2018, many Recruiters directly reported to an Account Manager.  (Dkt. No. 119-10 ¶ 8.) But in more recent years, "TEK has moved away from the model of having a Recruiter supervised by an Account Manager," and now most Recruiters are supervised by Recruiter Leads or Specialization Leads.  (*Id.*; Dkt. Nos. 119-13 ¶ 11; 119-5 ¶¶ 5, 12; 101-10 at 26, 28-29).)  Much like Account Managers and Recruiter Leads before them, "[s]pecialization leads have two to four recruiters aligned to them" and specialization leads are "the first layer of leadership" for Recruiters. (Dkt. No. 101-10 at 29.)

TEK makes money by placing TEK-recruited IT consultants with clients.  Sometimes the clients hire the consultant directly and pay TEK a negotiated fee for the referral.  Other times, the consultant is hired as a TEK employee and TEK places the employee with the client.  In that situation, TEK and the client negotiate a bill rate range per hour of work the consultant provides. (Dkt. No. 101-61 at 2; *see also* Dkt. No. 101-10 at 50; Dkt. No. 101-29 at 32.)  TEK also negotiates a rate that it will pay the consultant (pay rate).  The top of the pay rate range is "the most [TEK] would want to offer to a consultant to still have a healthy margin."  (Dkt. No. 101-10 at 51.)  The difference between the bill rate the client pays TEK and the pay rate TEK pays the consultant (after taking into account other costs) is how TEK makes money on these "contract to hire positions."  (*Id.*)

TEK evaluates and rewards Recruiters based on their "spread"—which refers to "the difference between what TEK's customer pays to have someone on assignment (the bill rate) and what it costs TEK to have the consultant on assignment (the pay rate, plus overhead and other costs)."  (Dkt. No. 119-7 ¶ 10.)  Accordingly "[s]pread is the overall gross profit that the Company is bringing in."  (Dkt. No. 101-88 at 4.)  When a client completes a requisition, it provides the "bill rate" range and the "pay rate" range.

## II.      DISCUSSION

### A.      Plaintiffs' Motion for Partial Summary Judgment

California law recognizes an exemption from overtime pay requirements for "executive,

United States District Court
Northern District of California

administrative, and professional employees."  Cal. Labor Code § 515; *see also* Cal. Indus. Welfare Comm'n, Wage Order No. 4-2001, Cal. Code Regs. tit. 8, § 11040(1)(A) (explaining the Wage Order's overtime compensation requirements "shall not apply to persons employed in administrative, executive, or professional capacities").

TEK asserts its Recruiters are exempt from overtime requirements because they fall under the exemption for "administrative" employees.  For purposes of this exemption, California law defines "[a] person employed in an administrative capacity" as:

> any employee:
>
> (a) Whose duties and responsibilities involve . . . :
>
>> (I)    The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers; . . .
>
> and
>
> (b) Who customarily and regularly exercises discretion and independent judgment; and . . .
>
> (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or
>
> (e) Who executes under only general supervision special assignments and tasks; and
>
> (f) Who is primarily engaged in duties that meet the test of the exemption. . . . The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job . . .
>
> (g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment.

Cal. Code Regs. tit. 8, § 11040(1)(A)(2).  TEK bears the burden of establishing the administrative exemption applies to its Recruiters.  *See Harris v. Superior Ct.*, 53 Cal. 4th 170, 182 (2011) (describing the administration exemption to overtime compensation requirements as an "affirmative defense").

United States District Court
Northern District of California

4

The administrative exemption is written in the conjunctive.  Thus, to ultimately prevail on its administrative exemption affirmative defense, TEK must prove all of the following requirements:

- Recruiters performed office work directly related to management policies or general business operations of TEK or TEK's clients,

- Recruiters customarily and regularly exercised discretion and independent judgment,

- Recruiters worked under only general supervision while performing (i) work along specialized or technical lines requiring special training, experience, or knowledge, or (ii) special assignments and tasks,

- Recruiters were "primarily engaged" in work meeting the above three requirements.

Cal. Code Regs. tit. 8, § 11040(1)(A)(2).[2]  For purposes of the administrative exemption, "primarily" "means more than one-half the employee's work time."  Cal. Code Regs. tit. 8, § 11040(2)(N); *Harris*, 53 Cal. 4th at 178 n.3.  The Court must consider the actual, day-to-day activities of Recruiters, and consider whether more than half of their work time meets the exemption's requirements.  "[U]nder California law, exemptions from statutory mandatory overtime provisions are narrowly construed."  *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 794 (1999).

Plaintiffs move for summary judgment on TEK's administrative exemption affirmative defense on the grounds TEK cannot satisfy any of the above requirements.  "When a plaintiff seeks summary judgment on [an] affirmative defense[], he or she may satisfy [the] Rule 56 burden by showing that there is an absence of evidence to support [an essential element] of the [non-moving party's] case."  *Powell v. Union Pac. R. Co.*, 864 F. Supp. 2d 949, 962 (E.D. Cal. 2012) (internal citations and quotation marks omitted); *see also Celotex v. Catrett*, 477 U.S. 317, 323 (1986) ("a complete failure of proof concerning an essential element of the nonmoving party's case … renders all other facts immaterial").  So, Plaintiffs are entitled to summary judgment if there is no genuine dispute that Recruiters do not meet at least one of the administrative

---

[2] The parties agree Recruiters meet the salary basis of the exemption.  *See* Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(g).

exemption's requirements.  To put it another way, TEK must identify evidence sufficient to support a finding by a reasonable trier of fact that Recruiters' duties satisfy each of the administrative exemption requirements.

### 1. Work Directly Related to Management Polices or General Business Operations of TEK or TEK's Customers

To qualify for the administrative exemption, Recruiters' work must primarily involve "[t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers."  Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(a)(I).  "Work qualifies as 'directly related' if it satisfies two components." *Harris*, 53 Cal. 4th at 181.  "First, it must be "*qualitatively* administrative.  Second, *quantitively*, it must be of substantial importance to the management or operations of the business." *Id.*

### a. Qualitatively Administrative

"Federal Regulations former part 541.205(b) (2000) discusses the qualitative requirement that the work must be administrative in nature." *Id.* at 182.  Specifically:

> The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control. An employee performing such work is engaged in activities relating to the administrative operations of the business notwithstanding that he is employed as an administrative assistant to an executive in the production department of the business.

29 C.F.R. § 541.205(b)(2000); *see* Cal. Code Regs. tit. 8, § 11040 ("[t]he activities constituting exempt work and non-exempt work" under California law "shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of" January 1, 2001: 29 C.F.R. §§ 541.201-205, 541.207-208, 541.210, and 541.215); *Harris*, 53 Cal. 4th at 180 n.5 (explaining the Code of Federal Regulations cited in the wage order should be those regulations in effect as of January 1, 2001).  "[T]his requirement is met if the employee engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs." *McKeen-Chaplin v. Provident Sav. Bank, FSB*,

1  862 F.3d 847, 851 (9th Cir. 2017) (internal citations omitted).

2  **b.     Quantitatively Administrative**

3      "Federal Regulations former part 541.205(c) (2000) relates to the quantitative component

4  that tests whether work is of 'substantial importance' to management policy or general business

5  operations." *Harris*, 53 Cal. 4th at 182.  Employees' work is of substantial importance if they

6  "carry out major assignments in conducting the operations of the business, or [their] work affects

7  business operations to a substantial degree, even though their assignments are tasks related to the

8  operation of a particular segment of the business." *Id*. at 180 n.6 (citing Fed. Regs. § 541.205(c)

9  (2000).)

10      **c.     Analysis**

11      TEK fails to identify evidence sufficient to support a finding Recruiters' primary duties are

12  qualitatively and quantitatively administrative.

13      **i.     Directly related to management policies or general
                 business operations *of TEK***

14

15      The undisputed evidence establishes Recruiters' primary job duty is to find, screen and

16  present to their Account Managers (or later, Recruiter Leads or Specialized Recruiters) candidates

17  qualified to meet TEK's clients' requirements for a particular position.  (Dkt. No. 114 at 31 ("As

18  Plaintiff's own [m]otion concedes, 'Recruiters spend the vast majority of their time screening for

19  candidates."").  Recruiters are therefore engaged in the day-to-day carrying out of TEK's

20  business—finding talent for its clients—and not performing work related to TEK's management

21  policies or general business operations.  *See Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1070

22  (9th Cir. 1990) (holding FLSA's administrative exemption was not met because while "probation

23  officers provide recommendations to the courts, these recommendations do not involve advice on

24  the proper way to conduct the business of the court, but merely provide information which the

25  court uses in the course of its daily production activities").  TEK's characterization of Recruiters

26  as "locat[ing] the best talent in the demanding IT marketplace and match[ing] those professionals

27  to important roles that serve a variety of purposes for TEK's customers" (Dkt. No. 114 at 8), is

28  consistent with that conclusion.

United States District Court
Northern District of California

TEK's emphasis on Recruiters' "negotiating" duties is unpersuasive.  The record supports a finding Recruiters "negotiate" the potential consultant's pay rate.  But, the negotiated rate must fall within the pay range provided by the client's requisition.  (Dkt. Nos. 119-9 ¶ 14; 101-10 at 51.)  When negotiating the pay rate, Recruiters may use "Café Compensation" or "Café Comp," "a tool… that allows them to calculate burdens and total spread for a consultant when negotiating their pay rates with them."  (Dkt. No. 101-88 at 12; *see also* Dkt. Nos. 101-97 ("Café Comp: Activity" worksheet); 101-1 at 37 (explaining the "café compensation calculator" is "a tool that our recruiters use to assist them in their negotiations with the consultant to determine what kind of compensation they can offer the consultant. . . . It allows for the recruiter to put in various inputs," including information "about pay, benefits, time off," "to determine . . . what factors could potentially be available to them to be able to negotiate with the consultant").)  The "burden," which is negotiated between the client and TEK, refers to the costs of employment, including the costs of recruiting, unemployment insurance, and workers' compensation.  (Dkt. No. 101-10 at 51-52; *see also* 101-30 at 14.)  The "standard burden" is 16%, and any changes to that percentage are negotiated by TEK's "senior director of finance."  (Dkt. No. 101-10 at 52; Dkt. No. 101-88 at 7.)[3]

Drawing all reasonable inferences from the record in TEK's favor, Recruiters' negotiating potential consultants' pay rate is not exempt work.  It is part of TEK's day-to-day business—finding and placing IT professionals with TEK's clients.  So, it is not qualitatively administrative.  *See Bratt*, 912 F.2d at 1070 (holding probation officers were not administrative employees because their work "primarily involve[d] the day-to-day carrying out of the business' affairs, rather than running the business itself or determining its overall course or policies").

Even assuming Recruiters' work negotiating consultants' pay could qualify as administratively qualitative work for TEK, the record does not support a finding the work is quantitatively administrative, that is, that it is of substantial importance to TEK, given that

---

[3] It is undisputed Recruiters do *not* negotiate the rate TEK's clients pay TEK, that is, the bill rate. (Dkt. No. 101-91 at 5 (TEK's Interrogatory response stating "[t]he rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters").

United States District Court
Northern District of California

Recruiters have no discretion to negotiate outside the range TEK management and/or the client sets.  TEK offers no evidence a Recruiter can negotiate a burden above 16% or promise a consultant higher pay than set forth in the client's requisition or by the Recruiter's supervisor.  (Dkt. Nos. 101-5 at 49 (explaining the "pay rate range and the bill rate" are "provided by the account manager"), 119-8 ¶ 15 (Nicole Guffy declaration indicating "I start negotiating pay for a candidate in my first or second call with them. Usually there is a pay range for the role that I am negotiating within."); 119-9 ¶ 14 (Cristen Kehl declaration indicating "Most job requirements include a pay range, but it is my call to negotiate the final pay for the candidate within that range."); 119-11 ¶ 13 (Lindzy McCarty declaration indicating "Most job requirements provide a pay range."); 119-4 ¶ 34 (Richell Rothermich declaration attesting "The job requirement will include an hourly pay range that the customer will pay someone to work in the role.").)

Finally, even if Recruiters' negotiating responsibilities could qualify as qualitatively and quantitatively administrative, TEK does not identify evidence sufficient to support a finding "negotiating" qualifies as a primary duty.  While TEK challenges Plaintiffs' evidence, it offers no evidence of its own remotely suggesting Recruiters spend more than 50% of their time negotiating with candidates about their compensation.

### ii.   Directly related to management policies or business operations *of TEK's customers*

TEK's main argument appears to be Recruiters satisfy the first administrative exemption requirement because of the services they provide to TEK's customers.  TEK asserts its Recruiters "advise [clients] on the market for talent related to a particular personnel need, and suggest change[s] []on the skills sought as well as the pay ranges for that talent" when developing requirements.  (Dkt. No. 114 at 25.)  But the record does not support a finding that, even assuming some Recruiters engage in such conduct, the conduct is of substantial importance to TEK's clients and is part of any Recruiter's primary duties.

For example, TEK identifies Jessica Budde, a TEK Recruiter since March 2020.  Ms. Budde attests:

> At least one or two times a month, I will join an Account Manager on a call with a hiring manager at a TEK client.  Account Managers

> include me on these calls because I have expertise in the labor market for technical jobs. When we meet with a customer's technical hiring manager, I can ask expert-level questions to identify specifically what skills the customer needs from a candidate in order to have a successful project. I sometimes join calls with a customer's hiring manager to present the credentials of specific candidates that I have identified as well.

(Dkt. No. 119-1 ¶ 14.) TEK also identifies the testimony of Kelly Boland Jones, an Account Manager from May 2018 through June 2021. (Dkt. No. 119-14 ¶ 4.) Ms. Boland Jones asserts Account Managers "typically will setup a call with the client's hiring manager to determine the specific needs of the position" and help create the requisition. (*Id.* ¶ 10.) She explains "[t]ypically one to two Recruiters join on the call with the hiring manager and the Account Manager" and "Account Managers lean on Recruiters to ask questions and help make the requisition as detailed as possible, particularly as it relates to the technical needs of the role, since Recruiters have deeper technical and market expertise." (*Id.*) But this testimony does not support a finding Recruiters *advise* TEK's clients on the running of their business; at most, it supports a finding that when Recruiters attend meetings with clients at the Account Manager's request, they do so to "ask questions" and "provide information"—not to provide advice. And even if the record supported a finding of Recruiters occasionally providing advice, there is no evidence of such advice being quantitatively administrative. TEK does not identify evidence that would support a finding Recruiters "carry out major assignments in conducting the operations of" TEK's clients' businesses, or that information Recruiters share with clients affects clients' "business operations to a substantial degree." Fed. Regs. § 541.205(c) (2001).

TEK also asserts "many Recruiters testify that they provide ongoing management of the talent placed at customers in line with TEK's expectations" and therefore "provide administrative human resources services to TEK's customers." (Dkt. No. 114 at 25.) For example, Garrett D. Haycock testifies Recruiters "get[] feedback from the customer" about the consultants they place at clients' companies, and then Recruiters "provid[e] that feedback to the consultant." (Dkt. No. 101-1 at 9.) While he maintains "Recruiters are always managing," he also admits Recruiters do not "oversee[] the actual work getting done" and do not "manag[e] [consultants'] day-to-day activity." (*Id.* at 11.) Similarly, Phoebe Rogers (Raras) indicates on her LinkedIn profile she

10

"[m]anage[s] and maintain[s] relationships with contract employees while on assignment."  (Dkt. No. 115-57 at 3.)  Jessica Budde, a TEK declarant who is currently a TEK Recruiter, indicates she "continue[s] to stay in touch with consultants throughout their assignments," and "[s]ometimes" has "to communicate performance feedback from a customer to a consultant."  (Dkt. No. 119-1 ¶ 21.)  "There have been times when [she] ha[s] had to tell consultants that their assignment is being terminated early for performance reasons."  (*Id.*)  She "ha[s] worked with some consultants who lost their assignments because of performance to help them make improvements for the future."  (*Id.*)

Drawing all reasonable inferences in TEK's favor, Recruiters' "management" of such employees does not qualify their work as administrative.  The undisputed evidence demonstrates TEK's Recruiters do not independently judge or manage the work of consultants; instead, they merely communicate TEK's clients' feedback to consultants or communicate information from Account Managers to consultants.  (Dkt. Nos. 101-5 at 48 (deposition of Leo DiBenedetto, explaining Recruiters do not do "their own performance evaluation of the consultants," but that it is "a recruiter's responsibility . . . to provide consultants performance feedback" which is "generally conducted after the account manager and the hiring manager get together and discuss the consultants that they work with"); 117-13 at 23 (deposition of Jill Unverferth indicating she would "relay" information from the Account Manager to the consultant "kind of like a messenger"); 117-16 at 41 (deposition of Bo Avery indicating "if the hiring manager had specific feedback for one consultant . . . then you would call and give feedback to that consultant on behalf of the customer"); 117-17 at 28 (deposition of Phoebe Rogers (Raras) attesting "[t]he account manager would then relay [information] onto me. And then either I could call the candidate myself or the account manager would do it or we would do it together. It really just depends on what the account manager would want. . . . [W]hatever the client told the account manager and then the account manager would tell me and I would just relay that information."); 115-10 at 25 (deposition of Faith Johnson indicating Recruiters do no "supervis[e] directly the technical work" but "engag[e] with the customer to make sure that they are delivering what we put them there to deliver, [and] addressing any performance gaps."))  Indeed, given that TEK does not require

Recruiters to have IT experience, and that TEK hires many Recruiters right out of college, it would defy common sense to have Recruiters, rather than TEK's clients or management, "manage" the IT professional consultants.  So, TEK fails to identify evidence sufficient to support a finding Recruiters advise TEK's clients' management as part of a qualitatively administrative function.

For the same reason, the evidence is also insufficient to support a finding Recruiters' alleged "management" could be found quantitatively administrative, that is, that it affects TEK's clients' business operations to a substantial degree.  TEK argues "[t]he work performed by Recruiters is of substantial importance to TEK's clients" because "Recruiters engage in sourcing to create a pool of qualified candidates for their customers' IT roles, which commonly involve business operations that are highly critical to the customers' business operations."  (Dkt. No. 114 at 19.)  Granted, the administrative exemption encompasses employees whose "work affects policy or whose responsibility it is to execute or carry it out."  (Dkt. No. 114 at 26 (citing 29 C.F.R. § 541.205(c)).  But TEK fails to explain how Recruiters' actions, rather than the actions of Account Managers or TEK's client's hiring department, are of "substantial importance" to TEK's clients.  While the Recruiters may source candidates, the undisputed evidence establishes the client's hiring manager decides the available positions' requirements and TEK's Account Managers have final say as to which consultants to present to TEK's clients.  And the client has the final say over who to hire.  Indeed, by TEK's definition, any employee whose actions relate to general business operations of the company in any way meets the quantitative requirement.  But, the test is not so broad.  Recruiters do not have the authority to bind TEK's clients in any way.

## 2. Whether Recruiters Exercise Discretion and Independent Judgment

To qualify for the administrative exemption, Recruiters must also "customarily and regularly exercise[] discretion and independent judgment."  Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(b).  This wage order incorporates the Code of Federal Regulations § 541.207 (2001), which defines "the exercise of discretion and independent judgment" as:

> involv[ing] the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . implies that the person has the

> authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

29 C.F.R. § 541.207(a)(2001).  So, if an employee "merely applies his knowledge in following prescribed procedures or determining which procedures to follow" or "determines whether specific standards are met" that employee "is not exercising discretion and judgment." *Id.* § 541.207(b).  The regulations give the example of an "inspector" who "perform[s] specialized work along standardized lines," but also "rel[ies] on technique and skills acquired by special training or experience." *Id.* § 541.207(c)(1).  Such an inspector "may make recommendations on the basis of the information they develop in the course of their inspections . . . but these recommendations are based on the development of facts as to whether there is conformity with the prescribed standards." *Id.*  Accordingly, "[t]he inspector is engaged in exercising skill rather than discretion and independent judgment." *Id.; see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1129 (9th Cir. 2002) ("The fact [the plaintiff's] work required a great deal of specialized knowledge and skill is not determinative. The regulations specifically warn against confusing 'the exercise of discretion and independent judgment' with 'the use of skill in applying techniques, procedures, or specific standards.'" (quoting 29 C.F.R. §§ 541.207(b)(1) and (c)).

Similarly, the federal regulations give the example of a personnel clerk who "screen[s]" applicants.  *Id.* § 541.207(c)(5).  The Federal Regulations explain:

> Typically such an employee will interview applicants and obtain from them data regarding their qualifications and fitness for employment. . . . The "screening" operation consists of rejecting all applicants who do not meet standards for the particular job or for employment by the company. The standards are usually set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials. It seems clear that such a personnel clerk does not exercise discretion and independent judgment.

*Id.*  However, the term "discretion and independent judgment" does "not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." *Id.* § 541.207(e).  Instead, "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.; see also In re Farmers Ins. Exch., Claims Representatives'*

*Overtime Pay Litig.*, 481 F.3d 1119, 1130 (9th Cir. 2007) (finding administrative exemption applied even though "supervisor approval [wa]s necessary before" the company "denies a claim," because "in such cases the adjuster often prepares a draft denial letter with the recommendation to deny coverage").

The record does not support a finding TEK's Recruiters customarily and regularly exercise discretion and independent judgment as to matters of significance.  The Recruiters' job is similar to the personnel clerk described in the regulation: they spend most of their time screening for candidates that match the job qualifications listed in the job requirements or requisitions.  (Dkt. Nos. 114 at 31 ("As Plaintiff's own [m]otion concedes, 'Recruiters spend the vast majority of their time screening for candidates."); 101-29 at 31 (Recruiters "[s]creen[] consultants to gain insight into their skills, goals, interests and provide[] relevant opportunities"); 101-30 at 13 (same); 101-31 at 13 (same); 101-32 at 18 (same); 101-57 at 27 (same).)  While Recruiters can choose how to source candidates, they do not have discretion or independence in terms of the candidates that get sent to the client—instead, Account Managers decide which individuals to send to clients.  (Dkt. Nos. 119-1 ¶ 19; 119-3 ¶ 17; 119-5 ¶ 23; 119-6 ¶19.)  Similarly, the clients, not Recruiters, decide which consultants to hire and how much to pay them.  (Dkt. Nos. 101-5 at 44; 101-10 at 50-51.)

TEK's Recruiter declarations do not establish a genuine issue of material fact.  Just as at class certification, TEK submits 14 declarations of "individuals who were employed by TEK as Recruiters or those familiar with the role."  (Dkt. No. 115 ¶ 16; *see* Dkt. Nos. 119-1-14.)  Most of TEK's declarations are not relevant to the question of whether Recruiters—as opposed to other, supervisory employees at TEK—exercise discretion and independent judgment.  Of TEK's 14 declarants, three are currently Recruiter Leads.[4]  (Dkt. Nos. 119-9 (Kehl) ¶ 16; 119-12 (Mendez) ¶ 5; 119-7 (Compton) ¶ 29.).  One is a Specialization Lead.  (Dkt. No. 119-11 ¶ 25 (McCarty).)  Two are Team Leads.  (Dkt. Nos. 119-8 (Guffy) ¶ 6; 119-10 (Levine-Gorelick) ¶¶ 26-27.)  One is

---

[4] Recruiter Leads are "lead recruiter[s] who [are] responsible for the onboarding, development, management, and success of new recruiters."  (Dkt. No. 115-53 at 2.)  Recruiter Leads "oversee a pod of recruiter trainees."  (*Id.*)  They are not part of the class or subclass.

United States District Court
Northern District of California

1    a Division Lead.  (Dkt. No. 119-14 (Boland Jones) ¶ 5.)  Another is a Delivery Manager.  (Dkt.

2    No. 119-13 ¶ 27 (Stryker).)  Although these eight declarants are not presently Recruiters, the

3    declarations almost universally use the present tense when describing job duties and activities.  So,

4    while these declarants may have relevant testimony regarding their past experiences as Recruiters,

5    given their use of present tense, their declarations cannot be read as testifying to that past

6    experience and therefore are not relevant to Recruiters' job duties.

7            Six of TEK's declarants were Recruiters at the time of making their declarations.  (Dkt.

8    Nos. 119-1 (Budde) ¶ 9; 119-2 (Ferrari) ¶ 5; 119-3 (Harvey) ¶ 5; 119-4 (Rothermich) ¶ 10; 119-5

9    (Whitman) ¶ 4; 119-6 (Yancy) ¶ 7).)  These declarants consistently testify Account Managers

10   choose which candidates to send to companies, and no Recruiter testifies they could choose which

11   consultants to hire or fire.

12           TEK argues Recruiters "evaluate candidates using their experience and judgment" which

13   requires Recruiters to go "beyond merely looking at their resume and LinkedIn profile."  (Dkt. No.

14   114 at 28.)  Accordingly, TEK asserts Recruiters had "great discretion and judgment on how to

15   evaluate and source candidates as well as which candidates to submit for a particular job

16   requisition."  (*Id.* at 29.)  Resolving all factual disputes in TEK's favor, TEK has established

17   Recruiters had discretion in deciding how to source candidates and over which candidates to

18   present to Account Managers.  But, the Court must also analyze "the importance of the decisions

19   over which [Recruiters] ha[ve] control."  *See Bothell*, 299 F.3d at 1129.  TEK has not presented

20   any evidence Recruiters' decisions as to *how* to source and screen candidates is a matter of

21   significance for TEK.  Instead, the undisputed evidence demonstrates any discretion as to how to

22   source candidates is not significant to TEK because there were two additional levels of

23   oversight—the Account Manager and the hiring director at the third-party company—before any

24   decision of significance.

25           TEK insists "[t]he fact that an employee's decision may be subject to review and that upon

26   occasion the decisions are revised or reversed after review does not mean that the employee is not

27   exercising discretion and independent judgment within the meaning of the regulations."  *Zelasko-*

28   *Barrett v. Brayton-Purcell, LLP*, 198 Cal. App. 4th 582, 591 (2011) (quoting 29 C.F.R. §

541.207(e) (2001)).  But Recruiters do not make a *decision of significance* that is then subject to review; instead, they screen applicants then present those applicants to the Account Manager who decides which candidates to send to the company.  The Account Manager's decision is then "subject to review" by TEK's client.  The Account Manager's decision may be significant, but the Recruiters only present candidates among whom the Account Manager selects from.  Recruiters "do not have the authority to negotiate and bind the company on significant matters; they do not provide consultation or expert advice to management; they are not involved in planning long- or short-term business objectives; they do not investigate and resolve matters of significance on behalf of management; and they do not represent the company in handling complaints, arbitrating disputes or resolving grievances."  *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1297 (C.D. Cal. 2015) (concluding appraisers did not exercise discretion as to matters of significance).  So, TEK has not identified evidence creating a genuine dispute of material fact as to whether Recruiters exercise independent judgment and discretion as to matters of significance.

TEK's citation to *Maddox v. Continental Casualty Co.* is unavailing.  No. CV 11-2451-JFW PLAX, 2011 WL 6825483 (C.D. Cal. Dec. 22, 2011).  In *Maddox*, the court held a "senior level underwriter" with 25 years of experience in commercial insurance exercised discretion and independent judgment under the administrative exemption.  *Id.* at *1.  The plaintiff "handled accounts . . . which exposed [the company] to millions of dollars of risk" and "was required to independently determine whether the risk was acceptable to" the company and "how to price that risk to hopefully ensure" the company "made a profit."  *Id.*  The court determined the plaintiff "was [] required to apply his own extensive experience and judgment in assessing the risks and setting the final price that would be quoted to the customer."  *Id.* at *6.  The plaintiff in *Maddox* had significantly more discretion and exposed his company to significantly more risk than TEK Recruiters—indeed, the court explained "he could and did bind [the company] to insurance contracts within the parameters set by [the company] without seeking and obtaining approval."  *Id.* at *7.  In contrast, TEK's Recruiters cannot even suggest candidates to clients without their Account Manager's approval; indeed, Recruiters do not even suggest candidates to clients;

1    Recruiters suggest candidates to Account Managers who suggest candidates to TEK's clients[5].

2    ### 3.    Whether Recruiters Perform under Only General Supervision

3    Finally, TEK must establish Recruiters are "'under only general supervision' while either:

4    (1) performing work along specialized or technical lines requiring special training, experience, or

5    knowledge, or (2) executing special assignments and tasks." *Campbell v.*

6    *PricewaterhouseCoopers, LLP*, 642 F.3d 820, 831 (9th Cir. 2011) (quoting Cal. Code Regs. tit. 8,

7    § 11040(1)(A)(2)).  "The 'general supervision' requirement has not received much interpretation."

8    *Campbell*, 642 F.3d at 831; *see also Lopez v. Liberty Mut. Ins. Co., No.* 2:14-CV-05576-AB-JCx,

9    2019 WL 4605706, at *5 (C.D. Cal. July 25, 2019) (quoting *Campbell* to explain the lack of

10   authority on "general supervision," and explaining "[s]ince [*Campbell*], the Ninth Circuit has

11   issued several memorandum dispositions applying *Campbell*, but distinguishing the cases on the

12   facts.").  Courts have considered factors such as whether the employees "are expected to, and do,

13   perform their work with little or no daily oversight; plan and prioritize their own work and daily

14   schedules; and make decisions . . . independently."  *Lopez*, 2019 WL 4605706, at *6; *see also*

15   *Gallardo v. AIG Domestic Claims, Inc.*, 629 F. App'x 783, 785 (9th Cir. 2015) (concluding an

16   employee worked under only general supervision because he "spent most of his time working

17   independently with little day-to-day oversight," and the "majority of [employee's] work provided

18   significant freedom and latitude to act").

19   TEK argues "many Recruiters operated with little or no oversight" as "they were not being

20   supervised regarding how they were evaluating, screening, and selecting candidates for

21   submission."  (Dkt. No. 114 at 31.)  But, even accepting that as true, there is no evidence that

22   supports an inference Recruiters' evaluations, screening, or selection of candidates required

23   "special training, experience, or knowledge."  *See* Cal. Code Regs. tit. 8, § 11040(1)(A)(2).

24   TEK's internal documents indicate Recruiters are an "entry-level position."[6]  (Dkt. No. 101-80 at

25   _____

26   [5] The declaration of Jessica Budde that "I sometimes join calls with a customer's hiring manager
     to present the credentials of specific candidates that I have identified" does not create a genuine

27   dispute.  She does not testify, and there is not evidence, that Recruiters ever present candidates to
     clients without the presence and leadership of their Account Managers.

28   [6] TEK argues "[t]he 'entry-level' role at TEK is Recruiter Trainee, a non-exempt, hourly

2 (when describing efforts to hire more Recruiters, indicating employees should "[b]e careful with the super tenured candidate. Try to stay under 5 years of experience, being this is an entry-level position.").)  TEK also asserts "Recruiters are highly specialized in their knowledge and training." (Dkt. No. 114 at 15.)  TEK's "Technical Staffing Recruiter" job description indicates "[n]o IT experience is needed" for the position because TEK's "comprehensive recruiter training program allows you to learn terminology, job functions, and applicable practices within the information technology industry."  (Dkt. No. 101-44 at 7.)  TEK refers to "specializations," as many of its Recruiters focus their work within a specific industry.  (Dkt. No. 101-10 at 22 ("[W]e've got highly specialized recruiting teams" such as "financial services specialized recruiters," a "risk and security team," and a "data analytics team.").  But just because TEK places Recruiters on a specific team does not support a finding the role *requires* special training, experience, or knowledge.  (Dkt. No. 101-10 at 22 (deposition of John Robert Doyle, Rule 30(b)(6) designee) ("Q. And when you say this 'highly specialized expertise,' recruiters don't have any prerequisites before they're hired to have any sort of technical knowledge; is that true? A. That's correct."), and at 63 ("Q. And when you're saying the specialized—like, we have new recruiters … joining these teams that haven't done any of this training, but what they're doing is they're focusing on who they're placing, the skills that the job candidates have? A. Correct.").)

* * *

In sum, TEK bears the burden of identifying evidence sufficient to support a finding Recruiters' job duties satisfy all the administrative exemption requirements.  Drawing all reasonable inferences in TEK's favor, TEK has failed to meet its burden.

### B.    TEK's Motion to Strike

TEK moves to strike the declaration of Lynsey Major, arguing (1) "the Declaration is not

---

position," and to become a recruiter an individual must "complete 13 weeks of training and demonstrate the ability to perform the duties of the exempt Recruiter."  (Dkt. No. 114 at 14.) According to TEK, "many Recruiters remain in that role for years."  (Dkt. No. 114 at 15.)  But Recruiter Trainees "do the job duty of a recruiter."  (Dkt. No. 101-10 at 55.)  So, while the Recruiter Trainee may be paid on a different pay scale, TEK has not provided any evidence the job duties of a Recruiter Trainee differ from that of a Recruiter.  Nor has TEK identified any evidence that supports an inference the Recruiter position is anything other than an entry-level role.

admissible as a 'summary' of data pursuant to Federal Rule[s] of Evidence 1006 because it is inaccurate, inconsistent, and mischaracterizes the evidence, and because it amounts to improper legal argument disguised as a summary," (2) the declaration is inadmissible under Federal Rules of Evidence 702 because "Plaintiffs offer testimony from Major as a *de facto* statistical 'expert,'" but she lacks the necessary qualifications and expertise.  (Dkt. No. 112 at 5.)  In concluding TEK has not met its burden of identifying evidence sufficient to support its administrative exemption affirmative defense, the Court did not rely on Ms. Major's declaration.  Nonetheless, because the issue will likely rearise, the Court addresses TEK's motion to strike.

Major is a paralegal for Werman Salas P.C., the firm representing Plaintiffs.  (Dkt. No. 101-23 ¶ 3.)  Her declaration indicates she reviewed "recruiter activity data" in the form of Excel workbooks "from Connected for the Named Plaintiffs Bo Avery, Phoebe Rodgers, Kristy Camilleri, and Jill Unverferth." (*Id.* ¶ 4.)  "Connected" is TEK's "proprietary tool used by Recruiters to review job requisitions; search for candidates for placement on assignment; review and record information about candidates, . . . ; create and manage candidate pipelines; submit candidates for consideration by clients; review and record information about individuals placed on assignment."  (Dkt. No. 112-3 at 6.)  Major indicates she "created a pivot table including all Activity except the activities that fall outside the Named Plaintiffs' dates of employment and excluding…two Activity types" because those two activities "relate to financial information and are not an action performed by the Named Plaintiffs."  (Dkt. No. 101-23 ¶ 10.)  Her pivot table then "counts the Activity Types and shows each as a percentage of the total activities."  (*Id.* ¶ 11.)  Major does the same analysis for the Connected data for TEK "employees who provided declarations in support of Defendant's Opposition to Plaintiffs' Motion for Class Certification." (*Id.* ¶ 23.)  In addition, Major reviewed TEK's "Job Data" for individuals who worked in recruiting positions.  (*Id.* ¶ 43.)  She "isolated the instances that employees worked in the position of Recruiter" and "computed each Recruiter's tenure" by subtracting the effective start date from the effective end date and dividing the difference by 365 days.  (*Id.* ¶ 46.)

### 1.    Federal Rules of Evidence 1006

Federal Rules of Evidence 1006 provides a "proponent may use a summary, chart, or

19

calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."

Plaintiffs have established the required conditions to admit summary evidence under Rule 1006. "A proponent of summary evidence must establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011). TEK challenges neither of these conditions: the underlying materials are admissible—they qualify as business records for the purpose of Rule 803(6)'s hearsay exception—and, as TEK provided the underlying materials, TEK was able to inspect them.

TEK maintains Major's summaries are inaccurate and argumentative, therefore they are inadmissible. But, most of TEK's arguments focus on *why* TEK believes the Connected data is not a reliable proxy for actual time spent on tasks and TEK's issues with the ways Major chose to organize the data. However, "[a] Rule 1006 summary chart need not accurately reflect all the facts in the case; it merely must accurately represent the facts that it purports to summarize." *United States v. Lynch*, 735 F. App'x 780, 786 (3d Cir. 2018). Major's summary accurately reflects the facts it purports to summarize and Major accurately describes the steps she took to organize the data. TEK has access to the same data, and TEK was able to analyze the data and provide its own summary based on differing assumptions if it so chose.

TEK argues "any summaries" under Rule 1006 "must be useful to the judge and jury," and Major's summaries are "not useful to the Court" because they "are highly misleading." (Dkt. No. 121 at 4.) Indeed, "[t]he purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *Rizk*, 660 F.3d at 1130. While TEK has established the Connected data does not definitively establish "what work activities Recruiters perform," (Dkt. No. 121 at 5), it is a datapoint that tends to suggest Recruiters perform some tasks more than others and therefore is relevant. Moreover, the summaries are useful because the underlying data includes "40,308 rows of data" for the named Plaintiffs (Dkt. No. 112-1 ¶ 21), and "213,528 rows of data" for TEK's declarants. (*Id.* ¶ 31.) The Court would likely be unable to individually analyze each row of that data, and therefore a

20

1    summary of the data is useful to the Court's analysis.

2               **2.      Federal Rule of Evidence 702**

3         Federal Rule of Evidence 702 provides requirements for expert witness testimony.  Expert

4    testimony includes "not only … testimony based on scientific knowledge, but also to testimony

5    based on technical and other specialized knowledge."  *Kumho Tire Co. v. Carmichael*, 526 U.S.

6    137, 141 (1999) (cleaned up).  But, Rule 702 does not apply to Major's testimony.  "[S]ummary

7    exhibits" do not necessarily "fall in the domain of experts because they contain math."  *Canava v.*

8    *Rail Delivery Serv. Inc.*, No. 5:19-CV-00401-SB-KK, 2021 WL 5445977, at *10 (C.D. Cal. Aug.

9    27, 2021) (cleaned up); *see also Kalloo v. Unlimited Mech. Co. of NY*, 977 F. Supp. 2d 187, 198

10   (E.D.N.Y. 2013) (explaining "[n]o expert analysis was involved" when "[t]he entries on the

11   spreadsheet were transparent, and the calculations were made by a computer program").

12        TEK's citation to *Faust v. Comcast Cable Communications Management, LLC*, is not to

13   the contrary.  No. CIV.A. WMN-10-2336, 2014 WL 3534008, at *2 (D. Md. July 15, 2014).  In

14   *Faust*, a court struck an attorney declaration that "purport[ed] to 'summarize' the relevant data,"

15   including "various log-in, timesheet, and payroll records" in an attempt to determine how much of

16   the time class members spent working was unpaid.  *Id.*  The declarant in *Faust* performed

17   additional evaluative, interpretive, and analytical steps and procedures on the data rather than

18   simply summarizing the totals and averages, as the declarant did in this case.  TEK identifies no

19   case indicating the simple math functions described by Major constitute expert analysis.  Nor does

20   TEK attempt to explain what about Major's analysis was "scientific, . . . technical" or based on

21   any other "specialized knowledge."  So, Rule 702 does not bar Major's declaration.

22                                          * * *

23        In sum, the Court DENIES Defendant's motion to strike Major's declaration.  But, as this

24   Order explains, the Court did not rely on the declaration in resolving Plaintiffs' motion for partial

25   summary judgment.

26        **C.      Objections**

27        TEK makes a series of objections to the Declaration of Sally J. Abrahamson as part of

28   Plaintiffs' reply.  (Dkt. No. 120.)  The Court does not rely on any of the objectionable content for

*United States District Court*
*Northern District of California*

purposes of this summary judgment order.[7]

Plaintiffs object to LinkedIn Profiles TEK attaches to its opposition because "TEK failed to authenticate the profiles." (Dkt. No. 117 at 19.) The Court OVERRULES Plaintiffs' objection as to the named Plaintiffs' LinkedIn Profiles.

### D. Motions to Seal

Plaintiffs filed an administrative motion to consider whether four exhibits submitted with Plaintiffs' motion for partial summary judgment should be sealed. (Dkt. No. 102.) TEK seeks to seal Dkt. Nos. 102-3, 102-4, 102-5, and 102-6 in their entirety. (Dkt. Nos. 102 at 2; 104.) These documents "quote, reference or otherwise refer to information related to certain TEK clients" and the "public disclosure of such information would cause competitive harm to TEK or otherwise disrupt its business relationships." (Dkt. No. 104-1 ¶ 3.) The information in the exhibits "is not publicly available." (*Id.* ¶ 8.) Plaintiffs take no position as to whether the materials should remain under seal. (Dkt. No. 102 at 2.)

TEK has "articulate[d] compelling reasons supported by specific factual findings," for keeping these documents sealed. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (cleaned up). "Courts have found that 'confidential business information' in the form of 'license agreements, financial terms, details of confidential licensing negotiations, and business strategies' satisfies the 'compelling reasons' standard." *Jam Cellars, Inc. v. Wine Grp. LLC*, No. 19-CV-01878-HSG, 2020 WL 5576346, at *1 (N.D. Cal. Sept. 17, 2020) (quoting *In re Qualcomm Litig.*, No. 3:17-CV-0108-GPC-MDD, 2017 WL 5176922, at *2 (S.D. Cal. Nov. 8, 2017)). The Court holds Dkt. Nos. 102-3, 102-4, 102-5, and 102-6 all contain such confidential business information that could harm TEK if publicly disclosed, so the Court GRANTS the administrative motion to seal the documents.

### CONCLUSION

For the reasons discussed above, the Court GRANTS Plaintiffs' motion for partial summary judgment, GRANTS Plaintiffs' administrative motion to consider whether another

---

[7] For that reason, the Court DENIES Plaintiffs' motion for leave to file responses to Defendant's objections to the declaration of Sally J. Abrahamson. (Dkt. No. 122.)

United States District Court
Northern District of California

party's materials should be sealed, DENIES TEK's motion to strike, and DENIES Plaintiffs'

motion for leave to file responses to Defendant's objections.  The Court will hold a further case

management conference on November 7, 2024 at 1:30 p.m. via Zoom video.  An updated joint

case management conference statement is due one week in advance.

This Order disposes of Docket Nos. 100, 102, 112, 122.

**IT IS SO ORDERED.**

Dated: September 23, 2024

JACQUELINE SCOTT CORLEY
United States District Judge